**IT IS ORDERED as set forth below:**



**Date: November 9, 2018**

_Susan D. Barrett_
_____
United States Bankruptcy Judge
Southern District of Georgia

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **FIBRANT, LLC, *et al.*,**[1] | ) | **Case No. 18-10274 (SDB)** |
| | ) | |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |
| | ) | |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,
(II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363
OF THE BANKRUPTCY CODE, (III) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, AND (IV) MODIFYING AUTOMATIC STAY**

Upon the motion, dated July 11, 2018 (the "DIP Motion"), of Fibrant, LLC ("Fibrant")

and its affiliated debtors, as debtors and debtors-in-possession (collectively, the "Debtors"), in

_____

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Fibrant, LLC (6694); Evergreen Nylon Recycling, LLC (7625); Fibrant South Center, LLC (8270); and Georgia Monomers Company, LLC (0042).

the above-referenced chapter 11 cases (the "Cases"), seeking entry of a final order (this "Final Order") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(e), 507, and 552 of chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), that, among other things:

(i)      authorizes the Fibrant, designated as "Borrower" under, and as defined in, the DIP Credit Agreement (as defined below) to obtain, and the other guarantors (the "DIP Guarantors") under the DIP Loan Documents (as defined below) to unconditionally guaranty, jointly and severally, the Debtors' obligations in respect of secured and superpriority postpetition financing, which consists of a delayed draw term loan facility for up to $3,500,000 (the "DIP Facility") pursuant to the terms of (x) this Final Order, (y) that certain Senior Secured Debtor-in-Possession Loan Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "DIP Credit Agreement"),[2] by and among the Borrower, the DIP Guarantors, and CAP II B.V. (the "DIP Lender"), in substantially the form attached to the DIP Motion, and (z) any and all other DIP Loan Documents (as defined in the DIP Credit Agreement), to: (A) fund, among other things, ongoing working capital, general corporate expenditures, and other financing needs of the Debtors in accordance with the Budget (as defined below), (B) pay certain transaction fees and other costs and expenses of administration of the Cases in accordance with the Budget, and (C) pay fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Lender under the DIP Loan Documents and this Final Order;

---

[2]  Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given to such terms in the DIP Credit Agreement.  A copy of the DIP Credit Agreement is attached hereto as Exhibit B.

(ii)      approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Final Order;

(iii)      grants to the DIP Lender (x) Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2) and (c)(3) of the Bankruptcy Code, which Liens shall be junior solely to any valid, enforceable and non-avoidable Liens that are (A) in existence on the Petition Date and (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code (all such liens, collectively, the "Prepetition Prior Liens"), and (y) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, including any Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof;

(iv)      authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including, without limitation, Cash Collateral in which the DIP Lender has a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Final Order or otherwise;

(v)      modifies the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Final Order; and

(vi)      waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Final Order.

3

Having considered the DIP Motion, the DIP Credit Agreement, the Declaration of David Leach in support of the DIP Motion (the "Leach Declaration"), the Declaration of David Leach in Support of the First Day Motions and Applications (Docket No. 18) (the "First Day Declaration," and together with the Leach Declaration, the "DIP Motion Declarations"), and the evidence submitted or proffered at the hearing on this Final Order (the "Final Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d) and 9014 and all applicable and Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Georgia (the "Local Rules"), notice of the DIP Motion and the Final Hearing having been provided pursuant to Bankruptcy Rule 4001(b)(1)(C); and it appearing that approval of the relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential to fund their winddown and decommissioning activities; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.  **Petition Date**.  On February 23, 2018 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

United States Bankruptcy Court for the Southern District of Georgia (this "Court"). The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. A statutory committee of unsecured creditors (the "Committee") has been appointed in the Cases. No trustee or examiner has been appointed in the Cases.

B.     **Jurisdiction and Venue**. This Court has core jurisdiction over the Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, and 9014.

C.     **Notice**. The Final Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001. Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtors, to certain parties in interest, including: (i) the United States Trustee, (ii) any entity holding a Lien in any assets of the Debtors, (iii) the DIP Lender, (iv) counsel to the DIP Lender, (v) the Committee, (vi) the Master Service List established in the Cases. Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Final Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules, and no other notice need be provided for entry of this Final Order.

D.     **Findings Regarding the DIP Facility**.

(i)     Need for Postpetition Financing. The Debtors need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly winddown and decommissioning activities and obtain confirmation of a chapter 11 plan, to maintain business

5

relationships with vendors and suppliers, to make payroll, to satisfy other working capital and operation needs, and to otherwise preserve the value of the Debtors' estates. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to preserve the value of the Debtors' estates. Irreparable harm will be caused to the Debtors and their estates if financing is not obtained and permission to use Cash Collateral is not granted, in each case, in accordance with the terms of this Final Order and the DIP Loan Documents.

(ii)     No Credit Available on More Favorable Terms.  As set forth in the DIP Motion and in the Leach Declaration in support thereof, the Debtors have determined, at the time hereof, that no acceptable financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents and this Final Order is available. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are unable to obtain secured credit under section 364(c) of the Bankruptcy Code without allowing the DIP Lender to provide the loans and other financial accommodations under the DIP Facility on the terms set forth herein and in the DIP Loan Documents (all of the foregoing described, including, without limitation, the DIP Liens and the DIP Superpriority Claims (as defined below), collectively, the "DIP Protections").

E.     **Availability of Financing**.  The DIP Lender is willing to provide financing to the Debtors and/or consent to the use of Cash Collateral by the Debtors, as applicable, subject to (i) the entry of this Final Order, (ii) the terms and conditions of the DIP Loan Documents, and (iii) findings by the Court that such postpetition financing and use of Cash Collateral is essential to the Debtors' estates, that the terms of such financing and use of Cash Collateral were negotiated in good faith and at arm's length, and that the DIP Liens, the DIP

6

Superpriority Claims, and the other protections granted pursuant to this Final Order and the DIP Loan Documents with respect to such financing and use of Cash Collateral will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code or this Final Order.  The DIP Lender has acted in good faith in, as applicable, negotiating, consenting to, and agreeing to provide the postpetition financing arrangements and/or use of Cash Collateral as contemplated by this Final Order and the DIP Loan Documents, and the reliance by the DIP Lender on the assurances referred to above is in good faith.

     F.      **[Reserved].**

     G.      **<u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.**

     (i)      The DIP Lender has indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Final Order.

     (ii)      The terms and conditions of the DIP Facility as set forth in the DIP Loan Documents and this Final Order, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Loan Documents and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  Such terms and conditions are supported by reasonably equivalent value and fair consideration.

     (iii)      The DIP Facility and the DIP Loan Documents were negotiated in good faith and at arm's length among the Debtors and the DIP Lender, respectively, with the assistance and counsel of their respective advisors, and all of the DIP Obligations shall be deemed to have been extended by the DIP Lender and its affiliates for valid business purposes

7

and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code or this Final Order, and the DIP Liens, the DIP Superpriority Claims, and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and this Final Order in the event this Final Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

        H.    **Relief Essential; Best Interest**.  Absent granting the relief set forth in this Final Order, the Debtors' estates and their ability to successfully sell their assets or otherwise preserve the enterprise value of the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Final Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.

     **NOW, THEREFORE**, on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors and the DIP Lender to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

     **IT IS ORDERED** that:

     1.    **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Final Order and the DIP Loan Documents.  Any objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

8

2.      **DIP Loan Documents and DIP Protections**.

(a)      <u>Approval of DIP Loan Documents</u>.  The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Final Order, to incur the DIP Obligations (as defined below) in accordance with, and subject to, the terms of this Final Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents which may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Final Order and the DIP Loan Documents.  The Debtors are hereby authorized and directed to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Final Order, including, without limitation, all reasonable attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Final Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect.  Upon their execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms. Each officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)      <u>DIP Obligations</u>.  For purposes of this Final Order, the term "<u>DIP Obligations</u>" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and other DIP Loan Documents (including, without limitation,

US-DOCS\101811346.14  Fibrant LLC - Final Order Authorizing DIP Facility

all "Obligations" as defined in the DIP Credit Agreement) and shall include, without limitation, the principal of, interest on, fees, costs, expenses, and other charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents and/or this Final Order), and any obligations in respect of indemnity claims, whether contingent or otherwise.

(c)     Authorization to Incur DIP Obligations.   To enable the Debtors to conduct an orderly winddown of their business and decommissioning activities and preserve and maximize the value of their estates, during the period from the entry of this Final Order through and including the Cash Collateral Termination Date, unless extended by written agreement of the DIP Lender (the period from the entry of this Final Order through and including such date, the "Availability Period"), and subject to the terms and conditions of this Final Order and the DIP Loan Documents, including, without limitation, the Budget Covenants as defined and contained in Paragraph 2(d) below, the Debtors are hereby authorized to use Cash Collateral and borrow and incur obligations under the DIP Facility in accordance with the DIP Loan Documents and this Final Order.  All DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the DIP Guarantors, as further provided in the DIP Loan Documents.

(d)     Budget.   Attached hereto as Exhibit A is a rolling 13-week cash flow budget (the "Initial Approved Budget") which reflects on a line-item basis the Debtors' (i) weekly projected cash receipts, (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases, capital expenditures, asset sales, issuances of any letter of credit, including the fees relating thereto, and estimated fees and expenses of the DIP Lender (including counsel and financial advisors therefor and any other fees and expenses

10

relating to the DIP Facility), (iii) the sum of weekly unused availability under the DIP Facility plus unrestricted cash on hand (collectively, "Aggregate Liquidity"), and (iv) the weekly outstanding principal balance of the loans made under the DIP Facility.  Commencing on November 14, 2018 and continuing every fourth Wednesday thereafter (*i.e.*, every four weeks), the Debtors shall prepare and deliver simultaneously to the DIP Lender and the Committee: (i) an updated "rolling" 13-week budget, which, once approved in writing by the DIP Lender in its sole discretion, shall supplement and replace the Approved Budget or Supplemental Approved Budget, as applicable, then in effect (each such updated budget that has been approved in writing by each of the DIP Lender, a "Supplemental Approved Budget") without further notice, motion, or application to, order of, or hearing before, this Court; provided, however, that the DIP Lender shall have one week to approve each updated "rolling budget" (failure of the DIP Lender to timely provide the Debtors written notice of any objection to such updated "rolling budget" shall be deemed to have approved such updated "rolling budget"); provided, further, however, that unless and until the DIP Lender has approved (or be deemed to have approved as provided above) such updated budget, the Debtors shall still be subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect in accordance with this Final Order, and the DIP Lender shall, as applicable, have no obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto, as applicable; and (ii) a variance report/reconciliation report certified by the General Manager of the Debtors, in form acceptable to the DIP Lender, setting forth (A) the actual cash receipts, expenditures, disbursements, and outstanding Loan balance of the Debtors for such immediately preceding four-week period on an aggregate basis and the Aggregate Liquidity as of the end of such four-week period, and (B) the variance in dollar amounts of the actual expenditures,

disbursements, and outstanding revolving loan balance for each four-week period from those budgeted amounts for the corresponding period reflected in the Approved Budget. The aggregate, without duplication, of all items in the Initial Approved Budget and any Supplemental Approved Budgets shall constitute the "Approved Budget." To the extent provided for in the DIP Credit Agreement, the reasonable professional fees, costs and expenses of the DIP Lender's advisors, respectively, shall be due, payable and paid in accordance with the terms of this Final Order notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget. The Debtors shall deliver to the Committee any proposed budgets, variance reports, or other written financial reports provided to the DIP Lender.

(e)     Budget Covenants. The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds in accordance with the specific purposes set forth in the Approved Budget (and in the case of the costs and expenses of the DIP Lender, in accordance with the DIP Loan Documents and this Final Order), subject to the following permitted variances, which shall be tested initially on November 14, 2018 (the "First Testing Date") (testing the period from October 14, 2018 (the "Starting Date") through and including November 9, 2018 (such initial testing period, the "First Testing Period")) and continuing every four weeks thereafter on a cumulative basis (each, a "Subsequent Testing Date"): (i) (A) for the First Testing Date, the sum of actual aggregate disbursements for the Initial Approved Budget or any subsequently Approved Budget, as applicable, in the First Testing Period shall not exceed 120% of the sum of the aggregate disbursements for such line item in such First Testing Period as set forth in the Approved Budget, and (B) for each Subsequent Testing Date, the sum of actual aggregate disbursements set forth in the Initial Approved Budget or any subsequently Approved Budget, as applicable, on a cumulative basis from the Starting Date through the

12

applicable Subsequent Testing Date shall not exceed 120% of the sum of the aggregate cumulative disbursements for such period as set forth in the Initial Approved Budget or any subsequently Approved Budget, as applicable.   The foregoing budget-related covenants are collectively referred to herein as the "Budget Covenants."

(f)      Interest, Fees, Costs and Expenses.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Final Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  The Debtors shall pay on demand all fees, costs, expenses (including reasonable out-of-pocket legal and other professional fees and expenses of the DIP Lender) and other charges payable under the terms of the DIP Loan Documents.  All such fees, costs, expenses and disbursements, whether incurred, paid or required to be paid prepetition or post-petition, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Lender and/or its professionals as of the Petition Date for payment of such fees, costs, expenses and disbursements may be applied for payment) as contemplated in this Final Order and the DIP Loan Documents filed with the Court, and shall be non-refundable and not subject to challenge in any respect.

(g)      Use of DIP Facility and Proceeds of DIP Collateral.  The Debtors shall apply the proceeds of all DIP Collateral (as defined below) solely in accordance with this Final Order and the applicable provisions of the DIP Loan Documents.  Without limiting the foregoing, the Debtors shall not be permitted to make any payments on account of any prepetition debt or obligation prior to the Payment in Full (as defined below) of the DIP Obligations, except with respect to (a) as provided in motions, orders, and requests for relief, each in form and substance

13

acceptable to the DIP Lender prior to such motion, order, or request for such relief being filed; or (b) as otherwise provided in the DIP Credit Agreement.

(h)    <u>Conditions Precedent</u>.  The DIP Lender has no obligation to extend credit under the DIP Facility or permit use of any DIP Collateral proceeds, including Cash Collateral, as applicable, unless and until all conditions precedent to the extension of credit and/or use of DIP Collateral or proceeds thereof under the DIP Loan Documents and this Final Order have been satisfied in full or waived in writing by the DIP Lender in accordance with the DIP Loan Documents and this Final Order.

(i)    <u>DIP Liens</u>.  As security for the DIP Obligations, the following security interests and liens, which shall immediately and without any further action by any Person, be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of this Final Order, are hereby granted by the Debtors to the DIP Lender, for its own benefit, on all assets and property of the Debtors, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Lender or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, proceeds of Avoidance Actions (but, for the avoidance of doubt, not the Avoidance Actions themselves), rights under section 506(c) of the

14

Bankruptcy Code, all other Collateral (as defined in the DIP Loan Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, as provided below (all of the foregoing collateral collectively referred to as the "DIP Collateral," and all such Liens granted to the DIP Lender for the benefit of all the DIP Lender pursuant to this Final Order and the DIP Loan Documents, the "DIP Liens"):

> (I)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority Lien on all unencumbered DIP Collateral (except for the Debtors' claims and causes of action under sections 502(d), 544, 545, 547-550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law (collectively, the "Avoidance Actions"), but including the proceeds of each of the foregoing, whether received by judgment, settlement, or otherwise); and

> (II)    pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable junior Lien upon all DIP Collateral that is subject solely to the Prepetition Prior Liens.

(j)      DIP Lien Priority.  Notwithstanding anything to the contrary contained in this Final Order or the DIP Loan Documents, for the avoidance of doubt, the DIP Liens granted to the DIP Lender shall be senior to all pre- and post-petition Liens other than the Carve-Out and Prepetition Prior Liens.  The DIP Liens and the DIP Superpriority Claims: (A) shall not be subject to sections 506, 510, 549, 550, or 551 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed in the Cases, upon the conversion

of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Cases.

(k)     Enforceable Obligations.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors and other parties-in-interest, in accordance with their terms.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(l)     Superpriority Administrative Claim Status.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Final Order, all of the DIP Obligations shall constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out in accordance with this Final Order, over all administrative expense claims, adequate protection and other diminution claims, unsecured claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation,

16

administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "DIP Superpriority Claims").   The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof.  Other than as expressly provided in the DIP Credit Agreement and/or this Final Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code and professional fees of the respective described in Paragraph 5(iii) hereof, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Lender arising under the DIP Loan Documents and/or this Final Order.

3.        **Authorization to Use Cash Collateral and Proceeds of the DIP Facility**. Subject to the terms and conditions of this Final Order and the DIP Loan Documents, including, without limitation, the Budget Covenants set forth in Paragraph 2(e) hereof, (a) the Debtors are authorized to use proceeds of credit extended under the DIP Facility from and after the Closing Date, and (b) the Debtors are authorized to use Cash Collateral; provided, however, that each Debtor shall be prohibited from at any time using proceeds of DIP Collateral (including Cash Collateral) and/or advances under the DIP Facility, in each case, except in accordance with the

17

terms and conditions of this Final Order and the DIP Loan Documents.  To fund the Debtors' working capital and other general corporate needs, in accordance with the terms of this Final Order, the DIP Loan Documents, and the Approved Budget, the Debtors may request advances and other financial accommodations under the DIP Facility.  The DIP Lender may terminate the applicable Debtors' right to use proceeds of extensions of credit under the DIP Facility, DIP Collateral, and Cash Collateral without further notice, motion, or application to, order of, or hearing before, the Court, in accordance with Paragraph 12 below, immediately upon notice to such effect by the DIP Lender to the Debtors after the occurrence and during the continuance of any Termination Event.  Upon the occurrence and during the continuance of a Termination Event (subject to Paragraph 12 below), the DIP Lender may terminate the consensual Cash Collateral use arrangement contained herein without further notice, motion, or application to, order of, or hearing before, the Court; provided, that the rights of the DIP Lender under this Final Order or otherwise shall not be affected by the waiver of any Termination Event by any other party.  The earliest date upon which the consensual Cash Collateral use arrangement described in this Final Order is terminated pursuant to this Paragraph 3 shall be referred to herein as the "Cash Collateral Termination Date."  Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable

18

DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lender in accordance with the terms of the DIP Loan Documents and this Final Order.

4.      **Automatic Postpetition Lien Perfection.**   This Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time and on the Petition Date.  The applicable Debtors shall execute and deliver to the DIP Lender all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated priority of the DIP Liens granted pursuant hereto.  Without limiting the foregoing, the DIP Lender may in its discretion file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order.

19

5.     **Carve-Out**.  Subject to the terms and conditions contained in this Paragraph 5, each of the DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve-Out in accordance with the terms of this Final Order:

(i)     Carve-Out.  For purposes of this Final Order, "Carve-Out" means (a) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (b) subject to the terms and conditions of this Final Order, the reasonable unpaid fees, costs, and disbursements of professionals retained by the Debtors in these Cases and the Debtors' ordinary course professionals (collectively, the "Debtors' Professionals") that are incurred prior to the delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below), are in accordance with the Approved Budget and are allowed pursuant to an order of the Court under sections 327, 330, or 363 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals; (c) subject to the terms and conditions of this Final Order, the reasonable unpaid fees, costs, and disbursements of professionals retained by the Committee in these Cases (collectively, the "Committee's Professionals") and all reasonable unpaid out-of-pocket expenses of the members of the Committee ("Committee Members"), in each case that are incurred prior to the delivery by the DIP Lender of a Carve-Out Trigger Notice and in accordance with the Approved Budget, and that are allowed by the Court under sections 328, 330, or 1103 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals; (d) the reasonable unpaid fees, costs, and disbursements of the Debtors' Professionals that are incurred after the delivery of a Carve-Out Trigger Notice, that are allowed by the Court under sections 327 or 363 of the Bankruptcy Code, in an aggregate amount not to exceed $200,000 (inclusive of any unapplied retainers held by such professionals) (the "Debtors'

20

Professionals Carve-Out Cap"); and (e) the reasonable unpaid fees, costs, and disbursements of the Committee Professionals and the reasonable unpaid expenses of Committee Members that are incurred after the delivery of a Carve-Out Trigger Notice, that are allowed by the Court under sections 328 or 1103 of the Bankruptcy Code, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $100,000 (inclusive of any unapplied retainers held by such professionals) (the "Committee Carve-Out Cap" and, together with the Debtors' Professionals Carve-Out Cap, the "Post-Default Carve-Out Cap") (clauses (a), (b), (c), (d), and (e), collectively, the "Carve-Out").  The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Lender to the Debtors' lead counsel, the United States Trustee, and lead counsel to the Committee, which notice may be delivered at any time following the occurrence and during the continuation of any Termination Event.  Upon the delivery of a Carve-Out Trigger Notice, (A) the Debtors shall immediately fund into the Carve-Out Account (as defined below) an amount equal to the Post-Default Carve-Out Cap, and (B) until the Carve-Out Account (as defined below) has been funded in an additional amount equal to the unpaid fees and expenses that were incurred prior to the delivery of the Carve-Out Trigger Notice in accordance with (b) and (c) above, that have not been disallowed by the Court and for which such Debtors' Professionals or Committee's Professionals have submitted a copy of an application to the Court or monthly fee statement, net proceeds of the DIP Collateral thereafter realized by or remitted to the DIP Lender that, but for the Carve-Out, would be utilized by the DIP Lender to permanently repay the DIP Obligations (x) shall be transferred by the Debtors into a segregated account established by the Debtors (the "Carve-Out Account") and (y) shall not reduce the DIP Obligations.  All amounts deposited in the Carve-Out Account shall continue to be subject to the DIP Liens such that, upon final payment of all amounts due and owing under

the Carve-Out, then any funds remaining in the Carve-Out Account shall be remitted to the DIP Lender in accordance with this Final Order, for application in accordance with this Final Order and the DIP Loan Documents, as applicable. No amounts set forth in this subparagraph (i) with respect to the Post-Default Carve-Out Cap may be modified without the prior written consent of the DIP Lender.

(ii)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees. The DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Debtors' Professionals or Committee's Professionals incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed (i) to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Debtors' Professionals or Committee's Professionals, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement or (ii) to increase the Carve-Out if actual allowed fees and expenses of any of the Debtors' Professionals or Committee's Professionals are higher in fact than the Carve-Out Cap. Notwithstanding any provision in this Paragraph 5 to the contrary, no portion of the Carve-Out, Cash Collateral, DIP Collateral or proceeds of the DIP Facility shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 13 hereof. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Committee, any other official or unofficial committee in these Cases, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses.

(iii) <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Prior to the occurrence of the Termination Declaration Date (as defined below), the Debtors shall be permitted to pay allowed fees of the Debtors' Professionals and the Committee's Professionals (to the extent the fees of the Debtors' Professionals and the Committee's Professionals were incurred in accordance with the Approved Budget), subject to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court. The amounts paid prior to the Carve-Out Trigger Notice shall not reduce the Carve-Out.

6. **Waiver of 506(c) Claims**. As a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Loan Documents (and their consent to the payment of the Carve-Out to the extent provided herein) and as a further condition to the Debtors' use of Cash Collateral pursuant to this Final Order, no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against the DIP Lender, the DIP Collateral and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence of the DIP Lender.

7. **After-Acquired Property**. Except as otherwise expressly provided in this Final Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date which is

23

not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

        8.    **Protection of DIP Lender Rights**.

        (a)    Unless the DIP Lender under the DIP Loan Documents shall have provided its prior written consent or all DIP Obligations have been Paid in Full (defined below), there shall not be entered in these proceedings, or in any Successor Cases, any order which authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, and/or the other DIP Protections granted pursuant to this Final Order to the DIP Lender; or (ii) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations or as otherwise permitted in the DIP Loan Documents and this Final Order.  For purposes of this Final Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations, (i) the indefeasible payment in full in cash of such obligations and (ii) the termination of all credit commitments under the DIP Loan Documents.

        (b)    The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will (i) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents, (ii) reasonably cooperate, consult with, and provide to the DIP Lender all such information as required or allowed under the DIP Loan Documents or the provisions of this Final Order, (iii) at reasonable times, permit representatives of the DIP Lender such rights to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit

US-DOCS\101811346.14  Fibrant LLC - Final Order Authorizing DIP Facility

and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, and independent public accountants as and to the extent required by the DIP Loan Documents, and (iv) permit the DIP Lender and its representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets.

9.      **Proceeds of Subsequent Financing**.   Without limiting the provisions and protections of Paragraph 8 above, if at any time prior to the Payment in Full of all the DIP Obligations (including subsequent to the confirmation of any Chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Lender until Payment in Full of the DIP Obligations.

10.      **Disposition of DIP Collateral**.  Unless the DIP Obligations are Paid in Full upon the closing of a sale or other disposition, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) without the prior written consent of the DIP Lender under the DIP Loan Documents (and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or any order of this Court), except as permitted in the DIP Loan Documents and this Final Order. Until the DIP Obligations are Paid in Full, upon any sale or other disposition of any of the DIP

Collateral (other than the South Center Assets), the Debtors shall deliver, to the extent required under the DIP Credit Agreement, within one Banking Day of receipt, the cash proceeds of such sale or disposition to the DIP Lender to be applied as indefeasible payment of the DIP Obligations.

11. **Termination Events**.  The following shall constitute a termination event under this Final Order and the DIP Loan Documents unless waived in writing by the DIP Lender (each, a "Termination Event"):

(a)  The occurrence of an "Event of Default" under the DIP Credit Agreement, as set forth therein (a "DIP Default Termination Event").

(b)  Any other breach, default or other violation by any of the Debtors of the terms and provisions of this Final Order.

12. **Rights and Remedies Upon Termination Event**.

(a)  Subject to the provisions of the DIP Credit Agreement and subparagraph (b) hereof, any automatic stay otherwise applicable to the DIP Lender is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the DIP Lender to exercise the following remedies immediately upon the occurrence and during the continuance of any Termination Event (as set forth in section 2(e) of this Final Order):  (i) terminate the DIP Obligations; (ii) declare the principal amount then outstanding of, and the accrued interest on, the DIP Obligations and all other amounts payable by the Debtors under the DIP Loan Documents to be forthwith due and payable, whereupon such amounts shall be immediately due and payable without presentment, demand, protest, or other formalities of any kind, all of which are hereby expressly waived by the Debtors; (iii) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Lender, but

US-DOCS\101811346.14  Fibrant LLC - Final Order Authorizing DIP Facility

without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) declare a termination, reduction, or restriction on the ability of the Debtors to use any Cash Collateral (except as permitted in Paragraph 16(b) below), including Cash Collateral derived solely from the proceeds of DIP Collateral (any such declaration to be made in writing to the Debtors, lead counsel to the Committee, and the United States Trustee shall be referred to herein as a "Termination Declaration" and the date which is the earliest to occur of any such Termination Declaration being herein referred to as the "Termination Declaration Date"); (v) reduce any claim to judgment; (vi) take any other action permitted by law; and/or (vii) take any action permitted to be taken by the DIP Loan Documents during the continuance of any Termination Event.

(b)      If (i) the Debtors do not seek, within five (5) Banking Days following a Termination Declaration Date, a determination by the Bankruptcy Court that a Termination Event has not occurred or is no longer continuing, and (ii) if the Debtors do seek such a determination, upon ten (10) Banking Days following a Termination Declaration Date, unless the Bankruptcy Court determines that a Termination Event has not occurred and/or is not continuing, the DIP Lender shall be deemed to have relief from the automatic stay and may foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise remedies against the DIP Collateral permitted by applicable nonbankruptcy law.  During the 10 Banking Day period after a Termination Declaration Date, the Debtors, the DIP Lender and the Committee shall be entitled to an emergency hearing before the Court for the sole purpose of contesting whether a Termination Event has occurred and/or is continuing, and section 105 of the Bankruptcy Code may not be invoked by the Debtors, the

Committee, or any other party in interest in an effort to restrict or preclude the DIP Lender from exercising any rights or remedies set forth in this Final Order or the DIP Loan Documents. Unless during such period the Court determines that a Termination Event has not occurred and/or is not continuing, the automatic stay, as to the DIP Lender, shall automatically terminate at the end of such 10 Banking Day period, without further notice or order.  During such 10 Banking Day period, the Debtors may not use Cash Collateral or any amounts under the DIP Credit Facility except to make disbursements in respect of employee compensation, employee benefits, and all employee-related obligations set forth in under the Approved Budget and, provided that such disbursements are in accordance with the Approved Budget.

(c)     All proceeds realized in connection with the exercise of the rights and remedies of the DIP Lender shall be turned over to the DIP Lender for application to the other DIP Obligations under, and in accordance with, the provisions of the DIP Loan Documents until Payment in Full of the DIP Obligations; provided, that in the event of the liquidation of the Debtors' estates after the occurrence and during the continuance of a Termination Event, the Carve-Out shall be funded into a segregated account exclusively (i) first, from proceeds of any unencumbered assets of the Debtors, and (ii) then from Cash Collateral received by the DIP Lender subsequent to the date of termination of the DIP Obligations and prior to the distribution of any such Cash Collateral to any other parties in interest.

(d)     The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of this Final Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the DIP Liens and to incur all liabilities and obligations to the DIP Lender under the DIP Loan Documents, the DIP Facility, and this Final Order, (ii) authorize the DIP Lender to retain and apply payments made in accordance with the

DIP Loan Documents and this Final Order, and (iii) otherwise to the extent necessary to implement and effectuate the provisions of this Final Order.

13. **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary, no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), or any portion of the Carve-Out may be used by (a) the Committee or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (or to pay any professional fees and disbursements incurred in connection therewith) to investigate or prosecute any litigation or other action in connection with the value of the DIP Collateral at any time; and (b) any of the Debtors, the Committee, and any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Lender; (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the DIP Lender and its officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including, without limitation, (A) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations, or the validity, extent, and priority of the DIP Liens;

(C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens or the other DIP Protections; (D) except to contest the occurrence or continuance of any Termination Event as permitted in Paragraph 12, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying the DIP Lender's (and, after the Payment in Full of the DIP Obligations, the DIP Collateral in accordance with the DIP Loan Documents or this Final Order); and/or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to the DIP Lender or under the DIP Loan Documents, as applicable; (iii) pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Lender; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby, without the consent of the DIP Lender.

14.     **Preservation of Rights Granted Under the Final Order**.

(a)     No Non-Consensual Modification or Extension of Final Order.     The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Final Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender.  In the event any or all of the provisions of this Final Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash whether previously or hereunder, or lien, claim, or priority authorized or created hereby.  Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Final Order, in the event any or all of the provisions of this Final Order are

hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Lender shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur, or stay shall affect (i) the validity, priority, or enforceability of any DIP Protections granted or incurred prior to the actual receipt of written notice by the DIP Lender, as the case may be, of the effective date of such reversal, modification, vacatur, or stay or (ii) the validity, enforceability and non-avoidability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations.  Notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Lender, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Lender shall be entitled to all of the DIP Protections and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order, and pursuant to the DIP Loan Documents with respect to all uses of Cash Collateral and all DIP Obligations.

(b)    <u>Dismissal</u>.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that (i) the DIP Protections shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations have been Paid in Full (and that all DIP Protections, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections.

(c)    <u>Survival of Final Order</u>.  The provisions of this Final Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court, or terminating the joint administration of these Cases or by any other act or omission.  The terms and provisions of this Final Order, including all of the DIP Protections and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender, shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections shall continue in these proceedings and in any Successor Cases, and shall maintain their respective priorities as provided by this Final Order.  Without the prior written consent of the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any Chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

15.    **Insurance Policies**.  Upon entry of this Final Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

16.    **Other Rights and Obligations**.

(a)    <u>Expenses</u>.  To the extent provided in the DIP Loan Documents (and without limiting the Debtors' respective obligations thereunder), the applicable Debtors will pay

US-DOCS\101811346.14  Fibrant LLC - Final Order Authorizing DIP Facility

all reasonable expenses incurred by the DIP Lender (including, without limitation, the reasonable fees and disbursements of all counsel for the DIP Lender and any internal or third-party appraisers, consultants, advisors and auditors engaged by or for the benefit of the DIP Lender and/or its counsel) in connection with the preparation, execution, delivery, and administration of the DIP Loan Documents, this Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

        (b)    <u>Notice of Professional Fees</u>.  Professionals for the DIP Lender (including, without limitation, professionals engaged by counsel to the DIP Lender) (collectively, the "<u>Lender Professionals</u>") shall not be required to comply with the United States Trustee fee guidelines or submit invoices to the Court, United States Trustee, the Committee or any other party-in-interest absent further court order.  Copies of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the applicable Lender Professional to the United States Trustee, counsel for the Committee, and such other parties as the Court may direct.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; <u>provided</u>, <u>however</u>, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.  Parties shall have ten (10) Banking Days after receipt of such summary invoice (the "<u>Review Period</u>") to object to the reasonableness of such fees and expenses by

33

providing written notice of such objection to the Debtors and the DIP Lender.  In the event that an objection is timely asserted to any such statement, the Debtors shall be authorized to pay only such charges shown on such statement as to which no objection has been asserted, but shall pay the charges as to which an objection has been asserted only as authorized by an order from this Court or as agreed to by the DIP Lender and the objecting party.  If the Debtors, United States Trustee, or counsel for the Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten days of receipt of such written notice, the Debtors, United States Trustee, or the Committee, as the case may be, shall file with the Court and serve on such Lender Professionals an objection (the "Fee Objection") limited to the issue of the reasonableness of such fees and expenses.  Any hearing on an objection to payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses which are the subject of such objection.  Within five (5) Banking Days after the expiration of the Review Period, the Debtors shall pay in accordance with the terms and conditions of this Final Order the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed.   The Debtors shall indemnify the DIP Lender (and other applicable parties) to the extent set forth in the DIP Loan Documents, including, without limitation, as provided in Section 12 of the DIP Credit Agreement.  All such unpaid fees, costs, expenses, charges, and indemnities of the DIP Lender that have not been disallowed by this Court on the basis of an objection filed by the United States Trustee or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Final Order.  Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any

Debtor to the DIP Lender in connection with or with respect to the DIP Facility, the DIP Credit Agreement, or the other DIP Loan Documents are hereby approved in full and non-refundable.

(c)     <u>Binding Effect</u>.  The provisions of this Final Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Lender, the Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; <u>provided</u>, <u>however</u>, that the DIP Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(d)     <u>No Waiver</u>.  The failure of the DIP Lender to seek relief or otherwise exercise its respective rights and remedies under this Final Order, the DIP Loan Documents, or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of the DIP Lender's rights hereunder, thereunder, or otherwise.  Nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any the DIP Lender, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest

35

such assertion).  Except as prohibited by this Final Order, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, the ability of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any Chapter 11 plan or plans with respect to any of the Debtors, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender.

(e)     No Third Party Rights.  Except as explicitly provided for herein or in any DIP Loan Document, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.  In determining whether to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Loan Documents, the DIP Lender shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(f)     No Marshaling.  The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g)     Amendments.  The Debtors are authorized and empowered, with the prior written consent of the DIP Lender, and prior written notice to the Committee, but without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver (i) increases the interest rate (other

US-DOCS\101811346.14  Fibrant LLC - Final Order Authorizing DIP Facility

than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of the DIP Lender in respect of the DIP Facility, or (iii) adds or amends (in any respect unfavorable to the Debtors) any Event of Default.  No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Lender and, except as provided herein, approved by this Court.

(h)     Inconsistency.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Final Order, the provisions of this Final Order shall govern and control.

(i)     Enforceability.  This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Final Order.

(j)     Reservation of Rights.  Nothing in this Final Order shall be deemed to constitute the consent of the DIP Lender, and the DIP Lender expressly reserves the right to object, to entry of any Order of the Bankruptcy Court that provides for the sale of all or substantially all of the assets of the Debtors to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations and the foregoing is Paid in Full on the closing date of such sale.

(k) <u>Headings</u>.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Final Order.

(l) <u>General Cooperation From Debtors; Access to Information</u>.  Without limiting any of the Debtors' other obligations in this Final Order or the DIP Loan Documents, each Debtor shall, and shall cause its senior officers, directors and financial advisors to, reasonably cooperate with the DIP Lender and its respective advisors and representatives, in furnishing documents and information as and when reasonably requested by such parties regarding the DIP Collateral or the Debtors' financial affairs, finances, financial condition, business, and operations.  Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Lender or its respective financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.

17. **Retention of Jurisdiction**.  The Bankruptcy Court has and will retain jurisdiction to enforce this Final Order according to its terms.

18. **Avoidance Actions**.  Neither the Debtors nor any party granted standing on behalf of the estates shall be entitled to file complaints or otherwise commence prosecution of, or take any other collection action with respect to, Avoidance Actions prior to the date that is 180 days after the Maturity Date unless the Bankruptcy Court orders otherwise after notice and a hearing.  For the avoidance of doubt, the DIP Lender shall not seek such an order permitting earlier prosecution of, or commencement of any other collection action with respect to, Avoidance Actions.

[END OF DOCUMENT]

US-DOCS\101811346.14  Fibrant LLC - Final Order Authorizing DIP Facility

Prepared and presented by:

KING & SPALDING LLP

*/s/ Jeffrey R. Dutson*
Paul Ferdinands
Georgia Bar No. 258623
pferdinands@kslaw.com
Jeffrey R. Dutson
Georgia Bar No. 637106
jdutson@kslaw.com
Sarah L. Primrose
Georgia Bar No. 532582
sprimrose@kslaw.com
1180 Peachtree Street
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

and

KLOSINSKI OVERSTREET, LLP

James C. Overstreet Jr.
Georgia Bar No. 556005
jco@klosinski.com
1229 Augusta West Parkway
Augusta, GA 30909
Telephone:  (706) 863-2255
Facsimile:  (706) 863-5885

COUNSEL FOR THE
DEBTORS-IN-POSSESSION

**<u>EXHIBIT A</u>**
**Initial Approved Budget**
(see attached)

Exhibit "A"

DRAFT - Subject to FRE 408

13-Week DIP Budget

# Fibrant, LLC
## 13-Week Cash Flow Forecast
($ in 000's)

| Week Ending | Oct 10/20/18 | Oct 10/27/18 | Nov 11/3/18 | Nov 11/10/18 | Nov 11/17/18 | Nov 11/24/18 | Dec 12/1/18 | Dec 12/8/18 | Dec 12/15/18 | Dec 12/22/18 | Dec 12/29/18 | Jan 1/5/19 | Jan 1/12/19 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecasted Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Beginning Cash Balance** | $2,985 | $2,878 | $2,000 | $2,004 | $2,127 | $2,194 | $2,000 | $5,325 | $5,308 | $4,715 | $4,535 | $4,265 | $4,248 | $2,985 |
| **RECEIPTS** | | | | | | | | | | | | | | |
| Operational Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Asset Sales | - | 240 | - | - | - | - | 5,000 | - | - | - | - | - | - | 5,240 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Environmental Reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | - | 240 | - | - | - | - | 5,000 | - | - | - | - | - | - | 5,240 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | |
| Supplier Payments | 10 | 10 | 10 | 10 | 10 | 10 | 10 | - | 10 | 10 | 10 | 10 | 10 | 120 |
| Austin Maintenance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll & Benefits | 44 | 135 | 44 | 44 | 44 | 70 | 44 | 5 | 44 | 5 | 96 | 5 | 110 | 715 |
| Utilities | 10 | - | - | - | 10 | - | - | - | 10 | - | - | - | - | 30 |
| Logistics & Transportation | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 39 | 570 | 2 | 2 | 18 | 12 | 2 | 2 | 2 | 18 | 14 | 2 | 2 | 686 |
| Environmental Remediation | 4 | 300 | 2 | 2 | 52 | 200 | 2 | 2 | 52 | 18 | 130 | 2 | 2 | 745 |
| **Total Cash Disbursements** | 107 | 1,015 | 58 | 82 | 134 | 292 | 58 | 17 | 118 | 33 | 250 | 17 | 114 | 2,296 |
| Debtor Professional Fees | - | 366 | 188 | 45 | 29 | 154 | - | - | 475 | 29 | - | - | 90 | 1,176 |
| Committee Professional Fees | - | 152 | - | - | - | - | - | - | - | - | - | - | - | 474 |
| DIP Lender Fees and Expenses | - | 125 | - | - | 20 | - | 5 | - | - | 119 | 5 | - | - | 150 |
| Other Restructuring Expenses | - | 55 | - | - | - | 15 | - | 17 | - | - | 15 | - | - | 85 |
| **Total Restructuring Disbursements** | - | 697 | 188 | 45 | 49 | 169 | 5 | - | 475 | 148 | 20 | - | 90 | 1,885 |
| **Net Change in Cash Flow** | ($107) | ($1,473) | ($246) | ($127) | ($183) | ($461) | $4,937 | ($17) | ($593) | ($181) | ($269) | ($17) | ($204) | $1,059 |
| **Cash Balance Before DIP Financing** | $2,878 | $1,405 | $1,754 | $1,877 | $1,944 | $1,733 | $6,937 | $5,308 | $4,715 | $4,535 | $4,265 | $4,248 | $4,045 | $4,045 |
| Debtor-In-Possession Financing | - | 595 | 250 | 250 | 250 | 267 | (1,611) | - | - | - | - | - | - | - |
| **Ending Cash Balance - A** | $2,878 | $2,000 | $2,004 | $2,127 | $2,194 | $2,000 | $5,325 | $5,308 | $4,715 | $4,535 | $4,265 | $4,248 | $4,045 | $4,045 |
| Debtor-In-Possession Financing Availability - B | 3,500 | 2,905 | 2,655 | 2,405 | 2,155 | 1,889 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| **Total Liquidity Available - A + B** | $6,378 | $4,905 | $4,659 | $4,532 | $4,349 | $3,889 | $8,825 | $8,808 | $8,215 | $8,035 | $7,765 | $7,748 | $7,545 | $7,545 |
| **Debtor-In-Possession Financing** | | | | | | | | | | | | | | |
| Beginning Balance | - | - | 595 | 845 | 1,095 | 1,345 | 1,611 | - | - | - | - | - | - | - |
| (+) Drawdown | - | 595 | 250 | 250 | 250 | 267 | - | - | - | - | - | - | - | 1,611 |
| (+) Repayment | - | - | - | - | - | - | (1,611) | - | - | - | - | - | - | (1,611) |
| Ending Balance | - | 595 | 845 | 1,095 | 1,345 | 1,611 | - | - | - | - | - | - | - | - |
| **Debtor-In-Possession Financing Availability** | | | | | | | | | | | | | | |
| Maximum Commitment - E | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Ending Debtor-In-Possession Financing Balance - F | - | 595 | 845 | 1,095 | 1,345 | 1,611 | - | - | - | - | - | - | - | - |
| Remaining Availability - E - F | 3,500 | 2,905 | 2,655 | 2,405 | 2,155 | 1,889 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |

**<u>EXHIBIT B</u>**
**DIP CREDIT AGREEMENT**
(see attached)

**Exhibit "B"**

**SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT**

This SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "Agreement") is dated as of [October __], 2018 and is by and among Fibrant, LLC, a Delaware limited liability company (the "Borrower"), Evergreen Nylon Recycling, LLC, a Georgia limited liability company ("Evergreen"), Fibrant South Center, LLC, a Georgia limited liability company ("Fibrant South"), and Georgia Monomers Company, LLC, a Georgia limited liability company ("Monomers" and, together with Evergreen and Fibrant South, the "Guarantors"; and the Guarantors, together with the Borrower, the "Debtors"), each a debtor and debtor-in-possession under the Bankruptcy Code (as defined below), and CAP II B.V., a private limited company organized under the laws of the Netherlands, as lender (the "DIP Lender").

**W I T N E S S E T H:**

WHEREAS, on February 23, 2018 (the "Petition Date"), the Debtors commenced chapter 11 cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Georgia, Augusta Division (the "Bankruptcy Court");

WHEREAS, each Debtor is continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested the DIP Lender to provide a delayed draw term loan credit facility (the "DIP Facility") to the Borrower in an aggregate principal amount of $3.5 million for the purposes described herein;

WHEREAS, to provide security for the repayment of the loans made available pursuant hereto and payment of the other obligations of the Debtors hereunder, the Debtors have agreed to provide the DIP Lender with Liens on the Collateral (as defined below); and

WHEREAS, the DIP Lender is willing to make the requested DIP Facility available on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the Debtors and the DIP Lender agree as follows:

1.    **Definitions**.  The terms listed below shall be defined as follows:

"$" "USD" and "dollars" denotes the lawful currency of the United States of America.

"Approved Budget" shall have the meaning set forth in Section 7(a) hereof.

"Asset Disposition" means the disposition whether by sale, lease, transfer, loss, damage, destruction, casualty, condemnation or otherwise of any of the following:  (a) any of the stock or other equity or ownership interest of any of the Borrowers' subsidiaries or (b) any or all of the assets of any Borrower or any of their subsidiaries; provided, however, that the term "Asset Disposition" shall not include any disposition of the South Center Assets made with the prior written consent of the DIP Lender.

"Availability Period" shall mean the period from the Closing Date to, but excluding, the Maturity Date.

"Banking Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to remain closed.

"Bankruptcy Code" shall have the meaning set forth in the recitals.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Borrowing Request" shall mean a Borrowing Request in the form attached hereto as Exhibit A, or such other form acceptable to the DIP Lender.

"Budget" shall mean the Initial Approved Budget and each subsequent Approved Budget.

"Chapter 11 Cases" shall mean the cases filed under Chapter 11 of the Bankruptcy Code by the Debtors, in their capacity as debtors and debtors-in-possession in the Bankruptcy Court.

"Charges" means all federal, state, county, city, municipal, local, foreign or other governmental taxes, levies, assessments, charges, liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Debtor, (d) any Debtor's ownership or use of any properties or other assets, or (e) any other aspect of any Debtor's business.

"Closing Date" shall mean [_____], 2018.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall mean the "DIP Collateral" as defined in, and the security interests granted pursuant to, the DIP Financing Order, the "Collateral" (or such other similar term) as defined in, and the security interests granted pursuant to, the other Collateral Documents, and any other property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the DIP Lender to secure the Obligations.

"Collateral Documents" shall mean the DIP Financing Order (to the extent it grants Liens on any Collateral) and any other security agreements, guarantees, pledge agreements, mortgages or similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations.

2

"Commitment" shall have the meaning set forth in Section 2(a) hereof.

"Default" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Designated Officer" shall mean David Leach, each Debtor's General Manager, or any successor thereto.

"DIP Facility" shall have the meaning set forth in the recitals.

"DIP Financing Order" shall mean a final, non-appealable order of the Bankruptcy Court approving the DIP Facility and entered in the Chapter 11 Cases, in form and substance satisfactory to the DIP Lender.

"DIP Loan Documents" shall mean this Agreement, the DIP Financing Order, the Collateral Documents and any other documents, instruments, or agreements delivered in connection with, or as support for, any of the foregoing, and any updates or renewals thereof.

"Event of Default" shall have the meaning set forth in Section 8 hereof.

"Federal Reserve Board" shall mean the Board of Governors of the Federal Reserve System.

"Initial Approved Budget" shall mean the Budget attached hereto as Exhibit B.

"Land Sale" shall mean the transactions set forth in that certain Purchase and Sale Agreement dated as of May 9, 2018, by and between PCS Nitrogen Fertilizer, L.P., as purchaser, and the Borrower, as seller.

"Law" shall mean any international, foreign, Federal, state or local statute, treaty, rule, guideline, regulation, ordinance, code, or administrative or judicial precedent or authority, including the interpretation or administration thereof by any governmental authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any governmental authority, in each case whether or not having the force of law.

"Lien" shall mean, with respect to any asset, any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or other) or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Laws of any jurisdiction).

"Loans" shall have the meaning set forth in Section 2(a) hereof.

"Maturity Date" shall mean the earliest to occur of (i) the receipt by any Debtor of the proceeds of the consummation of the Land Sale, (ii) confirmation of a chapter 11 plan in the Chapter 11 Cases and (iii) March 31, 2019.

"Obligations" shall mean all amounts owing by the Debtors to the DIP Lender pursuant to or in connection with this Agreement or any other DIP Loan Document including, without limitation, all principal and other amounts (if any) due and owing hereunder.

"Permitted Variance" shall mean (i) any favorable variance, (ii) an unfavorable variance of not more than 20% with respect to the aggregate disbursements set forth for any Testing Period (on a cumulative basis) in the Initial Approved Budget or the most recently Approved Budget delivered prior to the applicable Variance Report.

"Requirements of Law" shall mean, as to each Debtor, the organizational documents of such Debtor and each Law applicable to or binding upon such Debtor or any of its property or to which such Debtor or any of its property is subject.

"Restructuring Support Agreement" shall mean that certain Restructuring Support Agreement, dated as of June 18, 2018, among the Debtors, ChemicaInvest Holding, B.V., CAP I B.V., CAP II B.V., Fibrant Holding B.V., and Augusta Holdco, Inc., as may be amended, restated, or supplemented from time to time, including in connection with restatement to include the official committee of unsecured creditors appointed in the Chapter 11 Cases as a party thereto.

"South Center Assets" shall mean all property (excluding equity interests) owned by Fibrant South.

"Superpriority DIP Claims" shall mean all of the claims of the DIP Lender on account of the Obligations, which claims shall constitute administrative expenses of the Debtors in the Chapter 11 Cases, with administrative priority and senior secured status and entitled to the benefits of Sections 364(c) of the Bankruptcy Code, having a superpriority over any and all costs and expenses of the kind that are specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code or otherwise.

"Taxes" shall mean taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on or measured by the net income of the DIP Lender by the jurisdictions under the laws of which the DIP Lender is organized or conducts business or any political subdivision thereof.

"Testing Period" shall mean each period of four consecutive calendar weeks ending on the Friday immediately preceding the date that delivery of a Variance Report is required pursuant to Section 7(a).

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of Georgia; provided that if by reason of mandatory provisions of Law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of the DIP Lender in any

4

Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Georgia, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Variance Report" shall have the meaning set forth in Section 7(a) hereof.

**2. Borrowings, Conversions, Renewals and Payments.**

(a)     Subject to the terms and conditions set forth herein (including the conditions to borrowing set forth in Sections 4 and 5 hereof), the DIP Lender agrees to make multi-draw term loans ("Loans") to the Borrower, from time to time on any Banking Day during the Availability Period, in U.S. dollars in an aggregate principal amount for all such Loans not to exceed $3,500,000 (the "Commitment").  During the Availability Period, the Borrower shall be entitled to borrow and repay in whole or in part Loans in accordance with the terms and conditions of this Agreement; provided, however, that (i) the Borrower may not borrow any amounts hereunder should there exist a Default or Event of Default; and (ii) amounts borrowed under this Section 2(a) and repaid or prepaid may not be reborrowed.

(b)     The Borrower shall give the DIP Lender irrevocable notice of each borrowing by delivering a Borrowing Request by 5:00 p.m. New York, New York time not less than two (2) Banking Days prior to the date of each requested borrowing of a Loan; provided, however, that (i) no Loan shall be in an amount less than $500,000 for the first such borrowing and $250,000 for any subsequent borrowing, (ii) the Borrower shall not be permitted to deliver a Borrowing Request more frequently than once per calendar week, and (iii) the Borrower shall not be permitted to request Loans (and the DIP Lender shall not be required to fund Loans) in excess of the Debtors' budgeted cash needs for the four (4) calendar weeks immediately following the date of the Borrowing Request plus any undrawn budgeted amounts to be drawn in the time period preceding the Borrowing Request (as set forth in an Approved Budget).

(c)     The Borrower hereby unconditionally promises to pay to the DIP Lender the principal amount of all outstanding Loans on the Maturity Date or any earlier maturity date (whether by acceleration or otherwise), plus all other Obligations then outstanding without further application to or order of the Bankruptcy Court.

(d)     The Borrower shall have the right to make prepayments of principal at any time or from time to time, provided that:  (i) the Borrower shall give the DIP Lender irrevocable notice of each prepayment by 12:00 noon New York, New York time on the date of prepayment of a Loan; and (ii) all prepayments of Loans shall be in a minimum amount equal to the lesser of $25,000 or the unpaid principal amount of the Loans.

(e)     Immediately upon receipt by any Debtor of cash proceeds of any Asset Disposition, the Borrower shall prepay the Loans in an amount equal to all such proceeds, net of (A) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Debtors in connection therewith (in each case, paid to non-affiliates), (B) transfer taxes and (C) an appropriate reserve for income taxes in accordance with GAAP in connection therewith.  Any such prepayment shall be applied

5

as follows:  first, to fees and reimbursable expenses of the DIP Lender then due and payable pursuant to any of the DIP Loan Documents; second, to interest then due and payable on the Loans; and third, to the principal balance of the Loans outstanding until the same has been paid in full, with any remaining balance being applied in accordance with the DIP Financing Order or any other applicable order of the Bankruptcy Court.

(f)      CAP II B.V., acting as an agent of the Borrower solely for purposes of this Section 2(f), shall keep at its principal executive office a register for the registration and registration of transfers of Loans (and stated interest with respect thereto) or all or any portion of the Commitment with respect thereto.  The name and address of each holder of one or more Loans, each transfer thereof and the name and address of each transferee of one or more Loans shall be registered in such register.  The Loans will be maintained at all times in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury Regulations.

**3.      Interest, Fees and Payments.**

(a)      Each Loan shall bear interest on the unpaid principal thereof from the date made through repayment (whether by acceleration or otherwise) at a rate equal to 8.0% per annum.  Interest shall be computed on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan shall be included, and the date of repayment of such Loan shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on such Loan.

(b)      Interest on each Loan shall be payable in arrears (i) upon any prepayment of such Loan, whether voluntary or mandatory, to the extent accrued on the principal amount being prepaid, and (ii) at maturity.

(c)      [Reserved.]

(d)      Notwithstanding anything to the contrary set forth in this Section 3, if a court of competent jurisdiction determines in a final and non-appealable order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the DIP Lender is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.  In no event shall the total interest received by the DIP Lender pursuant to the terms hereof exceed the amount that the DIP Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate.

(e)      [Reserved.]

(f)       All payments hereunder shall be made in lawful money of the United States and in immediately available funds, without defense, recoupment, setoff of counterclaim, free of any restriction or condition.  If any payment to be made under this Agreement becomes due and payable on a day that is not a Banking Day, such payment shall be made on the next succeeding Banking Day, and such extension of time shall be included in the computation of the payment of interest hereunder.  The date and amount with respect to each Loan evidenced hereby and all payments of principal thereof shall be recorded by the DIP Lender on its books. Each Debtor waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Agreement.

(g)       So long as no Event of Default has occurred and is continuing, (i) voluntary prepayments shall be applied in accordance with the provisions of Section 2(d); and (ii) mandatory prepayments shall be applied as set forth in Section 2(e).  As to any other payment, and as to all payments made when an Event of Default has occurred and is continuing or following the earlier of the Maturity Date and the date upon which the Commitment expires or is terminated hereunder, each Debtor hereby irrevocably waives the right to direct the application of any and all payments received from or on behalf of such Debtor, and each Debtor hereby irrevocably agrees that DIP Lender shall have the continuing exclusive right to apply any and all such payments against the Obligations of the Debtors as the DIP Lender may deem advisable notwithstanding any previous entry by the DIP Lender in its books and records.   In all circumstances, after acceleration or maturity of the Obligations, or following the date upon which the Commitment expires or is terminated hereunder, all payments and proceeds of Collateral shall be applied to amounts then due and payable in the following order: (1) to fees and the DIP Lender's expenses reimbursable hereunder; (2) to interest on the Loans; (3) to principal payments on the Loans; and (4) to all other Obligations.

(h)       Any and all payments by each Debtor hereunder shall be made free and clear of and without deduction for any and all present or future Taxes.  If any Debtor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder, (i) the sum payable shall be increased as much as shall be necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this Section 3(h)), the DIP Lender receives an amount equal to the sum they would have received had no such deductions been made, (ii) such Debtor shall make such deductions, and (iii) such Debtor shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. Within thirty (30) days after the date of any payment of Taxes, the Borrower shall furnish to Agent the original or a certified copy of a receipt evidencing payment thereof.

(i)       The Borrower shall indemnify and, within ten (10) days of demand therefore, pay the DIP Lender for the full amount of Taxes (including any Taxes imposed by any jurisdiction on amounts payable under Section 3(h)) paid by the DIP Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

**4.       Conditions To Effectiveness**.   The obligation of the DIP Lender to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived in the sole and absolute discretion of the DIP Lender):

US-DOCS\102088223.4

    (a)      The DIP Lender (or its counsel) shall have received the following:

        (i)      a counterpart of this Agreement signed by each Debtor;

        (ii)      a copy of the constitutional documents of each Debtor that are on file with any governmental authority in the jurisdiction of organization of such Debtor, certified as of a recent date by such governmental authority, together with certificates attesting to the good standing of such Debtor in such jurisdiction;

        (iii)      a certificate of the secretary or other officer of each Debtor in charge of maintaining books and records of such Debtor certifying as to (A) the names and signatures of each officer of such Debtor that executes and delivers any DIP Loan Document on the Closing Date, (B) the constitutional documents of such Debtor attached to such certificate are complete and correct copies of such constitutional documents as in effect on the Closing Date (or, for any such constitutional documents delivered pursuant to clause (ii) above, that there have been no changes from such constitutional documents so delivered), and (C) the resolutions of such Debtor's appropriate governing body approving and authorizing the execution, delivery and performance of each DIP Loan Document to which such Debtor is a party;

        (iv)      a certificate from an authorized officer of the Borrower to the effect that the conditions set forth in Sections 5(b) and (c) below have been satisfied; and

        (v)      a duly executed Borrowing Request with respect to any Loan made on the Closing Date.

    (b)      All legal matters incident to this Agreement and the borrowings hereunder shall be satisfactory to the DIP Lender.

    (c)      All motions and other documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance satisfactory to the DIP Lender.

    (d)      The Bankruptcy Court shall have entered the DIP Financing Order, in form and substance satisfactory to the DIP Lender.

    (e)      The DIP Lender shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth in the DIP Financing Order.

    (f)      The Borrower shall have paid all fees, costs and expenses of the DIP Lender required to be paid pursuant to this Agreement and presented as of the Closing Date.

    **5**.      **Conditions to All Credit Extensions.**  The obligation of the DIP Lender to make a Loan on the occasion of any borrowing is subject to the satisfaction of each of the conditions set forth in Section 4 on the date of such Loan (other than those conditions expressly required to be satisfied on the Closing Date) and the following additional conditions:

(a)     The Borrower shall have delivered to the DIP Lender an appropriate Borrowing Request, duly executed and completed, by the time specified in, and otherwise as permitted by, this Agreement.

(b)     The representations and warranties made by each Debtor herein and in the other DIP Loan Documents shall be true and correct in all material respects at and as if made as of such date (in each case immediately prior to, and after giving effect to, the funding of any Loans) except to the extent they expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(c)     No Default or Event of Default shall exist or be continuing either prior to or after giving effect to the making of such Loan.

(d)     The making of such Loan (and the use of the proceeds therefrom) shall not violate any Law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)     The making of such Loan complies with the Budget, in all respects, or has otherwise been approved in writing by the DIP Lender.

(f)     The DIP Financing Order shall have been entered approving the DIP Facility, in form and substance satisfactory to the DIP Lender, which DIP Financing Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

(g)     There shall not exist any Law, ruling, judgment, order, injunction or other restraint that, in the reasonable judgment of the DIP Lender, prohibits, restricts or imposes a materially adverse condition on any Debtor, the DIP Facility or the exercise by the DIP Lender of its rights as a secured party with respect to the Collateral.

(h)     Any borrowing hereunder shall be limited to the amount that is required to fund disbursements permitted under the Budget.

The delivery of each Borrowing Request shall constitute (i) a representation and warranty by the Borrower of the correctness of the matters specified in subsections (b) through (h) above and (ii) a reaffirmation by each Debtor of the guaranty provisions set forth in <u>Section 10</u> and of the granting and continuance of the Liens on the Collateral.

      **6**.     **Representations.**  The Borrower represents and warrants that:

(a)     Upon entry of the DIP Financing Order, the DIP Loan Documents constitute the legal, valid and binding obligations of each Debtor party thereto, enforceable against such Debtor in accordance with their terms.

(b)     Each Debtor (i) is a limited liability company duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation or organization; (ii) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification; (iii) subject to the entry of the DIP Financing Order by the Bankruptcy Court, has the requisite power

and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted or proposed to be conducted; (iv) has all licenses, permits, consents or approvals from or by, and has made all material filings with, and has given all notices to, all governmental authorities having jurisdiction, to the extent required for such ownership, operation and conduct; and (v) is in compliance with its operating agreement.

(c)     Upon the entry by the Bankruptcy Court of the DIP Financing Order, the execution, delivery and performance by each Debtor of the DIP Loan Documents to which it is a party and the creation of all Liens provided for therein: (i) are within such Debtor's power; (ii) have been duly authorized by all necessary limited liability company action; (iii) do not contravene any provision of such Debtor's operating agreement; and (iv) do not violate any law or regulation, or any order or decree of any court or Governmental Authority.  Each of the DIP Loan Documents has been duly executed and delivered by each Borrower that is a party thereto and, subject to the entry of the DIP Financing Order, each such DIP Loan Document constitutes a legal, valid and binding obligation of such Debtor enforceable against it in accordance with its terms.

(d)     The execution, delivery and performance by each Debtor of the DIP Loan Documents and all other documents contemplated hereby or thereby, and the use of the proceeds of any of the Loans, do not and will not: (i) conflict with or constitute a breach of, or default under, or require any consent under, or result in the creation of any Lien, charge or encumbrance upon the property or assets of any Debtor pursuant to any other agreement or instrument (other than any pledge of or security interest granted in any Collateral pursuant to any DIP Loan Document) to which any Debtor is a party or is bound or by which its properties may be bound or affected; or (ii) violate any provision of any Law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to any Debtor.

(e)     Upon entry of the DIP Financing Order, no consent, approval or authorization of, or registration, declaration or filing with, any governmental authority or other person or entity is required as a condition to or in connection with the due and valid execution, delivery and performance by any Debtor of any DIP Loan Document.

(f)     This Agreement, taken together with the DIP Financing Order, is effective to create in favor of the DIP Lender legal, valid, enforceable and continuing Liens on, and security interests in, the Collateral pledged hereunder or thereunder, in each case subject to no Liens other than with respect to Liens permitted under the DIP Financing Order.  Pursuant to the terms of the DIP Financing Order, no filing or other action will be necessary to perfect or protect such Liens. Pursuant to and to the extent provided in the DIP Financing Order, the Obligations of each Debtor under this Agreement will constitute allowed administrative expense claims in the Chapter 11 Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Debtor now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person.

(g)     Each Debtor is in compliance with the terms and conditions of the DIP Financing Order.  The DIP Financing Order is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the DIP Lender, in its sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(h)     A true and complete copy of the Initial Approved Budget, as agreed to with the DIP Lender as of the Closing Date, is attached as Exhibit B hereto.  Each Budget includes and contains all fees, costs and expenses that are projected in the Borrower's reasonable commercial judgment to be payable, incurred and accrued by the Debtors (or their respective subsidiaries) during the period covered by such Budget.

(i)     Each Debtor owns good and marketable fee simple title to all of its owned real property and valid and marketable leasehold interests in all of its leased real property, and has good and marketable title to, or valid leasehold interests in, all of its personal property and other assets.  As of the Closing Date, none of the properties and assets of any Debtor are subject to any Liens other than as set forth on Schedule 6(i), and there are no facts, circumstances or conditions known to any Debtor that may result in any Liens.

(j)     No Debtor is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

(k)     No Debtor is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock" as such term is defined in Regulation U of the Federal Reserve Board ("Margin Stock").  No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Federal Reserve Board, including Regulation U or Regulation X.

(l)     All Federal and other material tax returns, reports and statements, including information returns, required by any governmental authority to be filed by any Debtor have been filed with the appropriate governmental authority, and all Charges have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof, except: (i) those which are not required to be paid due to the pending Chapter 11 Cases; and (ii) those which are being contested in good faith by appropriate proceedings and with respect to which the Borrower shall have set aside on its books reserves in accordance with GAAP.

(m)     Projections from time to time delivered hereunder are or will be based upon the estimates and assumptions stated therein, all of which the Borrower believed at the time of delivery to be reasonable and fair in light of current conditions and current facts known to the Borrower as of such delivery date, and reflect the Borrower's good faith and reasonable estimates of the future financial performance of the Debtors and of the other information projected therein for the period set forth therein.  Such projections are not a guaranty of future

11

performance and actual results may differ from those set forth in such projections. The Liens granted to the DIP Lender pursuant to the Collateral Documents will at all times be fully perfected Liens in and to the Collateral described therein, subject to the DIP Financing Order.

(n)     No Debtor is a party (as lessee) to any capital lease or operating lease with respect to real property or personal property, except for leases with respect to personal property having an aggregate fair market value for all such leased personal property not in excess of $500,000.

Each Borrowing Request under this Agreement shall constitute a representation and warranty by the Borrower that the statements above are true and correct both on the date of such request and on the date of the borrowing. Each Borrowing Request shall also constitute a representation by the Borrower that no Default or Event of Default under this Agreement has occurred and is continuing or would result from such borrowing.

**7.     Covenants**. The Borrower agrees that so long as the DIP Lender has any Commitment hereunder or any Obligation or other amount payable hereunder or under any DIP Loan Document remains unpaid:

(a)     The Borrower shall provide to the DIP Lender (i) every four weeks after the Closing Date, an updated 13-week cash flow forecast, in each case, in form, substance and methodology satisfactory to the DIP Lender in its reasonable discretion (each such forecast approved by the DIP Lender, an "Approved Budget") for the subsequent 13-week period consistent with the form of the Initial Approved Budget; and (ii) beginning on the fourth Wednesday following the Closing Date and on every fourth Wednesday thereafter, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Debtors for the prior Testing Period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such Testing Period as compared to the Initial Approved Budget or the most recently Approved Budget delivered prior to such Variance Report (as applicable) on a weekly and cumulative basis, and each such Variance Report shall include explanations for all material variances and shall be certified by the Designated Officer.

(b)     Each Debtor will provide to the DIP Lender such other reports and information as may be reasonably requested by the DIP Lender. In addition, the Borrower's accountants, financial advisors and consultants shall cooperate, consult with and provide to the DIP Lender all such information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of the Debtors.

(c)     The Debtors will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), which may be required under any applicable Law, or which the DIP Lender may reasonably request, to effectuate the transactions contemplated by this Agreement and the other DIP Loan Documents or to grant, preserve, protect or perfect the Liens created by this Agreement, the DIP Financing Order or other DIP Loan Documents or the validity or priority of any such Lien, all at the expense of the Borrower.

(d)     Except for and to the extent permitted under the DIP Financing Order, no Debtor will, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense

claim or Lien which is pari passu with or senior to the claims or Liens, as the case may be, of the DIP Lender against any Debtor hereunder or under the DIP Financing Order, or apply to the Bankruptcy Court for authority to do so.

(e)      No Debtor will, directly or indirectly (i) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of the DIP Financing Order except for any modifications and amendments agreed to in writing by the DIP Lender, (ii) apply to the Bankruptcy Court for authority to take any action prohibited by this Agreement (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the DIP Lender) or (iii) seek authorization for, or incur, create, assume, suffer to exist, or permit, any claims or Liens entitled to a superpriority under Sections 364(c) and 364(d) of the Bankruptcy Code that is senior or pari passu with the Superpriority DIP Claims.

(f)      Except as otherwise provided herein or approved by the DIP Lender, no Debtor will (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the DIP Financing Order and the Budget, (ii) permit a disbursement that would cause any Budget variance that would not otherwise constitute a Permitted Variance without the prior written consent of the DIP Lender or (iii) make any payment, or application for authority to pay, on account of any claim or debt other than payments authorized by the Bankruptcy Court and in compliance with the Budget.

(g)      No proceeds of Loans, proceeds of Collateral, or any "cash collateral" (as defined in the Bankruptcy Code) may be used directly or indirectly by any Debtor, any committee, any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor cases) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, the DIP Lender, in its capacity as DIP Lender, direct or indirect equityholder of the Debtors or otherwise, its controlling persons, affiliates or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or advisors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Superpriority DIP Claims or the DIP Loan Documents, (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Lender in the DIP Financing Order or under any of the DIP Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay the DIP Lender's assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable DIP Loan Documents and the DIP Financing Order), or (F) objecting to, contesting, or interfering with, in any way, the DIP Lender's enforcement or realization upon any of the Collateral once an Event of Default has occurred.

13

(h)     The Debtors shall remain in compliance with the Initial Approved Budget and any subsequent Approved Budget.  To comply with the Initial Approved Budget or any subsequent Approved Budget, the Debtors shall not exceed the aggregate disbursements set forth in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for any Testing Period (on a cumulative basis) by more than the Permitted Variance.  The Permitted Variance with respect to each Testing Period shall be determined and reported to the DIP Lender in each Variance Report. Budget compliance shall be tested every four weeks after the Closing Date and shall be tested on a cumulative basis from the Closing Date.

(i)     Except as otherwise provided herein or approved by the DIP Lender, no Debtor will use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with (and up to the amounts set forth for such purpose in) a Budget (subject to any Permitted Variance) and the DIP Financing Order.

(j)     Except as occasioned by the Chapter 11 Cases, each Debtor shall do or cause to be done all things necessary to preserve and keep in full force and effect its legal existence.

(k)     Each Debtor will pay and discharge promptly when due all Taxes and Charges imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims which, if unpaid, might give rise to a Lien upon such properties or any part thereof; provided, however, that such payment and discharge shall not be required with respect to (i) payments that are not required to be paid due to the pending Chapter 11 Cases; and (ii) any such Tax so long as (x) the validity or amount thereof shall be contested in good faith by appropriate proceedings and (y) the Borrower shall have set aside on its books reserves in accordance with GAAP with respect thereto.

(l)     The Debtors shall comply with the following milestones in the Chapter 11 Cases:

(i)     on or before November 15, 2018, the Debtors shall have filed a chapter 11 plan, disclosure statement, and motion to approve such disclosure statement, in each case in connection with the transactions set forth in the Restructuring Support Agreement and in form and substance reasonably acceptable to the DIP Lender;

(ii)     on or before January 15, 2019, the Bankruptcy Court shall have entered an order in form and substance reasonably acceptable to the DIP Lender approving a disclosure statement and solicitation of a chapter 11 plan in connection with the transactions set forth in the Restructuring Support Agreement; and

(iii)     on or before March 15, 2019, the Bankruptcy Court shall have entered an order in form and substance reasonably acceptable to the DIP Lender confirming a chapter 11 plan in connection with the transactions set forth in the Restructuring Support Agreement.

**8**.     **Events of Default.**  If any of the following events of default shall occur (each an "Event of Default"):

(a)     Any Debtor (i) shall fail to pay the principal of, interest on, or fees owing in respect of, any Loan or any of the other Obligations as and when due and payable, or (ii) fails to pay or reimburse the DIP Lender for any expense reimbursable hereunder or under any other DIP Loan Document within ten days following the DIP Lender's demand for such reimbursement or payment of expenses.

(b)     Any representation or warranty made or deemed made by any Debtor in this Agreement or by any Debtor in any DIP Loan Document to which it is a party, or in any certificate, document, opinion or financial or other statement furnished under or in connection with a DIP Loan Document, shall prove to have been incorrect in any material and adverse respect when so made or deemed made.

(c)     Any Debtor shall fail to perform or observe any term, covenant or agreement contained in any DIP Loan Document on its part to be performed or observed; provided that any Debtor's failure to perform or observe Section 7(a) hereof shall be subject to a cure period of 3 business days from the date of delivery of notice of default under Section 7(a) hereof to the Debtors; provided, further, that any Debtor's failure to perform or observe Section 7(b) hereof shall be subject to a cure period of 15 calendar days from the date of delivery of notice of default under Section 7(b) hereof to the Debtors;

(d)     Any material provision of any DIP Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Debtor shall challenge the enforceability of any DIP Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the DIP Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien purported to be created by any DIP Loan Document or the DIP Financing Order shall cease to be, or shall be asserted by any Debtor not to be, a valid, perfected, first-priority (except as otherwise expressly provided in such DIP Loan Document or the DIP Financing Order) security interest in the assets or properties covered thereby.

(e)     Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Debtor from complying or permits any Debtor not to comply, a default or breach occurs under any other agreement, document or instrument entered into either (x) prepetition and which is affirmed or assumed after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code, or (y) postpetition, to which any Debtor is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any indebtedness (other than the Obligations) of any Debtor in excess of $100,000 in the aggregate (including (x) undrawn committed or available amounts and (y) amounts owing to all creditors under any combined or syndicated credit arrangements), or (ii) causes, or permits any holder of such indebtedness or a trustee to cause, indebtedness or a portion thereof in excess of $100,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, or cash collateral in respect thereof to be demanded, in each case, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

15

(f)      Assets of any Debtor with a fair market value of $100,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Debtor and such condition continues for thirty (30) days or more.

(g)      Any of the following shall occur in the Chapter 11 Cases:

(i)      filing of, or entry of an order in any of the Chapter 11 Cases confirming, a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code by any Debtor that does not propose to indefeasibly repay the Obligations in full in cash and terminate the Commitment, unless otherwise consented to by the DIP Lender;

(ii)      any Debtor shall file a pleading seeking to vacate or modify the DIP Financing Order without the prior written consent of the DIP Lender;

(iii)      entry of an order without the prior consent of the DIP Lender amending, supplementing or otherwise modifying the DIP Financing Order;

(iv)      reversal, vacation or stay of the effectiveness of the DIP Financing Order;

(v)      any violation of the terms of the DIP Financing Order;

(vi)      entry of an order granting, or filing a motion by any Debtor seeking, dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(vii)      appointment of a Chapter 11 trustee in the Chapter 11 Cases;

(viii)      appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of any Debtor without the prior written consent of the DIP Lender;

(ix)      granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of any Borrower;

(x)      any Debtor's filing of a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or pari passu with the DIP Lender's claims and Liens under the DIP Facility;

(xi)      cessation of the Liens of the DIP Lender to be valid, perfected and enforceable in all respects in accordance with the DIP Financing Order;

(xii)      the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by a Debtor in any Chapter 11 Case: (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Loan Documents; (x) to grant any Lien upon or affecting any Collateral not otherwise permitted pursuant to the DIP Loan

16

Documents; (y) except as provided in the DIP Financing Order, to use cash collateral of the DIP Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender; or (z) any other action or actions adverse to the DIP Lender or its rights and remedies hereunder or its interest in the Collateral;

(xiii)   the payment of, or application for authority to pay, any prepetition claim without the DIP Lender's prior written consent unless otherwise expressly permitted under the DIP Loan Documents or unless otherwise expressly permitted by an order entered by the Bankruptcy Court prior to entry of the DIP Financing Order;

(xiv)   the Bankruptcy Court or any other court of competent jurisdiction enters an order or judgment allowing, imposing, surcharging or assessing any claim, cost or expense against the DIP Lender or against any of the Collateral (or any Debtor applies for, consents to, or acquiesces in, any such relief), whether pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(xv)   the sale, without the DIP Lender's consent, of all or substantially all of any Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, whether through one transaction or a series of transactions, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for indefeasible payment in full in cash of the Obligations and termination of the Commitment; provided, however, that for the avoidance of doubt, the sale of any South Center Assets with the prior written consent of the DIP Lender shall not constitute an Event of Default pursuant to this clause (xv);

(xvi)   the commencement of a suit or action against the DIP Lender and, as to any suit or action brought by any person other than a Debtor, officer or employee of a Debtor, the continuation thereof without dismissal for thirty (30) days after service thereof on the DIP Lender, that asserts or seeks by or on behalf of a Debtor, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases any legal or equitable remedy that would have the effect of modifying, subordinating, disallowing or otherwise impairing any or all of the Obligations or Liens of the DIP Lender under the DIP Loan Documents to any other claim; or

(xvii)   the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other DIP Loan Documents (or in each case any Debtor applies for, consents to, or acquiesces in, any such relief).

(h)   Any Debtor shall use Loan proceeds for any item other than those set forth in, and in accordance with, the Budget and as approved by the Bankruptcy Court.

(i)   Termination, expiration, amendment, or other modification, in each case, without the prior written consent of the DIP Lender, of that certain Purchase and Sale Agreement, dated as of May 9, 2018, by and between PCS Nitrogen Fertilizer, L.P. as purchaser, and the Borrower as seller.

US-DOCS\102088223.4

THEN, the DIP Lender may deliver written notice to the Borrower of the existence of an Event of Default whereupon if the Borrower does not seek, within five (5) Banking Days of the receipt of such written notice, a determination by the Bankruptcy Court that an Event of Default has not occurred or is no longer continuing, and obtain within ten (10) Banking Days of the receipt of such written notice an order by the Bankruptcy Court re-imposing the automatic stay, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents, and to take, subject to the provisions of the DIP Financing Order, any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

      (a)    declare the Commitment terminated whereupon the Commitment shall be immediately terminated;

      (b)    declare the unpaid principal of all Loans and any and all other indebtedness or Obligations of any and every kind owing by the Debtors to the DIP Lender hereunder to be due whereupon the same shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Debtors;

      (c)    enforce any and all rights against the Collateral in the possession of the DIP Lender, including, without limitation, disposition of the Collateral solely for application towards the Obligations; and/or

      (d)    take any other actions or exercise any other rights or remedies permitted under the DIP Financing Order, the DIP Loan Documents or applicable Law to effectuate the repayment of the Obligations;

provided that during the pendency of the five- and ten-Banking Day periods described above, the Borrower may not deliver a Borrowing Request and no borrowing of Loans hereunder shall be permitted.

Each Debtor shall cooperate fully with the DIP Lender in its exercise of rights and remedies, whether against the Collateral or otherwise.

In case any one or more of the covenants and/or agreements set forth in this Agreement or any other DIP Loan Document shall have been breached by any Debtor, then the DIP Lender may proceed to protect and enforce the DIP Lender's rights either by suit in equity and/or by action at law.  Without limitation of the foregoing, each Debtor agrees that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof.

    **9.**    **Certain Bankruptcy Matters.**

    (a)    The priority of the DIP Lender's claims against, and Liens on and in the Collateral of, the Debtors shall be set forth in the DIP Financing Order.

(b)     Except to the extent provided otherwise in the DIP Financing Order, each Debtor hereby agrees that the Obligations shall (i) constitute Superpriority DIP Claims with priority over all other costs and expense claims and unsecured claims against any Debtor now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all costs and expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code or otherwise and all super-priority administrative expense claims granted to any other person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court, and (ii) be secured and have priority pursuant to Section 364(c) of the Bankruptcy Code and, to the extent provided in the DIP Financing Order, shall not be subject to any claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code.  The Superpriority DIP Claims shall at all times be senior to the rights of the Debtors, the Debtors' estates, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code.

(c)     Except as set forth herein or in the DIP Financing Order, no other claim, administrative expense, or Lien having a priority superior or pari passu to those granted to the DIP Lender by the DIP Financing Order shall be granted or approved while any Obligations under this Agreement remain outstanding.  Except as set forth herein or in the DIP Financing Order, no costs or expenses of administration shall be imposed against the DIP Lender or any of the Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or the "equities of the case" doctrine, or otherwise, and each of the Debtors hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or the "equities of the case" doctrine, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the DIP Lender.

(d)     The Debtors agree, in each case, unless the DIP Lender consents in writing, that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in any Chapter 11 Case (and the Debtors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (ii) the superpriority administrative claim granted to the DIP Lender pursuant to the DIP Financing Order and described in this <u>Section 9</u> and the Liens granted to the DIP Lender pursuant to the DIP Financing Order and described in this <u>Section 9</u> shall not be affected in any manner by the entry of an order confirming a plan of reorganization in any Chapter 11 Case.

(e)     Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, without limiting any terms or conditions of the DIP Financing Order, the Debtors hereby irrevocably waive any right, (i) to grant or impose, or request that the Bankruptcy Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, Liens on or security interests in any of the Collateral securing the Obligations, which are <u>pari</u> <u>passu</u> with, equal to or superior to the Liens and security interests held by the DIP Lender; (ii) to grant or impose, or request that the Bankruptcy Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, claims or expenses against any Debtor, which are <u>pari</u> <u>passu</u> with, equal to or superior to the Obligations; and (iii) to use, or to request that the Bankruptcy Court authorize the use of, "cash collateral" (as defined in the Bankruptcy Code) or proceeds of Loans, except for such consensual uses expressly provided under the DIP Financing Order.

19

(f)     In the event of a conflict between, or inconsistency among, the DIP Financing Order, on the one hand, and any other DIP Loan Document, on the other hand, the DIP Financing Order shall control.

(g)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     The DIP Lender shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the DIP Financing Order or any other DIP Loan Document. If the DIP Lender shall, in its sole discretion, from time to time elect to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the DIP Lender's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the DIP Financing Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section or of the perfection of any other Liens in favor of the DIP Lender on the Collateral.

(ii)     Except as otherwise agreed to by the DIP Lender, the Liens, lien priorities, Superpriority DIP Claims and other rights and remedies granted to the DIP Lender pursuant to this Agreement, the DIP Financing Order or the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority DIP Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by any Debtor (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatsoever.

(h)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except to the extent provided in any of the DIP Financing Order and subject to the DIP Financing Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the DIP Lender against any Debtor in respect of any Obligations;

(ii)     other than as provided in the DIP Financing Order or the DIP Loan Documents, the DIP Lender's Liens on the Collateral shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or other person; and

20

(iii)     the DIP Lender's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the DIP Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the DIP Lender's Liens under applicable non-bankruptcy Law.

**10.     Guaranty**.

(a)     <u>Guaranty</u>.  Each Guarantor hereby agrees that such Guarantor is liable for, and hereby absolutely and unconditionally guarantees to the DIP Lender and its successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to the DIP Lender by the Borrower.  Each Guarantor agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this <u>Section 10</u> shall not be discharged until payment and performance, in full, of the Obligations has occurred, and that its obligations under this <u>Section 10</u> shall be absolute and unconditional, irrespective of, and unaffected by,

(i)     the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any other DIP Loan Document or any other agreement, document or instrument to which any Debtor is or may become a party;

(ii)     the absence of any action to enforce this Agreement (including this <u>Section 10</u>) or any other DIP Loan Document or the waiver or consent by the DIP Lender with respect to any of the provisions thereof;

(iii)     the existence, value or condition of, or failure to perfect its Lien against, any security for the Obligations or any action, or the absence of any action, by the DIP Lender in respect thereof (including the release of any such security);

(iv)     the insolvency of any Debtor; or

(v)     any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

Each Guarantor shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations guaranteed hereunder, and all Obligations shall be primary obligations or each Guarantor, regardless of which Debtor actually receives or is allocated the Loans hereunder or the amount of the Obligations received or the manner in which the DIP Lender accounts for the Obligations on its books and records.

Subject to the limitations set forth in <u>Section 8</u>, upon the occurrence and during the continuation of any Event of Default, the DIP Lender may proceed directly and at once, without notice, against any Debtor to collect and recover the full amount, or any portion of, the Obligations, without first proceeding against any other Debtor or any other person, or against any security or collateral for the Obligations.

(b)     Waivers by Guarantors.  Each Guarantor expressly waives all rights it may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to compel the DIP Lender to marshal assets or to proceed in respect of the Obligations guaranteed hereunder against any other Debtor, any other party or against any security for the payment and performance of the Obligations before proceeding against, or as a condition to proceeding against, such Guarantor.  Each Guarantor waives diligence, presentment, protest, demand for payment, notice of dishonor, notice of default and notice of nonpayment to or upon such Guarantor or any of the other Debtors with respect to the Obligations, and all suretyship defenses.

No payment made by any Debtor or any other person or received or collected by the DIP Lender by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment remain liable for the full amount of Obligations which remain outstanding from time to time, until all Obligations shall have been paid in full in cash, all other obligations under the DIP Loan Documents shall have been performed (other than (a) those expressly stated to survive termination and (b) contingent obligations as to which no claim has been asserted) and the Commitment shall have terminated or expired.

Without limiting the generality of the foregoing, each Guarantor agrees that its Obligations pursuant to this Section 10, and any security interest in respect thereof, shall not be affected by, and shall remain in full force and effect without regard to, and hereby waives all, rights, claims or defenses that it might otherwise have (now or in the future) with respect to each of the following (whether or not such Guarantor has knowledge thereof):  (i) the validity or enforceability of this Agreement, any other DIP Loan Document, any of the Obligations or any guarantee or right of offset with respect thereto at any time or from time to time held by the DIP Lender; (ii) any renewal, extension or acceleration of, or any increase in the amount of the Obligations, or any amendment, supplement, modification or waiver of, or any consent to departure from, the DIP Loan Documents; and (iii) any other circumstance whatsoever which may or might in any manner or to any extent vary the risk of any Debtor as an obligor in respect of the Obligations or which constitutes, or might be construed to constitute, an equitable or legal discharge of such Guarantor or any other Debtor for the Obligations, or of such Guarantor under the guarantee contained in this Section 10 or of any Lien or security interest granted by any Debtor, whether in the Chapter 11 Cases or in any other instance.

It is agreed among each Borrower and the DIP Lender that the foregoing waivers are of the essence of the transaction contemplated by this Agreement and the other DIP Loan Documents and that, but for the provisions of this Section 10 and such waivers, the DIP Lender would decline to enter into this Agreement.

(c)     Benefit of Guaranty.  Each Guarantor agrees that the provisions of this Section 10 are for the benefit of the DIP Lender and its successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Debtor and the DIP Lender, the obligations of such other Debtor under the DIP Loan Documents.

(d)     Waiver of Subrogation, Etc.  Notwithstanding anything to the contrary in this Agreement or in any other DIP Loan Document, and except as set forth in Section 10(g), each

Guarantor hereby expressly and irrevocably waives any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor.   Each Guarantor acknowledges and agrees that this waiver is intended to benefit the DIP Lender and shall not limit or otherwise affect such Guarantor's liability hereunder or the enforceability of this Section 10, and that the DIP Lender and its successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 10(d).

(e)   Election of Remedies.   If the DIP Lender may, under applicable law, proceed to realize its benefits under any of the DIP Loan Documents giving the DIP Lender a Lien upon any Collateral, whether owned by any Guarantor or by any other Person, either by judicial foreclosure or by non-judicial sale or enforcement, the DIP Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Section 10.   If, in the exercise of any of its rights and remedies, the DIP Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Debtor or any other person, whether because of any applicable laws pertaining to "election of remedies" or the like, each Guarantor hereby consents to such action by the DIP Lender and waives any claim based upon such action, even if such action by the DIP Lender shall result in a full or partial loss of any rights of subrogation that each Guarantor might otherwise have had but for such action by the DIP Lender. Any election of remedies that results in the denial or impairment of the right of the DIP Lender to seek a deficiency judgment against any Guarantor shall not impair any other Guarantor's obligation to pay the full amount of the Obligations.   In the event the DIP Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or the DIP Loan Documents, the DIP Lender may bid all or less than the amount of the Obligations and the amount of such bid need not be paid by the DIP Lender but shall be credited against the Obligations.   The amount of the successful bid at any such sale, whether the DIP Lender or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Section 10, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which the DIP Lender might otherwise be entitled but for such bidding at any such sale.

(f)   Limitation.   Notwithstanding any provision herein contained to the contrary, each Guarantor's liability under this Section 10 shall be limited to an amount not to exceed as of any date of determination the amount that could be claimed by the DIP Lender from such Guarantor under this Section 10 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Guarantor's right of contribution and indemnification from each other Guarantor under Section 10(g).

(g)   Contribution with Respect to Guaranty Obligations.

(i)   To the extent that any Guarantor shall make a payment under this Section 10 of all or any of the Obligations (a "Guarantor Payment") that, taking into account all other Guarantor Payments then previously or concurrently made by any other Guarantor, exceeds the amount that such Guarantor would otherwise

23

have paid if each Guarantor had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Obligations and termination of the Commitment, such Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(ii)    As of any date of determination, the "Allocable Amount" of any Guarantor shall be equal to the maximum amount of the claim that could then be recovered from such Guarantor under this Section 10 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(iii)    This Section 10(g) is intended only to define the relative rights of Guarantors and nothing set forth in this Section 10(g) is intended to or shall impair the obligations of Guarantors to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement, including Section 10(a).

(iv)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Guarantor to which such contribution and indemnification is owing.

(v)    The rights of the indemnifying Guarantors against other Guarantors under this Section 10(g) shall be exercisable upon the full and indefeasible payment of the Obligations and the termination of the Commitment.

(h)    Liability Cumulative.  The liability of Guarantors under this Section 10 is in addition to and shall be cumulative with all liabilities of each Guarantor to the DIP Lender under this Agreement and the other DIP Loan Documents to which such Guarantor is a party or in respect of any Obligations or obligation of the other Guarantors, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(i)    Subordination.

(i)    Each Debtor covenants and agrees that the payment of any indebtedness and all obligations and liabilities owing by any Debtor in favor of any other Debtor, whether now existing or hereafter incurred (collectively, the "Intercompany Obligations") is subordinated, to the extent and in the manner provided in this Section 10(i), to the prior payment in full in cash of all

24

Obligations owed or hereafter owing to the DIP Lender by the Debtors and that such subordination is for the benefit of the DIP Lender.

(ii)     Each Debtor hereby (A) authorizes the DIP Lender to demand specific performance of the terms of this Section 10(i) at any time when any Debtor shall have failed to comply with any provisions of this Section 10(i) which are applicable to it and (B) irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

(iii)     Upon any distribution of assets of any Debtor in any dissolution, winding up, liquidation or reorganization (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or otherwise):

> (x)     the DIP Lender shall first be entitled to receive payment in full in cash of the Obligations before any Debtor is entitled to receive any payment on account of the Intercompany Obligations.
>
> (y)     Any payment or distribution of assets of any Debtor of any kind or character, whether in cash, property or securities, to which any other Debtor would be entitled except for the provisions of this Section 10(i)(iii), shall be paid by the liquidating trustee or agent or other person making such payment or distribution directly to the DIP Lender in the manner set forth herein, to the extent necessary to make payment in full in cash of all Obligations remaining unpaid after giving effect to any concurrent payment or distribution or provisions therefor to the DIP Lender.
>
> (z)     In the event that notwithstanding the foregoing provisions of this Section 10(i)(iii), any payment or distribution of assets of any Debtor of any kind or character, whether in cash, property or securities, shall be received by any other Debtor on account of any Intercompany Obligations before all Obligations are paid in full in cash, such payment or distribution shall be received and held in trust for and shall be paid over to the DIP Lender for application to the payment of the Obligations until all of the Obligations shall have been paid in full in cash, after giving effect to any concurrent payment or distribution or provision therefor to the DIP Lender.

(iv)     No right of the DIP Lender or any other present or future holders of the Obligations to enforce subordination as provided herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Debtor or by any act or failure to act, in good faith, by any Debtor, or by any noncompliance by any Debtor with the terms of the Intercompany Obligations, regardless of any knowledge thereof which any Debtor may have or be otherwise charged with.

25

## 11.    Grant of Security.

(a)     To secure the Obligations, effective immediately upon entry of the DIP Financing Order, pursuant to Sections 364(c)(2) and(3) of the Bankruptcy Code, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition (i) first-priority security interests in and Liens on all Collateral that is not subject to a valid, enforceable, perfected, and non-avoidable Lien or security interest and (ii) security interests in and Liens on all Collateral that is subject to a valid, enforceable, perfected, and non-avoidable Lien or security interests junior only to such Liens and security interests.

(b)     To the extent permitted by applicable Law, each Debtor hereby irrevocably authorizes DIP Lender and its affiliates, counsel and other representatives, at any time and from time to time, to file in the name of any Debtor or otherwise and without separate authorization or authentication of any Debtor appearing thereon, such UCC financing statements or continuation statements as the DIP Lender may reasonably deem necessary or reasonably appropriate to further perfect or maintain the perfection of the Liens of the DIP Lender under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby "all of the debtor's personal property and assets" or words to similar effect, whether now owned or hereafter acquired, notwithstanding that such description may be broader in scope than the Collateral described in this Agreement.  Each Debtor hereby also authorizes DIP Lender and its affiliates, counsel and other representatives, at any time and from time to time, to execute and file any and all agreements, instruments, documents and papers as the DIP Lender may reasonably request to evidence the Liens of the DIP Lender in any patent, trademark, copyright or other intellectual property, including without limitation the goodwill or accounts and general intangibles of such Debtor relating thereto or represented thereby.  Each Debtor agrees that, except to the extent that any filing office requires otherwise, a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.

(c)     Each Debtor will promptly deliver each instrument and any other document, and take any other action, that may be reasonably requested by the DIP Lender in order to perfect the DIP Lender's Liens on the Collateral.

## 12.    Indemnity; Expenses.

(a)      The Borrower shall indemnify and hold harmless each of the DIP Lender and its affiliates, and each of the DIP Lender's and its affiliates' respective officers, directors, employees, attorneys, agents and representatives (each, an "<u>Indemnified Person</u>"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other DIP Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all environmental liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the DIP Loan Documents (collectively, "<u>Indemnified Liabilities</u>"); <u>provided</u> that the Borrower shall not be liable for any indemnification

26

to any Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense is determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence, fraud or willful misconduct.  No Indemnified Person shall be responsible or liable to any other party to any DIP Loan Document, any successor, assignee or third party beneficiary of such person or any other person asserting claims derivatively through such party, for indirect, punitive, exemplary or consequential damages which may be alleged as a result of credit having been extended, suspended or terminated under any DIP Loan Document or as a result of any other transaction contemplated hereunder or thereunder.

(b)     Subject to the terms of the DIP Financing Order, the Borrower shall reimburse the DIP Lender for (i) all reasonable fees, costs and expenses (including the reasonable fees and expenses of all of its counsel, advisors, consultants and auditors) and (ii) all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors (including environmental and management consultants and appraisers), incurred in connection with the negotiation, preparation, administration and filing and/or recordation of the DIP Loan Documents and the DIP Financing Order and incurred in connection with, without limitation:

(i)      any amendment, modification or waiver of, consent with respect to, or termination of, any of the DIP Loan Documents or advice in connection with the administration of the Loans made pursuant hereto or its rights hereunder or thereunder;

(ii)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by the DIP Lender, any Debtor or any other person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Loan Documents, or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof; in connection with a case commenced by or against any or all of the Debtors or any other person that may be obligated to the DIP Lender by virtue of the DIP Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(iii)    any attempt to enforce any remedies of the DIP Lender against any or all of the Debtors or any other person that may be obligated to the DIP Lender by virtue of any of the DIP Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(iv)    the obtaining of approval of the DIP Loan Documents by the Bankruptcy Court;

27

(v)     efforts to verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

including, as to each of clauses (i) through (v) above, all reasonable attorneys' and other professional and service providers' fees actually incurred and arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 11(b), all of which shall be payable, on demand, by the Borrower to the DIP Lender.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services; provided, however, that the Borrower shall not be obligated to reimburse fees or expenses of the DIP Lender incurred on or prior to October 15, 2018 in an aggregate amount greater than $125,000.

13.     **Jurisdiction.**   To the maximum extent not prohibited by applicable Law, each Debtor hereby irrevocably: (i) submits to the jurisdiction of any Georgia state or United States federal court sitting in Augusta, Georgia over any action or proceeding arising out of this Agreement; (ii) agrees that all claims in respect of such action or proceeding may be held and determined in such Georgia state or federal court; (iii) agrees that any action or proceeding brought against the DIP Lender may be brought only in a Georgia state or United States federal court sitting in Augusta, Georgia; (iv) consents to the service of process in any such action or proceeding in either of said courts by mailing thereof by the DIP Lender by registered or certified mail, postage prepaid, to such Debtor at its address specified on the signature page hereof, or at such Debtor's most recent mailing address as set forth in the records of the DIP Lender; and (v) waives any defense on the basis of an inconvenient forum. Notwithstanding any other provision of this Section 13, the Bankruptcy Court shall have exclusive jurisdiction over any action or dispute involving, relating to or arising out of this Agreement or the other DIP Loan Documents. Each Debtor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit or proceeding in such state and hereby waives any defense on the basis of an inconvenient forum.  Nothing herein shall affect the right of the DIP Lender to serve legal process in any other manner permitted by Law or affect the right of the DIP Lender to bring any action or proceeding against any Debtor or its property in the courts of any other jurisdiction.

14.     **Waiver of Jury Trial.**

EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO

REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

    **15.**     **Miscellaneous.**

    (a)     The provisions of this Agreement are intended to be severable. If for any reason any provisions of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

    (b)     No amendment, modification, supplement or waiver of any provision of this Agreement nor consent to departure by any Debtor therefrom shall be effective unless the same shall be in writing and signed by the Debtors and the DIP Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

    (c)     No failure on the part of the DIP Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof or preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by Law.

    (d)     This Agreement shall be binding on the Debtors and their respective successors and assigns and shall inure to the benefit of the DIP Lender and its successors and assigns, except that (i) no Debtor may assign or delegate any of its obligations hereunder without the prior written consent of the DIP Lender and (ii) no assignment of the Loans or the Commitment hereunder by the DIP Lender or any of its successors or assigns shall be effective unless prior written notice of such assignment has been delivered to CAP II B.V. and the Borrower.

    (e)     Unless otherwise agreed in writing, notices shall be given to the DIP Lender and each Debtor at its addresses set forth in the signature page of this Agreement, or such other address communicated in writing by either such party to the other. Notices to the DIP Lender shall be effective upon receipt.

    (f)     Sections 3(h) and (i), 13, 14 and 16 hereof shall survive the repayment of the Loans.

    (g)     Each reference herein to the DIP Lender shall be deemed to include its successors and assigns, in whose favor the provisions hereof shall inure. Each reference herein to a Debtor shall be deemed to include the respective heirs, executors, administrators, legal representatives, successors and assigns of such Debtor, all of whom shall be bound by the provisions hereof.

    (h)     This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

US-DOCS\102088223.4

**16.   Governing Law.**   This Agreement shall be governed by and construed in accordance with federal Law applicable to the DIP Lender and, to the extent not preempted by federal Law, the Law of the State of Georgia, without regard to its conflicts of laws principles.

**The remainder of this page is intentionally blank.**

30

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above.

**BORROWERS:**   Fibrant, LLC

By:_____
    Name:
    Title:

**OTHER DEBTORS:**   Evergreen Nylon Recycling, LLC

By:_____
    Name:
    Title:

Fibrant South Center, LLC

By:_____
    Name:
    Title:

Georgia Monomers Company, LLC

By:_____
    Name:
    Title:

**Address for notices to the Debtors:**   Fibrant, LLC
1 Seventh St., River Place
Suite 500
Augusta, GA 30901
Attention: David Leach
Telephone: (706) 849-6537
E-mail: david.leach@fibrantllc.com

With a copy to (which shall not constitute notice):

King & Spalding LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
Attn: Paul Ferdinands

*Signature Page to Senior Secured Debtor-in-Possession Loan Agreement*

**DIP LENDER:**

CAP II B.V.

By:_____
    Name:
    Title

**Address for notices to DIP Lender:**

CAP II B.V.
Schiphol Boulevard 369
Tower F, 7th Floor
1118 BJ Schiphol
The Netherlands
Attention: Jean-Paul Van de Velde, General Counsel
Telephone: +31 6 25636746
Fax: +31 20 6543229
E-mail: jean-paul.velde-van-de@chemicainvest.com

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022-4834
Attention: Gary Gengel, Adam Goldberg
Telephone: 212-906-1200
E-Mail: Gary.Gengel@lw.com, Adam.Goldberg@lw.com

*Signature Page to Senior Secured Debtor-in-Possession Loan Agreement*

<u>Exhibit A</u>

Form of Borrowing Request

[*Date*]

CAP II B.V.
Schiphol Boulevard 369
Tower F, 7th Floor
1118 BJ Schiphol
The Netherlands
Attention: Jean-Paul Van de Velde, General Counsel
Telephone: +31 6 25636746
Fax: +31 20 6543229
E-mail: jean-paul.velde-van-de@chemicainvest.com

Ladies and Gentlemen:

Reference is made to that certain SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT, dated as of [_____], 2018 (the "<u>Loan Agreement</u>"), by and among Fibrant, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), Evergreen Nylon Recycling, LLC, a Georgia limited liability company, Fibrant South Center, LLC, a Georgia limited liability company, and Georgia Monomers Company, LLC, a Georgia limited liability company, each a debtor and debtor-in-possession under the Bankruptcy Code, and CAP II B.V., as lender (the "<u>DIP Lender</u>"). Terms defined in the Loan Agreement are used herein with the same meanings. This notice constitutes a Borrowing Request, and the Borrower hereby requests a Loan under the Loan Agreement, and in that connection the Borrower specifies the following information with respect to the Loan requested hereby:

(A)     Aggregate principal amount of Loan[1]: _____

(B)     Date of Loan  (which is a Banking Day): _____

(C)     Location and number of the Borrower's account to which proceeds of the Loan are to be disbursed: _____

---

[1]  Not less than $500,000 for the first borrowing; not less than $250,000 for each subsequent borrowing.

The Borrower hereby represents and warrants that the conditions specified in paragraphs (b) through (h) of <u>Section 5</u> of the Loan Agreement are satisfied as of the date hereof.

Very truly yours,

**Fibrant, LLC**

By: _____
    Name:
    Title:

<u>Exhibit B</u>

Initial Approved Budget

See Attached.

Exhibit "A"

DRAFT - Subject to FRE 408

## Fibrant, LLC
### 13-Week Cash Flow Forecast

($ in 000's)

| | Oct | Oct | Nov | Nov | Nov | Nov | Dec | Dec | Dec | Dec | Dec | Jan | Jan | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | Total |
| Forecasted Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Beginning Cash Balance** | $2,985 | $2,878 | $2,000 | $2,004 | $2,127 | $2,194 | $2,000 | $5,325 | $5,308 | $4,715 | $4,535 | $4,265 | $4,248 | $2,985 |
| **RECEIPTS** | | | | | | | | | | | | | | |
| Operational Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Asset Sales | - | 240 | - | - | - | - | 5,000 | - | - | - | - | - | - | 5,240 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Environmental Reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Receipts | - | 240 | - | - | - | - | 5,000 | - | - | - | - | - | - | 5,240 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | |
| Supplier Payments | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | - | 120 |
| Austin Maintenance | 0 | 0 | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll & Benefits | 44 | 135 | 44 | 70 | 44 | 70 | 44 | 5 | 44 | 5 | 96 | 5 | 110 | 715 |
| Utilities | 10 | - | - | - | 10 | - | - | - | 10 | - | - | - | - | 30 |
| Logistics & Transportation | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | 39 | 570 | 2 | 2 | 18 | 12 | 2 | 2 | 2 | 18 | 14 | 2 | 2 | 686 |
| Environmental Remediation | 4 | 300 | 2 | - | 52 | 200 | 2 | - | 52 | - | 130 | 2 | 2 | 745 |
| Total Cash Disbursements | 107 | 1,015 | 58 | 82 | 134 | 292 | 58 | 17 | 118 | 33 | 250 | 17 | 114 | 2,296 |
| Debtor Professional Fees | - | 366 | 188 | - | 29 | - | - | - | 475 | 29 | - | - | 90 | 1,176 |
| Committee Professional Fees | - | 152 | - | 45 | - | 154 | - | - | - | 119 | 5 | - | - | 474 |
| DIP Lender Fees and Expenses | - | 125 | - | - | - | 15 | 5 | - | - | - | 5 | - | - | 150 |
| Other Restructuring Expenses | - | 55 | - | - | 20 | - | - | - | - | - | 10 | - | - | 85 |
| Total Restructuring Disbursements | - | 697 | 188 | 45 | 49 | 169 | 5 | - | 475 | 148 | 20 | - | 90 | 1,885 |
| **Net Change in Cash Flow** | ($107) | ($1,473) | ($246) | ($127) | ($183) | ($461) | $4,937 | ($17) | ($593) | ($181) | ($269) | ($17) | ($204) | $1,059 |
| **Cash Balance Before DIP Financing** | $2,878 | $1,405 | $1,754 | $1,877 | $1,944 | $1,733 | $6,937 | $5,308 | $4,715 | $4,535 | $4,265 | $4,248 | $4,045 | $4,045 |
| Debtor-in-Possession Financing | - | 595 | 250 | 250 | 250 | 267 | (1,611) | - | - | - | - | - | - | - |
| **Ending Cash Balance - A** | $2,878 | $2,000 | $2,004 | $2,127 | $2,194 | $2,000 | $5,325 | $5,308 | $4,715 | $4,535 | $4,265 | $4,248 | $4,045 | $4,045 |
| **Debtor-In-Possession Financing** | | | | | | | | | | | | | | |
| Debtor-In-Possession Financing Availability - B | 3,500 | 2,905 | 2,655 | 2,405 | 2,155 | 1,889 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| **Total Liquidity Available - A + B** | $6,378 | $4,905 | $4,659 | $4,532 | $4,349 | $3,889 | $8,825 | $8,808 | $8,215 | $8,035 | $7,765 | $7,748 | $7,545 | $7,545 |
| **Debtor-In-Possession Financing** | | | | | | | | | | | | | | |
| Beginning Balance | - | - | 595 | 845 | 1,095 | 1,345 | 1,611 | - | - | - | - | - | - | - |
| (+) Drawdown | - | 595 | 250 | 250 | 250 | 267 | - | - | - | - | - | - | - | 1,611 |
| (-) Repayment | - | - | - | - | - | - | (1,611) | - | - | - | - | - | - | (1,611) |
| Ending Balance | - | 595 | 845 | 1,095 | 1,345 | 1,611 | - | - | - | - | - | - | - | - |
| **Debtor-In-Possession Financing Availability** | | | | | | | | | | | | | | |
| Maximum Commitment - E | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| Ending Debtor-In-Possession Financing Balance - F | - | 595 | 845 | 1,095 | 1,345 | 1,611 | - | - | - | - | - | - | - | - |
| Remaining Availability - E - F | 3,500 | 2,905 | 2,655 | 2,405 | 2,155 | 1,889 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |

13-Week DIP Budget