## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **FIBRANT, LLC,** | ) | **Case No. 18-10274 (SDB)** |
| **EVERGREEN NYLON RECYCLING, LLC,** | ) | |
| **FIBRANT SOUTH CENTER, LLC, and** | ) | |
| **GEORGIA MONOMERS COMPANY, LLC,** | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | |
| | ) | |
| | ) | |

## MODIFIED SECOND AMENDED AND RESTATED PLAN OF LIQUIDATION FOR FIBRANT, LLC, *et al.*

**Dated as of the 9th day of October, 2023**

**Filed by:**

**Fibrant, LLC, Evergreen Nylon Recycling, LLC, Fibrant South Center, LLC, and Georgia Monomers Company, LLC**
**Debtors and Debtors In Possession**

**Attorneys for the Debtors and Debtors In Possession:**

**Jonathan W. Jordan**
**Sarah L. Primrose**
**King & Spalding LLP**
**1180 Peachtree Street**
**Atlanta, Georgia 30309**
**(404) 572-4600**

**James C. Overstreet, Jr.**
**Klosinski Overstreet**
**1229 Augusta West Parkway**
**Augusta, Georgia 30909**
**(706) 863-2255**

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS AND GENERAL PROVISIONS** .................................................. 1
    1.1    *DEFINITIONS.* ........................................................................... 1
    1.2    *TIME.* ...................................................................................... 16

**ARTICLE II CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS; IMPAIRMENT** ................ 16
    2.1    *SUMMARY.* .............................................................................. 16
    2.2    *DEEMED ACCEPTANCE OF PLAN.* ............................................... 16
    2.3    *CIH CLAIMS.* ......................................................................... 16
    2.4    *CONFIRMATION PURSUANT TO SECTION 1129(B) OF THE BANKRUPTCY CODE.* ... 17

**ARTICLE III TREATMENT OF CLAIMS AND EQUITY INTERESTS** ............................... 17
    3.1    *CLASS 1—MISCELLANEOUS SECURED CLAIMS.* ............................ 17
    3.2    *CLASS 2—PRIORITY CLAIMS.* ................................................... 18
    3.3    *CLASS 3—ENVIRONMENTAL REMEDIATION CLAIMS.* ...................... 18
    3.4    *CLASS 4—GENERAL UNSECURED CLAIMS.* ................................... 18
    3.5    *CLASS 5 – EQUITY INTERESTS.* ................................................. 20
    3.6    *NO WAIVER OF DEFENSES.* ...................................................... 20

**ARTICLE IV TREATMENT OF UNCLASSIFIED CLAIMS** .......................................... 20
    4.1    *SUMMARY.* .............................................................................. 20
    4.2    *ADMINISTRATIVE EXPENSE CLAIMS.* ......................................... 20
    4.3    *TAX CLAIMS.* .......................................................................... 21

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................ 21
    5.1    *REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES.* ....... 21
    5.2    *CURE OF DEFAULTS; ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES* ... 21
    5.3    *CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES.* ................ 23
    5.4    *SURVIVAL OF CERTAIN INDEMNIFICATION OBLIGATIONS.* ................... 23
    5.5    *CERTAIN APPLICABLE INSURANCE MATTERS.* ............................... 23

**ARTICLE VI MEANS FOR IMPLEMENTATION OF PLAN** ......................................... 24
    6.1    *SUBSTANTIVE CONSOLIDATION.* ............................................... 24
    6.2    *DISSOLUTION OF FIBRANT.* ..................................................... 24
    6.3    *VESTING OF THE DEBTORS' ASSETS.* .......................................... 24
    6.4    *OPERATION OF THE DEBTORS.* ................................................. 25
    6.5    *BILLING AND COLLECTION OF ACCOUNTS RECEIVABLE.* ................... 26
    6.6    *MAINTENANCE OF BANK ACCOUNTS AND DISTRIBUTION OF LIQUIDATION PROCEEDS.* ... 26
    6.7    *CANCELLATION OF EXISTING SECURITIES OF DEBTORS AND AGREEMENTS.* ......... 26
    6.8    *BOOKS AND RECORDS.* ............................................................ 27
    6.9    *CORPORATE ACTION.* .............................................................. 27
    6.10   *PRESERVATION OF CAUSES OF ACTION.* ..................................... 27
    6.11   *EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS.* .................. 28
    6.12   *ELT TRANSACTION AND CHEMICAINVEST PARTIES' PAYMENTS.* ......... 28

6.13    *FIBRANT SOUTH CENTER PROCEEDS.* ................................................................ 28
6.14    *ESTABLISHMENT OF THE ENVIRONMENTAL REMEDIATION TRUST.* ...................... 29
6.15    *TRANSFER OF THE ENVIRONMENTAL REMEDIATION PROPERTY.* ......................... 29
6.16    *APPOINTMENT OF THE ENVIRONMENTAL REMEDIATION TRUSTEE.* ...................... 29
6.17    *TRANSFER OF REMAINING ASSETS.* ................................................................... 29
6.18    *EXEMPTION FROM CERTAIN TRANSFER TAXES AND RECORDING FEES.* .............. 29
6.19    *FURTHER AUTHORIZATION.* .............................................................................. 30
6.20    *ESTABLISHMENT OF THE LITIGATION TRUST.* ..................................................... 30
6.21    *DISSOLUTION.* .................................................................................................. 30
6.22    *INSURANCE SETTLEMENTS.* ............................................................................... 30

**ARTICLE VII PROVISIONS REGARDING CORPORATE GOVERNANCE OF DEBTORS ............... 31**
7.1    *AMENDMENT OF ORGANIZATIONAL DOCUMENTS.* ............................................. 31
7.2    *MANAGERS AND OFFICERS OF DEBTORS.* ............................................................ 31

**ARTICLE VIII DISTRIBUTIONS ............................................................................................ 31**
8.1    *DISBURSING AGENTS.* ....................................................................................... 31
8.2    *DISTRIBUTIONS OF CASH.* .................................................................................. 31
8.3    *NO INTEREST ON CLAIMS.* .................................................................................. 32
8.4    *DELIVERY OF DISTRIBUTIONS.* ........................................................................... 32
8.5    *DISTRIBUTIONS TO HOLDERS AS OF THE RECORD DATE.* ...................................... 32
8.6    *DE MINIMIS DISTRIBUTIONS.* ............................................................................ 32
8.7    *FRACTIONAL DOLLARS.* .................................................................................... 32
8.8    *WITHHOLDING TAXES.* ..................................................................................... 33
8.9    *TAX REPORTING.* .............................................................................................. 33
8.10    *UNDISTRIBUTED FUNDS.* ................................................................................. 33

**ARTICLE IX PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS ................. 33**
9.1    *OBJECTIONS TO CLAIMS.* ................................................................................... 33
9.2    *NO DISTRIBUTIONS PENDING ALLOWANCE.* ....................................................... 33
9.3    *ESTIMATION OF CLAIMS.* ................................................................................... 33
9.4    *RESOLUTION OF CLAIMS OBJECTIONS.* ............................................................... 34
9.5    *DISTRIBUTIONS AFTER ALLOWANCE.* ................................................................. 34
9.6    *DISTRIBUTIONS ON INSURED CLAIMS.* ............................................................... 34

**ARTICLE X EFFECT OF PLAN ON CLAIMS AND EQUITY INTERESTS .................................... 35**
10.1    *REVESTING OF ASSETS.* .................................................................................... 35
10.2    *TREATMENT OF CLAIMS AND EQUITY INTERESTS.* ............................................... 35
10.3    *RELEASE BY DEBTORS OF CERTAIN PARTIES.* ..................................................... 35
10.4    *THIRD PARTY RELEASES.* .................................................................................. 36
10.5    *CHEMICAINVEST RELEASES.* ............................................................................ 37
10.6    *SETOFFS.* ........................................................................................................ 37
10.7    ***EXCULPATION AND LIMITATION OF LIABILITY.*** ............................................... 37
10.8    ***INJUNCTION.*** .............................................................................................. 38
10.9    *WAIVER OF STATUTORY LIMITATION ON RELEASES.* ............................................ 39
10.10    *WAIVER OF CERTAIN AVOIDANCE ACTIONS.* ..................................................... 39
10.11    *VESTING OF CERTAIN CAUSES OF ACTION.* ....................................................... 39
10.12    *PRESERVATION OF ALL CAUSES OF ACTION NOT EXPRESSLY SETTLED OR*
         *RELEASED.* ..................................................................................................... 39

- ii -

10.13   *EFFECT OF CONFIRMATION.* .......................................................................................... 40
10.14   *NO DISCHARGE.* ........................................................................................................ 41

**ARTICLE XI CONDITIONS PRECEDENT** .................................................................................. **41**
11.1   *CONDITIONS TO CONFIRMATION.* ................................................................................ 41
11.2   *CONDITIONS TO THE EFFECTIVE DATE.* ....................................................................... 41
11.3   *WAIVER OF CONDITIONS TO CONFIRMATION OR EFFECTIVE DATE.* ..................... 41

**ARTICLE XII RETENTION AND SCOPE OF JURISDICTION OF THE BANKRUPTCY COURT** ....... **42**
12.1   *RETENTION OF JURISDICTION.* ................................................................................... 42
12.2   *ALTERNATIVE JURISDICTION.* ................................................................................... 43
12.3   *FINAL DECREE.* ........................................................................................................ 43

**ARTICLE XIII THE CREDITOR TRUSTEE** ............................................................................. **44**
13.1   *APPOINTMENT.* ......................................................................................................... 44
13.2   *RETENTION OF PROFESSIONALS.* ............................................................................... 44
13.3   *LIMITED LIABILITY.* ................................................................................................ 44
13.4   *AUTHORITY.* ............................................................................................................ 44
13.5   *REPORTING.* ............................................................................................................ 45
13.6   *COMPENSATION AND REIMBURSEMENT.* .................................................................. 45
13.7   *REPLACEMENT OF CREDITOR TRUSTEE.* ................................................................... 45
13.8   *DISCHARGE OF CREDITOR TRUSTEE.* ....................................................................... 45

**ARTICLE XIV MISCELLANEOUS PROVISIONS** ....................................................................... **45**
14.1   *MODIFICATION OF THIS PLAN.* ................................................................................. 45
14.2   *ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST.* ........ 46
14.3   *CREDITORS' COMMITTEE.* ....................................................................................... 46
14.4   *APPLICABLE LAW.* ................................................................................................... 46
14.5   *PREPARATION OF ESTATES' RETURNS AND RESOLUTION OF TAX CLAIMS.* ............. 46
14.6   *HEADINGS.* .............................................................................................................. 46
14.7   *REVOCATION OF PLAN.* ........................................................................................... 46
14.8   *CONFIRMATION OF PLANS FOR SEPARATE DEBTORS.* .............................................. 46
14.9   *NO ADMISSIONS; OBJECTION TO CLAIMS.* ............................................................... 46
14.10  *NO BAR TO SUITS.* ................................................................................................... 47
14.11  *EXHIBITS/SCHEDULES.* ............................................................................................ 47
14.12  *CONFLICTS.* ............................................................................................................. 47
14.13  *NOTICES.* ................................................................................................................. 47
14.14  *SECTION 1125 OF THE BANKRUPTCY CODE.* ............................................................. 48
14.15  *SEVERABILITY.* ........................................................................................................ 49
14.16  *DESIGNATED NOTICE.* .............................................................................................. 49
14.17  *EMPLOYEE RECORDS.* .............................................................................................. 49

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **FIBRANT, LLC, *et al.*,**[1] | ) | **Case No. 18-10274 (SDB)** |
| | ) | |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | |

**MODIFIED SECOND AMENDED AND RESTATED PLAN OF LIQUIDATION FOR
FIBRANT, LLC; EVERGREEN NYLON RECYCLING, LLC; FIBRANT SOUTH
CENTER, LLC; AND GEORGIA MONOMERS COMPANY, LLC**

**INTRODUCTION**

Fibrant, LLC ("Fibrant"), Evergreen Nylon Recycling, LLC ("Evergreen"), Fibrant South Center, LLC ("South Center"), and Georgia Monomers Company, LLC ("Monomers") (each a "Debtor" and collectively, the "Debtors"), debtors and debtors in possession in the above-captioned cases, propose this Plan for the resolution of the outstanding Claims against and Equity Interests in the Debtors. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

**ARTICLE I
Definitions and General Provisions**

For the purposes of this Plan, except as otherwise expressly provided, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Section 1.1 of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, terms shall include the plural as well as the singular in number, and the masculine shall include the feminine and the feminine shall include the masculine in gender.

    1.1    *Definitions*. The following terms shall have the following meanings when used in this Plan:

    1.1.1    "Administrative Expense Claim" means a Claim (other than a DIP Lender Claim) for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Fibrant, LLC (6694); Evergreen Nylon Recycling, LLC (7625); Fibrant South Center, LLC (8270); and Georgia Monomers Company, LLC (0042).

Code, including the actual, necessary costs and expenses, incurred on or after the Filing Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries or commissions for services rendered after the commencement of the Bankruptcy Cases, Professional Compensation, and all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code; provided, however, that the term Administrative Expense Claim does not include any Assumed Obligations (as defined in the ELT Property Transfer Agreement).

       1.1.2    "Affiliates" shall have the meaning ascribed to such term by section 101(2) of the Bankruptcy Code.

       1.1.3    "Allowed" shall mean when used in reference to a Claim, such Claim or any portion thereof that (i) has been allowed by a Final Order of the Bankruptcy Court; (ii) is listed in any of the Debtors' respective Schedules and for which no contrary proof of claim has been filed, other than a Claim that is listed in any of the Debtors' Schedules at zero or as disputed, contingent, or unliquidated; (iii) is evidenced by a proof of claim that has been timely filed with the Bankruptcy Court or the Claims Agent on or before any applicable claim bar date or deemed to be timely filed pursuant to any Final Order of the Bankruptcy Court or under applicable law, and as to which (A) no objection to its allowance has been filed on or before the Claims Objection Deadline, or (B) any objection to its allowance has been settled or withdrawn, or has been overruled by a Final Order; or (iv) is listed in Schedule 1 to the Plan as an Allowed Claim (regardless of whether such Claim has been listed by the Debtors in their Schedules and regardless of whether a proof of claim has been filed in respect thereof); provided, however, that Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims for the purposes of distribution under this Plan.

       1.1.4    "Applicable Causes of Action" means the Applicable ELT Insurance Causes of Action and the Causes of Action.

       1.1.5    "Applicable CIH Insurance Causes of Action" means any and all claims, actions, causes of action, suits, choses in action and rights to payment of the Debtors and their Estates arising with respect to the Applicable Insurance for losses or liabilities other than those relating to environmental releases or contamination ELT assumed with respect to the Environmental Remediation Property pursuant to the ELT Transaction.

       1.1.6    "Applicable ELT Insurance Causes of Action" means any and all claims, actions, causes of action, suits, choses in action and rights to payment of the Debtors and their Estates arising with respect to the Applicable Insurance solely for losses or liabilities relating to environmental releases or contamination ELT assumed with respect to the Environmental Remediation Property pursuant to the ELT Transaction, subject to Section 6.22 of the Plan.

       1.1.7    "Applicable Insurance" shall mean all primary and excess liability insurance policies, including any environmental liability insurance, that the Debtors have asserted or could assert provides coverage to the Debtors (including any of their predecessors in interest) for losses or liabilities relating to environmental releases or contamination with respect to the Environmental Remediation Property, subject to Section 6.22 of the Plan. Subject to the provisions

of Paragraphs 13 and 14 of the Confirmation Order, the Applicable Insurance shall include the policies listed on <u>Schedule 4</u>.

    1.1.8 &ldquo;Assets&rdquo; means, collectively, all of the property, as defined by section 541 of the Bankruptcy Code, of each of the Estates of the Debtors (including all of the assets, property, interests (including equity interests) and effects, real and personal, tangible and intangible, including all Causes of Action), wherever situated as such property exists on the Effective Date or thereafter.

    1.1.9 &ldquo;Avoidance Action&rdquo; means any claim or cause of action of an Estate arising out of or maintainable pursuant to sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

    1.1.10 &ldquo;Ballot&rdquo; means each of the ballot forms that were distributed with the Disclosure Statement to Holders of Claims included in Classes that are Impaired under this Plan and are entitled to vote under Article III of this Plan to accept or reject this Plan.

    1.1.11 &ldquo;Bankruptcy Case&rdquo; means, with respect to each Debtor, the chapter 11 case initiated by such Debtor&rsquo;s filing on the Filing Date of a voluntary petition for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Bankruptcy Cases are being jointly administered in the Bankruptcy Court as Bankruptcy Case No. 18-10274 (SDB) pursuant to the *Order Directing Joint Administration of Chapter 11 Cases* entered by the Bankruptcy Court on March 7, 2018.

    1.1.12 &ldquo;Bankruptcy Code&rdquo; means title 11 of the United States Code.

    1.1.13 &ldquo;Bankruptcy Court&rdquo; means the United States Bankruptcy Court for the Southern District of Georgia, Augusta Division or, in the event such court ceases to exercise jurisdiction over any Bankruptcy Case, such court or adjunct thereof that exercises jurisdiction over such Bankruptcy Case in lieu of the United States Bankruptcy Court for the Southern District of Georgia, Augusta Division.

    1.1.14 &ldquo;Bankruptcy Rules&rdquo; means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as applicable to the Bankruptcy Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applied to the Bankruptcy Cases or proceedings therein, as the case may be.

    1.1.15 &ldquo;Business Day&rdquo; means any day on which commercial banks are required to be open for business in Augusta, Georgia.

    1.1.16 &ldquo;Cash&rdquo; means legal tender of the United States of America and equivalents thereof.

    1.1.17 &ldquo;Causes of Action&rdquo; means all Avoidance Actions of the Debtors and their Estates and any and all claims, actions, causes of action, choses in action, debts, dues, sums of money, reckonings, bonds, bills, specialties, covenants, contracts, controversies, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims,

contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims (including all claims and any avoidance, preference, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code) suits, accounts, agreements, promises, rights to payment and claims of the Debtors and their Estates, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured, and whether asserted or assertable directly, indirectly or derivatively, in law, equity, or otherwise; provided, however, the term "Causes of Action" shall not include (i) any Waived Avoidance Actions, (ii) any claims, actions, causes of action, suits, accounts, agreements, promises, rights to payment or claims released pursuant to Article X of this Plan, (iii) any actions, causes of action, suits, choses in action, rights to payment or claims transferred and assigned to ELT pursuant to the ELT Property Transfer Agreement, (iv) the DSM SPA Causes of Action, (v) the Applicable CIH Insurance Causes of Action, or (vi) the Applicable ELT Insurance Causes of Action.

1.1.18    "Certificate" means any instrument, including any note, bond, indenture, or other document, evidencing or creating any indebtedness or obligation of the Debtors or otherwise evidencing a Claim.

1.1.19    "ChemicaInvest Affiliated Parties" means each direct and indirect equity holder of the ChemicaInvest Parties (including ChemicaInvest Netherlands, B.V., ChemicaInvest Netherlands II B.V., ChemInvest Holdings S.à.r.l., ChemInvest Holdings II S.à.r.l., Top Hat Holdings Limited and Top Hat Holdings II Limited, but excluding Newco C B.V. and any direct or indirect equity holders thereof), and any investment funds or vehicles directly or indirectly owning equity in such equity holder companies and any investment advisers to and/or partners of such funds, vehicles or equity holder companies, together with their respective Affiliates, subsidiaries, and each of the foregoing's respective officers, directors, managers, members, equity holders, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; provided, however, such term shall not include any of the DSM Entities.

1.1.20    "ChemicaInvest Parties" means CIH, CAP I B.V., CAP II B.V., Fibrant Holding B.V., and Augusta Holdco, Inc.

1.1.21    "CIH" means ChemicaInvest Holding, B.V.

1.1.22    "CIH Causes of Action" means (i) all claims, actions, causes of action, suits, choses in action and rights to payment that could be asserted by CIH against any DSM Entity relating to or arising out of environmental contamination at the Debtors' owned real property and arising under the DSM SPA, and (ii) the Applicable CIH Insurance Causes of Action: provided, however, the CIH Causes of Action shall not include any claims, actions, causes of action, suits, choses in action or rights to payment arising from (i) the Settlement Payments, (ii) contributions or payments by any ChemicaInvest Party to the Debtors prior to the Filing Date, including under (a) that certain Escrow Agreement, dated July 6, 2016, by and among Fibrant, CIH and Wells Fargo Bank, N.A., or (b) that certain Capital Contribution Agreement, dated May 23, 2016, between Augusta Holdco, Inc. and Fibrant; provided, further, the CIH Causes of Action shall not include any claims, actions, causes of action, suits, choses in action or rights to payment arising

under the DSM SPA that are unrelated to environmental contamination at the Debtors' owned real property.

1.1.23    "CIH Claims" means any and all Claims that ChemicaInvest Parties may have against the Debtors.

1.1.24    "CIH Released Parties" means collectively: (a) each of the Debtors; (b) each of the Releasing Parties, (c) the Committee and each of its members, and (d) each Debtor's, the Committee's and each Releasing Party's officers, directors, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; provided, however, subject to the terms of the Insurance Settlements, such term shall not include any of the DSM Entities or issuers of the Applicable Insurance.

1.1.25    "Claim" means a claim against one of the Debtors (or any combination of them), whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

1.1.26    "Claims Agent" means Kurtzman Carson Consultants LLC.

1.1.27    "Claims Litigation" means any and all litigation or proceedings arising out of objections to Claims asserted against the Estates, motions to estimate Claims asserted against the Estates or affirmative counterclaims or requests for setoff or recoupment that are raised with regard to Claims asserted against the Estates.

1.1.28    "Claims Objection Deadline" means the latest of (i) ninety (90) days after the Effective Date, (ii) the first Business Day that is at least ninety (90) days after a specific proof of claim was filed, or (iii) such other time as may be ordered by the Bankruptcy Court after Designated Notice.

1.1.29    "Classes" means a category of Claims or Equity Interests described in Article III of this Plan.

1.1.30    "Committee" means the Official Committee of Unsecured Creditors appointed in the Debtors' Bankruptcy Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.1.31    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

1.1.32    "Confirmation Hearing" means the hearing before the Bankruptcy Court held to consider confirmation of this Plan and related matters under section 1128 of the Bankruptcy Code, as such hearing may be continued.

1.1.33    "Confirmation Order" means the order entered by the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.34    "Consummation Date" means the date on which the Liquidating Agent and the Creditor Trustee (solely with respect to GUC Funds) make the Final Distribution of the GUC Funds, Liquidation Proceeds and Retained Proceeds in accordance with this Plan.

1.1.35    "Creditor Released Parties" means, collectively: (a) each of the ChemicaInvest Parties, (b) each of the ChemicaInvest Affiliated Parties, and (c) each of the Settling Insurers.

1.1.36    "Creditor Trust" means the trust established by the Creditor Trust Agreement for the purposes of facilitating the distribution of GUC Funds to Holders of Allowed Class 4 Claims and related matters.

1.1.37    "Creditor Trust Agreement" means the Creditor Trust Agreement by and among the Debtors, the ChemicaInvest Parties,  the Committee and the Creditor Trustee, establishing the Creditor Trust in conformity with the provisions of this Plan.  The Creditor Trust Agreement will be entered into on (or as of) the Effective Date.

1.1.38    "Creditor Trust Reserve" means a reserve in the amount of $100,000, which shall be remitted to the Creditor Trust and used to fund the costs associated with the Creditor Trustee's consummation of its rights and obligations under the Plan and Creditor Trust Agreement, including funding the out-of-pocket expenses of the Creditor Trustee and the fees and expenses of the Creditor Trustee's professionals.  To the extent the Creditor Trust Reserve is depleted, it shall be replenished in the Creditor Trustee's sole discretion out of the GUC Funds; provided, however, for the avoidance of doubt, that any such replenishment shall not reduce the amount of GUC Funds for the purposes of determining any amounts of Net Litigation Proceeds to be delivered to the Creditor Trust (including the maximum amount of Net Litigation Proceeds deliverable to the Creditor Trust).  For the avoidance of doubt, the Creditor Trustee, as trustee of the Creditor Trust, has the sole and exclusive right to access, utilize, and/or make Distributions from the Creditor Trust Reserve.

1.1.39    "Creditor Trustee" means GlassRatner Advisory & Capital Group, LLC by and through Joseph Pegnia, appointed, effective as of the Effective Date, as trustee of the Creditor Trust for the purposes of representing the interests of Holders of Allowed Class 4 General Unsecured Claims and making Distributions to Allowed Class 4 General Unsecured Claims under the Plan and Creditor Trust Agreement.  For the avoidance of doubt, all funds transferred to the Creditor Trustee for the purposes of making distributions to Holders of Allowed Class 4 Claims pursuant to the Plan are transferred to the Creditor Trustee solely in its capacity as trustee of the Creditor Trust and shall be construed as transfers to the Creditor Trust accordingly.

1.1.40    "Debtor" or "Debtors" means, individually, Fibrant, Evergreen, South Center, and Monomers, each of which is a Debtor in its Bankruptcy Case.

1.1.41    "Debtor Released Parties" means, collectively: (a) each of the ChemicaInvest Parties, (b) each of the ChemicaInvest Affiliated Parties, and (c) each of the Settling Insurers.

1.1.42    "Designated Notice" means notice and an opportunity for a hearing as defined in section 102(1) of the Bankruptcy Code, with notice limited to the Debtors, the Liquidating Agent, the Creditor Trustee, the United States Trustee, and other parties in interest who, after entry of the Confirmation Order, file a request for such notice with the Clerk of the Bankruptcy Court and serve a copy of same on counsel for the Debtors.  Until and including thirty

(30) days after the Effective Date, Designated Notice means notice pursuant to the *Order Establishing Notice and Administrative Procedures* entered by the Bankruptcy Court on March 7, 2018, in the Bankruptcy Cases.

    1.1.43   "DIP Credit Facility" means that certain Senior Secured Debtor-In-Possession Loan Agreement, as amended from time to time, by and between the Debtors and the DIP Lender, as approved by the DIP Order.

    1.1.44   "DIP Lender" means CAP II B.V.

    1.1.45   "DIP Lender Claims" means any Claims of the DIP Lender arising under the DIP Credit Facility or the DIP Order.

    1.1.46   "DIP Order" means that certain Final Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Liens and Superpriority Claims, and (IV) Modifying the Automatic Stay, entered by the Bankruptcy Court on November 14, 2018 [Docket No. 456].

    1.1.47   "Disallowed Claim" means a Claim or any portion thereof that (i) has been disallowed by a Final Order, (ii) is listed in any of the Debtors' respective Schedules at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court or the Claims Agent pursuant to the Bankruptcy Code or any Final Order of the Bankruptcy Court, (iii) is not listed in any of the Debtors' respective Schedules and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court or the Claims Agent pursuant to the Bankruptcy Code or any Final Order of the Bankruptcy Court, or (iv) except as otherwise agreed by the Creditor Trustee and the Holder of such Claim or as otherwise ordered by the Bankruptcy Court, is a General Unsecured Claim that is not listed on Schedule 1 to the Plan.

    1.1.48   "Disclosure Statement" means the written disclosure statement that relates to this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time with the prior written consent of the ChemicaInvest Parties.

    1.1.49   "Disclosure Statement Order" means the Order of the Bankruptcy Court approving the Disclosure Statement as entered on the docket of the Bankruptcy Cases, as such Order may be amended, supplemented, or modified from time to time with the prior written consent of the ChemicaInvest Parties.

    1.1.50   "Disputed Claim" means, with reference to any Claim, a Claim or any portion thereof that is the subject of an objection timely filed in the Bankruptcy Court and which objection has not been withdrawn, settled or overruled by a Final Order of the Bankruptcy Court. Disputed Claims shall also include any Claim held by a creditor against which the Debtors or the Liquidating Agent has asserted a claim that has the effect, under section 502(d) of the Bankruptcy Code, of precluding a Distribution with respect to such Claim; provided, however, the Debtors and

the Liquidating Agent shall not assert any claims that constitute Waived Avoidance Actions. Furthermore, Disputed Claims shall also include any Claims that are listed as Disputed Claims on Schedule 1 to the Plan.

1.1.51    "Distribution" means any distribution of Cash by (or on behalf of) the Debtors to a Holder of an Allowed Claim made in accordance with the Plan.

1.1.52    "Distribution Date" means (i) the Initial Distribution Date and the date of the first Distribution made by the Creditor Trustee pursuant to section 3.4.2 of this Plan, and (ii) the first Business Day after the end of the months of March, June, September and December, commencing with the first such date to occur more than ninety (90) days after the Initial Distribution Date and continuing until the Consummation Date; provided, however, with respect to Distributions made by the Liquidating Agent, that a Distribution Date (other than the Initial Distribution Date and Consummation Date) shall not occur in the discretion of the Liquidating Agent if the aggregate value of the consideration to be distributed on account of all Allowed Claims on such Distribution Date is less than one million and 00/100 dollars ($1,000,000.00), in which case the amount to be distributed shall be retained and added to the amount to be distributed on the next Distribution Date.

1.1.53    "District Court" means the United States District Court for the Southern District of Georgia, Augusta Division.

1.1.54    "DSM" shall mean Koninklijke DSM, N.V.

1.1.55    "DSM Entities" shall mean (a) DSM, (b) all of DSM's Affiliates and subsidiaries (other than any ChemicaInvest Parties), and (c) all officers, directors, managers, members, equity holders, employees, agents, financial advisors, attorneys, accountants, consultants, representatives, and other professionals of DSM or of any such Affiliate or subsidiary (other than any ChemicaInvest Parties).

1.1.56    "DSM SPA" shall mean that certain Agreement for the Sale and Purchase of all Issued and Outstanding Shares in DSM Fibre Intermediates International B.V., DSM Composite Resins Holding International B.V. and DSM Fibre Intermediates China B.V., dated July 30, 2015, by and between CIH and DSM (as amended to date).

1.1.57    "DSM SPA Causes of Action" means all claims, actions, causes of action, suits, choses in action and rights to payment that could be asserted by any one or more of the Debtors or their Estates against any DSM Entity, but only to the extent relating to or arising out of environmental contamination at the Debtors' owned real property or arising under the DSM SPA.

1.1.58    "Effective Date" means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be not more than ten (10) Business Days after the date on which the conditions to the Effective Date provided for in this Plan have been satisfied or waived by the Debtors and the ChemicaInvest Parties.

1.1.59    "ELT" means Environmental Liability Transfer, Inc. and its permitted assignee under the ELT Property Transfer Agreement, Augusta Liquidations, LLC.

1.1.60    "ELT Property Transfer Agreement" means the Property Transfer Agreement, by and among the Debtors, the ChemicaInvest Parties and ELT, pursuant to which ELT will acquire the Environmental Remediation Property and will assume responsibility for the environmental remediation of the Facility. A copy of the executed ELT Property Transfer Agreement is attached to this Plan as Exhibit A.

1.1.61    "ELT Transaction" means the transactions contemplated by the ELT Property Transfer Agreement and the Environmental Remediation Trust Agreement.  The ELT Transaction shall be consummated pursuant to Sections 105, 363, 365 and 1123(a)(5) of the Bankruptcy Code.

1.1.62    "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.1.63    "Environmental Remediation Claims" means any and all Claims asserted, or that could be asserted, against any one or more of the Debtors by the EPA or the EPD pursuant to federal law, state law, the EPD Permit, or any other basis.

1.1.64    "Environmental Remediation Property" means the Property (as such term is defined in the ELT Property Transfer Agreement) of the Debtors to be transferred to ELT pursuant to the ELT Property Transfer Agreement.

1.1.65    "Environmental Remediation Trust" means the Fibrant Environmental Remediation Trust, established by the Environmental Remediation Trust Agreement and described in Article VI of the Plan.

1.1.66    "Environmental Remediation Trust Agreement" means the Environmental Remediation Trust Agreement by and among the Debtors, the ChemicaInvest Parties, ELT (or ELT's assignee pursuant to Section 15 of the ELT Property Transfer Agreement) and Delaware Trust Company, solely in its capacity as the Environmental Remediation Trustee, establishing the Environmental Remediation Trust in conformity with the provisions of the Plan and the ELT Property Transfer Agreement.   The form of the Environmental Remediation Trust Agreement is attached to this Plan as Exhibit B and will be entered into on (or as of) the Effective Date.

1.1.67    "Environmental Remediation Trust Assets" means the Remediation Payment to be made by the ChemicaInvest Parties to the Environmental Remediation Trust as provided in Sections 6.15 and 10.10.2 of this Plan and such other assets acquired, earned or held by the Environmental Remediation Trust from time to time pursuant to the Environmental Remediation Trust Agreement.

1.1.68    "Environmental Remediation Trustee" means Delaware Trust Company, which has been appointed to administer the Environmental Remediation Trust in accordance with the terms of the Environmental Remediation Trust Agreement.

1.1.69    "EPA" means the United States Environmental Protection Agency.

1.1.70    "EPD" means the Georgia Department of Natural Resources, Environmental Protection Division.

1.1.71    "EPD Permit" means Hazardous Waste Permit No. HW-016 (ST & CA) issued to Fibrant by the EPD.

1.1.72    "Equity Interest" means any equity interest in a Debtor that existed immediately prior to the Filing Date.

1.1.73    "Estate" means, with regard to each Debtor, the estate that was created by the commencement by a Debtor of a Bankruptcy Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include any and all rights, powers, and privileges of such Debtor and any and all interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that such Debtor or such Estate shall have had as of the commencement of the Bankruptcy Case, or which such Estate acquired after the commencement of the Bankruptcy Case.

1.1.74    "Estate Cash" means all Cash held by the Estates (whether existing as of the Effective Date or later recovered, received, or otherwise obtained), less the payment, in full, of all Allowed Claims in Class 1 and Class 2, all Allowed Administrative Expense Claims and Allowed Tax Claims, less and except an appropriate amount of Retained Proceeds.

1.1.75    "Estate Payment" means a Cash payment in an amount equal to $2,500,000.00 to be made by the ChemicaInvest Parties on the Effective Date to the Creditor Trust for the benefit of Holders of Allowed Class 4 General Unsecured Claims, with such payment to be used to fund Distributions to Holders of Allowed General Unsecured Claims in Class 4 and the fees and expenses incurred by the Creditor Trustee pursuant to Article XIII of this Plan; provided, however, if the sum of the Estate Cash and the Estate Payment exceed $6 million as of the Effective Date, then the Estate Payment shall be reduced by an amount equal to such excess.

1.1.76    "Executory Contract or Unexpired Lease" means all executory contracts and unexpired leases to which any of the Debtors is a party. Notwithstanding any other provision of the Plan, the Applicable Insurance shall not be treated as (or deemed to be) Executory Contracts or Unexpired Leases for purposes of the Plan.

1.1.77    "Fibrant South Center Proceeds" means any Cash and any non-cash proceeds received by South Center from the sale of the South Center Assets, less the payment of all fees, expenses and costs incurred by the Debtors in connection with the sale of the South Center Assets.

1.1.78    "Filing Date" means February 23, 2018.

1.1.79    "Final Distribution" means the final Distribution by the Liquidating Agent or the Creditor Trustee to the holders of Allowed Claims in accordance with this Plan.

1.1.80    "Final Order" means an order of the Bankruptcy Court, the District Court, or any other court of competent jurisdiction as to which (i) any appeal that has been taken has been finally determined or dismissed, or (ii) the time for appeal has expired and no appeal, motion for

reconsideration, *vacatur* or rehearing, or request for a stay has been filed timely. In the case of an order of the Bankruptcy Court, the time for appeal, motion for reconsideration, *vacatur* or rehearing, or request for a stay for purposes of this definition, shall be the time permitted for an appeal to the District Court.

1.1.81    "General Unsecured Claims" means Claims against any Debtor that are not Administrative Expense Claims, Claims on account of Professional Compensation, Tax Claims, Miscellaneous Secured Claims, Priority Claims, Environmental Remediation Claims, or Intercompany Claims.

1.1.82    "GUC Funds" means (i) the Estate Payment, plus, (ii) the Estate Cash, plus (iii) if applicable, a portion of the Net Litigation Proceeds pursuant to the formula set forth in Section 3.4.2 hereof.

1.1.83    "Holder" means a holder of a Claim or Equity Interest, as applicable.

1.1.84    "Impaired" shall have the meaning ascribed to such term in section 1124 of the Bankruptcy Code.

1.1.85    "Initial Distribution Date" means the first Business Day after the Effective Date or as soon as reasonably practical thereafter; provided, however, that in no event shall the Initial Distribution Date be more than thirty (30) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

1.1.86    "Insurance Payment" means the cash payment to be made by the ChemicaInvest Parties on (or as of) the Effective Date pursuant to Section 7.5(a) of the ELT Property Transfer Agreement, in connection with obtaining certain insurance policies.

1.1.87    "Insurance Settlements" means, collectively, those certain comprehensive settlements set forth in this Plan and the settlement agreements attached hereto as Exhibit D and incorporated into and implemented by the Plan, by and among: (a) the Debtors, (b) CIH, (c) ELT, and (d) each of the Settling Insurers, and consented to by the Creditor Trustee, pursuant to which, in exchange for the Settlement Payments thereunder, the Settling Insurers receive the benefit of the releases and injunctions hereunder and other protections set forth herein and in the Insurance Settlements.

1.1.88    "Intercompany Claim" means any Claim asserted by a Debtor against another Debtor.

1.1.89    "Interim Distribution Agreements" means letter agreements entered into by Fibrant with certain Holders of General Unsecured Claims prior to the Filing Date, pursuant to which such Holders received interim payments with respect to such Holders' General Unsecured Claims.

1.1.90    "Letter of Credit" means the irrevocable standby letter of credit, dated April 25, 2016, in the amount of $2,126,200.00 established by Citibank, N.A. for the benefit of the EPD, as extended from time to time in accordance with the terms of such letter of credit.

1.1.91    "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.1.92    "Liquidating Agent" means Lawrence Hirsh and any successors under this Plan.   Confirmation of this Plan shall constitute the approval of the Liquidating Agent as a professional person pursuant to the applicable provisions of the Bankruptcy Code.   Except as otherwise specifically provided for herein (including with respect to the duties delegated to the Creditor Trustee), the Liquidating Agent shall conduct the final liquidation and distribution of the Estates and conduct the wind-up of the Debtors' affairs, in each case in accordance with the terms and conditions of this Plan.

1.1.93    "Liquidation Proceeds" means any Cash received by the Estates from any source, less and except an appropriate amount of Retained Proceeds.   "Liquidation Proceeds" includes Cash generated by (a) the collection of outstanding accounts receivable, (b) sales of the Debtors' assets (other than the South Center Assets and the Environmental Remediation Property), and (c) the return of any deposits or escrowed funds to the Debtors.   Liquidation Proceeds shall include any Cash held by any of the Debtors as of the Effective Date, and all Cash realized from the liquidation of any asset of the Debtors or the Estates (after satisfaction of any Lien on such asset that secures a Secured Claim).

1.1.94    "Litigation Trust" means the trust established by the Litigation Trust Agreement and described in the Plan.

1.1.95    "Litigation Trust Agreement" means the Litigation Trust Agreement by and among the Debtors and the Litigation Trustee, establishing the Litigation Trust in conformity with the provisions of this Plan.   The form of the Litigation Trust Agreement is attached to this Plan as <u>Exhibit C</u> and will be entered into on (or as of) the Effective Date.

1.1.96    "Litigation Trustee" means the trustee appointed under the Litigation Trust Agreement, in its capacity as such.

1.1.97    "Miscellaneous Secured Claims" means a Secured Claim other than any Secured Claim that has been fully and finally satisfied prior to the Effective Date.

1.1.98    "Net Litigation Proceeds" means any Cash received by CIH, ELT or the Litigation Trust from any source in connection with the prosecution, settlement and enforcement or realization of the Applicable Causes of Action, the DSM SPA Causes of Action and the CIH Causes of Action, less the payment of all fees, expenses and out-of-pocket costs incurred by CIH, the Litigation Trust, and ELT in connection therewith (which such  parties are hereby authorized to pay from such Cash without any notice to any other parties in interest or the Bankruptcy Court and without any requirement of application or hearing).

1.1.99    "PCS Nitrogen" means PCS Nitrogen, Inc., together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).   PCS Nitrogen shall not include the Plaintiffs.

1.1.100  "Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.1.101  "Plaintiffs" means the Debtors, CIH, and ELT, together with each of their respective predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.1.102  "Plan" means this Second Amended and Restated Plan of Liquidation for Fibrant, LLC, Evergreen Nylon Recycling, LLC, Fibrant South Center, LLC, and Georgia Monomers Company, LLC, dated as of May 22, 2019, as it may be amended, altered, supplemented or modified from and after the date hereof, with the prior written consent of the ChemicaInvest Parties.

1.1.103  "Plan Objection Deadline" means the date and time by which objections to confirmation and consummation of the Plan must be filed with the Bankruptcy Court and served in accordance with the Disclosure Statement Order.

1.1.104  "Priority Claim" means a Claim entitled to priority under the provisions of section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Tax Claim.

1.1.105  "Professional Compensation" means (i) any amounts that the Bankruptcy Court allows pursuant to section 330 of the Bankruptcy Code as compensation earned, and reimbursement of expenses incurred, by professionals employed by the Debtors or the Committee, and (ii) any amounts the Bankruptcy Court allows pursuant to sections 503(b)(3) and (4) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Cases.

1.1.106  "Record Date" means the date established in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining the identity of Holders of Allowed Claims entitled to Distributions under this Plan.  If no Record Date is established in the Confirmation Order or any other order of the Bankruptcy Court, then the Record Date shall be the Confirmation Date.

1.1.107  "Record Holder" means the Holder of a Claim or Holder of an Equity Interest as of the Record Date.

1.1.108  "Releasing Parties" means collectively: (a) all parties-in-interest in these Bankruptcy Cases, and (b) all Holders of Claims; provided, however, that (1) EPD and EPA are Releasing Parties solely with respect to liabilities related to the Environmental Remediation Property under the Georgia Hazardous Waste Management Act, Official Code of Georgia Annotated ("O.C.G.A."), Section 12-8-66(e) and 12-8-71(b), the Georgia Hazardous Site Response Act, Sections 12-8-90 through 12-8-97, Sections 106 and 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§9606 and 9607(a), and Section 7003 of the Resource Conservation and Recovery Act, 42 U.S.C. §6973, and (2) except as

provided in clause (1) above, the Releasing Parties shall not include the United States of America or any department, agency, or instrumentality thereof, or the State of Georgia or any department, agency, or instrumentality thereof.

1.1.109  "Remediation Payment" means a Cash payment in an amount equal to $12.85 million (as such amount may be adjusted pursuant to Section 2.2 of the ELT Property Transfer Agreements) to be made by the ChemicaInvest Parties on the Effective Date to the Environmental Remediation Trust pursuant to the ELT Property Transfer Agreement and the Environmental Remediation Trust Agreement.

1.1.110  "Retained Proceeds" means the Unpaid Claims Reserve plus a portion of the Cash in the Estates, as determined by the Liquidating Agent in its reasonable discretion on or immediately prior to the Effective Date and from time to time thereafter after consulting in good faith with the Creditor Trustee or the Committee (as applicable), that shall be retained in the Estates as a reserve fund to cover, among other things, (a) payments to Holders of Disputed Claims in Class 1 or Class 2 or Disputed Claims that are asserted as Administrative Expense Claims or Tax Claims, which are not Allowed Claims on the Effective Date or any applicable Distribution Date (it being understood that the Bankruptcy Court may, at the request of the Liquidating Agent, fix the amount of the reserve fund allocated to Disputed Claims); (b) Professional Compensation; (c) the post-Effective Date costs and expenses of liquidating and administering the Estates (including resolving Disputed Claims); (d) Tax Claims (if any) and other Priority Claims accruing after the Effective Date; (e) a reasonable reserve for the payment of the post-Effective Date compensation and expenses of the Liquidating Agent and the fees and expenses of professional persons retained by the Liquidating Agent and/or the Debtors; and (f) the Creditor Trust Reserve (which shall be paid to the Creditor Trust and administered and distributed by the Creditor Trustee). On a quarterly basis, the Liquidating Agent shall assess the amount of Retained Proceeds and, to the extent the Liquidating Agent determines (after consulting in good faith with the Creditor Trustee) there are excess funds available, the Liquidating Agent shall pay such excess funds, as an addition to the GUC Funds, to the Creditor Trust on such quarterly basis.  Further on, the Consummation Date, any remaining Retained Proceeds (after the payment, in full, of all Allowed Claims in Class 1 and Class 2, all Allowed Administrative Expense Claims and Allowed Tax Claims, all post-Effective Date compensation and expenses of the Liquidating Agent, and all fees and expenses of professional persons retained by the Liquidating Agent) shall be added to the GUC Funds and used to make the Final Distribution under this Plan.  Notwithstanding any of the foregoing, to the extent that the application of remaining Retained Proceeds causes the amount of GUC Funds to exceed $7 million, such remaining Retained Proceeds shall be paid to CIH.

1.1.111  "Schedules" means, with respect to any Debtor, the Schedules of Assets and Liabilities such Debtor filed in its Bankruptcy Case, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

1.1.112  "Secured Claim" means a Claim against any Debtor to the extent secured by a Lien on any property of such Debtor to the extent of the value of said property as provided in section 506(a) of the Bankruptcy Code.

1.1.113  "Settlement Payments" means, collectively, the Remediation Payment, the Estate Payment, the Insurance Payment, any payments made under the Insurance Settlements,

and the payment by the ChemicaInvest Parties of $850,000 to fund a deductible trust, which proceeds shall be used to cover deductibles/self-insured retentions under certain insurance policies (pursuant to Section 7.5(b) of the ELT Property Transfer Agreement).

1.1.114   "Settling Insurers" means, collectively, ACE Property & Casualty Insurance Company; United States Fire Insurance Company; Century Indemnity Company; Columbia Casualty Company; Employers Insurance of Wausau, A Mutual Company; National Union Fire Insurance Company of Pittsburgh, Pa.; Lexington Insurance Company; First State Insurance Company; Allstate Insurance Company, solely as successor in interest to Northbrook Excess and Surplus Insurance Company; Continental Casualty Company; The Continental Insurance Company as successor to certain interests of Harbor Insurance Company; Certain Underwriters at Lloyd's, London; NRG Victory Reinsurance Limited (as successor to New London Reinsurance Company Limited); Tenecom Limited (as successor to Accident & Casualty Company of Winterhur); The Ocean Marine Insurance Company Limited (as successor to Edinburgh Assurance Company and World Auxiliary Insurance Corporation Limited); The Scottish Lion Insurance Company Limited; Certain London Market Companies (The Edinburgh Assurance Company; World Auxiliary Insurance Company Limited; Accident & Casualty Insurance Company of Winterhur (No. 2A/C); Accident & Casualty Insurance Company of Winterthur (No. 3A/C); New London Reinsurance Company Limited; and The Scottish Lion Insurance Company Limited); Starr Indemnity & Liability Company, formerly known as Republic Insurance Company; and Berkshire Hathaway Specialty Insurance Company, formerly known as Stonewall Insurance Company; Alba General Insurance Company Limited; The Dominion Insurance Company Limited; Catalina Worthing Insurance Ltd F/K/A Hfpi (As Part VII Transferee Of (Excess Insurance Company Ltd And/Or London & Edinburgh Insurance Company Ltd As Successor To London & Edinburgh General Insurance Company Ltd)); Assicurazioni Generali Spa (Uk Branch); British Reserve Insurance Company Limited (formerly Allianz Suisse Insurance Company) (fka Helvetia Accident Swiss Insurance Company Limited); London And Edinburgh General Insurance Company Limited; River Thames Insurance Company Limited; Cavello Bay Reinsurance Limited as successor to the interests of Harper Insurance Ltd F/K/A Turegum Ins Co; Argonaut Northwest Insurance Company; Argonaut Northwest Insurance Company; Delta-Lloyd Non-Life Insurance Company Limited; National Casualty Company; National Casualty Company Of America Limited; Admiral Insurance Company Mt. McKinley Insurance Company; and The North River Insurance Company.

1.1.115   "South Center Assets" shall mean all property owned by South Center and all Equity Interests of South Center held by the other Debtors.

1.1.116   "Tax Claim" means any Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.1.117   "Unimpaired" means, with respect to a Class of Claims, any Class that is not Impaired.

1.1.118   "Unpaid Claims Reserve" shall have the meaning ascribed to such term in Section 8.4 hereof.

1.1.119  "Waived Avoidance Action" means: (i) any Avoidance Action against any Holder of an Allowed Claim arising out of or maintainable pursuant to any state fraudulent conveyance laws or sections 544, 547, 548, 550 or 553(b) of the Bankruptcy Code; and (ii) any Avoidance Action against any Holder of an Allowed Claim arising out of or maintainable pursuant to section 549 of the Bankruptcy Code relating to the payment of valid pre-petition obligations of the Debtors; provided, however, Waived Avoidance Actions shall not include any Avoidance Actions that may be asserted against any DSM Entity.

1.2     *Time*.  Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day which is a Saturday, Sunday, or legal holiday under the laws of the United States of America or the State of Georgia, then the time for the occurrence or happening of said event shall be extended to the next day that is not a Saturday, Sunday, or legal holiday.

## ARTICLE II
### Classification of Claims and Equity Interests; Impairment

2.1     *Summary*. The categories of Claims and Equity Interests set forth below classify all Claims against and Equity Interests in the Debtors for all purposes of this Plan.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  The treatment with respect to each Class of Claims and Equity Interests provided for in Article III shall be in full and complete satisfaction and release of such Claims and Equity Interests.

The classification of Claims under this Plan is as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Miscellaneous Secured Claims | Unimpaired | No |
| 2 | Priority Claims | Unimpaired | No |
| 3 | Environmental Remediation Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |

The classification of Equity Interests under this Plan is as follows:

| | | | |
|---|---|---|---|
| 5 | Equity Interests in Fibrant | Impaired | No |

2.2     *Deemed Acceptance of Plan*.  Classes 1 and 2 are Unimpaired under this Plan. Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, Classes 1 and 2 are deemed to accept this Plan and are not entitled to vote to accept or reject this Plan.

2.3     *CIH Claims*. As a settlement of the CIH Claims in connection with the terms and conditions of the Plan and related documents and agreements, notwithstanding any other provision of this Plan, all CIH Claims are waived and deemed discharged as of the Effective Date, and the Holders of such Claims are not entitled to vote to accept or reject this Plan or to receive any Distributions under this Plan on account of the CIH Claims; provided, however, for the avoidance of doubt, that nothing in the foregoing shall release any party from obligations under the Plan, and the ChemicaInvest Parties shall be entitled to enforce the terms and conditions of the Plan and

related documents and agreements. All proofs of claim filed by the ChemicaInvest Parties shall be deemed expunged upon the Effective Date without any requirement of further notice or filing by any party. Notwithstanding the foregoing, any DIP Lender Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Agreement and DIP Order, including any expenses payable under the DIP Credit Agreement or DIP Order; provided, however, that the Allowed amount of DIP Lender Claims on account of such Claims arising on or before October 15, 2018 shall be no greater than $125,000. Except to the extent that the DIP Lender agrees to less favorable treatment, on or before the Effective Date, each Holder of an Allowed DIP Lender Claim shall receive, on account of and in full and final satisfaction, settlement, release, and discharge of such Claim, indefeasible payment in full in Cash.

2.4     *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*. The Debtors will request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code with respect to any Class that rejects, or is deemed to have rejected, this Plan.

## ARTICLE III
## Treatment of Claims and Equity Interests

3.1     *Class 1—Miscellaneous Secured Claims*.

    3.1.1     Classification: Class 1 consists of all Miscellaneous Secured Claims.

    3.1.2     Treatment: The legal, equitable and contractual rights of the Holders of Class 1 Miscellaneous Secured Claims are unaltered by this Plan. Unless the Holder of such Claim and the Liquidating Agent agree to a different treatment, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Miscellaneous Secured Claim becomes Allowed, each Holder of an Allowed Class 1 Miscellaneous Secured Claim shall receive, in full and final satisfaction of such Allowed Class 1 Miscellaneous Secured Claim, either:

    (a)     Cash in an amount equal to such Allowed Miscellaneous Secured Claim, including any interest on such Allowed Miscellaneous Secured Claim required to be paid pursuant to applicable law;

    (b)     the proceeds of the sale or disposition of the collateral securing such Allowed Miscellaneous Secured Claim to the extent of the value of the Holder's interest in such collateral; or

    (c)     the collateral securing such Allowed Miscellaneous Secured Clam.

Notwithstanding any other provision of this Plan, (1) the Allowed Miscellaneous Secured Claim of Augusta Sulfate Company, LLC may be paid as contemplated by Section 6.13 of the Plan promptly following the sale or other disposition of the South Center Assets, and (2) Augusta Sulfate Company, LLC shall not have any other Allowed Claims or receive any other Distributions under the Plan.

In the event that the Debtors elect to treat an Allowed Miscellaneous Secured Claim under clause (a) or (b) of this Section 3.1.2, the Liens securing such Claim shall be deemed released without the need for further action.

3.1.3     Voting:  Class 1 is an Unimpaired Class, and the Holders of Allowed Class 1 Miscellaneous Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.

3.2     *Class 2—Priority Claims.*

3.2.1     Classification:  Class 2 consists of all Priority Claims.

3.2.2     Treatment:  The legal, equitable and contractual rights of the Holders of Class 2 Priority Claims are unaltered by this Plan.  Unless the Holder of such Claim and the Debtors agree to a different treatment, each Holder of an Allowed Class 2 Priority Claim shall receive, in full and final satisfaction of such Allowed Class 2 Priority Claim, Cash equal to the full amount of such Allowed Priority Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date such Priority Claim becomes Allowed.

3.2.3     Voting:  Class 2 is an Unimpaired Class, and the Holders of Class 2 Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

3.3     *Class 3—Environmental Remediation Claims.*

3.3.1     Classification:   Class 3 consists of all Environmental Remediation Claims.

3.3.2     Treatment: Except to the extent that a Holder of an Environmental Remediation Claim agrees to a less favorable treatment, each Environmental Remediation Claim shall be resolved and satisfied (in full) by the closing of the ELT Transaction and the assumption by ELT of the "Assumed Obligations" pursuant to Section 9.1 of the ELT Property Transfer Agreement.  Holders of Environmental Remediation Claims shall not be entitled to receive any Cash Distributions under the Plan. EPD has asserted a claim against the Letter of Credit that the Debtors employ to satisfy certain financial assurance obligations arising under federal and state law and the EPD Permit. The Letter of Credit shall remain in place until ELT accepts the Environmental Remediation Property, EPD transfers the EPD Permit to ELT and ELT posts financial assurance acceptable to the EPD. The Letter of Credit shall then be released to the party that posted it.

3.3.3     Voting: Class 3 is an Impaired Class.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 3 Environmental Remediation Claim is entitled to vote to accept or reject this Plan.

3.4     *Class 4—General Unsecured Claims.*

3.4.1    Classification:  Class 4 consists of all General Unsecured Claims.

3.4.2    Treatment:  Beginning on either (i) the thirtieth (30th) day from the Effective Date, with respect to Allowed Class 4 Claims listed on Schedule 1 (subject to the Creditor Trustee establishing a reserve for Disputed Claims in Class 4), (ii) the first Distribution Date after the applicable Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (iii) the first Distribution Date after the date on which any objection to such General Unsecured Claim is settled, withdrawn, or overruled pursuant to a Final Order of the Bankruptcy Court, each Holder of an Allowed Class 4 General Unsecured Claim shall receive a pro rata Distribution of any GUC Funds.  On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Creditor Trustee shall continue to make pro rata Distributions to the holders of Allowed Claims in Class 4 of any available GUC Funds that remain in the Debtors' Estates, until the Consummation Date.  The timing of Distributions made to Holders of Allowed Claims in Class 4 pursuant to this Plan shall be determined by the Creditor Trustee in his sole discretion.

Notwithstanding any other provision of this Section 3.4.2, (a) each Holder of a Class 4 Claim that is listed on Schedule 1 to the Plan as Allowed shall be deemed to have an Allowed Claim in the amount set forth opposite such Holder's name on Schedule 1 for all purposes, and such Claims shall not be subject to objection, recharacterization, disallowance or subordination; (b) each Holder of a Class 4 Claim that is listed on Schedule 1 to the Plan as a Disputed Claim shall be deemed to have an Allowed Claim in an amount to be established pursuant to either an agreement between such Holder and the Creditor Trustee or pursuant to a Final Order by the Bankruptcy Court, as applicable; (c) notwithstanding the terms and conditions of the Interim Distribution Agreements, all Distributions to Holders of Allowed Class 4 Claims shall be made on a pro rata basis out of the GUC Funds; and (d) except as otherwise agreed by the Creditor Trustee and the Holder of such Claim or as otherwise ordered by the Bankruptcy Court, any Class 4 General Unsecured Claim that is not listed on Schedule 1 shall be deemed a Disallowed Claim under the Plan.

The aggregate Distributions payable to each Holder of an Allowed Class 4 General Unsecured Claim shall not exceed the Allowed Amount of such Claim.  The Distributions payable under this Section 3.4.2 shall be in full and final satisfaction of the amounts due to Holders of Allowed Class 4 General Unsecured Claims under the Plan.

In the event that the amount of GUC Funds on the Effective Date is less than $6 million, then (a) if the amount of GUC Funds on the Effective Date is $5.1 million or more, thirty percent (30%) of the Net Litigation Proceeds shall be added to the GUC Funds, (b) if the amount of GUC Funds on the Effective Date is $4.6 million or more but less the $5.1 million, forty percent (40%) of the Net Litigation Proceeds shall be added to the GUC Funds, and (c) if the amount of GUC Funds on the Effective Date is less than $4.6 million, fifty percent (50%) of the Net Litigation Proceeds shall be added to the GUC Funds; provided, however, once the aggregate amount of the GUC Funds equals $7 million, no further portion of the Net Litigation Proceeds shall be added to the GUC Funds.  All GUC Funds shall be paid to the Creditor Trust for the benefit of Holders of Allowed Class 4 General Unsecured Claims.

All GUC Funds shall be remitted to the Creditor Trustee (or the Creditor Trust, as applicable) beginning as of the Effective Date so the Creditor Trustee can carry out its duty to make Distributions from the GUC Funds to Holders of Allowed Class 4 General Unsecured Claims.

3.4.3     Voting:  Class 4 is an Impaired Class.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Claim in Class 4 is entitled to vote to accept or reject this Plan.

3.5     *Class 5 – Equity Interests*.

3.5.1     Classification: Class 5 consists of all Equity Interests.

3.5.2     Treatment: Class 5 will receive neither receive any Distribution under the Plan nor retain any property under the Plan.  All Equity Interests in the Debtors shall be deemed cancelled upon the Effective Date.

3.5.3     Voting: Class 5 is an Impaired Class and will receive no Distribution under the Plan and, therefore, holders of Equity Interests in Class 5 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

3.6     *No Waiver of Defenses.* Except as otherwise provided in this Plan, nothing under this Plan is intended to or shall affect the Debtors', the Liquidating Agent's or the Estates' rights and defenses in respect of any Claim under this Plan, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against such Claims.

## ARTICLE IV
## Treatment of Unclassified Claims

4.1     *Summary.*  Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, this Plan.  All such Claims are instead treated separately in accordance with this Article IV and in accordance with the requirements set forth in sections 1129(a)(9)(A) and (C) of the Bankruptcy Code.

4.2     *Administrative Expense Claims*.

4.2.1     Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash on the latest of (i) the Effective Date, (ii) as soon as practicable after the date on which such Claim becomes an Allowed Administrative Expense Claim, (iii) upon such other terms as may be agreed upon by such Holder and the Liquidating Agent, or (iv) as otherwise ordered by the Bankruptcy Court.

4.2.2     **Except as otherwise provided in this Plan, any Person holding an Administrative Expense Claim (other than a claim for Professional Compensation and other than any claim for fees and charges assessed against the Estates under chapter 123 of title 128 of the United States Code) shall file a proof of such Administrative Expense Claim with**

the Claims Agent within thirty (30) days after the Liquidating Agent provides notice by mail or by publication, in a form and manner approved by the Bankruptcy Court, of the occurrence of the Effective Date.  At the same time any Person files an Administrative Expense Claim, such Person shall also serve a copy of the Administrative Expense Claim upon counsel for the Liquidating Agent and the Creditor Trustee.  Any Person who fails to timely file and serve a proof of such Administrative Expense Claim shall be forever barred from seeking payment of such Administrative Expense Claim by the Debtors and the Estates.

4.2.3     Any Person seeking an award by the Bankruptcy Court of Professional Compensation shall file a final application with the Bankruptcy Court for allowance of Professional Compensation for services rendered and reimbursement of expenses incurred through the Effective Date within sixty (60) days after the Effective Date or by such other deadline as may be fixed by the Bankruptcy Court.  The provisions of this paragraph shall not apply to any professional providing services pursuant to, and subject to the limits contained in, the *Order Authorizing Debtors to Retain and Compensate Professionals Used in the Ordinary Course of Business* entered in the Bankruptcy Cases on May 1, 2018.

4.3     *Tax Claims.*  Except to the extent that the Holder of a particular Tax Claim has agreed to a different treatment of such Claim, each Holder of an Allowed Tax Claim shall receive Cash on the Effective Date (or as soon thereafter as is reasonably practicable) in an amount equal to such Allowed Tax Claim.  The Debtors shall pay each Tax Claim that becomes Allowed following the Effective Date in Cash in full as soon as reasonably practicable after the date such Claim becomes Allowed.

## ARTICLE V
## Treatment of Executory Contracts and Unexpired Leases

5.1     *Rejection of Certain Executory Contracts and Unexpired Leases.*  On the Effective Date, (i) the Executory Contracts or Unexpired Leases listed on <u>Schedule 2</u> shall be deemed assumed by Fibrant and assigned to ELT, (ii) the Executory Contracts or Unexpired Leases listed on <u>Schedule 3</u> shall be deemed assumed by Fibrant, and (iii) all other Executory Contracts or Unexpired Leases of the Debtors will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except those Executory Contracts or Unexpired Leases that (a) have been previously rejected or assumed by any Debtor pursuant to an order of the Bankruptcy Court, (b) are the subject of a motion to assume filed by any Debtor which is pending on the Effective Date, or (c) are assumed by any Debtor pursuant to the Plan or the Confirmation Order.

5.2     *Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases*

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to this Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable cure amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree with the Debtors in writing (the "Cure Claim Amount").

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under this Plan, at least twenty (20) days prior to the Plan Objection Deadline, the Debtors shall file and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim Amount, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment, under this Plan or any related Cure Claim Amount, must be filed, served and actually received by the Debtors prior to the Plan Objection Deadline (notwithstanding anything in the Schedules or a proof of claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Claim Amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and Cure Claim Amount. The Confirmation Order shall constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any proposed Cure Claim Amount, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (c) any other matter pertaining to assumption or assignment, the applicable Cure Claim Amount required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment; provided, however, that following the resolution of any such dispute the Debtors or the Liquidating Agent, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it. The Debtors or the Liquidating Agent, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code. Any proofs of claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order shall be deemed disallowed and expunged (subject to any cure claims filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to this Plan, upon and as of the Effective Date, the applicable assignee shall be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors shall be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

5.3     *Claims Based on Rejection of Executory Contracts or Unexpired Leases.* All proofs of claim with respect to Claims arising from the rejection pursuant to this Plan of any Executory Contracts or Unexpired Leases, if any, must be filed with the Claims Agent and served upon counsel for the Liquidating Agent within thirty (30) days after the Effective Date (for the avoidance of doubt, this requirement does not apply to Holders of Claims that have their Claims listed in Schedule 1, as those Claims are treated as Allowed or Disputed Claims, as applicable, pursuant to this Plan). Any Claims arising from the rejection of Executory Contracts or Unexpired Leases that become Allowed Claims are classified and shall be treated as a Class 4 General Unsecured Claims, as applicable. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to this Plan not filed within the time required by this section will be forever barred from assertion against the Debtors, the Estates, and each of their successors and assigns and their assets and properties unless otherwise ordered by the Bankruptcy Court or provided in this Plan. All such late-filed Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Section 10.8 herein. Notwithstanding the foregoing, a Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease rejected pursuant to an order of the Bankruptcy Court must be filed prior to any bar date set forth in such order.

5.4     *Survival of Certain Indemnification Obligations.* Notwithstanding any other provision of this Plan, the obligations of the Debtors pursuant to their organizational documents to indemnify persons serving after the Filing Date as officers, directors, managers, agents, or employees of the Debtors with respect to actions, suits and proceedings against the Debtors or such officers, directors, managers, agents, or employees, based upon any act or omission for, on behalf of, or relating to the Debtors and occurring prior to or after the Filing Date, shall not be discharged or impaired by the confirmation of the Plan (it being understood that such obligations shall continue to be obligations of the Debtors and the Estates from and after the Confirmation Date).

5.5     *Certain Applicable Insurance Matters.* On the Effective Date, pursuant to Sections 105 and 1123(a)(5)(B) of the Bankruptcy Code, the Debtors shall transfer and assign (i) to ELT all of the Debtors' rights to assert and pursue claims under the Applicable ELT Insurance Causes of Action, and ELT shall have the right thereafter to prosecute, settle, enforce, and otherwise realize, or control the prosecution, settlement, enforcement or other realization of, the Debtors' (including any of their predecessors in interest) claims and rights arising under the Applicable ELT Insurance Causes of Action, and (ii) to CIH all of the Debtors' rights to assert and pursue claims under the Applicable CIH Insurance Causes of Action, and CIH shall have the right thereafter to prosecute, settle, enforce, and otherwise realize, or control the prosecution, settlement, enforcement or other realization of, the Debtors' (including any of their predecessors in interest) claims and rights arising under the Applicable CIH Insurance Causes of Action. For the avoidance of doubt, the Net Litigation Proceeds in respect of the Applicable CIH Insurance Causes of Action shall be subject to the rights of Holders of Allowed Class 4 General Unsecured Claims to receive Net Litigation Proceeds pursuant to section 3.4 of this Plan.

## ARTICLE VI
## Means for Implementation of Plan

6.1 *Substantive Consolidation*. This Plan is premised on the substantive consolidation of the Debtors with respect to the treatment of all Claims and Equity Interests. This Plan shall serve as a request by the Debtors, in lieu of a separate motion, to the Bankruptcy Court, that it grant substantive consolidation with respect to the treatment of all Claims and Equity Interests as follows: on the Effective Date, (a) all assets and liabilities of the Debtors will be pooled or treated as though they were pooled; (b) all guarantees by each Debtor of the obligations of the other Debtors and any joint and several liability of the Debtors shall be eliminated; (c) all Intercompany Claims shall be cancelled and extinguished without the payment of any consideration; (d) no Distributions shall be made under the Plan on account of any Equity Interest held by a Debtor; and (e) each and every Claim against any Debtor shall be deemed filed against the consolidated Debtors and all Claims filed against more than one Debtor for the same liability shall be deemed one Claim against the consolidated Debtors. The entry of the Confirmation Order shall constitute the approval by the Bankruptcy Court, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors and their Estates for all purposes relating to the Plan, including for purposes of voting, confirmation, and Distributions. Unless otherwise provided herein, the consolidation of the Debtors effected by the Plan shall not (other than for purposes relating to Distributions, as set forth above) affect (i) the legal and organizational structure of the Debtors, (ii) any defense to any Claim or cause of action, or (iii) any distributions out of any insurance policy or proceeds of such policy.

6.2 *Dissolution of Fibrant*. Fibrant will be deemed dissolved and will cease to exist upon the date the EPD Permit is transferred, which dissolution shall occur immediately following the transfer of the EPD Permit to ELT; such dissolution shall be deemed to occur pursuant to the applicable laws of the State of Delaware and without the necessity of taking any action or making any filing with the Delaware Secretary of State or otherwise. Fibrant and the Liquidating Agent are authorized to file the Plan and Confirmation Order as evidence of the dissolution of Fibrant and shall take such actions as reasonably requested by the ChemicaInvest Parties with respect to the dissolution of Fibrant and administration of such dissolution with the Delaware Secretary of State.

6.3 *Vesting of the Debtors' Assets*. Pursuant to this Plan, all property of the Debtors and their Estates shall vest automatically in the Debtors on the Effective Date (without the necessity of executing any instruments of assignment), for the express purpose of allowing the Debtors to close the ELT Transaction and the Liquidating Agent and Creditor Trustee to make Distributions to Holders of Claims pursuant to the terms and conditions of this Plan. In addition, on the Effective Date, (a) the Causes of Action shall be deemed transferred, conveyed and assigned to the Litigation Trust, (b) the Applicable ELT Insurance Causes of Action shall be deemed transferred, conveyed and assigned to ELT, and (c) the DSM SPA Causes of Action and the Applicable CIH Insurance Causes of Action shall be deemed transferred, conveyed and assigned to CIH. As of the Effective Date, (i) all property of the Debtors shall be free and clear of all Liens, Claims and Equity Interests, and (ii) the rights of Holders of Claims to receive Distributions shall be governed by the Plan.

6.4    *Operation of the Debtors*. The Liquidating Agent shall have the rights, powers and duties as set forth in this Plan and shall be responsible for administering this Plan under the terms and subject to the conditions set forth herein.  After the Effective Date, the Liquidating Agent shall be authorized to take, on behalf of the Debtors, all necessary, desirable or appropriate actions to direct and oversee any remaining business activities, winddown activities, and to proceed with an orderly, expeditious and efficient liquidation and distribution of the Estates.  The Liquidating Agent shall be authorized to retain or engage, or to cause the Debtors to retain or engage, such employees, professional persons and agents as are appropriate or desirable to continue the liquidation of the Estates.  Further, the Liquidating Agent shall be authorized to make Distributions from the Retained Proceeds to pay the costs and expenses incurred after the Effective Date in connection with the administration, liquidation and distribution of the Estates, without the necessity of providing any notice or seeking or obtaining any approval of the Bankruptcy Court with respect to such Distributions.  Without limiting the generality of the foregoing, the Liquidating Agent shall be authorized to make Distributions from the Retained Proceeds to pay the fees and expenses of any professional persons retained by the Liquidating Agent and/or the Debtors.  The Liquidating Agent shall be the representative of the Estates as contemplated by section 1123(b)(3)(B) of the Bankruptcy Code.  Except as otherwise specifically provided in this Plan, the Liquidating Agent shall have full and exclusive power and authority to act on behalf of the Debtors and shall be responsible for performing the duties of the Debtors under this Plan.  The Liquidating Agent shall have the rights, duties and powers of a trustee appointed pursuant to sections 701, 702 and 1104 of the Bankruptcy Code to act on behalf of the Debtors with regard to the administration of the Bankruptcy Cases and the assets of the Estates.  No recourse shall ever be had, directly or indirectly, against the Liquidating Agent personally, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Agent under this Plan, or by reason of the creation of any indebtedness by the Liquidating Agent under this Plan for any purpose authorized by this Plan, save and except in cases of defalcation, misappropriation, fraud or gross negligence by the Liquidating Agent, it being expressly understood and agreed that such liabilities, promises, contracts, instruments, undertakings, obligations, covenants and agreements shall be enforceable only against and be satisfied only out of the assets of the Debtors or shall be evidence only of a right of payment from the Debtors' assets.  The Liquidating Agent shall be indemnified and held harmless by the Estates from and against any expenses (including the reasonable fees and expenses of counsel), damages or losses incurred or suffered by the Liquidating Agent in connection with any claim or demand which in any way arises out of or relates to this Plan or the services of the Liquidating Agent under this Plan; provided, however, if the Liquidating Agent is guilty of defalcation, misappropriation, fraud or gross negligence, then the Liquidating Agent shall bear all losses, damages and expenses arising as a result of such defalcation, misappropriation, fraud or gross negligence.  The Liquidating Agent may resign at any time in its sole discretion, and such resignation shall be effective upon the earlier of (i) 30 days after the Liquidating Agent has given written notice of resignation to the Creditor Trustee and filed such notice with the Bankruptcy Court, and (ii) the date the Bankruptcy Court approves a successor to the resigning Liquidating Agent.  In case of the resignation of the Liquidating Agent, a successor shall thereupon be appointed by the Creditor Trustee, subject to approval of the Bankruptcy Court, or, in the event that the Creditor Trustee does not exist or does not exercise such right of appointment, by the Bankruptcy Court.  The Liquidating Agent shall be reimbursed for any out-of-pocket expenses incurred in connection with the discharge of its duties

under this Plan and shall be compensated for his services at his standard hourly rate. The Liquidating Agent's compensation and expenses shall be reimbursed and/or paid out of the Retained Proceeds and such compensation and expenses may be paid without the necessity of providing notice to any party in interest or obtaining any approval from the Bankruptcy Court. On the Consummation Date, after making the Final Distribution under this Plan, the Liquidating Agent shall be discharged from its duties under this Plan.

6.5     *Billing and Collection of Accounts Receivable.*  As of the Effective Date, the Liquidating Agent shall be authorized to: (i) complete the billing of the Debtors' account debtors; (ii) send correspondence to the Debtors' account debtors requesting payment of all amounts outstanding, due and payable to the Debtors; (iii) engage in other collection activity to ensure payment of outstanding accounts receivable; and (iv) employ or cause the Debtors to employ one or more collection agencies to further pursue collection of any outstanding accounts receivable.

6.6     *Maintenance of Bank Accounts and Distribution of Liquidation Proceeds.* The Liquidating Agent and the Creditor Trustee shall have the authority and responsibility to disburse the assets of the Estates to the Holders of Allowed Claims and otherwise in accordance with the terms of this Plan. All GUC Funds, Liquidation Proceeds and Retained Proceeds shall be held in trust for the benefit of Holders of Allowed Claims in one or more separate bank or other depository accounts throughout the term of this Plan. The Liquidating Agent shall be entitled to use the Debtors' bank accounts that are in existence as of the Effective Date and shall be authorized to open such bank or other depository accounts as may be necessary or appropriate in the discretion of the Liquidating Agent to enable it to carry out the provisions of this Plan (provided that any bank account opened by the Liquidating Agent shall be at a financial institution approved by the Office of the United States Trustee). The Liquidating Agent may, from time to time, cause the Debtors to invest the Liquidation Proceeds and Retained Proceeds in certificates of deposit, treasury bills, money market accounts or other short term investments. All interest earned shall be retained for Distribution to the Holders of Allowed Claims pursuant to this Plan. The Liquidating Agent  and the Creditor Trustee (with respect to Class 4 Claims) shall prepare and maintain an adequate set of financial books, records or databases that will allow the Liquidating Agent and Creditor Trustee (as applicable) to accurately track the amount of Claims asserted against the Estates and the amounts paid to each Holder of an Allowed Claim pursuant to the terms of this Plan; provided that the Liquidating Agent also shall be entitled to use the Debtors' books and records (including the books and records maintained by the Claims Agent that are in existence on the Effective Date). On the Initial Distribution Date or, with respect to the Creditor Trustee, on the 30th day from the Effective Date (or as soon thereafter as is reasonably practicable), and each subsequent Distribution Date, the Liquidating Agent, and the Creditor Trustee with respect to Class 4 General Unsecured Claims, shall make Distributions to the Holders of Allowed Claims in accordance with the terms of this Plan. The Liquidating Agent, and the Creditor Trustee with respect to Class 4 General Unsecured Claims, will continue to make Distributions until the assets in the Estates have been fully distributed to Holders of Allowed Claims in accordance with the terms of this Plan.

6.7     *Cancellation of Existing Securities of Debtors and Agreements.* On the Effective Date, except as otherwise specifically provided for herein, (a) any and all agreements, Certificates or other documents evidencing or creating any Claims, rights, indebtedness or obligation of or ownership interest in the Debtors will be deemed to be fully and finally cancelled, and (b) the

obligations of, Claims against, and/or Equity Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar organizational documents governing any and all agreements, Certificates or other documents evidencing or creating any Claims, rights, indebtedness or obligation of or ownership interest in the Debtors will be terminated and released.

6.8     *Books and Records*.  To the extent not already transferred on the Effective Date, the Debtors shall transfer dominion and control over any and all books and records that may relate to the Environmental Remediation Property to ELT on the Effective Date; provided, however, that any books and records that may relate to the Causes of Action shall be transferred to CIH (in its capacity as Trustee under the Litigation Trust Agreement), any books and records that may relate to the Applicable CIH Insurance Cause of Action shall be transferred to CIH, and any books and records that may relate to the Applicable ELT Insurance Causes of Action shall be transferred to ELT. CIH or ELT, as applicable, may, and shall be deemed authorized but not required to, abandon all such books and records on or after ninety (90) days from the Effective Date, provided, however, that CIH and ELT shall not dispose or abandon any books and records that are reasonably likely to pertain to pending litigation in which the Litigation Trust, the Debtors or the Debtors' current or former officers, directors or managers are a party or that pertain to Claims without further order of the Bankruptcy Court nor shall CIH or ELT dispose of or abandon any books or records relating to the Environmental Remediation Property, the Applicable Causes of Action, or the DSM SPA Causes of Action without first consulting one another. Pursuant to section 554 of the Bankruptcy Code, Section 6.8 of the Plan shall constitute a motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the books and records of the Debtors.

6.9     *Corporate Action.* Each of the matters provided for under this Plan involving the organizational structure of any Debtor or any limited liability company action to be taken by or required of any Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by officers, creditors, managers or equity holders of any of the Debtors.

6.10     *Preservation of Causes of Action.*  Except as expressly set forth in this Plan (including Section 9.6 of this Plan), in accordance with section 1123(b)(3) of the Bankruptcy Code, (i) the Litigation Trust (as assignee of the Debtors) will retain and may (but is not required to) enforce all Causes of Action, (ii) ELT (as assignee of the Debtors) will retain and may (but is not required to) enforce all Applicable ELT Insurance Causes of Action, and (iii) CIH (as assignee of the Debtors) will retain and may (but is not required to) enforce all DSM SPA Causes of Action and the Applicable CIH Insurance Causes of Action. After the Effective Date, the Litigation Trustee, ELT, and CIH, in their respective sole and absolute discretion (except as provided in Section 10.7 of this Plan), shall have the right to bring, settle, release, compromise, or enforce such Applicable Causes of Action, Applicable CIH Insurance Causes of Action, and DSM SPA Causes of Action (or decline to do any of the foregoing), without further approval of the Bankruptcy Court. The failure of the Debtors to specifically list any claim, right of action, suit, proceeding or other Applicable Cause of Action, Applicable CIH Insurance Cause of Action or DSM SPA Cause of Action in this Plan does not, and will not be deemed to, constitute a waiver or release by the Estates, the Liquidating Agent, the Litigation Trust, ELT, CIH or the Debtors of such claim, right

of action, suit, proceeding or other Applicable Cause of Action, Applicable CIH Cause of Action or DSM SPA Cause of Action, and the Litigation Trust, ELT, and CIH will retain the right to pursue such claims, rights of action, suits, proceedings and other Applicable Causes of Action, Applicable CIH Cause of Action and DSM SPA Cause of Action (as applicable), each in its respective sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Applicable Cause of Action, Applicable CIH Cause of Action or DSM SPA Cause of Action upon or after the confirmation or consummation of this Plan.

6.11    *Effectuating Documents; Further Transactions*. Each of the Debtors, their respective officers and designees, and the Liquidating Agent, are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions, as may be necessary, desirable or appropriate, or as may be reasonably requested by the ChemicaInvest Parties, to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.  In order to facilitate the liquidation and distribution of the Estates and the wind-down of the Debtors' affairs, on the Effective Date the Liquidating Agent shall be deemed, by operation of law and the Confirmation Order and without need for any action by any person affiliated with the Debtors or any officer or manager of the Debtors, to hold an irrevocable power of attorney on behalf of each Debtor and each Estate and with respect to all of the Assets.

6.12    *ELT Transaction and ChemicaInvest Parties' Payments*.   Pursuant to the ELT Property Transfer Agreement, on the Effective Date, (a) ELT shall acquire the Environmental Remediation Property and assume responsibility for environmental remediation of the Environmental Remediation Property on the terms set forth in the ELT Property Transfer Agreement, and (b) the ChemicaInvest Parties shall pay (i) to the Environmental Remediation Trust the Remediation Payment, (ii) the Insurance Payment, and (iii) to the Debtors the Estate Payment.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the ELT Property Transfer Agreement, the Environmental Remediation Trust Agreement and the Litigation Trust Agreement.

6.13    *Fibrant South Center Proceeds*.  If the South Center Assets are sold by South Center (a) prior to or on the Effective Date, the Debtors shall transfer fifty percent (50%) of the Fibrant South Center Proceeds to the Environmental Remediation Trust, which shall reduce on a dollar-for-dollar basis the amount of the Remediation Payment to be paid by CIH to the Environmental Remediation Trust, and (b) after the Effective Date, the Debtors or Liquidating Agent (as applicable) shall transfer fifty percent (50%) of the Fibrant South Center Proceeds to CIH promptly following the closing of the sale of the South Center Assets. The remaining fifty percent (50%) of the Fibrant South Center Proceeds shall be distributed to Augusta Sulfate Company, LLC ("Augusta Sulfate") in full satisfaction of its Allowed Miscellaneous Secured Claim; provided, however, if Augusta Sulfate is the purchaser of the South Center Assets, then (i) the Allowed Miscellaneous Secured claim of Augusta Sulfate shall be deemed satisfied as of the closing of the sale, (ii) Augusta Sulfate shall receive a purchase price "credit" in an amount equal to fifty percent of the Fibrant South Center Proceeds, and (iii) no funds shall be distributed to Augusta Sulfate in connection with the sale of the South Center Assets.

6.14    *Establishment of the Environmental Remediation Trust*. On the Effective Date, the Environmental Remediation Trust shall be established pursuant to the Environmental Remediation Trust Agreement for the purposes of, among other things: (i) holding the Environmental Remediation Trust Assets; (ii) carrying out administrative functions related to the Environmental Remediation Trust Assets; and (iii) funding implementation of future Clean-Up Activities (as such term is defined in the Environmental Remediation Trust Agreement) with respect to the Environmental Remediation Property. Upon execution of the Environmental Remediation Trust Agreement, the Environmental Remediation Trustee shall be authorized to take all steps necessary to complete the formation of the Environmental Remediation Trust. The Environmental Remediation Trust shall be administered by the Environmental Remediation Trustee in accordance with the Environmental Remediation Trust Agreement and the ELT Property Transfer Agreement.

6.15    *Transfer of the Environmental Remediation Property*. On the Effective Date, the Debtors shall transfer, assign, and deliver to ELT all of Debtors' right, title and interest in and to the Environmental Remediation Property in accordance with section 1141 of the Bankruptcy Code. Pursuant to Sections 363(f) and 1123(a)(5)(B) and (D) of the Bankruptcy Code, the foregoing transfers shall be: (i) free and clear of all claims, liens, encumbrances and interests against the Debtors of any kind or nature whatsoever (other than "Permitted Title Exceptions," as such term is defined in the ELT Property Transfer Agreement); and (ii) subject to any rights of the ChemicaInvest Parties, ELT, the Debtors, EPA and EPD under the Environmental Remediation Trust Agreement or the ELT Property Transfer Agreement.

6.16    *Appointment of the Environmental Remediation Trustee.* Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the appointment of the Environmental Remediation Trustee, and such appointment shall be effective as of the Effective Date. The Environmental Remediation Trustee shall have and perform the duties and obligations set forth in the Environmental Remediation Trust Agreement.

6.17    *Transfer of Remaining Assets*.  On and after the Effective Date, the Liquidating Agent shall have sole authority to cause the Debtors to liquidate and sell, and the Liquidating Agent shall pursue the liquidation of, all remaining Assets.  The Liquidating Agent shall have the authority to consummate such liquidations and sales without the necessity of obtaining any approval from the Bankruptcy Court or providing notice to any party in interest if the aggregate purchase price for the Assets to be sold in connection with a particular transaction is less than or equal to $500,000; provided, however, the Liquidating Agent shall have the right in its sole discretion to seek and obtain Bankruptcy Court approval of any sale transaction if the Liquidating Agent believes it is in the best interests of the Estates to do so.  If the aggregate purchase price in connection with a particular sale transaction exceeds $500,000, then Bankruptcy Court approval (following Designated Notice) shall be required.  The Liquidating Agent shall also have the authority, if appropriate in the sole discretion of the Liquidating Agent, to abandon any Assets that cannot be liquidated or sold in a cost effective manner or that have inconsequential value.

6.18    *Exemption From Certain Transfer Taxes and Recording Fees*. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to any other Person pursuant to this Plan (including pursuant to the ELT Property Transfer Agreement and including any sale of the South Center Assets), or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax,

conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6.19   *Further Authorization.* Each of the Debtors and the Liquidating Agent shall be entitled to seek such orders, judgments, injunctions and rulings as they deem necessary or desirable to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

6.20   *Establishment of the Litigation Trust*.  On the Effective Date, the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purposes of, among other things, (i) holding the Causes of Action, (ii) prosecuting, settling, enforcing and/or realizing on the Causes of Action, and (iii) if applicable, paying a portion of the Net Litigation Proceeds to the Debtors (which will be added to the GUC Funds).  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the appointment of the Litigation Trustee as trustee of the Litigation Trust, and such appointment shall be effective as of the Effective Date.

6.21   *Dissolution*.  Evergreen and Monomers will be deemed dissolved and will cease to exist upon the date that is 150 days after the Effective Date, which dissolution shall occur immediately following the 150th day; such dissolution shall be deemed to occur pursuant to the applicable laws of the State of Georgia and without the necessity of taking any action or making any filing with the Georgia Secretary of State or otherwise. The Liquidating Agent is authorized to take such actions as reasonably requested by the ChemicaInvest Parties with respect to the dissolution of Evergreen and Monomers and administration of such dissolution with the Georgia Secretary of State. After the occurrence of the Consummation Date and the entry of an order of the Bankruptcy Court closing the Bankruptcy Cases, South Center shall be deemed dissolved pursuant to the applicable laws of the State of Georgia without the necessity of taking any action or making any filing with the Georgia Secretary of State or otherwise.

6.22   *Insurance Settlements*.   The Settling Insurers have entered into the Insurance Settlements, whereby each of the Settling Insurers will acquire any and all rights and interests of the Plaintiffs in and to the Applicable Insurance and any other applicable policies as provided under each of the respective Insurance Settlements (collectively and individually, the "Settled Policies"), free and clear of any and all Liens, Claims, encumbrances, interests and rights of any nature, whether at law or in equity, of any Person or Entity, pursuant to Section 363(b), (f) and (m) of the Bankruptcy Code.  The Insurance Settlements also provide for releases of the Settling Insurers and injunctions in favor of the Settling Insurers and the Settled Policies, subject to entry of an order of the Bankruptcy Court approving the Insurance Settlements and modifying the Plan to include the Settling Insurers as Creditor Released Parties and Debtor Released Parties under Sections 1.1.35, 1.1.41, 10.3, 10.4 and 10.8 of the Plan, as applicable.

In order to effectuate the terms of the Insurance Settlements, the Plaintiffs, or certain of them, have caused or will cause: (a) ELT and CIH to assign any and all rights and interests in and to the Settled Policies, including the Applicable ELT Insurance Causes of Action and the Applicable CIH Insurance Causes of Action, to South Center; and (b) the Debtors, and each of

-30-

them, to transfer, sell and assign and any all of their rights and interests in and to the Settled Policies to the applicable Settling Insurer.

The Debtors have filed a motion with the Bankruptcy Court seeking approval of the Insurance Settlements and modification of the Plan (the "Plan Modifications") consistent therewith, pursuant to Sections 105(a), 363, and 1127 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 (the "Settlement Motion"). Actual or constructive notice of the Settlement Motion has been or will be provided to, among other parties in interest, known and unknown Holders of Claims against the Debtors or interests in the Settled Policies, pursuant to Bankruptcy Rules 2002 and 6004. Entry of an order approving the Settlement Motion shall, among other things, constitute Bankruptcy Court approval of the Insurance Settlements and the Plan as modified, and application of the Confirmation Order to the Plan as modified, pursuant to Sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, as applicable, and Bankruptcy Rules 6004 and 9019. Notwithstanding any provision of the Plan or order of the Court approving the Plan Modifications to the contrary, no liability shall attach to the Liquidating Agent or Creditor Trustee, in each case, in their personal capacities, or their respective employers, affiliates, predecessors, or attorneys or other agents and professionals arising from the Plan Modifications requested in the Settlement Motion, and such persons and entities shall be treated as exculpated parties pursuant to Section 10.7 of the Plan through the date of consummation of all requested Plan Modifications.

## ARTICLE VII
## Provisions Regarding Corporate Governance of Debtors

7.1    *Amendment of Organizational Documents.* On and as of the Effective Date, the organizational documents of each Debtor shall be deemed to have been amended to prohibit the issuance of nonvoting equity securities to the extent required by the Bankruptcy Code.

7.2    *Managers and Officers of Debtors.* On the Effective Date (a) the authority, power and incumbency of the persons then acting as officers and managers of the Debtors shall be terminated and such officers and managers shall be deemed to have resigned, and (b) the Liquidating Agent shall be deemed the sole officer and sole manager of each Debtor and shall be deemed to have succeeded to such powers as would have been previously exercisable by the equityholder of each Debtor.

## ARTICLE VIII
## Distributions

8.1    *Disbursing Agents.* Except with respect to Distributions made by the Creditor Trustee to Holders of Allowed Class 4 General Unsecured Claims, all Distributions under this Plan shall be made by the Liquidating Agent.

8.2    *Distributions of Cash.* Any Distribution of Cash made by the Liquidating Agent, or by the Creditor Trustee with respect to Allowed Class 4 General Unsecured Claims, pursuant to this Plan shall, at the Liquidating Agent's or Creditor Trustee's option, as applicable, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

8.3    *No Interest on Claims*. Unless otherwise specifically provided for in this Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on Claims and no Holder shall be entitled to interest accruing on or after the Filing Date on any Claim.

8.4    *Delivery of Distributions*. The Distribution to a Holder of an Allowed Claim shall be made by the Liquidating Agent and, with respect to Holders of Allowed Class 4 General Unsecured Claims, the Creditor Trustee: (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to the Debtors, the Liquidating Agent or the Creditor Trustee after the date of any related proof of claim, (c) at the address set forth in any Notice of Transfer of Claim, (d) at the address reflected in the Schedules if no proof of claim has been filed and the Debtors, Liquidating Agent and Creditor Trustee have not received a written notice of a change of address, or (e) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtors' books and records.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Liquidating Agent or Creditor Trustee, as applicable, is notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest from the original Distribution Date to the new Distribution Date. Amounts in respect of undeliverable Distributions made in Cash shall be retained by the Liquidating Agent in an "Unpaid Claims Reserve" until such Distributions are claimed.  All Cash Distributions returned to the Liquidating Agent or Creditor Trustee and not claimed within six (6) months of return shall be irrevocably retained by the Liquidating Agent (and the funds held in the Unpaid Claims Reserve shall become Liquidation Proceeds at the end of such six-month period) notwithstanding any federal or state escheat laws to the contrary.  After the end of such six-month period, the Claim of any other Person to such property shall be discharged and forever barred.

8.5    *Distributions to Holders as of the Record Date*. All Distributions on Allowed Claims shall be made to the Record Holders of such Claims.  As of the close of business on the Record Date, the Claims register maintained by the Claims Agent shall be closed. The Liquidating Agent and Creditor Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  The Liquidating Agent and Creditor Trustee shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.

8.6    *De Minimis Distributions*. Except for Distributions being made on the Consummation Date, the Liquidating Agent and the Creditor Trustee, as applicable, shall have no obligation to make a Distribution if the amount to be distributed to the specific Holder of the Allowed Claim is less than Fifty Dollars ($50.00); provided, however, if the Liquidating Agent elects not to make a Distribution as contemplated by this Section 8.6, such Distribution shall be held for the Holder of such Claim until the next Distribution Date at which time such Distribution shall be made (unless this Section 8.6 shall again apply).

8.7    *Fractional Dollars*. Any other provision of this Plan notwithstanding, the Liquidating Agent and Creditor Trustee, as applicable, shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

8.8     *Withholding Taxes*.  The Debtors, the Creditor Trustee and the Liquidating Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements. Any amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to the Holders of applicable Claims.

8.9     *Tax Reporting*.   In order to receive Distributions under the Plan, all Holders of Allowed Claims will need to identify themselves to the Liquidating Agent or Creditor Trustee, as applicable, and provide all tax information the Liquidating Agent or Creditor Trustee, as applicable, deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each Holder).  The Liquidating Agent and/or Creditor Trustee, as applicable, may refuse to make a Distribution to any Holder of a Claim that fails to furnish such information within ninety (90) calendar days after a request by the Liquidating Agent or Creditor Trustee for the completion and return of the appropriate form.  In such instance, (i) such Holder shall be deemed to have forfeited its right to such Distributions, (ii) the Claim(s) of such Holder shall be waived, discharged, and forever barred without further order of the Bankruptcy Court, and (iii) such Distribution shall revert back to the Estates notwithstanding any federal, state, or escheat law to the contrary.

8.10    *Undistributed Funds*.   The Creditor Trustee may deliver to CIH any undistributed funds in the Estates if, in the reasonable judgment of the Creditor Trustee, the cost of calculating and making a final Distribution of the remaining funds is excessive in relation to the benefits to the Holders of Allowed Claims who would otherwise be entitled to such Distributions.

### ARTICLE IX
### Procedures for Treating and Resolving Disputed Claims

9.1     *Objections to Claims*.  The Creditor Trustee and the Liquidating Agent shall be entitled to object to Claims within the respective Class(es) for which the Creditor Trustee and Liquidating Agent, as applicable, are responsible for making Distributions; provided, however, that the Creditor Trustee and Liquidating Agent shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date, or (ii) that are Allowed by the express terms of this Plan.  Any objections to Claims must be filed by the Claims Objection Deadline.

9.2     *No Distributions Pending Allowance*.  Except as otherwise provided herein, no Distributions will be made with respect to any portion of a Claim unless and until (i) the Claims Objection Deadline has passed and no objection to such Claim has been filed, or (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.  Notwithstanding the foregoing, any undisputed portion of a Disputed Claim shall be deemed Allowed and the Holder of such Disputed Claim shall receive Distributions on the undisputed portion of such Disputed Claim pursuant to the terms of this Plan.

9.3     *Estimation of Claims.* The Debtors, the Creditor Trustee, or the Liquidating Agent, as the case may be, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502 of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Agent have previously objected to such Claim or whether the

Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (and after the Effective Date, the Liquidating Agent) may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

9.4     *Resolution of Claims Objections*.  On and after the Effective Date, the Liquidating Agent and the Creditor Trustee (each with respect to the Class(es) for which such party is responsible for making Distributions) shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims without approval of the Bankruptcy Court. This Section 9.4 is not intended to and shall not be construed as limiting the rights of Debtors' insurers to control the defense and settlement of Claims allegedly covered under any Applicable Insurance policy.

9.5     *Distributions After Allowance*.  As soon as practicable after (i) the occurrence of the applicable Claims Objection Deadline, if no objection to such Claim has been timely filed, or (ii) a Disputed Claim becomes an Allowed Claim, the Debtors, with respect to all Distributions other than to Holders of General Unsecured Claims, will distribute to the Holder thereof all Distributions to which such Holder is then entitled under this Plan. With respect to General Unsecured Claims, on the first Distribution Date after (i) the occurrence of the applicable Claims Objection Deadline, if no objection to such Claim has been timely filed, or (ii) a Disputed Claim becomes an Allowed Claim, notwithstanding the dollar threshold in Section 1.1.45 of the Plan, the Holder of an Allowed General Unsecured Claim shall receive the Distribution to which such Holder is then entitled plus any Distribution such Holder would have received on a prior Distribution Date had such Holder's Claim been Allowed on such prior Distribution Date; provided, however, if the date such General Unsecured Claim becomes entitled to a Distribution is less than twenty (20) Business Days prior to the next Distribution Date, the Distribution with respect to such Claim will be made on the first Distribution Date that occurs more than twenty (20) Business Days after the Claim becomes entitled to a Distribution.

9.6     *Distributions On Insured Claims*.  Except as provided in any order of the Bankruptcy Court, if any Holder has asserted an Allowed Claim that is covered as to liability, in whole or in part, by an insurance policy that is assumed or otherwise remains in effect pursuant to the terms of this Plan, such Holder will have an Allowed Claim entitled to a Distribution under this Plan only to the extent of any deductible or self-insured retention under the applicable insurance policy that was unpaid or otherwise unexhausted as of the Filing Date. Notwithstanding the foregoing, the Holder shall be entitled to pursue recovery of any amount in excess of such unpaid deductible or self-insured retention from the applicable insurance carrier (up to the full amount of such Allowed Claim) and, in connection therewith, notwithstanding the discharge of the balance of such Claim provided pursuant to this Plan, such Holder may continue to pursue the balance of such Claim against the Debtors solely for the purposes of liquidating such Claim and obtaining payment of the balance of such liquidated Allowed Claim from any otherwise applicable

policy of insurance.  Except as otherwise provided in the applicable insurance policy, the applicable insurance carrier may, at its expense, employ counsel, direct the defense, and determine whether and on what terms to settle any Disputed Claim for the purposes of determining the amount of insurance proceeds that will be paid on account of such Claim.  Except as provided in any order of the Bankruptcy Court, if after liquidation of an Allowed Claim pursuant to this Section 9.6, it is determined that there are insufficient insurance proceeds available to satisfy the amount of such Claim that is in excess of any unpaid deductible or self-insured retention, then the Holder of such Allowed Claim shall have a Claim in the amount of such insufficiency.  Notwithstanding any other provision of this Plan, after the Effective Date the Bankruptcy Court shall be authorized to enter one or more orders in the Bankruptcy Cases modifying and amending the provisions of this Section 9.6, provided that any such modifications shall not be material and adverse to the interests of Holders of insured Claims.  The treatment of any Claim or portion of a Claim as an Allowed Claim under this Section 9.6 shall not constitute a settlement or adjudication of the Claim (as to liability or damages) for any purpose other than distribution from the Estates and shall not be offered or admitted into evidence for any purpose in any other proceeding to determine the amount of the Claim for the purpose of recovering against insurance coverage, or in any action to establish insurance coverage.

## ARTICLE X
### Effect of Plan on Claims and Equity Interests

10.1   *Revesting of Assets*.  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including the Applicable Causes of Action and DSM SPA Causes of Action, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the Debtors for the express purpose of allowing the consummation of the Plan and ELT Transaction and allowing the Liquidating Agent to make Distributions to Holders of Claims pursuant to the terms and conditions of this Plan.

10.2   *Treatment of Claims and Equity Interests.*  Except as otherwise specifically provided in this Plan or in the Confirmation Order, the Distributions and rights that are provided in this Plan shall govern the rights of all Holders of Claims, whether known or unknown, against, Liens on, and Equity Interests in the Debtors or their Estates that arose prior to the Effective Date, and no such Holder shall be authorized or permitted to take any action that is inconsistent with the Plan.

10.3   *Release by Debtors of Certain Parties.*  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration provided by or on behalf of the Debtor Released Parties (including payment of the Settlement Payments), each of the Debtors and the Estates shall be deemed to have provided a full, complete, unconditional, final and irrevocable release to the Debtor Released Parties, from any and all Causes of Action and any other claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of any Debtor, whether accrued or unaccrued, whether matured or unmatured, whether existing or hereafter arising, whether known or unknown, foreseen or unforeseen, direct or indirect, fixed or contingent, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, in law, equity, contract, tort or otherwise, which any of the Debtors and the Estates has, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, equitable

subordination, breach of fiduciary duty, contribution, indemnification, joint liability, or otherwise, or based in whole or in part upon any act or omission, event, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date and arising from or related in any way to the Debtors, including those in any way related to the Bankruptcy Cases or the Plan; provided, however, the foregoing release does not release any obligations of any Debtor Released Party under the Plan or any document, instrument or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Section 10.3, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Section 10.3 is: (i) in exchange for the good and valuable consideration provided by or on behalf of the Debtor Released Parties and is a good faith settlement and compromise; (ii) in the best interests of the Debtors and all holders of Equity Interests and Claims; (iii) fair, equitable, and reasonable; and (iv) given and made after due notice and opportunity for hearing.

10.4    *Third Party Releases*. Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration provided by or on behalf of the Creditor Released Parties (including payment of the Settlement Payments), each Releasing Party shall be deemed to have provided a full, complete, unconditional, final and irrevocable release to each Creditor Released Party from any and all causes of action and any other claims, debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of any Debtor, whether accrued or unaccrued, whether matured or unmatured, whether existing or hereafter arising, whether known or unknown, foreseen or unforeseen, direct or indirect, fixed or contingent, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, in law, equity, contract, tort or otherwise, which any Releasing Party has, based in whole or in part upon any act or omission, event, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date and arising from or related in any way to the Debtors, the Estates and their business operations, assets and liabilities, including those in any way related to the Bankruptcy Cases or the Plan; provided, however, the foregoing release does not release any obligations of any Creditor Released Party under the Plan or any document, instrument, or agreement executed to implement the Plan; provided, further, that if prior to or on the Effective Date, any Releasing Party has directly or indirectly brought or asserted a claim or cause of action that has been released or is contemplated to be released pursuant to the Plan against any Creditor Released Party, such Releasing Party shall withdraw and/or dismiss, with prejudice, such pending claim or cause of action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Section 10.4, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Section 10.4 is: (i) in exchange for the good and valuable consideration provided by or on behalf of the Creditor Released Parties and is a good faith settlement and compromise; (ii) in the best interests of the Debtors and all holders of Equity Interests and Claims; (iii) fair, equitable, and reasonable; and (iv) given and made after due notice and opportunity for hearing. For the avoidance of doubt, all references to Releasing Parties set forth in this Section 10.4 and elsewhere in this Plan shall have the meaning set forth in Section 1.1.107.

-36-

Nothing herein shall be deemed to release the Settling Insurers for any (a) Claims held by the United States of America, the State of Georgia, or PCS Nitrogen, or (b) Claims in connection with any insurance policy other than the Settled Policies.

10.5    *ChemicaInvest Releases*.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, each ChemicaInvest Party shall be deemed to have provided a full, complete, unconditional, final and irrevocable release to each CIH Released Party from any and all causes of action and any other claims, debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, including any derivative claims asserted on behalf of any Debtor, whether accrued or unaccrued, whether matured or unmatured, whether existing or hereafter arising, whether known or unknown, foreseen or unforeseen, direct or indirect, fixed or contingent, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, in law, equity, contract, tort or otherwise, which any ChemicaInvest Party has, based in whole or in part upon any act or omission, event, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date and arising from or related in any way to the Debtors, the Estates and their business operations, assets and liabilities, including those in any way related to the Bankruptcy Cases or the Plan; provided, however, the foregoing release does not release any obligations of any CIH Released Party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Section 10.5, which includes, by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Section 10.5 is: (i) in exchange for the good and valuable consideration provided by or on behalf of the CIH Released Parties and is a good faith settlement and compromise; (ii) in the best interests of the Debtors and all holders of Equity Interests and Claims; (iii) fair, equitable, and reasonable; and (iv) given and made after due notice and opportunity for hearing.

10.6    *Setoffs*.  The Debtors may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Estates of any such claim that the Debtors or the Estates may have against such Holder.  This section is without prejudice to the setoff and recoupment rights, if any, of the Holders of Class 4 Claims.

10.7    ***Exculpation and Limitation of Liability*. The Debtors, the Estates, the Committee, the members of the Committee solely in their capacities as such, and any of such parties' respective current and/or post-Filing Date and pre-Effective Date members, officers, directors, managers, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action, or liability to one another or to any Holder of any Claim or Equity Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Bankruptcy Cases, the filing of the Bankruptcy Cases, the**

negotiation, formulation, preparation, dissemination, and filing of this Plan, the pursuit of confirmation or the pursuit of approval of this Plan, the Estates, the property to be distributed under this Plan, the Disclosure Statement or any other contract, instrument, release or other agreements or documents created or entered into in connection with this Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. No Holder of any Claim or Interest, or other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the parties listed in this provision for any act or omission in connection with, relating to, or arising out of the Bankruptcy Cases, the filing of the Bankruptcy Cases, the negotiation, formulation, preparation, dissemination, and filing of this Plan, the pursuit of confirmation or the pursuit of approval of this Plan, the Estates, the property to be distributed under this Plan, the Disclosure Statement or any other contract, instrument, release or other agreements or documents created or entered into in connection with this Plan. Nothing in this Section 10.7 relieves any Person from complying with the applicable provisions of the federal securities laws. Notwithstanding any other provision of the Plan (including the provisions of this Section 10.7), (a) the releases of liability by EPD and EPA shall be limited to Sections 10.4 (subject to Section 1.1.110) and 10.9 (to the extent Section 10.9 clarifies the releases in Section 10.4), (b) the exculpation and limitation of liability contained in this Section 10.7 extends to acts or omissions occurring from and after the Filing Date and through and including the Confirmation Date, and (c) Claims for payment of statutory fees pursuant to 28 U.S.C. §1930(a)(6) are not barred by this Section 10.7.

10.8    *Injunction*. Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate Final Order of the Bankruptcy Court, all Persons who have held, hold, or may hold Claims against or Equity Interests in any of the Debtors are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Creditor Released Parties with respect to any such Claim or Equity Interest; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors or Creditor Released Parties on account of any such Claim or Equity Interest; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Debtors or Creditor Released Parties or against the property or interests in the property thereof on account of any such Claim or Equity Interest; (d) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claim which is treated or satisfied pursuant to the Plan; and (e) taking any action to interfere with the implementation or consummation of the Plan; provided, however, the provisions of this Section 10.8 shall not prevent any Person from taking action in the Bankruptcy Court to enforce their rights under and in accordance with this Plan.

For the avoidance of doubt, any Person who now holds or who may in the future hold any Claims or interests of any kind or nature against, in or to any Debtor, CIH, ELT, or the Settled Policies, or any of them, is hereby forever barred, prohibited, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing any such Claims or interests against, in or to any Debtor, CIH, ELT or the Settled Policies, against any of the Settling Insurers or against, in or to any of the Settled Policies.

**Notwithstanding anything in this Section 10.8 or any other provision of the Plan to the contrary, nothing herein shall be deemed to enjoin the United States of America, the State of Georgia, or PCS Nitrogen from taking any action(s) against the Settling Insurers or the Settled Policies, or any of them.**

10.9 *Waiver of Statutory Limitation on Releases*. Each Releasing Party expressly acknowledges that although ordinarily a general release may not extend to claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the releases provided under the Plan the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of granting the release, which if known by it may have materially affected its settlement with the released party. The releases contained in this Article X are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, or foreseen or unforeseen.

10.10 *Waiver of Certain Avoidance Actions*. On and as of the Effective Date, each Debtor, in its individual capacity and as a debtor in possession for and on behalf of its Estate, shall waive, and be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever waived, the Waived Avoidance Actions. The Debtors, the Committee, the Liquidating Agent, the Creditor Trustee, and other potential representatives of the Estates shall be bound, to the same extent the Debtors are bound, by the waiver set forth above.

10.11 *Vesting of Certain Causes of Action*. Except as otherwise provided in the Plan or Confirmation Order, any and all Causes of Action that the Debtors and the Estates may hold against any Entity shall vest in the Litigation Trust on the Effective Date; provided, however, that the Net Litigation Proceeds shall be distributed to CIH and, if applicable, to the Creditor Trust (so as to permit Distributions to Holders of Allowed Class 4 General Unsecured Claims pursuant to section 3.4 of the Plan). Except as otherwise provided in the Plan (including Section 9.6) or the Confirmation Order, (x) any and all Applicable ELT Insurance Causes of Action that the Debtors and the Estates may hold against any Entity shall vest in ELT on the Effective Date; and (y) any and all Applicable CIH Insurance Causes of Action that the Debtors and the Estates may hold against any Entity shall vest in CIH on the Effective Date; provided, however, that, in each case, the Net Litigation Proceeds shall be distributed to CIH and, if applicable, to the Creditor Trust (so as to permit Distributions to Holders of Allowed Class 4 General Unsecured Claims pursuant to section 3.4 of the Plan). Except as otherwise provided in the Plan or Confirmation Order, any and all DSM SPA Causes of Action that the Debtors and the Estates may hold against any Entity shall vest in CIH on the Effective Date; provided, however, that the Net Litigation Proceeds shall be distributed to CIH and, if applicable, to the Creditor Trust (so as to permit Distributions to Holders of Allowed Class 4 General Unsecured Claims pursuant to section 3.4 of the Plan).

10.12 *Preservation of All Causes of Action Not Expressly Settled or Released*. Unless a claim, action, cause of action, suit, chose in action or right to payment against any Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order

(including the Confirmation Order) of the Bankruptcy Court, the Debtors and their Estates expressly reserve such claim, action, cause of action, suit, chose in action or right to payment for later adjudication or administration (including claims, actions, causes of action, suits, choses in action or rights to payment not specifically identified or described in the Plan or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims, actions, causes of action, suits, choses in action or rights to payment upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such claims, actions, causes of action, suits, choses in action or rights to payment have been released in the Plan (including, for the avoidance of doubt, the releases contained in Section 10.3) or any other Final Order (including the Confirmation Order). In addition, the Debtors and their Estates expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits.

10.13   *Effect of Confirmation*.

10.13.1   *Binding Effect.*  On the Confirmation Date, the provisions of this Plan shall be binding on the Debtors, the Estates, all Holders of Claims against or Equity Interests in the Debtors, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted this Plan.

10.13.2   *Automatic Stay*.  The automatic stay arising out of section 362(a) of the Bankruptcy Code shall continue in full force and effect until the Consummation Date and the Debtors and the Estates shall be entitled to all of the protections afforded thereby.  All assets of the Debtors (including the GUC Funds, Liquidation Proceeds and the Retained Proceeds) shall remain property of the Estates until distributed in accordance with this Plan, and no Person shall at any time have any claim to or interest in any asset of the Debtors except to the extent that such Person is the Holder of an Allowed Claim entitled to Distributions under this Plan.

10.13.3   *Filing of Reports.*  Notwithstanding any provision in this Plan to the contrary, quarterly disbursement reports shall be filed in the Bankruptcy Cases until such time as the Bankruptcy Cases are closed, converted to Chapter 7, or dismissed.  All fees required to be paid by 28 U.S.C. §1930(a)(6) ("US Trustee Fees") will accrue and be timely paid until the Bankruptcy Cases are closed, dismissed or converted to another chapter of the Bankruptcy Code.  Any US Trustee Fees that are due and owing as of the Effective Date will be paid on the Effective Date.  From and after the Effective Date, the Liquidating Agent shall file the reports and cause the Estates to pay the US Trustee Fees as contemplated by this Section 10.13.3.

10.13.4   *Post-Effective Date Retention of Professionals*.  Upon the Effective Date, any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Debtors and the Liquidating Agent will employ and pay professionals (to be paid from Retained

Proceeds), and the Creditor Trustee will employ its professionals (to be paid from the Creditor Trust Reserve or GUC Funds), in each case in the ordinary course of business.

10.14   *No Discharge*.  Notwithstanding any other provision of the Plan or Confirmation Order, pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtors will not receive a discharge.

## ARTICLE XI
## Conditions Precedent

11.1   *Conditions to Confirmation*. The following are conditions precedent to confirmation of this Plan that may be satisfied or waived in accordance with Section 11.3 of this Plan:

11.1.1   The Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance acceptable to the ChemicaInvest Parties and the Debtors in their sole and absolute discretion approving the Disclosure Statement, which shall be in form and substance acceptable to the ChemicaInvest Parties and the Debtors in their sole and absolute discretion, and

11.1.2   The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the ChemicaInvest Parties and the Debtors in their sole and absolute discretion and reasonably acceptable to the Committee and entered on the docket of the Bankruptcy Cases.

11.2   *Conditions to the Effective Date*. The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Section 11.3 of this Plan:

11.2.1   The Confirmation Order shall have been entered by the Bankruptcy Court and shall be in form and substance acceptable to the ChemicaInvest Parties and the Debtors in their sole and absolute discretion, and reasonably acceptable to the Committee, shall not have been vacated, reversed or modified and, as of the Effective Date, shall not be stayed;

11.2.2   The ELT Transaction shall have been consummated;

11.2.3   The Debtors shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement this Plan and that is required by law, regulation, or order; and

11.2.4   **[DELETED INTENTIONALLY]**

11.2.5   The Confirmation Order shall have become a Final Order.

11.3   *Waiver of Conditions to Confirmation or Effective Date.*  The conditions set forth in Sections 11.1 and 11.2 of this Plan may be waived in writing, in whole or in part, with the consent of the Committee, the Debtors and the ChemicaInvest Parties without any notice to any other parties in interest or the Bankruptcy Court and without a hearing; provided that the consent of the Committee shall not be unreasonably withheld.  The failure to satisfy or waive any condition

to the Confirmation Date or the Effective Date may be asserted by the Debtors or ChemicaInvest Parties in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or ChemicaInvest Parties). The failure of the Debtors and the ChemicaInvest Parties to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XII
## Retention and Scope of Jurisdiction of the Bankruptcy Court

12.1    *Retention of Jurisdiction*. Subsequent to the Effective Date, to the extent consistent with 28 U.S.C. § 1334, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

12.1.1    To adjudicate objections concerning the allowance, priority or classification of Claims and any subordination thereof, and to establish a date or dates by which objections to Claims must be filed to the extent not established herein;

12.1.2    To liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated Claim, and to establish the amount of any reserve required to be withheld from any Distribution under this Plan on account of any disputed, contingent or unliquidated Claim;

12.1.3    To resolve all matters related to the rejection, or assumption and/or assignment, of any Executory Contract or Unexpired Lease of the Debtors;

12.1.4    To hear and rule upon all Causes of Action, Applicable CIH Insurance Causes of Action, Applicable ELT Insurance Causes of Action, or DSM SPA Causes of Action, in each case as commenced or pursued by the Debtors, the Liquidating Agent, the Litigation Trust, CIH or ELT, as applicable;

12.1.5    To hear and rule upon all applications for Professional Compensation;

12.1.6    To remedy any defect or omission or reconcile any inconsistency in this Plan, as may be necessary to carry out the intent and purpose of this Plan;

12.1.7    To construe or interpret any provisions in this Plan and to issue such orders as may be necessary for the implementation, execution and consummation of this Plan, to the extent authorized by the Bankruptcy Code;

12.1.8    To hear, rule upon and enter orders approving any sales of Assets (including sales of fee owned real property) by the Debtors after the Effective Date;

12.1.9    To adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan, including any disputes that may arise between the Liquidating Agent, CIH and/or the Creditor Trustee;

12.1.10    To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including the Distribution of funds from the Estates and the payment of Claims;

12.1.11    To determine any suit or proceeding brought by the Debtors or the Liquidating Agent to recover property under any provisions of the Bankruptcy Code;

12.1.12    To hear and determine any tax disputes concerning the Debtors and to determine and declare any tax effects under this Plan;

12.1.13    To hear, rule upon and enter orders regarding any disputes, controversies or other matters relating to or arising under the ELT Property Transfer Agreement, the Environmental Remediation Trust Agreement, the Litigation Trust Agreement and/or the Debtors' rights thereunder;

12.1.14    To determine such other matters as may be provided for in this Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

12.1.15    To determine any controversies, actions or disputes that may arise under the provisions of this Plan, or the rights, duties or obligations of any Person under the provisions of this Plan;

12.1.16    To decide or resolve any motions, adversary proceedings, contested or litigated matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Liquidating Agent after the Effective Date.

12.1.17    To enforce the releases contained in Sections 10.3, 10.4, 10.5 and 10.7 hereof.

12.1.18    To enforce the injunction set forth in Section 10.8 hereof.

12.1.19    To adjudicate any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of, or in connection with, any agreement pursuant to which the Debtors sold any of their assets during the Bankruptcy Cases; and

12.1.20    To enter a final decree closing the Bankruptcy Cases.

12.2    *Alternative Jurisdiction*.  In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then the District Court shall hear and determine such matter.  If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.

12.3    *Final Decree*. The Bankruptcy Court may, upon application of the Liquidating Agent after Designated Notice, at any time on or after one hundred twenty (120) days after the Initial Distribution Date, enter a final decree in these cases, notwithstanding the fact that additional funds may eventually be distributed to parties in interest.  In such event, the Bankruptcy Court may enter an Order closing these cases pursuant to section 350 of the Bankruptcy Code; <u>provided</u>,

however, that: (a) the Debtors, the Liquidating Agent, the Creditor Trustee and other parties in interest shall continue to have the rights, powers, and duties set forth in this Plan; (b) any provision of this Plan requiring the absence of an objection shall no longer be required, except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy Court may from time to time reopen the Bankruptcy Cases if appropriate for any of the following purposes:  (i) administering Assets; (ii) entertaining any adversary proceedings, contested matters or applications the Debtors, the Liquidating Agent, ELT or CIH have brought or bring with regard to the liquidation of Assets or the prosecution of Applicable Causes of Action or DSM SPA Causes of Action; (iii) enforcing or interpreting this Plan or supervising its implementation; (iv) enforcing, interpreting or supervising the implementation of the ELT Property Transfer Agreement, the Environmental Trust Agreement or the Litigation Trust Agreement; or (v) for other cause.

## ARTICLE XIII
## The Creditor Trustee

13.1     *Appointment*. On the Effective Date, the Committee's appointment of the Creditor Trustee shall become effective, and the Creditor Trustee shall be authorized to perform his duties under this Plan and Creditor Trust Agreement, including making distributions to Holders of Allowed Class 4 General Unsecured Claims, objecting to the Disputed Claims listed in Schedule 1, and overseeing the actions of the Liquidating Agent, the Litigation Trust, and CIH under the Plan.

13.2     *Retention of Professionals.* The Creditor Trustee may retain professionals and the reasonable fees and expenses of such professionals shall be paid out of the Creditor Trust Reserve, without the necessity of obtaining any approval from the Bankruptcy Court or providing notice to any party in interest with respect to such retention or payment.

13.3     *Limited Liability.* Neither the Creditor Trustee nor its counsel shall be liable for anything other than its own acts or omissions as constitute willful misconduct or gross negligence in the performance of its duties.  The Creditor Trustee shall be indemnified and held harmless by the Estates from and against any expenses (including the reasonable fees and expenses of counsel), damages, liabilities, claims or losses incurred or suffered by the Creditor Trustee in connection with any claim or demand which in any way arises out of or relates to this Plan and Creditor Trust Agreement or the services of the Creditor Trustee under this Plan and Creditor Trust Agreement; provided, however, if the Creditor Trustee is determined to be guilty of defalcation, misappropriation, fraud or gross negligence by a Final Order of a court of competent jurisdiction, then the Creditor Trustee shall bear all losses, damages and expenses arising as a result of such defalcation, misappropriation, fraud or gross negligence.

13.4     *Authority.* Consistent with the terms of this Plan and Creditor Trust Agreement, the Creditor Trustee shall have the authority to (i) review the activities of the Liquidating Agent; (ii) seek to remove and replace the Liquidating Agent for good cause shown; provided, however, any removal or replacement of the Liquidating Agent shall require approval of the Bankruptcy Court following Designated Notice and the removal or replacement of the Liquidating Agent shall not be effective unless the Liquidating Agent shall have received at least 30 days' advance written notice of such proposed removal or replacement; (iii) object to Class 4 Claims (other than those listed as Allowed in Schedule 1); (iv) establish a reserve for payment of any Disputed Claims in

Class 4; and (v) make Distributions to Holders of Allowed Class 4 Claims in accordance with the terms of this Plan.

13.5    *Reporting*. The Liquidating Agent shall submit quarterly reports to the Creditor Trustee, which shall detail, among other things, the key activities undertaken and fees incurred by the Liquidating Agent in connection with this Plan during the reporting period.  The Liquidating Agent shall also promptly report to the Creditor Trustee, at the reasonable request of the Creditor Trustee or counsel retained by the Creditor Trustee, on any matter that reasonably relates to the post-Effective Date administration of the Estates or Distributions under the Plan.  In the event that a portion of the Net Litigation Proceeds are required to be added to the GUC Funds, and only until the earlier of the aggregate amount of GUC Funds is $7 million or the Litigation Trustee, CIH, and ELT determine not to pursue any remaining Applicable Causes of Action, Applicable CIH Insurance Causes of Action and DSM SPA Causes of Action, CIH shall be required to (i) submit quarterly reports to the Creditor Trustee which shall detail, among other things, the key activities taken by the Litigation Trustee, CIH or ELT, as applicable, in connection with this Plan and the Litigation Trust Agreement, and (ii) provide the Creditor Trustee with notice of seven (7) days or, if not practicable under the circumstances, such other notice as is reasonably practicable, of any proposed settlement of any Causes of Action of the Litigation Trust, including the key terms of such proposed settlement, and shall consult to the extent reasonably practicable with the Creditor Trustee regarding such proposed settlement and the distribution of any Net Litigation Proceeds thereof; provided, however, that CIH and ELT, as applicable shall not be required to disclose any information subject to attorney-client privilege, attorney work product protection, or other applicable privileges or protections.

13.6    *Compensation and Reimbursement*.  The Creditor Trustee shall be entitled to payment of fees and reimbursement of expenses to be paid from the Creditor Trust Reserve or GUC Funds (as applicable).

13.7    *Replacement of Creditor Trustee*. In the event that the Creditor Trustee resigns or is otherwise removed, the Bankruptcy Court shall appoint a replacement to fulfill the duties of the Creditor Trustee under this Plan on motion by an interested party.

13.8    *Discharge of Creditor Trustee.* Effective as of the Consummation Date, the Creditor Trustee shall be discharged of its duties and responsibilities under this Plan and Creditor Trust Agreement.

## ARTICLE XIV
## Miscellaneous Provisions

14.1    *Modification of this Plan*.  The Debtors may modify this Plan with the prior written consent of the ChemicaInvest Parties pursuant to section 1127 of the Bankruptcy Code and as herein provided, to the extent applicable law permits.  The Debtors may modify this Plan with the prior written consent of the ChemicaInvest Parties in accordance with this paragraph, before or after confirmation, upon notice to the Creditor Trustee only, or after such notice and hearing as the Bankruptcy Court deems appropriate, if the Bankruptcy Court finds that the modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto.  In the event of any modification on or before

confirmation, any votes to accept or reject this Plan shall be deemed to be votes to accept or reject this Plan as modified, unless the Bankruptcy Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes. The Debtors reserve the right in accordance with section 1127 of the Bankruptcy Code to modify this Plan with the prior written consent of the ChemicaInvest Parties at any time before the Confirmation Date.

14.2    *Allocation of Plan Distributions Between Principal and Interest*. To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

14.3    *Creditors' Committee*. On the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Cases and under the Bankruptcy Code; provided, however, notwithstanding the foregoing, the Committee shall continue to exist for the limited purpose of filing appropriate fee applications or requests for expense reimbursements.

14.4    *Applicable Law*. Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by the laws of the State of Georgia.

14.5    *Preparation of Estates' Returns and Resolution of Tax Claims.* The Debtors or the Liquidating Agent shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505 of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

14.6    *Headings*. The headings of the Articles and the sections of this Plan have been used for convenience of reference only and shall not limit or otherwise affect the meaning of this Plan. Whenever the words "include," "includes" or "including" (or other words of similar import) are used in this Plan, they shall be deemed to be followed by the words "without limitation."

14.7    *Revocation of Plan*. The Debtors reserve the right, unilaterally and unconditionally, to revoke or withdraw this Plan at any time prior to entry of the Confirmation Order, and upon such revocation or withdrawal this Plan shall be deemed null and void and of no force or effect.

14.8    *Confirmation of Plans for Separate Debtors*. In the event the Debtors are unable to confirm this Plan with respect to all Debtors, the Debtors reserve the right, unconditionally, with the prior written consent of the ChemicaInvest Parties to proceed with this Plan with respect to any Debtor for which the confirmation requirements of the Bankruptcy Code are met.

14.9    *No Admissions; Objection to Claims*. Nothing in this Plan shall be deemed to constitute an admission that any Person as being the Holder of a Claim is the Holder of an Allowed Claim, except as expressly provided in this Plan. The failure of the Debtors to object to or examine any Claim for purposes of voting shall not be deemed a waiver of the Debtors' rights to object to or reexamine such Claim in whole or in part (including for purposes of Distribution).

14.10   *No Bar to Suits*.  Except as otherwise provided in Article X of this Plan, neither this Plan nor confirmation hereof shall operate to bar or estop the Liquidating Agent, the Estates, the Litigation Trust, ELT, the Debtors, or the ChemicaInvest Parties from commencing any cause of action or any other legal action against any Holder of a Claim or Equity Interest or any other Person, whether such cause of action or other legal action arose prior to or after the Confirmation Date and whether or not the existence of such cause of action or any other legal action was disclosed in any disclosure statement filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim or Equity Interest.

14.11   *Exhibits/Schedules*. All exhibits and schedules to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

14.12   *Conflicts*. In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern and control.

14.13   *Notices*.  Any notice required or permitted to be provided to the Debtors, the Liquidating Agent, the Creditor Trustee or the ChemicaInvest Parties under this Plan shall be in writing and served by overnight courier service, facsimile transmission or certified mail, return receipt requested, addressed as follows:

> Debtors and/or Liquidating Agent for the Debtors:
>
> Fibrant, LLC
> c/o Alvarez & Marsal North America, LLC
> Monarch Tower
> 3424 Peachtree Road NE, Suite 1500
> Atlanta, Georgia, 30326
> Attn:   Klaus Gerber
> Email: kgerber@alvarezandmarsal.com
>
> with a copy to (which shall not constitute notice):
>
> King & Spalding LLP
> 1180 Peachtree Street, NE
> Atlanta, GA 30309
> Attn:   Jonathan Jordan, Sarah L. Primrose
> Email: jjordan@kslaw.com, sprimrose@kslaw.com
>
> The Creditor Trustee:
>
> Lowenstein Sandler LLP
> One Lowenstein Drive
> Roseland, NJ 07068
> Attn:   Jeffrey D. Prol, Michael Papandrea
> Email: jprol@lowenstein.com, mpapandrea@lowenstein.com
>
> Lowenstein Sandler LLP

1251 Avenue of the Americas
New York, NY  10020
Attn:   Bruce S. Nathan
Email: bnathan@lowenstein.com

B. Riley Advisory Services
3445 Peachtree Road, Suite 1225
Atlanta, GA 30326
Attn.: Joseph V. Pegnia
E-mail: jpegnia@brileyfin.com

The ChemicaInvest Parties:

c/o ChemicaInvest Holding B.V.
Mauritslaan 49, 6129 EL Urmond
The Netherlands
Attn: Jean-Paul Van de Velde
Email: jean-paul.velde-van-de@chemicainvest.com

with copies to (which shall not constitute notice):

Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attn: Gary Gengel, Adam J. Goldberg
Email: gary.gengel@lw.com, adam.goldberg@lw.com

Scroggins & Williamson, P.C.
4401 Northside Parkway, Suite 450
Atlanta, Georgia 30327
Attn: Matthew Levin
Email: mlevin@swlawfirm.com

14.14  *Section 1125 of the Bankruptcy Code*. The entry of the Confirmation Order shall constitute the determination by the Bankruptcy Court that the Debtors have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Debtors (and each of their respective Affiliates, officers, directors, managers, employees, consultants, agents, advisors, members, attorneys, accountants, financial advisors, other representatives and Professionals) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and/or purchase of any securities offered or sold under this Plan, and are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time on account of such solicitation or participation for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale, or purchase of any securities offered or sold under this Plan.

14.15   *Severability*. Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of this Plan other than Section 10.3 or 10.4 is either illegal on its face or illegal as applied to any Claim or Equity Interest, such provision shall be unenforceable as to all Holders of Claims or Equity Interests or to the specific Holder of such Claim or Equity Interest, as the case may be, as to which such provision is illegal.  Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of this Plan.  The Debtors and the ChemicaInvest Parties reserve the right not to proceed with Confirmation or consummation of this Plan if any such ruling occurs.

14.16   *Designated Notice*.  Notwithstanding any other provision of this Plan, when notice and a hearing is required with regard to any action to be taken after the Confirmation Date by the Debtors and/or the Liquidating Agent, Designated Notice shall be adequate.

14.17   *Employee Records*.   On or after the Effective Date of the Plan, the Debtors will transfer their employee and human resources records regarding their former employees to a DSM Entity, pursuant to a data transfer agreement.  The Debtors shall use commercially reasonable efforts to ensure that the data transfer agreement provides that such DSM Entity will be obligated (i) to keep the records confidential, (ii) to comply with all federal, state and local laws regarding the records, (iii) to use the employee information only in connection with providing services and benefits to participants under DSM's defined benefit pension plan, (iv) to protect the information through a business associate agreement, and (v) to allow the Debtors reasonable access to the records during normal business hours to allow the Debtors to comply with any legal obligations they may have.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the transfer of the employee records to such DSM Entity.

## CONFIRMATION REQUEST

The Debtors hereby request confirmation of this Plan pursuant to section 1129(a) or section 1129(b) of the Bankruptcy Code.

[SIGNATURE PAGE FOLLOWS]

Dated as of this 9th day of October, 2023.

Respectfully submitted,

**FIBRANT, LLC**


By: */s/ Klaus Gerber*
    Klaus Gerber
    Liquidating Agent


**EVERGREEN NYLON RECYCLING, LLC**


By: */s/ Klaus Gerber*
    Klaus Gerber
    Liquidating Agent

**FIBRANT SOUTH CENTER, LLC**


By: */s/ Klaus Gerber*
    Klaus Gerber
    Liquidating Agent

**GEORGIA MONOMERS COMPANY, LLC**


By: */s/ Klaus Gerber*
    Klaus Gerber
    Liquidating Agent

**KING & SPALDING LLP**

*/s/ Jonathan W. Jordan*
Jonathan W. Jordan
Georgia Bar No. 404874
jjordan@kslaw.com
Sarah L. Primrose
Georgia Bar No. 532582
sprimrose@kslaw.com
1180 Peachtree Street
Atlanta, Georgia 30309-3521
Telephone:  (404) 572-4600
Facsimile:  (404) 572-5100

And

**KLOSINSKI OVERSTREET, LLP**

James C. Overstreet Jr.
Georgia Bar No. 556005
jco@klosinski.com
1229 Augusta West Parkway
Augusta, GA 30909
Telephone:  (706) 863-2255
Facsimile:  (706) 863-5885


**COUNSEL FOR THE
DEBTORS-IN-POSSESSION**

## Schedule 1

| Creditor | Claim |
|---|---|
| ADS Security LP | $ 790 |
| AIG | 39,822 |
| Advanced Disposal Services | 7,133 |
| Advansix, Inc. | 1,016 |
| Airgas USA, LLC | 5,338 |
| Allied Universal Security Services | 735 |
| American Railcar Leasing, LLC | 1,650,000 |
| Ascentis Corporation | 2,647 |
| Augusta Chiller Service Inc | 4,317 |
| Augusta Data Storage Inc. | 131 |
| Augusta Utilities Department | 9,041 |
| Austin Maintenance & Construction, Inc. | 2,784 |
| Bank of America | 45,997 |
| Blue Ridge Railcar Repair LLC | 4,211 |
| BMSI Packaging Services, Inc. | 323,695 |
| Century 3 Inc. | 19,474 |
| Chemtrade (F/K/A General Chemicals) | 16,223,768 |
| Cherry Bekaert | 14,863 |
| Chevron Phillips Chemical Co. LP | 5,930,004 |
| Control Southern Inc. | 114,440 |
| Covanta Environmental Solutions LLC. | 1,990 |
| Cranston Engineering Group, P.C. | 5,000 |
| Crawford's Contracting Services | 1,163 |
| Csra Analytical Laboratories Inc | 4,348 |
| CSX Transportation, Inc. | 2,090 |
| Deloitte Tax Llp | 22,089 |
| Earthlink Business | 8,230 |
| Emerson Process | 468,772 |
| Environmental Operating Solutions Inc. | 8,974 |
| Estate of Malcolm Baxley | 500,000 (less insurance recoveries) |
| Ferguson Enterprises | 11,168 |
| Flint Hills Resources, LP | 713,112 |
| GATX Rail / A Division of GATX | 5,707,425 |
| Georgia Power | 124,946 |
| Geosyntec Consultants, Inc. | 7,394 |
| Giffin Gear Inc. | 43,050 |
| Greatamerica Financial Services | 2,620 |
| Haver & Boecker Usa | 1,513 |
| Herc Rentals Inc. | 2,707 |
| Hoerbiger Service Inc. | 28,526 |
| Hood Packaging Corporation | 52,748 |
| Horne Label & Printing | 30,705 |
| IDG USA LLC | 897 |
| Industrial Kiln & Dryer Group, Inc. | 18,165 |
| Internal Revenue Service (General Unsecured portion) | 3,712 |
| Interstate Commodities (RM Railcar) | 3,363,026 |

**Schedule 1**

| Creditor | Claim |
|---|---:|
| J&H Equipment, Inc. | 741 |
| Kevin R. Boyle | 39 |
| Koch Rail LLC | 125,400 |
| Kunkle Oil Co., Inc | 1,392 |
| Linde, Inc. (F/K/A The BOC Group, Inc.) | 2,328,459 |
| LWD Group Escrow Account | 26,050 |
| Maxim Crane Works LP | 850 |
| MECS, Inc | 14,937 |
| Midwest Railcar Corporation | 28,200 |
| Mobile Mini Tank & Pump Solutions | 1,043 |
| MRC Global, Inc. | 32,224 |
| Nanjing Baose Co. Ltd | 113,141 |
| Nexair, LLC | 2,321 |
| Onion Enterprise | 57,950 |
| Payneless Enterprises LLC | 2,681 |
| PCS Nitrogen, Inc. | 606,253.76 |
| Pollock Financial Services Inc. | 3,987 |
| Process Equipment Inc. | 12,149 |
| Rawson, Inc. | 64,007 |
| Safety-Kleen/Cleanharbors | 4,611 |
| SGS North America, Inc. | 3,672 |
| Southeast Railcar, Inc. | 27,238 |
| Spok, Inc. | 35 |
| The Great Walton Railroad Co., Inc. | 3,240 |
| Thompson Industrial Services LLC | 20,945 |
| United Rentals (North America) Inc. | 871 |
| United Technology Group, LLC | 9,563 |
| Vallen Distribution, Inc. | 638 |
| Veenschoten And Company | 152,010 |
| Weathers Commercial Fleet | 1,070 |
| Windstream | 4,158 |
| | **$ 39,184,448.76** |

## Schedule 2

**Executory Contracts and Unexpired Leases Assumed and Assigned to ELT**

The following contracts and leases will be assumed and assigned by the Debtors pursuant to the Plan:

1. Amended and Restated Lease dated September 1, 2017 by and between Fibrant, LLC and DSM Coating Resins, Inc. (Sch. G. 2.20)

2. Memorandum of Lease dated September 1, 2017 by and between Fibrant, LLC and DSM Coating Resins, Inc. (Sch. G. 2.23)

3. Easement and Maintenance Agreement dated September 1, 2017 by and between Fibrant, LLC and DSM Coating Resins, Inc. (Sch. G. 2.22)

4. Ground Lease between Fibrant, LLC and Praxair, Inc. dated October 16, 2018

## Schedule 3

### Executory Contracts and Unexpired Leases Assumed by Debtors

1. Augusta Sulfate Company, LLC: Settlement Agreement dated January 1, 2018 (Schedule G, 2.104)

2. Kevin Boyle: Agreement (Schedule G, 2.64)

3. Univar USA Inc.:  License Agreement dated March 20, 2017 between Fibrant and Univar and Declaration of Easement dated August 26, 2005 executed by Fibrant in favor of Univar.

## Schedule 4

### Applicable Insurance Policies

The Applicable Insurance (as defined in Section 1.1.7 of the Plan) includes the following insurance policies:

1. Admiral Insurance Company (2/1/75) – Policy No. 5 CG 0071

2. Admiral Insurance Company (4/1/81) – A1 CM 2315

3. Admiral Insurance Company (4/1/82) – A2 CM 2956

4. Admiral Insurance Company (4/1/83) – A3 CM 3088

5. AIG 500 12 84 (2/1/76) (Sch. G. 2.87)

6. AIG 500 17 87 (4/1/77) (Sch. G. 2.87)

7. AIG 551 31 62 (4/1/80) (Sch. G. 2.87)

8. AIG 1168554 (4/1/76) (Sch. G. 2.87)

9. AIG 1975-76 Umbrella Policy (Sch. G. 2.87)

10. Allstate Insurance 63 007 805 (4/1/81) (Sch. G. 2.88)

11. Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America XBC 15 43 69 (4/1/1984 – 4/1/1985) (Sch. G. 2.89)

12. Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America XBC G00021623 (3/31/1985 - 3/31/1986) (Sch. G. 2.89)

13. Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America XBC G00021647 (3/31/1985 - 3/31/1986) (Sch. G. 2.89)

14. Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 61 89 (4/1/1982 – 4/1/1983) (Sch. G. 2.90)

15. Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 65 15 (4/1/1983 - 4/1/1984) (Sch. G. 2.90)

16. Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 69 53 (3/31/1985 – 3/31/1986) (Sch. G. 2.90)

17. Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 79 47 (3/31/1985 – 3/31/1986) (Sch. G. 2.90)

18. Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 79 48 (3/31/1985 – 3/31/1986) (Sch. G. 2.90)

19. CNA 968 21 95 (1/1/73) (Sch. G. 2.91)

20. CNA 988 31 59 (1/1/74) (Sch. G. 2.91)

21. CNA GLA 467668 (4/1/76) (Sch. G. 2.91)

22. CNA 416 99 91 (4/1/80) (Sch. G. 2.91)

23. CNA 917 65 61 (3/31/85) (Sch. G. 2.91)

24. United States Fire Insurance Company GLA 28 40 22 (2/1/1976 – 4/1/1977) (Sch. G. 2.92)

25. Crum and Foster XS 2951 (4/1/76) (Sch. G. 2.92)

26. United States Fire Insurance Company 540 0797517 (4/1/1977 – 4/1/1978) (Sch. G. 2.92)

27. Crum and Foster XS 2973 (4/1/77) (Sch. G. 2.92)

28. Crum and Foster 540 189362 7 (4/1/78) (Sch. G. 2.92)

29. Crum and Foster 1975-76 Primary Policy (Sch. G. 2.92)

30. Crum and Foster GLA 46 77 45 (5/1/78) (Sch. G. 2.92)

31. Harbor Insurance Company 1976-77 Excess Policy 122409 (Sch. G. 2.93)

32. Harbor Insurance Company 1977-78 (Sch. G. 2.93)

33. Hartford 902403 (5/1/75) (Sch. G. 2.94)

34. Hartford 945396 (4/1/80) (Sch. G. 2.94)

35. Hartford 903060 (umbrella 1976-77) (Sch. G. 2.94)

36. Hartford 948534 (umbrella 4/1/81)

37. Home Insurance Company 9 63 15 32 (8/24/79) (Sch. G. 2.95)

38. Home Insurance Company 1 47 15 35 (4/1/84) (Sch. G. 2.95)

39. Liberty Mutual 5376 00 102718 (3/31/85) (Sch. G. 2.96)

40. Lloyd's L 64E 2 120A (2/13/64) (Sch. G. 2.97)

41. Lloyd's L 65E 2 102 (2/13/65) (Sch. G. 2.97)

42. Lloyd's 65E 2 102A 65 10754 3 BB 402286 (2/13/65) (Sch. G. 2.97)

43. Lloyd's L 68E 1 162 68 10754 2 B-14449 (2/13/68) (Sch. G. 2.97)

44. Lloyd's L 68E 1 162A 68 10754 3 B 14450 (2/13/68) (Sch. G. 2.97)

45. Lloyd's C 71E 3 119 (2/13/71) (Sch. G. 2.97)

46. Lloyd's 1964-65 Umbrella Policy (Sch. G. 2.97)

47. Lloyd's 1985-86 Excess Policy (Sch. G. 2.97)

48. Mt. McKinley GSL 00005 (4/1/79) (Sch. G. 2.98)

49. Mt. McKinley GSL 00106 (4/1/80) (Sch. G. 2.98)

50. Protective National Insurance 1982-83 Umbrella Policy (Sch. G. 2.99)

51. Protective National Insurance 1983-84 Umbrella Policy (Sch. G. 2.99)

52. Starr Indemnity CDU-1583 (4/1/78) (Sch. G. 2.101)

53. Starr Indemnity CDU-2583 (4/1/79) (Sch. G. 2.101)

54. Starr Indemnity CDU-6578 (6/15/81) (Sch. G. 2.101)

55. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company CG 35 02 59 (1/1/1971 – 1/1/1972)

56. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company CG 14 03 05 (1/1/1972 – 1/1/1973)

57. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company 1964-65 Policy (Sch. G. 2.102)

58. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company 1964-65 Policy (Sch. G. 2.102)

59. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company 1965-68 Policy (Sch. G. 2.102)

60. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company 1968-70 Policy (Sch. G. 2.102)

61. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company CG 26 80 80 (1/1/1970 – 1/1/1971)

62. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company 41 AF 181029 (6/1/1983) (Sch. G. 2.102)

63. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company 45 AET 11089 (6/1/1985) (Sch. G. 2.102)

64. Zurich International 72, 538-85-C (3/31/85) (Sch. G. 2.103)

## Exhibit A

**[*See ECF No. 848*]**

# Exhibit B

**[*See ECF No. 848*]**

**<u>Exhibit C</u>**

**[*See ECF No. 848*]**

## Exhibit D

**Insurance Settlements**

## SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE

THIS SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE ("Agreement") is entered into by and between ChemicaInvest Holding, B.V.; Augusta Liquidations LLC; Environmental Liability Transfer, Inc.; and Fibrant, LLC, Fibrant South Center, LLC, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC, by and through the Liquidating Agent (as hereinafter defined), on the one hand, and Allstate Insurance Company, individually, and as successor in interest to Northbrook Excess and Surplus Insurance Company, on the other hand.  The above-named entities are sometimes referred to herein collectively as the "Parties," and individually as "Party."

### RECITALS

**WHEREAS**, Northbrook Excess and Surplus Insurance Company issued or allegedly issued excess liability insurance policy no. 63 007 805 (as hereinafter further defined, the "Allstate Policy") to Columbia Nitrogen Corporation ("Columbia Nitrogen"); and

**WHEREAS**, Fibrant, LLC was found to be the successor in interest to insurance rights under the Allstate Policy in the Plan confirmed by Bankruptcy Court Order dated May 22, 2019 in Case No. 18-10274 (SDB); and

**WHEREAS**, beginning in or about 1963, various entities, including at times Columbia Nitrogen and/or Fibrant, constructed and operated a facility located on a parcel of real estate at 1408 Columbia Nitrogen Drive, Augusta, Georgia, where various entities, including Columbia Nitrogen and Fibrant, manufactured caprolactam, ammonium sulfate, and other products (as hereinafter defined, the "Site"); and

**WHEREAS**, Columbia Nitrogen's operations at the Site allegedly caused environmental contamination at and around the Site; and

-1-

**WHEREAS**, Plaintiffs have alleged that Columbia Nitrogen, or its successor in interest to coverage under the Allstate Policy, is subject to potential environmental claims relating to historical operations at the Site, arising under certain environmental laws and regulations, including, *inter ali*a, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Georgia Hazardous Waste Management Act, O.C.G.A. § 12-8-60 et seq., and the Hazardous Waste Permit for the Site, (Permit No. HW-016 (ST&CA) and Facility I.D. No. GAD 051011609); and

**WHEREAS**, on February 3, 2018, Fibrant (6694), together with Evergreen (7625), South Center (8270), and Georgia Monomers (0042) (collectively, "Debtors"),[1] filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Georgia; and

**WHEREAS**, on May 29, 2019, an order was entered in the Bankruptcy Case confirming the Plan; and

**WHEREAS**, pursuant to the Plan, (i) ownership of the Site was conveyed to ELT, which later assigned such ownership to Augusta Liquidations, and (ii) any and all of Debtors' rights to assert and pursue causes of action under the Allstate Policy were assigned in part to CIH and in part to ELT (collectively, the "Plan Assignments"), the latter of which later assigned its rights to Augusta Liquidations; and

**WHEREAS**, on or about June 12, 2019, Debtors, CIH and Augusta Liquidations commenced  the "Insurance Action" (as hereinafter defined), seeking a declaratory judgment that Allstate (together with other defendant insurers) are obligated to defend Debtors and CIH for claims arising from the Site, to reimburse past and future costs incurred to comply with Debtors'

---

[1] Pursuant to the Plan, as modified, Fibrant, Evergreen, and Georgia Monomers were dissolved.

-2-

obligations under RCRA Costs, and to indemnify and defend Augusta Liquidations against any damages, expenses, and settlement payments at the Site; and

**WHEREAS**, Allstate disputes the allegations of the Insurance Action and denies that it has any obligation to provide coverage for the claims of Debtors, CIH and/or Augusta Liquidations; and

**WHEREAS**, certain Parties engaged in a mediation of their dispute over insurance coverage before Timothy P. Gallagher, Esquire, of the Gallagher Law Group P.C., Los Angeles, CA; and

**WHEREAS**, the Parties now desire finally and completely to resolve, compromise, and settle all disputes between them, including without limitation (i) any and all Claims relating to the Site, the Insurance Action, coverage under the Allstate Policy and other matters addressed herein, and (ii) any disputes arising out of or related to the Bankruptcy Case, without any admission of liability or concession of the validity of the positions or arguments advanced by each other; and

**WHEREAS**, as part of this compromise and resolution, all Parties intend and agree that Allstate will repurchase all of Debtors' rights, title and Interests in, to and under the Allstate Policy, free and clear of all Interests of any Person, except as expressly set forth in this Agreement; and

**WHEREAS**, by and through this Agreement, Plaintiffs seek to provide Allstate with the broadest possible release, as set forth herein, with respect to the Allstate Policy and to provide that Allstate shall have no further obligations to Plaintiffs, Debtors' creditors or other parties-in-interest in the Bankruptcy Case, except as expressly set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

-3-

1.    **DEFINITIONS**

As used in this Agreement, the following terms have the following meanings:

1.1    "Allstate" means Allstate Insurance Company, individually and as successor in interest to Northbrook Excess and Surplus Insurance Company, and all of their predecessor, successor, parent, subsidiary and affiliated companies and representatives to the fullest extent permitted by law.

1.2    "Allstate Policy" means Northbrook Excess and Surplus Insurance Company Policy No. 63 007 805, and any and all insurance policies, known or unknown, issued or allegedly issued by, or novated to or assumed by, Allstate Insurance Company or Northbrook Excess and Surplus Insurance Company to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals Augusta, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, DSM Chemical Holding Company, DSM Finance USA, Inc., DSM Holding Company USA Inc., or Fibrant, LLC.  For the avoidance of doubt, "Allstate Policy" does not include insurance policies issued after the Plan Effective Date, such as policies issued to Augusta Liquidations, remediation contractors, or subcontractors (if any).

1.3    "Approval Motion" means the motion to be filed seeking approval of the terms of this Agreement, including the sale of the Allstate Policy provided for herein, and entry of the Approval Order, as provided in Section 4.1 hereof.

1.4    "Approval Order" means an order entered by the Bankruptcy Court, upon a hearing following proper notice, containing all of the provisions set out in Section 4.1 hereof, with no wording that is contrary to or inconsistent with such provisions, and which is reasonably acceptable to Allstate and CIH.

-4-

1.5    "Augusta Liquidations" means Augusta Liquidations, LLC, and all of its predecessors, successors, parents, subsidiaries and affiliated companies and representatives to the fullest extent permitted by law.

1.6    "Bankruptcy Case" means collectively the jointly-administered Chapter 11 cases captioned *In re: Fibrant, LLC, et al.,* Lead Case No. 18-10274-SDB, presently pending before the Bankruptcy Court, Judge Susan D. Barrett presiding.

1.7    "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended from time to time.

1.8    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Georgia.

1.9    "Bankruptcy Notice Parties" means the following:

    (i)    all known creditors of Debtors;

    (ii)   the Office of the United States Trustee for the Southern District of Georgia;

    (iii)  all Persons that have filed a notice of appearance and/or demand for service of papers in the Bankruptcy Case;

    (iv)   all Persons that have filed a notice of appearance and/or demand for service of papers in the Insurance Action;

    (v)    all Persons identified on any and all service lists in the Bankruptcy Case;

    (vi)   the Georgia Department of Natural Resources, Environmental Protection Division;

    (vii)  the Attorney General of the State of Georgia;

    (viii) the United States Environmental Protection Agency;

    (ix)   the Attorney General of the United States;

    (x)    the United States Attorney for the Southern District of Georgia;

    (xi)   the United States Internal Revenue Service;

    (xii)    all known insurers of Debtors;

    (xiii)    all Persons with a known Interest in the Site, including those Persons that ever owned the Site, had a leasehold interest in the Site, or that hold a lien against the Site, regardless of the date thereof, and any known insurer of such property owner or lessee;

    (xiv)    all known Persons owning real property adjoining the Site;

    (xv)    all known Persons with an Interest in the Allstate Policies; and

    (xvi)    any other Person designated by the Bankruptcy Court as requiring notice.

1.10    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

1.11    "CIH" means ChemicaInvest Holding, B.V., and all of its predecessors, successors, parents, subsidiaries and affiliated companies and representatives to the fullest extent permitted by law.

1.12    "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; and, including but not limited to (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause of action of any sort, whether currently known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

1.13    "Contribution Claim" means any Claim for contribution, also including but not limited to, indemnity, equitable indemnity, subrogation, equitable subrogation, or a demand or

action by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a Claim that it asserts was more than its proper or proportionate share.

1.14    "Direct Action Claim" means any Claim by any Person against an insurer, which is identical or similar to, or relating to, the same or similar acts or omissions giving rise to a Claim against Plaintiffs, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action against an insurer.

1.15    "Effective Date" means the last date on which each of the following conditions precedent have occurred: (a) each of the Parties has executed this Agreement; (b) the Approval Order is a Final Order; (c) the Plan Modifications have been approved by Final Order of the Bankruptcy Court; and (d) this Agreement has not been terminated under Section 4.8 hereof or otherwise.

1.16    "ELT" shall have the meaning assigned in Section 1.1.59 of the Plan. The Parties agree that the only "permitted assignee under the ELT Property Transfer Agreement", as that phrase is defined in Section 1.1.59 of the Plan, is Augusta Liquidations, LLC.

1.17    "Environmental Claim" means any Claim of any kind, including for bodily injury, property damage, personal injury, advertising injury, economic loss, loss of use, environmental investigation or remediation costs, natural resource damages or toxic torts, that arises from Environmental Contamination.

1.18    "Environmental Contamination" means the actual, potential, or alleged presence of, exposure to, or injury or damage from any smoke, vapors, soot, fumes, acids, alkaloids, chemicals, liquids, gases, waste materials, irritants, contaminants or pollutants of any type, including, but not limited to: (a) any substance defined or designated as a "hazardous substance" pursuant to Sections 101(14) and 102(a) of the Comprehensive Environmental Response

Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601(14) and 9602(a); (b) any "pollutant or contaminant" under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1); (c) any substance defined as a "hazardous waste" in Section 6903(5) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, et seq.; (d) any chemical, substance or mixture found by the Administrator of the United States Environmental Protection Agency and/or any state agency to present an unreasonable risk of injury to health or the environment pursuant to Toxic Substances Control Act 15 U.S.C. § 2601, et seq.; (e) any substance listed in the United States Department of Transportation Table, 49 C.F.R. 172.101; and (f) any substance designated or considered to be a "hazardous substance," "hazardous material," "hazardous waste," "waste," "pollutant" or "contaminant" under any federal, state or local law, statute, rule, regulation or judicial decision that relates to, amends or is a successor to any of the foregoing statutes, rules, regulations or cases, or that defines any of the foregoing terms.

1.19    "Evergreen" means Evergreen Nylon Recycling, LLC, and all of its predecessors, successors, parents, subsidiaries and affiliated companies and representatives to the fullest extent permitted by law.

1.20    "Extra-Contractual Claim" means any Claim against an insurer, seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.

1.21    "Fibrant" means Fibrant, LLC, individually and as the successor in interest to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North

America, Inc., DSM Chemicals North America, LLC, and affiliates of each to the fullest extent permitted by law.

1.22    "Georgia Monomers" means Georgia Monomers Company, LLC, and all of its predecessors, successors, parents, subsidiaries and affiliated companies and representatives to the fullest extent permitted by law.

1.23    "Final Order" means an order as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Parties and their counsel or, in the event that an appeal, writ of certiorari, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, petition for review, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

1.24    "Insurance Action" means the adversary proceeding commenced in the Bankruptcy Court by Plaintiffs against Allstate and others, docketed at Adversary Proceeding 19-01016 (SDB).

1.25    "Insurance Coverage Claim" means any Claim seeking defense, indemnity or any other insurance coverage or benefit, including any Contribution Claim or other similar Claim, under or relating to the Allstate Policy.

1.26   "Interests" means all liens, Claims, encumbrances, interests, defenses and other rights of any nature, whether at law or in equity, including all Environmental Claims, Contribution Claims, Direct Action Claims, Insurance Coverage Claims and Extra-Contractual Claims.

1.27   ""Liquidating Agent" means Klaus Gerber, solely in his capacity as liquidating agent of the Debtors and their estates under the Plan.

1.28   "PCS Nitrogen" means PCS Nitrogen, Inc. and its successors, future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders and assigns (in each case, solely in their capacities as such.)  PCS Nitrogen shall not include any of Plaintiffs.

1.29   "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or partnership joint venture, trust or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.30   "Plaintiffs" means CIH, Augusta Liquidations, South Center, ELT, Fibrant, Evergreen, and Georgia Monomers.

1.31   "Plan" means the Second Amended and Restated Plan of Liquidation for Debtors, as confirmed in the Bankruptcy Case by order dated May 29, 2019, and as subsequently modified.

1.32   "Plan Effective Date" means June 26, 2019, the date on which the Plan became effective.

-10-

1.33    "RCRA Costs" means investigative, remedial, and other costs and expenses incurred pursuant to RCRA, GHWMA, the RCRA Permit, other applicable environmental laws, and regulations, related to soil and groundwater contamination at the Site.

1.34    "RCRA Permit" means Hazardous Waste Permit No. HW-016(ST&CA) issued to Fibrant, as the same may be amended from time to time.

1.35    "Site" means all property, buildings, soil, surface water, and groundwater at, adjacent to and beneath the premises on Columbia Nitrogen Drive in Augusta Georgia, which is or has been owned and/or occupied by Fibrant and its predecessors in interest, as defined in the report of Ramboll Environ prepared for Fibrant and dated May 16, 2017, including without limitation Solid Waste Management Areas (SWMAs) A through D, and the air above the Site, the ground and groundwater below the Site, and all air, soil, surface water, and groundwater in the vicinity of the Site allegedly impacted by Environmental Contamination originating from the Site. The cover page to the May 16, 2017 report of Ramboll Environ is attached hereto as **Exhibit A**.

1.36    "South Center" means Fibrant South Center, LLC, and all of its predecessors, successors, parents, subsidiaries and affiliated companies and representatives to the fullest extent permitted by law.

As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate; "it" shall include "he" and "she;" and "each" and "all" includes "each" and "every."

## 2.    SALE/BUYBACK OF THE ALLSTATE POLICY AND THE SETTLEMENT PAYMENT

2.1    **Settlement Payment.**   On or before forty-five (45) days following the Effective Date, Allstate Insurance Company will pay, for the benefit of all Plaintiffs, Two Hundred Twenty-Five Thousand Dollars ($225,000) (hereinafter referred to as the "Settlement Payment") to CAP I

-11-

BV.  Payment of the Settlement Payment will be made by wire transfer or other immediately available funds to:

> CAP I BV
> Mauritslaan 49
> 6129 EL Urmond
> The Netherlands
>
> CITIBANK EUROPE PLC, NL BRANCH
> IBAN Number: NL96CITI0266041485
> Swift code/BIC: CITINL2X

2.2     **Sale/Buyback Of The Allstate Policy.**     Upon the Effective Date, and in consideration thereof, and without any further action of the Parties, Debtors, by and through the Liquidating Agent, shall sell, convey, transfer, assign and deliver any and all of Debtors' Interests in, to and under the Allstate Policy, including any and all rights assigned to South Center pursuant to Section 3.8 of this Agreement, to Allstate, free and clear of any and all Interests of any other Persons, in full and final settlement of all of Plaintiffs' Interests relating to the Allstate Policy. Subject to the terms of this Agreement and the entry of the Approval Order, (i) the Settlement Payment is the total amount that Allstate is obligated to pay on account of any and all Interests of any kind relating to the Allstate Policy; (ii) the Settlement Payment represents the full purchase price of the Allstate Policy under Section 363(b) of the Bankruptcy Code, and, upon its payment, Allstate shall own the Allstate Policy free and clear of any and all Interests of any Person; and (iii) the Settlement Payment is reasonable and fair consideration and provides reasonably equivalent value for the buyback of the Allstate Policy.

2.3     **Payment Is Final.**  Subject only to the terms and conditions of this Agreement and the Approval Order, the Settlement Payment will be final and irrevocable, and will not be subject to any claims for setoff, contribution, or charge-backs (including, without limitation, any claims

for additional premiums, retrospective premiums, self-insured retentions, deductibles or recoupment of prior payments to any insured under the Allstate Policy).

2.4    **Allocation Of The Settlement Payment.**  Allstate has complete discretion to allocate the Settlement Payment as it sees fit.  Nothing in this Agreement shall preclude Allstate from pursuing reinsurance recoveries for the Settlement Payment from a reinsurer.

**3.    RELEASE**

3.1    **Release Of Allstate And Buyback Of The Allstate Policy.**  Upon the Effective Date, based upon the mutual promises and covenants contained herein, including the Settlement Payment, and in consideration thereof, the sufficiency of which is hereby acknowledged by the Parties hereto, Plaintiffs unconditionally, irrevocably and absolutely waive, release, and forever discharge Allstate from any and all past, present, and future Claims, liabilities, duties to defend or indemnify, causes of action, demands, rights, damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive or exemplary damages that were or could have been alleged), or any other obligations under or relating to the Allstate Policy of every kind, nature and description whatsoever, whether arising in law or in equity.  As to Plaintiffs, the Allstate Policy will have no further force or effect whatsoever.  Plaintiffs' releases include, without limitation, (i) any liability for past, present, or future Environmental Claims, known and unknown, arising out of the Site; (ii) any liability arising under or relating to the RCRA Permit, CERCLA, or Natural Resource Damages; (iii) any Direct Action Claims; (iv) any Contribution Claims; (v) any Extra-Contractual Claims; and (vii) any Claims that were asserted or could have been asserted in the Insurance Action.

3.2    **Additional Release Of Allstate.**  In addition, Plaintiffs release Allstate under any other general liability insurance policy, or policy providing liability coverage for third-party property damage, bodily injury or personal injury, known or unknown, confirmed or unconfirmed,

-13-

under which they can claim insurance coverage for liabilities relating to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, DSM Chemicals North America, LLC, Fibrant, or the Site (including any adjoining properties).

      3.3    **Limitations On Scope Of Release.**  Notwithstanding any other provision of this Agreement, Plaintiffs do not release any Claims held by the United States of America, the State of Georgia, or PCS Nitrogen.  Plaintiffs also do not release any Claim under insurance policies issued after the Plan Effective Date or presently maintained by entities currently performing work at the Site.

      3.4    **Release In All Capacities.**  The releases provided in Sections 3.1 and 3.2 above are provided by Plaintiffs in all of their actual or alleged capacities, including, without limitation, as an alleged insured, additional insured, successor to an insured, assignor, assignee, subrogor, subrogee, indemnitor, indemnitee, creditor, or judgment creditor of Fibrant, or of any other Person.

      3.5    **Warranty Regarding Known Claims.**  Plaintiffs represent and warrant that as of the date they have executed this Agreement, Plaintiffs are not "on notice" of any Claims arising from the operations of Debtors, or any of them, or their predecessors, for which Plaintiffs are alleged to, or may be liable other than the Environmental Claims relating to the Site.

      3.6    **Warranty Regarding Known Allstate Policies.**  Plaintiffs represent and warrant that they are unaware of any insurance policy issued by Allstate to Debtors, or any of them, other than the Allstate Policy.

      3.7    **Changes In Fact Or Law.**  The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Allstate Policy or otherwise. The Parties may hereafter discover facts different from, or in addition to, those which they now believe

to be true with respect to any and all of the Claims released in this Agreement.  Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects to the fullest extent permitted by law, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

      3.8    **Assignment Of Interests In The Allstate Policy To South Center.**  To facilitate the releases, injunction and buyback contemplated in this Agreement, the Parties agree and acknowledge that on or before the Effective Date, Augusta Liquidations, ELT, and CIH shall assign all of their Interests, if any, in, to and under the Allstate Policy to South Center, which assignment shall (i) encompass all such Interests, if any, of Augusta Liquidations, ELT, and CIH, in, to and under the Allstate Policy and (ii) be in form and substance acceptable to Allstate.

      3.9    **No Other Assignment.**  Other than the assignment of Debtors' rights to assert and pursue causes of action under the Allstate Policy in part to CIH and in part to ELT, the latter of which later assigned such rights to Augusta Liquidations, pursuant to the Plan, and other than the reassignment expressly provided for in Section 3.8 of this Agreement, Plaintiffs warrant and represent that they (i) have not sold, assigned or transferred and will not sell, assign or transfer, in whole or in part, to any Person any of their Interests in, to or under the Allstate Policy and (ii) are the owners of the Allstate Policy rights and Interests subject of this Agreement, *provided, however,* that Debtors' warranty with respect to this clause (ii) is limited by Debtors' warranty that, subsequent to the assignment provided in Section 3.8 of this Agreement, Debtors own any and all such rights assigned to Debtors by CIH, ELT and/or Augusta Liquidations, together with any other Allstate Policy rights of Debtors existing prior to the Plan Assignments, with no further warranty expressed or implied as to the scope of those rights.  Moreover, Plaintiffs represent, warrant, covenant and agree that, except as provided for in this Agreement, they have not and will not in

-15-

any way assist any Person in the establishment of any Interest in, to or under, or Claim against, the Allstate Policy.

## 4.  FIBRANT'S BANKRUPTCY-RELATED OBLIGATIONS

4.1    Within fourteen (14) business days after the date on which this Agreement has been executed by all Parties, the Debtors, by and through the Liquidating Agent, shall file the appropriate motion or motions seeking approval of the terms of this Agreement, including the sale of the Allstate Policy and the Plan Modifications, and entry of the Approval Order together with appropriate findings of fact and conclusions of law, in form and substance acceptable to the Parties. The Approval Order shall:

(a)    Approve this Agreement in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 105(a), and Bankruptcy Rules 6004 and 9019;

(b)    Find this Agreement was negotiated in good faith, the product of arms-length bargaining, free from fraud or collusion, is reasonable, fair and equitable, and in the best interests of Debtors' estates and their creditors after consideration of (i) the probability of success in the Insurance Action, with due consideration for the uncertainty in fact and law; (ii) the likely difficulties in collection; (iii) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (iv) the paramount interest of creditors;

(c)    Authorize the Parties to undertake the settlement, and perform the obligations and the transactions contemplated by this Agreement;

(d)    Authorize the sale of Plaintiffs' Interests in, to and under the Allstate Policy to Allstate free and clear of any and all Interests of any and all Persons, with all Interests in, to and under, and Claims against Plaintiffs' Interests in, the Allstate Policy being fully extinguished without reservation;

-16-

(e)     Provide that Allstate is a good faith purchaser of the Allstate Policy for value and, as such, is entitled to all protections provided to a good faith purchaser under Bankruptcy Code § 363(m);

(f)     Provide that the consummation of this Agreement releases Allstate from liability to Plaintiffs under the Allstate Policy and applicable law;

(g)     Provide that the sale of the Allstate Policy outside the ordinary course of business, free and clear of the Interests of any and all Persons, satisfies the requirements respectively of § 363(b) and § 363(f);

(h)     Enter an injunction pursuant to 11 U.S.C. §§ 105(a) 1123, 1127, and 1129, and in accordance with applicable Eleventh Circuit law governing injunctions and releases, providing that any Person (other than the United States of America, the State of Georgia and PCS Nitrogen) who now holds or who may in the future hold any Claims or Interests of any kind or nature against Plaintiffs, or any of them, or against, in, to or under the Allstate Policy, is hereby forever barred, prohibited, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any such Claims or Interests against Allstate, or against, in, to or under the Allstate Policy;

(i)     Approve modifications of the Plan, pursuant to Bankruptcy Code § 1127, in form and substance reasonably acceptable to Allstate and CIH, providing that Allstate shall be deemed a "Settling Insurer" for purposes of and as defined in the Plan, and that "Settling Insurers" shall be deemed to be treated as "Creditor Released Parties" for purposes of the release and injunction provisions of the Plan (as those terms are defined in the modified Plan) (the "Plan Modifications"); provided that no release or injunction shall be required from or against the United States of America, the State of Georgia, or PCS Nitrogen;

-17-

(j)       Find that due, reasonable and adequate notice of the (i) sale of the Allstate Policy; (ii) terms and conditions of this Agreement, including the releases and injunctions; and (iii) hearing on the approval of this Agreement (including the sale provided for herein) was provided in accordance with Bankruptcy Rules 2002 and 6004 and published in accordance with Section 4 of this Agreement; and

(k)       Find that the Bankruptcy Court has jurisdiction to enter the relief requested in the Approval Motion, including the buyback, releases and injunctions.

4.2       The Parties agree to support this Agreement and the Approval Motion requesting the Bankruptcy Court to approve this Agreement, including, if deemed advisable by Allstate or other Settling Insurers, by providing sworn testimony so the Bankruptcy Court can determine that among other things, this Agreement is in the best interests of Debtors' creditors.  For the avoidance of doubt, the Parties do not anticipate sworn testimony from representatives of CIH, ELT, or Augusta Liquidations. For avoidance of doubt, all fees, expenses and other costs incurred by or to be incurred by the Liquidating Agent shall be funded through an advance retainer by CIH, and the Liquidating Agent shall have no obligations under this Agreement with respect to Sections 3.8, 4.1 through 4.5, 4.7 and 5.1 in the absence of such prior funding.

4.3       Debtors shall serve notice of the Approval Motion and of the hearing thereon.  Such notice shall be accomplished through electronic means or, at Allstate's election (which election shall be made by Allstate by the date on which this Agreement has been executed by all Parties), by mail on each of the Bankruptcy Notice Parties by United States mail, postage pre-paid.  If mail notification is elected, the mailing expense shall be borne equally by Allstate and any other Settling Insurers whose polices are also being sold that have elected notification through mail.

-18-

4.4     To ensure the broadest notice possible, Debtors shall also publish notice of the sale of the Allstate Policy to Allstate pursuant to Bankruptcy Code §§ 363(b), (f) and (m) and Bankruptcy Rules 6004 and 9019 and of the hearing seeking the Approval Order in the national edition of the *USA Today*, and twice in the *Atlanta Journal-Constitution* and *The Augusta Chronicle*.  Publication of the notice of the sale of the Allstate Policy shall be at the expense of Allstate, and in a form and substance acceptable to Allstate; *provided however*, if any such advertisement notices the sale of policies other than the Allstate Policy issued by Allstate, the expense of such publication shall be borne equally by Allstate and the other Settling Insurers whose polices are also being sold, and the notice shall be in a form and substance acceptable to both Allstate and those other Settling Insurers.

4.5     If the Approval Order is appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), then subject to the Parties' termination rights set forth below, the Parties shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; *provided, however*, that nothing herein shall preclude the Parties from mutually consummating the transactions contemplated herein if the Approval Order shall have been entered and is not stayed; *provided further, however,* that nothing herein shall obligate Allstate to consummate the transactions contemplated herein unless and until the Approval Order is a Final Order.

4.6     The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, either the Approval Order or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be materially inconsistent with the terms of this Agreement.

-19-

4.7     Plaintiffs shall cooperate with Allstate and its representatives in connection with efforts to obtain entry of the Approval Order and the bankruptcy proceedings directly related to entry of the Approval Order.  Plaintiffs shall not submit to the Bankruptcy Court for approval any motion, plan of reorganization, adversary proceeding, filing or other request the approval of which would conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of Allstate hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

4.8     Allstate shall have no obligation to remit the Settlement Payment until the Approval Order is entered and the Effective Date occurs.  If (i) the Approval Order is vacated or modified, or otherwise entered in a form that is not reasonably acceptable to Allstate, or (ii) the Approval Order is reversed on appeal, then Allstate may terminate this Agreement by delivering written notice to Plaintiffs within ten (10) business days of notice of such event.   In the event this Agreement is terminated, (i) the Agreement shall be void; (ii) Allstate shall not be obligated to pay the Settlement Payment; and (iii) the Parties shall have all of the rights, defenses and obligations under or with respect to the Allstate Policy that they would have had absent this Agreement.

## 5.     **DISMISSAL**

5.1     **Dismissal Of Allstate From The Insurance Action.**  Within ten (10) business days after receipt of the Settlement Payment, the Parties will file a stipulation in the Insurance Action dismissing, with prejudice and without costs to any Party, all Claims and causes of action asserted in that action by Plaintiffs against Allstate.  Plaintiffs and Allstate agree to cooperate and, if necessary, to take any further action consistent with this Agreement to effect the dismissal with prejudice of Allstate from the Insurance Action.

-20-

6.      **INDEMNIFICATION**

6.1     **Defense And Indemnification.**  CIH (or an affiliated entity established to maintain the following obligation) will defend, indemnify and hold harmless Allstate for Claims against it by any Person relating to RCRA Costs or other Environmental Claims arising from the Site, including but not limited to, the following: (i) Claims by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under the Allstate Policy; (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of Fibrant; and (iii) Claims directly against Allstate by any other Person, including, but not limited to, Direct Action Claims or third-party beneficiary Claims.

6.2     **Limitations On Plaintiffs' Indemnification Obligations.**

(a)     The indemnification and defense obligations enumerated in Section 6.1 do not extend to Claims brought by (i) a party to the Insurance Action (or affiliated entities) or (ii) PCS Nitrogen.

(b)     The indemnification and defense obligations enumerated in Section 6.1 will incept upon the receipt of the Settlement Payment and is capped at the amount of the Settlement Payment, less creditor recovery (i.e., the portion of the Settlement Payment paid to creditors and/or a trust established for the benefit of creditors under the Plan).  Upon exhaustion of the cap amount by payment of defense or indemnity to Allstate, any obligations under this Section 6 shall immediately terminate.

(c)     Any obligation of Plaintiffs to pay for Allstate's defense and indemnity under this Agreement shall immediately terminate upon the close of the Bankruptcy Case.

6.3     **Defense Of Allstate.**  The defense of Allstate for an indemnified Claim under Section 6.1 will proceed as follows:

-21-

(a)     Plaintiffs, through their own counsel, will use reasonable efforts to obtain a dismissal of Allstate and the substitution of a Plaintiff entity on the basis that any of Allstate's obligations with respect to the Allstate Policy was finally resolved by a reasonable, good faith settlement and that Plaintiffs agreed to accept a judgment reduction with respect to any obligation of Allstate as set forth in Sections 7.1 and 7.2 below.

(b)     Should the claimant refuse to dismiss Allstate, Allstate will have the right to select defense counsel, subject to Plaintiffs' consent, which shall not be unreasonably withheld, to defend Allstate at Plaintiffs' expense ("Retained Counsel").  Any such Retained Counsel will be chosen from among insurance coverage counsel used by Allstate, at rates not to exceed those routinely paid by Allstate for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

(c)     Allstate will have the right to control all positions taken on its behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the Allstate Policy.

7.     **JUDGMENT REDUCTION**

7.1     In connection with any Claim related to a Claim released under this Agreement brought by Fibrant, CIH or Augusta Liquidations against any Person other than Allstate, which results in an adjudication on the merits, whether in court or another tribunal with jurisdiction, or in a binding arbitration award, that such other Person is liable to Fibrant, CIH or Augusta Liquidations, and that such judgment or binding arbitration award includes sums which are allocable to Allstate under the Allstate Policy, Fibrant, CIH and Augusta Liquidations agree to reduce the judgment or binding arbitration award against such other Person or take other steps as necessary in order to avoid such liability being imposed on Allstate.  Such a reduction in Fibrant's, CIH's or Augusta Liquidations' judgment or binding arbitration award will be accomplished by

subtracting from the judgment or binding arbitration award against any such Person the share of the judgment or binding arbitration award, if any, which is allocated or allocable to Allstate.

      7.2    To ensure that such a reduction is accomplished and Allstate is protected, the applicable Plaintiff who brought any such Claim described in Section 7.1 and Allstate shall move the court or appropriate tribunal for a finding that this Agreement was made in good faith and the appropriate form of relief is a contribution bar in favor of Allstate. In the event a court or other tribunal will not make such findings or grant the appropriate relief, Allstate will also be entitled to assert this paragraph as a defense in any Claim against it for any such portion of the judgment or binding arbitration award, and will be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Allstate from liability for the judgment or binding arbitration award.

      7.3    In the event any Plaintiff settles any Claim related to or arising out of a Claim released under this Agreement with any Person other than Allstate without Allstate's consent, the settling Plaintiff agrees that it will not seek from Allstate any sums allocated or allocable to Allstate by such settlement.  Each Plaintiff further agrees that it will use reasonable efforts to obtain a release in favor of Allstate from any Person with which they settle any Claims relating to or arising out of Claims released under this Agreement.

## 8.    **ADDITIONAL PROVISIONS**

      8.1    **Restrictions On Disclosure Of Agreement.**  It is a material inducement for the Parties to enter into this compromise and settlement of their disputes and differences that the terms and provisions of this Agreement, shall be, and remain, strictly confidential, until the Agreement is filed in the Bankruptcy Case for purposes of obtaining the Approval Order.  Prior to such public filing, neither this Agreement, nor any of its terms, may be disclosed to any Person, except that this Agreement and its terms may be disclosed: (i) as required by law or court order; (ii) to any

reinsurer, reinsurance intermediary, or retrocessionaire of the Parties, if any, in connection with insurance or reinsurance obligations or to any reinsurance arbitrator(s); (iii) to the officers, directors, employees, representatives, counsel, accountants, agents and auditors of any of the Parties; (iv) in any action or proceeding between the Parties where the existence or terms of the Agreement are at issue; or (v) by written agreement of the Parties.  If this Agreement or its terms are disclosed pursuant to subparagraphs (i) or (iv) above, the Party disclosing such information shall give prior written notice thereof to each of the other Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (ii), (iii), or (v) above, the Party disclosing such information shall advise the recipient of the provisions of this paragraph.

8.2    **"Most Favored Nation" Agreement.**  If Plaintiffs enter into a settlement with another insurer to resolve Plaintiffs' Claims against such other insurer in the Insurance Action, and such settlement provides for broader releases, injunctions, indemnification or sale/assignment provisions than those agreed to herein, including within the context of the Bankruptcy Case, the applicable release, injunction, indemnification and/or sale/assignment provisions of the settlement between the Parties shall be deemed modified without further act or deed of the Parties to provide the same scope of release (including the parties released, the relationship to the issuing insurer, and the breadth of the release), injunction, indemnification and/or sale/assignment as provided in such other agreement between Plaintiffs and the other insurer, for no additional consideration. Plaintiffs, except for Debtors or the Liquidating Agent and his professionals, shall provide Allstate with information concerning other settlement agreements that implicate this provision and shall cooperate with Allstate to the extent necessary to amend this Agreement, any proposed Approval Motion and/or any proposed Approval Order to the extent Allstate deems necessary to effectuate the intent of this Section 8.2.

-24-

8.3     **Amendments.**   Subject to the provisions of Section 8.2 above, neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by written amendment signed by the Parties.

8.4     **No Precedential Value.**  This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies.  It shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of the Parties under any insurance policies issued to Fibrant or to any other Person.

8.5     **Agreement Voluntarily Entered Into By Each Of The Parties.**  This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them.  The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

8.6     **Interpretation.**  This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement.  In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties.  Accordingly, none of the Parties shall be presumptively entitled to have any provisions of the Agreement construed against any of the other Parties in accordance with any rule of law, legal decision or doctrine.

8.7     **No Admission.**  This Agreement is the result of a compromise of disputed issues. This Agreement does not constitute and may not be construed as an admission of any liability, fact, course of performance, or wrongdoing by any Party.  This Agreement is not, and cannot be

construed as, any admission by any Party that any defense, indemnity, contribution, or other obligation exists under the Allstate Policy for the Claims released herein.

     8.8    **Entire And Integrated Agreement.**  This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters and there are no promises, representations warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

     8.9    **No Third-Party Beneficiaries.** Nothing in this Agreement is intended or shall be construed to give any Person, other than Allstate and Plaintiffs and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of Allstate and Plaintiffs, as well as each of their respective successors and permitted assigns, and for the benefit of no other Person.

     8.10   **Severability.**  If any provisions of this Agreement or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, and application of such provisions to other circumstances, shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.

     8.11   **Notice.**  Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first-class mail, postage prepaid or by

overnight mail or by electronic mail, addressed as follows or as the Parties subsequently may direct in writing:

> As to Allstate:
>
>> Kurt A. Schaden
>> Direct Claim Consultant
>> Allstate Insurance Company
>> Specialty Operations Div.
>> 100 East Palatine Road
>> Wheeling, IL 60090
>> kschaden@allstate.com
>>
>> With a copy to:
>>
>> Robert R. Anderson III
>> Hughes Socol Piers Resnick & Dym, Ltd.
>> 70 W. Madison St., Suite 4000
>> Chicago, IL 60602
>> randerson@hsplegal.com
>
> As to Plaintiffs:
>
>> Michel Govaert
>> Mauritslaan 49
>> 6129 EL Urmond | The Netherlands
>> Michel.Govaert@chemicainvest.com
>>
>> With a copy to:
>>
>> Brook Roberts
>> LATHAM & WATKINS LLP
>> 12670 High Bluff Drive
>> San Diego, CA 92130
>> brook.roberts@lw.com

8.12 **Headings.** The section titles, captions, and headings contained in the Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

8.13 **Recitals.** The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted therein in any action or proceeding involving

any of the Parties, other than an action or proceeding brought to enforce the terms of this Agreement, or an action by a third party attacking the enforceability of this Agreement. The Parties do not intend that such recitals constitute admissions of fact by any of them.

8.14 **Additional Representations And Warranties.** ChemicaInvest Holding, B.V.; Augusta Liquidations LLC; Environmental Liability Transfer, Inc.; Fibrant, LLC, Fibrant South Center, LLC, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC, by and through the Liquidating Agent; and Allstate Insurance Company, each respectively represents and warrants that it is fully authorized to (i) enter into this Agreement on its own behalf and on behalf of its respective Plaintiff(s) or Allstate, as applicable, and (ii) subject to Bankruptcy Court approval, consummate the transactions contemplated herein, including but not limited to the sale/buyback of the Allstate Policy. In addition, each of ChemicaInvest Holding, B.V., Augusta Liquidations LLC, Environmental Liability Transfer, Inc., and Allstate Insurance Company represents and warrants that (i) it is duly organized and existing in good standing under the laws of the United States, (ii) it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or internal approval is necessary, and (iii) the making and performance of this Agreement will not violate any provision of the law or the Party's articles of incorporation, charter, or by-laws. In addition, each of the individuals signing this Agreement represents and warrants that they are authorized to execute this Agreement on behalf of the Party(ies) whom they represent and, subject to Bankruptcy Court approval, consummate the transactions contemplated herein on behalf of such Party(ies), including but not limited to the sale/buyback of the Allstate Policy.

-28-

8.15   **<u>Execution In Counterparts.</u>**   This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

*[remainder of page intentionally left blank*

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _9/22/2023_                        CHEMICAINVEST HOLDING, B.V.

By: _____

Name: _Michel Govaert_

Title: _Director_

Dated: _____          AUGUSTA LIQUIDATIONS LLC
                                          a Missouri limited liability company
                                          By: Environmental Liability Transfer, Inc.
                                          Its: Manager

By:_____

Print Name: _Michael J. Roberts_

Title: _Vice President_

Dated:_____           ENVIRONMENTAL LIABILITY
                                          TRANSFER, INC.
                                          a Missouri corporation

By:_____

Print Name: _Michael J. Roberts_

Title: _Vice President_

[Signature Pages]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____          CHEMICAINVEST HOLDING, B.V.

                                           By: _____

                                           Name: _____

                                           Title: _____

Dated: _9·22·23_                           AUGUSTA LIQUIDATIONS LLC
                                           a Missouri limited liability company
                                           By:  Environmental Liability Transfer, Inc.
                                           Its:  Manager

                                           By: _____

                                           Print Name:  Michael J. Roberts

                                           Title:  Vice President

Dated: _9·22·23_                           ENVIRONMENTAL LIABILITY
                                           TRANSFER, INC.
                                           a Missouri corporation

                                           By: _____

                                           Print Name:  Michael J. Roberts

                                           Title:  Vice President

[Signature Pages]

Dated: 9/3/2023

FIBRANT, LLC, on behalf of itself and Fibrant

By: _____

Name:   Klaus Gerber

Title:   Liquidating Agent on Behalf of Fibrant, LLC

Dated: 9/3/2023

FIBRANT SOUTH CENTER, LLC, on behalf of itself and South Center

By: _____

Name:  Klaus Gerber

Title:   Liquidating Agent on Behalf of Fibrant South Center, LLC

Dated: 9/3/2023

GEORGIA MONOMERS COMPANY, LLC, on behalf of itself and Georgia Monomers

By: _____

Name:  Klaus Gerber

Title:  Liquidating Agent on Behalf of Georgia Monomers Company, LLC

Dated: 9/3/2023

EVERGREEN NYLON RECYCLING, LLC, on behalf of itself and Evergreen

By: _____

Name:  Klaus Gerber

Title:  Liquidating Agent on Behalf of Evergreen Nylon Recycling, LLC

[Signature Pages]

Dated: **10/5/23**

ALLSTATE INSURANCE COMPANY, on
behalf of itself and Allstate

By: _[signature]_

Name: Kurt A. Schaden

Title: Direct Claim Consultant

**EXHIBIT A**
**[Intentionally Omitted]**

## SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE

THIS SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE ("Agreement") is entered into by and between ChemicaInvest Holding, B.V. ("CIH"); Augusta Liquidations LLC ("Augusta Liquidations"); Environmental Liability Transfer, Inc. ("ELT"); and Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc. and DSM Chemicals North America, LLC ("Fibrant"), Evergreen Nylon Recycling, LLC, Fibrant South Center, LLC ("South Center"), and Georgia Monomers Company, LLC, by and through Klaus Gerber, as their duly appointed Liquidating Agent (the "Liquidating Agent"), on the one hand, and ACE Property & Casualty Insurance Company, formerly known as CIGNA Property & Casualty Insurance Company, formerly known as Aetna Insurance Company ("ACE P&C"), Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company, and as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century Indemnity"), and United States Fire Insurance Company, as to policies assumed by Westchester Fire Insurance Company ("US Fire"), on the other hand.  The parties are sometimes referred to herein collectively as the "Parties," and individually as "Party."

## RECITALS

**WHEREAS**, ACE P&C, Century Indemnity, and US Fire issued or allegedly issued certain liability insurance policies to Columbia Nitrogen Corporation and Columbia Nipro Corporation, including without limitation the policies listed on **Exhibit B** hereto (as defined herein, the "Chubb Policies"); and

-1-

**WHEREAS**, Columbia Nipro Corporation became known as Fibrant (as hereinafter defined) through a series of corporate name changes and one change of corporate form from a corporation to a limited liability company; and

**WHEREAS**, beginning in or about 1963, Fibrant constructed and operated a facility located on a parcel of real estate at 1408 Columbia Nitrogen Drive, Augusta, Georgia, at which Fibrant manufactured caprolactam, ammonium sulfate, and other products (as hereinafter defined, the "Site"); and

**WHEREAS**, Fibrant's operations at the Site allegedly caused environmental contamination at and around the Site; and

**WHEREAS**, Fibrant has alleged that it is subject to potential environmental claims relating to historical operations at the Site, arising under certain environmental laws and regulations, including the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Georgia Hazardous Waste Management Act, O.C.G.A. § 12-8-60 et seq., and the Hazardous Waste Permit for the Site, (Permit No. HW-016 (ST&CA) and Facility I.D. No. GAD 051011609); and

**WHEREAS**, on February 3, 2018, Fibrant, together with Evergreen Nylon Recycling, LLC, South Center, and Georgia Monomers Company, LLC (collectively, "Debtors")[1], filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court"); and

---

[1] The original Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Fibrant, LLC (6694); Evergreen Nylon Recycling, LLC (7625); Fibrant South Center, LLC (8270); and Georgia Monomers Company, LLC (0042). Pursuant to the Plan, as modified, Fibrant, LLC, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC were dissolved.

**WHEREAS**, on May 29, 2019, an order was entered in the Bankruptcy Case confirming the Debtors' Second Amended and Restated Plan of Liquidation (the "Plan"); and

**WHEREAS**, pursuant to the Plan, (a) ownership of the Site was conveyed to Augusta Liquidations, and (b) the Debtors' rights to assert and pursue causes of action under the Chubb Policies were assigned in part to CIH and in part to Augusta Liquidations; and

**WHEREAS**, on or about June 12, 2019, Debtors, CIH and Augusta Liquidation commenced an adversary proceeding in the Bankruptcy Court (the "Insurance Action"), seeking a declaratory judgment that ACE P&C, Century Indemnity, and US Fire (together with other defendant insurers) are obligated to defend Debtors and CIH for claims arising from the Site, to reimburse past and future costs incurred to comply with the Debtors' obligations under RCRA Costs, and to indemnify and defend Augusta Liquidations against any damages, expenses, and settlement payments at the Site.

**WHEREAS**, ACE P&C, Century Indemnity, and US Fire dispute the allegations of the Insurance Action and deny that they have any obligation to provide coverage for the claims of Debtors, CIH and Augusta Liquidations; and

**WHEREAS**, Fibrant has also tendered to ACE P&C, Century Indemnity, and US Fire asbestos bodily injury claims asserted against it, including without limitation the Baxley Claim (as hereinafter defined), on the basis that the claims arise from the operations of Fibrant at the Site and that Fibrant is entitled to coverage for those claims under the Chubb Policies; and

**WHEREAS**, ACE P&C, Century Indemnity, and US Fire have denied coverage for the Baxley Claim on the basis that Fibrant failed to give proper and timely notice of the Baxley Claim, and on other grounds, and reserved their rights to deny coverage on additional grounds; and

**WHEREAS**, certain Parties agreed to mediate their disputes before Timothy P. Gallagher, Esquire, of the Gallagher Law Group P.C., Los Angeles, CA; and

**WHEREAS**, the Parties now desire finally and completely to resolve, compromise, and settle all disputes between them, including without limitation (i) any and all Claims (as hereinafter defined) relating to the Site, the Insurance Action, the Baxley Claim, and other matters addressed herein, and (ii) any disputes arising out of or related to the Bankruptcy Case, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, and

**WHEREAS**, as part of this compromise and resolution, ACE P&C, Century Indemnity, and US Fire wish to repurchase all of Debtors' rights, title and interests in the Chubb Policies, free and clear of all Interests of any Person, except as expressly set forth in this Agreement;

**WHEREAS**, by and through this Agreement, Plaintiffs seek to provide the Chubb Insurers with the broadest possible release, as set forth herein, with respect to the Chubb Policies and to provide that the Chubb Insurers shall have no further obligations to the Plaintiffs, Debtors' creditors or other parties-in-interest, except as expressly set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.  **<u>DEFINITIONS</u>**

As used in this Agreement, the following terms have the following meanings:

1.1  "ACE P&C" means ACE Property & Casualty Insurance Company, formerly known as CIGNA Property & Casualty Insurance Company, formerly known as Aetna Insurance Company.

1.2   "Approval Motion" means the motion to be filed seeking approval of the terms of this Agreement, including the sale of the Chubb Policies provided for herein, and entry of the Approval Order, as provided in Section 4.1 hereof.

1.3   "Approval Order" means an order entered by the Bankruptcy Court, upon a hearing following proper notice, containing all of the provisions set out in Section 4.1 hereof, but no provision that is contrary to or inconsistent with such provisions, which becomes a Final Order, and the wording of the Approval Order shall be as set forth in **Exhibit A** hereto, or otherwise reasonably acceptable to the Chubb Insurers and CIH.

1.4   "Bankruptcy Case" means the bankruptcy case captioned *In re: Fibrant, LLC, et al.,* Case No. 18-10274-SDB, presently pending before the Bankruptcy Court, Judge Susan D. Barrett presiding.

1.5   "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

1.6   "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Georgia.

1.7   "Bankruptcy Notice Parties" means the following

(i)   all known creditors of Debtors;

(ii)   the Office of the United States Trustee for the Southern District of Georgia;

(iii)   all Persons that have filed a notice of appearance and/or demand for service of papers in the Bankruptcy Case;

(iv)   all Persons that have filed a notice of appearance and/or demand for service of papers in the Insurance Action;

(v)   all Persons identified on any and all service lists in the Bankruptcy Case;

(vi)    the Georgia Department of Natural Resources, Environmental Protection Division;

(vii)   the Attorney General of the State of Georgia;

(viii)  the United States Environmental Protection Agency;

(ix)    the Attorney General of the United States;

(x)     the United States Attorney for the Southern District of Georgia;

(xi)    the United States Internal Revenue Service;

(xii)   all known insurers of the Debtors;

(xiii)  all Persons with a known Interest in the Site, including those Persons that ever owned the Site, had a leasehold interest in the Site, or that hold a lien against the Site, regardless of the date thereof, and any known insurer of such property owner or lessee;

(xiv)   all known Persons owning real property adjoining the Site;

(xv)    all known Persons with an Interest in the Chubb Policies;

(xvi)   any other known Person asserting an Interest in the Bankruptcy Case and/or sought to be bound by the Approval Order; and

(xvii)  any other Person designated by the Bankruptcy Court as requiring notice.

1.8     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure

1.9     "Baxley Claim" means all Claims for or arising out of alleged bodily injury to Malcolm Baxley from exposure to asbestos, including all Claims asserted in the action entitled *Betty Baxley, Individually and as Personal Representative of the Estate of Malcolm M. Baxley v. 3M Corp., et al.*, Superior Court of Richmond County, Georgia, No.2016 RCCV 548.

1.10    "Century Indemnity" means Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company, and as successor to CCI Insurance Company, as successor to Insurance Company of North America.

1.11    "Chubb Insurers" means ACE P&C, Century Indemnity, US Fire and all their predecessors and successors.

1.12    "Chubb Companies" means the Chubb Insurers and all their affiliated companies and representatives, as identified on Schedule "A" attached, and each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, partners, beneficiaries, and assigns.

1.13    "Chubb Policies" means all insurance policies, known or unknown, issued or allegedly issued by, or novated to or assumed by, any Chubb Insurer to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC, including US Fire policies having policy numbers GLA 284022 and GLA 5400797517. "Chubb Policies" include, but are not limited to, the policies and alleged policies listed in Schedule "B" attached.  For the avoidance of doubt, "Chubb Policies" do not include insurance policies issued after the Effective Date of the Plan or those currently effective policies maintained by entities currently performing work at the Augusta Site—such as policies issued to Augusta Liquidations, remediation contractors, or subcontractors—if any.

1.14    "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass,

-7-

negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause of action of any sort, whether currently known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

1.15    "Contribution Claim" means any Claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a Claim of its insured in a situation where two or more policies issued by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

1.16    "Debtor Entities" means South Center and shall also encompass the rights and interests, if any, of the dissolved entities previously party to the Bankruptcy Case, including, Fibrant, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC.

1.17    "Direct Action Claim" means any Claim by any Person against an insurer, which is identical or similar to, or relating to, the same or similar acts or omissions giving rise to a Claim against Plaintiffs, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action.

1.18    "Effective Date" means the last date on which each of the following conditions precedent have occurred: (a) each of the Parties has executed this Agreement and delivered its signature page to the other Parties; (b) the Approval Order is a Final Order; (c) the Plan Modification has been approved by Final Order of the Bankruptcy Court; and (d) this Agreement has not been terminated under Sections 4.7 or 8.10 hereof or otherwise.

1.19    "ELT" shall have the meaning assigned in Section 1.1.59 of the Plan.

1.20    "Environmental Claim" means any Claim of any kind, including for bodily injury, property damage, personal injury, advertising injury, economic loss, loss of use, environmental investigation or remediation costs, natural resource damages or toxic torts, that arises from Environmental Contamination.

1.21    "Environmental Contamination" means the actual, potential, or alleged presence of, exposure to, or injury or damage from any smoke, vapors, soot, fumes, acids, alkaloids, chemicals, liquids, gases, waste materials, irritants, contaminants or pollutants of any type, including, but not limited to: (a) any substance defined or designated as a "hazardous substance" pursuant to Sections 101(14) and 102(a) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601(14) and 9602(a); (b) any "pollutant or contaminant" under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1); (c) any substance defined as a "hazardous waste" in Section 6903(5) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, et seq.; (d) any chemical, substance or mixture found by the Administrator of the United States Environmental Protection Agency and/or any state agency to present an unreasonable risk of injury to health or the environment pursuant to Toxic Substances Control Act 15 U.S.C. § 2601, et seq.; (e) any substance listed in the United States Department of Transportation Table, 49 C.F.R. 172.101; and (f) any substance designated or considered to be a "hazardous substance," "hazardous material," "hazardous waste," "waste," "pollutant" or "contaminant" under any federal, state or local law, statute, rule, regulation or judicial decision that relates to, amends or is a successor to any of the foregoing statutes, rules, regulations or cases, or that defines any of the foregoing terms.

1.22    "Extra-Contractual Claim" means any Claim against an insurer, seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith;

failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.

1.23    "Fibrant" means Fibrant, LLC formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc. and DSM Chemicals North America, LLC.

1.24    "Final Order" means an order as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Parties and their counsel or, in the event that an appeal, writ of certiorari, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, petition for review, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order".

1.25    "Insurance Action" means the adversary proceeding commenced in the Bankruptcy Court by Plaintiffs against ACE P&C, Century Indemnity, US Fire and others, docketed at Adversary Proceeding 19-01016 (SDB).

1.26    "Insurance Coverage Claim" means any Claim seeking defense or indemnity or any other benefit, including any Contribution Claim or other similar Claim, under or relating to the Chubb Policies.

1.27    "Interests" means all liens, Claims, encumbrances, interests, defenses and other rights of any nature, whether at law or in equity, including all Environmental Claims, Contribution Claims, Direct Action Claims, Insurance Coverage Claims and Extra-Contractual Claims.

1.28    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or partnership joint venture, trust or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.29    "PCS Nitrogen" means PCS Nitrogen, Inc., together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).  PCS Nitrogen shall not include the Plaintiffs.

1.30    "Plaintiffs" means Fibrant, LLC, Evergreen Nylon Recycling, LLC, South Center, Georgia Monomers Company, LLC, ChemicaInvest Holding, B.V., and Augusta Liquidations, LLC, together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates (including ELT), divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

-11-

1.31    "Plan" means the Second Amended and Restated Plan of Liquidation for the Debtors, as confirmed in the Bankruptcy Case by Order dated May 29, 2019.

1.32    "RCRA Costs" means investigative, remedial, and other costs and expenses incurred pursuant to RCRA, GHWMA, the RCRA Permit, other applicable environmental laws, and regulations, related to soil and groundwater contamination at the Site.

1.33    "RCRA Permit" means Hazardous Waste Permit No. HW-016(ST&CA) issued to Fibrant, as the same may be amended from time to time.

1.34    "Site" means all property, buildings, soil, surface water, and groundwater at and beneath the premises on Columbia Nitrogen Drive in Augusta Georgia, which is or has been owned and/or occupied by Fibrant, LLC and its predecessors in interest, as defined in the report of Ramboll Environ prepared for Fibrant and dated May 16, 2017, including without limitation Solid Waste Management Areas (SWMAs) A through D, and the air above the Site, the ground and groundwater below the Site, and all air, soil, surface water, and groundwater in the vicinity of the Site allegedly impacted by Environmental Contamination originating from the Site.

1.35    "US Fire" means United States Fire Insurance Company, solely with respect to policy nos. GLA 284022 and GLA 540 079751 7.

As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate; "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every".

## 2.    SALE/BUYBACK OF THE CHUBB POLICIES AND THE SETTLEMENT PAYMENT

2.1    **Settlement Payment**.  On or before forty-five (45) days following the Effective Date, one or more of the Chubb Insurers will pay to CAP I BV, as agent and designee of the Plaintiffs, with express authority of Plaintiffs to accept and receive the Settlement Payment on

their behalf, the total sum of One Million Six Hundred Twenty-Five Thousand Dollars ($1,625,000) (hereinafter referred to as the "Settlement Payment").  Payment of the Settlement Payment will be made by check payable to:

> CAP I BV
> Mauritslaan 49
> 6129 EL Urmond
> The Netherlands

2.2    **Sale/Buyback of the Chubb Policies.**  Upon receipt of the Settlement Payment by CAP I BV as agent and designee of the Plaintiffs, and in consideration thereof, and without any further action of the Parties, the Liquidating Agent, on behalf of the Debtors shall sell, convey, transfer, assign and deliver Debtors' Interest in the Chubb Policies, including any and all rights assigned pursuant to Section 3.7 of this Agreement,  to the Chubb Insurers, free and clear of any and all Interests of any other Persons, in full and final settlement of all of Plaintiffs' Interests relating to the Chubb Policies.   Subject to the terms of this Agreement and the entry of the Approval Order, (i) the Settlement Payment is the total amount that the Chubb Insurers are obligated to pay on account of any and all Interests of any kind relating to the Chubb Policies; (ii) the Settlement Payment represents the full purchase price of the Chubb Policies, and, upon its payment, the Chubb Insurers shall own their respective Chubb Policies free and clear of all Interests of any Person; and (iii) the Settlement Payment is reasonable and fair consideration for the buyback of the Chubb Policies.

2.3    **Payment is Final**.  The Settlement Payment will be final and irrevocable, and will not be subject to any claims for set-off, contribution, or charge-backs (including, without limitation, any claims for additional premiums, retrospective premiums, self-insured retentions, deductibles or recoupment of prior payments to any insured under the Chubb Policies).  The Chubb

Companies do not waive and specifically preserve their right to seek contribution, indemnity, or subrogation against any insolvent carrier, including The Home Insurance Company and Highlands Insurance Company, or any successors thereto in liquidation and any guarantee association or liquidator which is responsible for liabilities of any insolvent carrier.

      2.4   **Allocation of the Settlement Payment**.  The Chubb Insurers have complete discretion to allocate the Settlement Payment to any of the Chubb Policies as they see fit.  Nothing in this Agreement shall preclude the Chubb Insurers from pursuing reinsurance recoveries for the Settlement Payment from their reinsurers.

**3.**    **RELEASE**

      3.1   **Release of the Chubb Insurers and Termination of the Chubb Policies**. Effective upon receipt by Plaintiffs of the Settlement Payment disbursed in accordance with Section 2.1 of this Agreement, and in consideration thereof, Plaintiffs waive, release, and forever discharge the Chubb Insurers  from any and all past, present, and future Claims, liabilities, duties to defend or indemnify, causes of action, demands, rights, damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive or exemplary damages that were or could have been alleged), or any other obligations under or relating to the Chubb Policies  of every kind, nature and description whatsoever, whether arising in law or in equity.  As to Plaintiffs, the Chubb Policies will have no further force or effect whatsoever.  Plaintiffs' releases include, without limitation, (a) any liability for past, present, or future Environmental Claims, known and unknown, arising out of the Site; (b) any liability arising under or relating to the RCRA Permit; (c) any liability arising out of the Baxley Claim, (d) any Direct Action Claims; (e) any Contribution Claims; (f) any Extra-Contractual Claims, and (g) any claims that were asserted or could have been asserted in the Insurance Action.

3.2  **Additional Release of the Chubb Companies.**  In addition, Plaintiffs release the Chubb Companies under any other general liability insurance policy, or policy providing liability coverage for third-party property damage, bodily injury or personal injury, known or unknown, confirmed or unconfirmed, under which they can claim insurance coverage for liabilities relating to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC, or to the Site (including any adjoining properties).

3.3  **Limitations on Scope of Release**.  Notwithstanding any other provision of this Agreement, Plaintiffs do not release any Claims held by any entity that does not fall within the definition of "Plaintiffs" set forth above, including but not limited to PCS Nitrogen.  Plaintiffs also do not release any claim under insurance policies issued after the Effective Date of the Plan.  For the avoidance of doubt, it is not the Parties' intent to release any obligations in connection with currently effective policies maintained by entities currently performing work at the Site.

3.4  **Release In All Capacities.**  The releases provided in Paragraphs 3.1 and 3.2 above are provided by Plaintiffs in all of their actual or alleged capacities, including, without limitation, as an alleged insured, additional insured, successor to an insured, assignor, assignee, subrogor, subrogee, indemnitor, indemnitee, creditor, or judgment creditor of Fibrant, or of any other Person.

3.5  **Warranty Regarding Known Claims.**  Plaintiffs represent and warrant that as of the date Plaintiffs have executed this Agreement and delivered their signature pages to the other Parties, Plaintiffs are not "on notice" of any Claims arising from the operations of Fibrant for which Plaintiffs are alleged to be liable other than the Environmental Claims relating to the Site and the Baxley Claim.  For purposes of this Agreement, "on notice" means that the Persons

responsible for handling the insurance affairs of the Plaintiffs have received notification from any source of the assertion or filing of a Claim.

3.6    **Changes In Fact Or Law.**  The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Chubb Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims released in this Agreement.  Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

3.7    **Assignment of Interests in the Chubb Policies by Augusta Liquidations to Debtor Entities.**  To facilitate the releases contemplated in this Agreement, the Parties agree and acknowledge that Augusta Liquidations shall assign its Interests in the Chubb Policies, along with the interests of ELT and CIH, if any, to the Debtor Entities.

3.8    **No Other Assignment.**  Other than the assignment of Debtors' rights to assert and pursue causes of action under the Chubb Policies in part to CIH and in part to Augusta Liquidations pursuant to the Plan, and other than any re-assignment expressly provided for in this Agreement, Plaintiffs warrant and represent that they (i) will not assign or transfer, in whole or in part, to any Person any of their rights under the Policies and (ii) have not assigned or transferred, in whole or in part, to any Person any of their rights under the Policies with respect to Claims released under this Agreement, *provided, however,* that the Debtors' warranty with respect to this clause (ii) is limited to the warranty that, subsequent to the assignment provided in Section 3.7 of this Agreement, the Debtors own any and all such rights assigned to the Debtor Entities by CIH, ELT and/or Augusta Liquidations, with no further warranty expressed or implied as to the scope of those rights.  Moreover, Plaintiffs represent, warrant, and agree that, except as provided for in this

-16-

Agreement, they will not in any way assist any Person in the establishment of any Claim against the Chubb Insurers relating to any Claim released under this Agreement.

## 4.  **FIBRANT'S BANKRUPTCY-RELATED OBLIGATIONS**

4.1     Within fourteen (14) Business Days after the date on which this Agreement has been executed by all Parties, the Liquidating Agent shall file the appropriate motion or motions seeking approval of the terms of this Agreement, including the sale of the Chubb Policies and a modification of the Plan as provided for herein, and entry of the Approval Order together with appropriate findings of fact and conclusions of law, in the form attached as **Exhibit A** hereto.  The Approval Order shall:

(a)     Approve this Agreement in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 105(a), and Bankruptcy Rules 6004 and 9019;

(b)     Find this Agreement was negotiated in good faith, the product of arms-length bargaining, free from fraud or collusion, is reasonable, fair and equitable, and in the best interest of the estate and its creditors after consideration of (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the likely difficulties in collection; (c) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of creditors;

(c)     Authorize the Parties to undertake the settlement, perform the obligations and the transactions contemplated by this Agreement;

(d)     Authorize the sale of Plaintiffs' Interests in the Chubb Policies to the Chubb Insurers free and clear of any and all Interests of any Person, with all Interests in and to, and Claims against, Plaintiffs' Interests in the Chubb Policies being fully extinguished without reservation as to the Chubb Insurers;

(e)      Provide that the Chubb Insurers are good faith purchasers of the Chubb Policies for value and, as such, are entitled to all protections provided to a good faith purchaser under Bankruptcy Code § 363(m);

(f)      Provide that the consummation of this Agreement releases the Chubb Companies from liability to Plaintiffs under the Chubb Policies and/or applicable law;

(g)      Provide that the sale of the Chubb Policies outside the ordinary course of business, free and clear of the Interests of all Persons, satisfies the requirements respectively of § 363(b) and § 363(f);

(h)      Enter an injunction pursuant to 11 U.S.C. §§ 105(a) 1123, 1127, and 1129 providing that any person (other than the United States of America and the State of Georgia and PCS Nitrogen) who now holds or who may in the future hold any Claims or Interests of any kind or nature against the Plaintiffs or the Chubb Policies is hereby forever barred, prohibited, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any released Claims or such Interests against any of the Chubb Insurers, or the Chubb Policies.

(i)      Approve a modification of the Plan, pursuant to 11 U.S.C. § 1127, in form and substance reasonably acceptable to the Chubb Insurers and CIH, providing that the Chubb Insurers shall be deemed "Settling Insurers" for purposes of the Plan, and that "Settling Insurers" (as defined in the modified Plan) shall be deemed to be treated as "Creditor Released Parties" and "Debtor Released Parties" for purposes of the release and injunction provisions of the Plan (as those terms are defined in the modified Plan); provided that no release shall be required from the United States of America, the State of Georgia, or PCS Nitrogen.

(j)      Find that due and adequate notice of the (a) sale of the Chubb Policies; (b) terms and conditions of this Agreement; and, (c) hearing on the approval of this Agreement

-18-

(including the sale provided for herein) was provided in accordance with Bankruptcy Rules 2002 and 6004 and published in accordance with Section 4.2 of this Agreement.

For avoidance of doubt, all fees, expenses and other costs incurred by or to be incurred by the Debtors' Liquidating Agent shall be funded through an advance retainer by CIH and the Debtors' Liquidating Agent shall have no obligations under this Agreement with respect to Sections 3.7, 4.1 through 4.4, 4.6 and 5.1 in the absence of such prior funding.

      4.2    The Debtors shall serve notice of the Approval Motion and of the hearing thereon. Such notice shall be accomplished through electronic means or, at the Chubb Insurers' election (which election shall be made by the Chubb Insurers by the date on which this Agreement has been executed by all Parties) by mail on each of the Bankruptcy Notice Parties by United States mail, postage pre-paid.  If mail notification is elected, the mailing expense shall be borne equally by the Chubb Insurers and any other Settling Insurers whose polices are also being sold that have elected notification through mail.

      4.3    To ensure the broadest notice possible, Plaintiffs shall also publish notice of the sale of the Chubb Policies to the Chubb Insurers pursuant to §§ 363(b), (f) and (m) and Bankruptcy Rules 6004 and 9019 and of the hearing seeking the Approval Order in the national edition of the *USA Today*, and twice in the *Atlanta Journal-Constitution* and *The Augusta Chronicle*, within a period of seven (7) days.  Publication of the notice of the sale of the Chubb Policies shall be at the expense of the Chubb  Insurers, and in a form and substance acceptable to the Chubb Insurers; *provided however*, if any such advertisement notices the sale of policies other than the Chubb Policies issued by the Chubb Insurers, the expense of such publication shall be borne equally by the Chubb Insurers and the other Settling Insurers whose polices are also being sold, and the notice

shall be in a form and substance acceptable to both the Chubb Insurers and those other Settling Insurers.

4.4     If the Approval Order is appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), then subject to the Parties' termination rights set forth below, the Parties shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; *provided, however*, that nothing herein shall preclude the Parties from mutually consummating the transactions contemplated herein if the Approval Order shall have been entered and is not stayed.

4.5     The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, either the Approval Order or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be materially inconsistent with the terms hereof.

4.6     Plaintiffs shall cooperate with the Chubb Insurers and their representatives in connection with efforts to obtain entry of the Approval Order and the bankruptcy proceedings directly related to entry of the Approval Order.  Plaintiffs shall not submit to the Bankruptcy Court for approval any motion, plan of reorganization, adversary proceeding, filing or other request the approval of which would conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of the Chubb Insurers hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

4.7     The Chubb Insurers shall have no obligation to remit the Settlement Payment until the Approval Order is entered and the Effective Date occurs.  If (i) the Approval Order is vacated

or modified, or otherwise entered in a form that is not acceptable to the Chubb Insurers, or (ii) the Approval Order is reversed on appeal, then the Chubb Insurers may terminate this Agreement by delivering written notice to the Plaintiffs within fifteen (15) business days of such event.  In the event this Agreement is terminated, (i) the Agreement shall be void; (ii) the Chubb Insurers shall not be obligated to pay the Settlement Payment; and (iii) the Parties shall have all of the rights, defenses and obligations under or with respect to the Chubb Policies that they would have had absent this Agreement.

**5.    DISMISSAL**

5.1    **Dismissal of ACE P&C, Century Indemnity, and US Fire From the Insurance Action.**  Within ten (10) business days after receipt of the Settlement Payment, the Parties will file a stipulation in the Insurance Action dismissing, with prejudice and without costs to either party, all Claims and causes of action asserted in that action by Plaintiffs against ACE P&C and Century Indemnity, and all Claims and causes of action asserted against US Fire with respect to policy nos. GLA 284022 and GLA 540 079751 7.  Plaintiffs and ACE P&C, Century Indemnity and US Fire agree to cooperate and, if necessary, to take any further action consistent with this Agreement to effect the dismissal with prejudice of ACE P&C, Century Indemnity and US Fire (with respect to policy nos. GLA 284022 and GLA 540 079751 7) from the Insurance Action.

**6.    INDEMNIFICATION**

6.1    **Defense and Indemnification.**  CIH (or an affiliated entity established to maintain the following obligation) will defend and indemnify the Chubb Companies for claims against them by any Person relating to RCRA Costs, including but not limited to, the following: (i) Claims by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under any of the Chubb Policies, (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of Fibrant, and (iii) Claims

-21-

directly against the Chubb Insurers by any other Person who does not qualify as an insured under any of the Chubb Policies, including, but not limited to, Direct Action Claims or third-party beneficiary Claims.

6.2     **Limitations on Plaintiffs' Indemnification Obligations.**

(a)     The indemnification and defense obligations enumerated in Section 6.1 do not extend to claims brought by (i) a party to the Insurance Action (or affiliated entity) or (ii) PCS Nitrogen.

(b)     The indemnification and defense obligations enumerated in Section 6.1 will incept upon the receipt of the Settlement Payment and will be capped at the amount of the Settlement Payment, less creditor recovery (i.e. the portion of the Settlement Payment paid to creditors and/or a trust established for the benefit of creditors under the Plan).  Upon exhaustion of the amounts set forth in this Section 6.2(b) by payment of defense or indemnity to the Chubb Companies, any obligations under this Section 6 shall immediately terminate and the Chubb Companies shall pay for their own defense and indemnity.

(c)     Any obligation on the part of Plaintiffs to pay for the Chubb Companies' defense and indemnity under this Agreement shall immediately terminate upon the close of the Bankruptcy Case.

6.3     **Defense of the Chubb Insurers**.   The defense of the Chubb Insurers for an indemnified Claim under Section 6.1 will proceed as follows:

(a)     Plaintiffs, through their own counsel, will use reasonable efforts to obtain a dismissal of the Chubb Insurers and the substitution of an appropriate Plaintiff entity on the basis that the Chubb Insurers' obligations with respect thereto were finally resolved by a reasonable,

good faith settlement and that Plaintiffs also agreed to accept a judgment reduction with respect to any obligation of the Chubb Insurers as set forth in Paragraphs 7.1 and 7.2 below.

(b)     Should the claimant refuse to dismiss the Chubb Insurers, the Chubb Insurers will have the right to select defense counsel, subject to Plaintiffs' consent, which consent shall not be unreasonably withheld, to defend the Chubb Insurers at Plaintiffs' expense ("Retained Counsel").  Any such Retained Counsel will be chosen from among insurance coverage counsel used by the Chubb Insurers, at rates not to exceed those routinely paid by the Chubb Insurers for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

(c)     The Chubb Insurers will have the right to control all positions taken on their behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the Chubb Policies.

## 7.     **JUDGMENT REDUCTION**

7.1     In connection with any Claim related to a Claim released under this Agreement brought by Fibrant, CIH or Augusta Liquidations against any Person other than the Chubb Insurers, which results in an adjudication on the merits, whether in court or another tribunal with jurisdiction, or in a binding arbitration award, that such other Person is liable to Fibrant, CIH or Augusta Liquidations, and that such judgment or binding arbitration award includes sums which are allocable to the Chubb Insurers under any Chubb Policies, Fibrant, CIH and Augusta Liquidations will agree to reduce the judgment or binding arbitration award against such other Person or take other steps as necessary in order to avoid such liability being imposed on the Chubb Insurers.  Such a reduction in Fibrant's, CIH's or Augusta Liquidations' judgment or binding arbitration award will be accomplished by subtracting from the judgment or binding arbitration

award against any such Person the share of the judgment or binding arbitration award, if any, which is applicable to the Chubb Insurers.

7.2     To ensure that such a reduction is accomplished and the Chubb Insurers are protected, the applicable Plaintiff who brought any such Claim described in Section 7.1 and the Chubb Insurers shall move the court or appropriate tribunal for a finding this Agreement was made in good faith and the appropriate form of relief is a contribution bar in favor of the Chubb Insurers. In the event a court or other tribunal will not make such findings or grant the appropriate relief, the Chubb Insurers will also be entitled to assert this paragraph as a defense in any Claim against them for any such portion of the judgment or binding arbitration award, and will be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Chubb Insurers from liability for the judgment or binding arbitration award solely to the extent such judgment or award relates to Claims released under this Agreement.

7.3     In the event any Plaintiff settles any Claim related to or arising out of a Claim released under this Agreement with any Person other than the Chubb Insurers without the Chubb Insurers' consent, the settling Plaintiff agrees that it will not seek from the Chubb Insurers any sums allocated to the Chubb Insurers by such settlement.  Each Plaintiff further agrees that it will use reasonable efforts to obtain a release in favor of the Chubb Insurers from any Person with which they settle any Claims relating to or arising out of Claims released under this Agreement.

## 8.     ADDITIONAL PROVISIONS

8.1     **Restrictions On Disclosure Of Agreement.**  It is a material inducement for the Parties to enter into this compromise and settlement of their disputes and differences that the terms and provisions of this Agreement, shall be, and remain, strictly confidential, until the Agreement is filed in the Bankruptcy Case for purposes of obtaining the Approval Order.  Prior to such public filing, neither this Agreement, nor any of its terms, may be disclosed to any Person, except that

this Agreement and its terms may be disclosed; (a) as required by law or court order; (b) to any reinsurer, reinsurance intermediary, or retrocessionaire of the Parties, if any, in connection with insurance or reinsurance obligations or to any reinsurance arbitrator(s); (c) to the officers, directors, employees, representatives, counsel, accountants, agents and auditors of any of the Parties; (d) in any action or proceeding between the Parties where the existence or terms of the Agreement are at issue; or (e) by written agreement of the Parties.  If this Agreement or its terms are disclosed pursuant to subparagraphs (a) or (d) above, the party disclosing such information shall give prior written notice thereof to each of the other Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (b), (c), or (e) above, the party disclosing such information shall advise the recipient of the provisions of this paragraph.

8.2     **"Most Favored Nation" Agreement.**  If Plaintiffs enter into a settlement with another insurer to resolve Plaintiffs' claims against such other insurer in the Insurance Action, and such settlement provides for broader releases or indemnification provisions than those agreed to herein, including within the context of the Bankruptcy Case, the release and indemnification provisions of the settlement between the Parties shall be modified automatically to provide the same scope of release (including the parties released, the relationship to the issuing insurer, and the breadth of the release) and scope of indemnification as provided in such other agreement between Plaintiffs and the other insurer, for no additional consideration. Plaintiffs, except for the Debtors or the Liquidating Agent or his professionals, shall provide the Chubb Insurers with information concerning other settlement agreements that implicate this provision.

8.3     **Amendments.**  Subject to the provisions of Section 8.2 hereof, neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties.

8.4    **No Precedential Value.**  This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies. This Agreement shall not be construed as an admission of coverage under the Chubb Policies for any claim, or an admission concerning any issue of law or fact.  This Agreement is without prejudice to any positions taken by the Chubb Companies with regard to other policies, other claims, and other insureds.  It shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of any of the Parties under any insurance policies issued to Fibrant or to any other Person.

8.5    **Agreement Voluntarily Entered Into By Each Of The Parties.**  This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them.  The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

8.6    **Interpretation.**  This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties.  Accordingly, none of the Parties shall be presumptively entitled to have any provisions of the Agreement construed against any of the other Parties in accordance with any rule of law, legal decision or doctrine.

8.7    **No Admission.**  This Agreement is the result of a compromise of disputed issues. This Agreement does not constitute and may not be construed as an admission of any liability, fact, course of performance, or wrongdoing by any Party.  This Agreement is not, and cannot be

construed as, any admission by any Party that any defense, indemnity, contribution, or other obligation exists under the Chubb Policies for the Claims released herein.

8.8    **Entire And Integrated Agreement.**  This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters and there are no promises, representations warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

8.9    **No Third-Party Beneficiaries.**  Nothing in this Agreement is intended or shall be construed to give any Person, other than the Chubb Companies and Plaintiffs and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the Chubb Companies and Plaintiffs, as well as each of their respective successors and permitted assigns, and for the benefit of no other Person.

8.10    **Severability.**  If any provisions of this Agreement or the application thereof, other than the releases set forth in Sections 3.1 and 3.2, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, and application of such provisions to other circumstances, shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.

8.11    **Notice.**  Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid or by

overnight mail or by electronic mail, addressed as follows or as the Parties subsequently may direct in writing:

> As to the Chubb Insurers:
>
> > Edward Jarosz
> > Direct Claim Handler
> > Brandywine Group of Insurance and Reinsurance Companies
> > 510 Walnut Street (WB11E)
> > Philadelphia, PA 19106
> > Edward.Jarosz@brandywineholdings.com
> >
> > With a copy to:
> >
> > Robert F. Walsh, Esq.
> > White and Williams LLP
> > 1650 Market Street
> > One Liberty Place, Suite 1800
> > Philadelphia, PA 19103-7395
> > walshr@whiteandwilliams.com
>
> As to Plaintiffs:
>
> > Michel Govaert
> > Mauritslaan 49
> > 6129 EL Urmond | The Netherlands
> > Michel.Govaert@chemicainvest.com
> >
> > With a copy to:
> >
> > Brook Roberts
> > LATHAM & WATKINS LLP
> > 12670 High Bluff Drive
> > San Diego, CA 92130
> > brook.roberts@lw.com

8.12   **Headings.**   The section titles, captions, and headings contained in the Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

8.13   **Recitals.**   The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted therein in any action or proceeding involving

any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

8.14   **Additional Representations and Warranties.**  CIH, Augusta Liquidations, ELT, the Liquidating Agent for the Debtors, ACE P&C, Century Indemnity, and US Fire each represents and warrants that it is fully authorized to enter into this Agreement on its own behalf and on behalf of Plaintiffs and the Chubb Insurers respectively, as those terms are defined herein.  In addition, each of CIH, Augusta Liquidations, ELT, ACE P&C, Century Indemnity, and US Fire represents and warrants that (i) it is duly organized and existing in good standing under the laws of the United States, (ii) it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or internal approval is necessary, and (iii) the making and performance of this Agreement will not violate any provision of the law or the Party's articles of incorporation, charter, or by-laws.  In addition, each of the individuals signing this Agreement represents and warrants that they are authorized to execute this Agreement on behalf of the Party(ies) whom they represent.

8.15   **Execution in Counterparts.**   This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____9/3/2023_____          CHEMICAINVEST HOLDING, B.V.

By: _____

Name: __Michel Govaert__

Title: ___Director_____

Dated: _____          AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By:  Environmental Liability Transfer, Inc.
Its:  Manager

By:_____

Print Name:_Michael J. Roberts_____

Title:_Vice President_____

Dated:_____          ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name:_Michael J. Roberts_____

Title:_Vice President_____

*[signature page]*

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____          CHEMICAINVEST HOLDING, B.V.

                                  By: _____

                                  Name: _____

                                  Title: _____

Dated: *9·22·23*                  AUGUSTA LIQUIDATIONS LLC
                                  a Missouri limited liability company
                                  By:  Environmental Liability Transfer, Inc.
                                  Its:  Manager

                                  By:_____

                                  Print Name: Michael J. Roberts

                                  Title: Vice President

Dated: *9·22·23*                  ENVIRONMENTAL LIABILITY
                                  TRANSFER, INC.
                                  a Missouri corporation

                                  By:_____

                                  Print Name: Michael J. Roberts

                                  Title: Vice President

*[signature page]*

Dated: 9/3/2023

FIBRANT, LLC, on behalf of itself and Fibrant

By: _____

Name: __Klaus Gerber__

Title:  Liquidating Agent on Behalf of Fibrant, LLC


Dated: 9/3/2023

FIBRANT SOUTH CENTER, LLC, on behalf of itself and South Center

By: _____

Name: __Klaus Gerber__

Title:  Liquidating Agent on Behalf of Fibrant South Center, LLC


Dated: 9/3/2023

GEORGIA MONOMERS COMPANY, LLC, on behalf of itself and Georgia Monomers

By: _____

Name: __Klaus Gerber__

Title:  Liquidating Agent on Behalf of Georgia Monomers Company, LLC


Dated: 9/3/2023

EVERGREEN NYLON RECYCLING, LLC, on behalf of itself and Evergreen

By: _____

Name: __Klaus Gerber__

Title:  Liquidating Agent on Behalf of Evergreen Nylon Recycling, LLC


*[signature page]*

Dated: 08/30/2023

ACE P&C, CENTURY INDEMNITY AND
US FIRE

By: _____

Name: Edward Jarosz

Title: Claim Director

*[signature page]*

**EXHIBIT A**
**[Intentionally Omitted]**

[Exhibit A]

## <u>EXHIBIT B</u>

The following insurance policies are included within the definition of Chubb Policies as set forth in Section I, 1.13 of the Agreement:

1.  Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America XBC 15 43 69 (4/1/1984 – 4/1/1985)

2.  Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America XBC G00021623 (3/31/1985 3/31/1986)

3.  Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America XCP G00021647 (3/31/1985 -3/31/1986)

4.  Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 61 89 (4/1/1982 – 4/1/1983)

5.  Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 65 15 (4/1/1983 -4/1/1984)

6.  Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 69 53 (3/31/1985 – 3/31/1986)

7.  Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 79 47 (3/31/1985 – 3/31/1986)

8.  Century Indemnity Company, as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company: ZCX 00 79 48 (3/31/1985 – 3/31/1986)

9.  United States Fire Insurance Company GLA 28 40 22 (2/1/1976 – 4/1/1977)

10. United States Fire Insurance Company 540 0797517 (4/1/1977 – 4/1/1978)

11. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company CG 35 02 59 (1/1/1971 – 1/1/1972)

12. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company CG 14 03 05 (1/1/1972 – 1/1/1973)

13. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company Alleged 1964-65 Policy (Disputed)

14. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company Alleged 1965-68 Policy (Disputed)

15. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company Alleged 1968-70 Policy (Disputed)

16. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company CG 26 80 80 (1/1/1970 – 1/1/1971)

17. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company 41 AF 181029 (6/1/1983)

18. ACE Property & Casualty Insurance Company, formerly known as CIGNA Property and Casualty Insurance Company, formerly known as Aetna Insurance Company 45 AET 11089 (6/1/1985)

[Exhibit B]

## SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE

THIS SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE ("Agreement") is entered into by and between ChemicaInvest Holding, B.V. ("CIH"); Augusta Liquidations LLC ("Augusta Liquidations"); Environmental Liability Transfer, Inc. ("ELT"); and Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc. and DSM Chemicals North America, LLC ("Fibrant"), Evergreen Nylon Recycling, LLC, Fibrant South Center, LLC ("South Center"), and Georgia Monomers Company, LLC, by and through Klaus Gerber, as their duly appointed Liquidating Agent (the "Liquidating Agent"), on the one hand, and Admiral Insurance Company ("Admiral") on the other hand.  The parties are sometimes referred to herein collectively as the "Parties," and individually as "Party."

## RECITALS

**WHEREAS**, Admiral issued or allegedly issued certain liability insurance policies to Columbia Nitrogen Corporation and Columbia Nipro Corporation, including without limitation the policies listed on **Exhibit A** hereto (as defined herein, the "Admiral Policies"); and

**WHEREAS**, Columbia Nipro Corporation became known as Fibrant (as hereinafter defined) through a series of corporate name changes and one change of corporate form from a corporation to a limited liability company; and

**WHEREAS**, beginning in or about 1963, Fibrant constructed and operated a facility located on a parcel of real estate at 1408 Columbia Nitrogen Drive, Augusta, Georgia, at which Fibrant manufactured caprolactam, ammonium sulfate, and other products (as hereinafter defined, the "Site"); and

**WHEREAS**, Fibrant's operations at the Site allegedly caused environmental contamination at and around the Site; and

-1-

**WHEREAS**, Fibrant has alleged that it is subject to potential environmental claims relating to historical operations at the Site, arising under certain environmental laws and regulations, including the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Georgia Hazardous Waste Management Act, O.C.G.A. § 12-8-60 et seq., and the Hazardous Waste Permit for the Site, (Permit No. HW-016 (ST&CA) and Facility I.D. No. GAD 051011609); and

**WHEREAS**, on February 3, 2018, Fibrant, together with Evergreen Nylon Recycling, LLC, South Center, and Georgia Monomers Company, LLC (collectively, "Debtors"),[1] filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court"); and

**WHEREAS**, on May 29, 2019, an order was entered in the Bankruptcy Case confirming the Debtors' Second Amended and Restated Plan of Liquidation (the "Plan"); and

**WHEREAS**, pursuant to the Plan, (a) ownership of the Site was conveyed to Augusta Liquidations, and (b) the Debtors' rights to assert and pursue causes of action under the Admiral Policies were assigned in part to CIH and in part to Augusta Liquidations; and

**WHEREAS**, on or about June 12, 2019, Debtors, CIH and Augusta Liquidation commenced an adversary proceeding in the Bankruptcy Court (the "Insurance Action"), seeking a declaratory judgment that Admiral (together with other defendant insurers) are obligated to defend Debtors and CIH for claims arising from the Site, to reimburse past and future costs incurred to

---

[1] The original Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Fibrant, LLC (6694); Evergreen Nylon Recycling, LLC (7625); Fibrant South Center, LLC (8270); and Georgia Monomers Company, LLC (0042). Pursuant to the Plan, as modified, Fibrant, LLC, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC were dissolved.

comply with the Debtors' obligations under RCRA Costs, and to indemnify and defend Augusta Liquidations against any damages, expenses, and settlement payments at the Site.

**WHEREAS**, Admiral disputes the allegations of the Insurance Action and denies that it has any obligation to provide coverage for the claims of Debtors, CIH and Augusta Liquidations; and

**WHEREAS**, certain Parties agreed to mediate their disputes before Timothy P. Gallagher, Esquire, of the Gallagher Law Group P.C., Los Angeles, CA; and

**WHEREAS**, the Parties now desire finally and completely to resolve, compromise, and settle all disputes between them, including without limitation (i) any and all Claims (as hereinafter defined) relating to the Site, the Insurance Action, and other matters addressed herein, and (ii) any disputes arising out of or related to the Bankruptcy Case, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, and

**WHEREAS**, as part of this compromise and resolution, Admiral wishes to repurchase all of Debtors' rights, title and interests in the Admiral Policies, free and clear of all Interests of any Person, except as expressly set forth in this Agreement;

**WHEREAS**, by and through this Agreement, Debtor seeks to provide the Admiral Insurers (as hereinafter defined) with the broadest possible release, as set forth herein, with respect to the Admiral Policies and to provide that the Admiral Insurers shall have no further obligations to the Plaintiffs, Debtor's creditors or other parties-in-interest, except as expressly set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

-3-

1.     **<u>DEFINITIONS</u>**

As used in this Agreement, the following terms have the following meanings:

1.1     "Admiral Companies" means the Admiral Insurers and all their affiliated companies and representatives.

1.2     "Admiral Insurers" means Admiral Insurance Company and all of its predecessors and successors.

1.3     "Admiral Policies" means all insurance policies, known or unknown, issued or allegedly issued by, or novated to or assumed by, any Admiral Insurer to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC. "Admiral Policies" include, but are not limited to, the policies and alleged policies listed in **Exhibit A** hereto.  For the avoidance of doubt, "Admiral Policies" do not include insurance policies issued after the Effective Date of the Plan or those currently effective policies maintained by entities currently performing work at the Augusta Site—such as policies issued to Augusta Liquidations, remediation contractors, or subcontractors—if any.

1.4     "Approval Motion" means the motion to be filed seeking approval of the terms of this Agreement, including the sale of the Admiral Policies provided for herein, and entry of the Approval Order, as provided in Section 4.1 hereof.

1.5     "Approval Order" means an order entered by the Bankruptcy Court, upon a hearing following proper notice, containing all of the provisions set out in Section 4.1 hereof, but no provision that is contrary to or inconsistent with such provisions, which becomes a Final Order, and the wording of the Approval Order shall be reasonably acceptable to the Admiral Insurers and CIH.

-4-

1.6    "Bankruptcy Case" means the bankruptcy case captioned *In re: Fibrant, LLC, et al.,* Case No. 18-10274-SDB, presently pending before the Bankruptcy Court, Judge Susan D. Barrett presiding.

1.7    "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

1.8    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Georgia.

1.9    "Bankruptcy Notice Parties" means the following

(i)      all known creditors of Debtors;

(ii)     the Office of the United States Trustee for the Southern District of Georgia;

(iii)    all Persons that have filed a notice of appearance and/or demand for service of papers in the Bankruptcy Case;

(iv)     all Persons that have filed a notice of appearance and/or demand for service of papers in the Insurance Action;

(v)      all Persons identified on any and all service lists in the Bankruptcy Case;

(vi)     the Georgia Department of Natural Resources, Environmental Protection Division;

(vii)    the Attorney General of the State of Georgia;

(viii)   the United States Environmental Protection Agency;

(ix)     the Attorney General of the United States;

(x)      the United States Attorney for the Southern District of Georgia;

(xi)     the United States Internal Revenue Service;

(xii)    all known insurers of the Debtors;

(xiii)   all Persons with a known Interest in the Site, including those Persons that ever owned the Site, had a leasehold interest in the Site,

or that hold a lien against the Site, regardless of the date thereof, and any known insurer of such property owner or lessee;

(xiv)   all known Persons owning real property adjoining the Site;

(xv)   all known Persons with an Interest in the Admiral Policies;

(xvi)   any other known Person asserting an Interest in the Bankruptcy Case and/or sought to be bound by the Approval Order; and

(xvii)   any other Person designated by the Bankruptcy Court as requiring notice.

1.10   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure

1.11   "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause of action of any sort, whether currently known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

1.12   "Contribution Claim" means any Claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a Claim of its insured in a situation where two or more policies issued by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

1.13    "Direct Action Claim" means any Claim by any Person against an insurer, which is identical or similar to, or relating to, the same or similar acts or omissions giving rise to a Claim against Plaintiffs, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action.

1.14    "Effective Date" means the last date on which each of the following conditions precedent have occurred: (a) each of the Parties has executed this Agreement and delivered its signature page to the other Parties; (b) the Approval Order is a Final Order; (c) the Plan Modification has been approved by Final Order of the Bankruptcy Court; and (d) this Agreement has not been terminated under Sections 4.7 or 8.10 hereof or otherwise.

1.15    "Environmental Claim" means any Claim of any kind, including for bodily injury, property damage, personal injury, advertising injury, economic loss, loss of use, environmental investigation or remediation costs, natural resource damages or toxic torts, that arises from Environmental Contamination.

1.16    "Environmental Contamination" means the actual, potential, or alleged presence of, exposure to, or injury or damage from any smoke, vapors, soot, fumes, acids, alkaloids, chemicals, liquids, gases, waste materials, irritants, contaminants or pollutants of any type, including, but not limited to: (a) any substance defined or designated as a "hazardous substance" pursuant to Sections 101(14) and 102(a) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601(14) and 9602(a); (b) any "pollutant or contaminant" under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1); (c) any substance defined as a "hazardous waste" in Section 6903(5) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, et seq.; (d) any chemical, substance or mixture found by the Administrator of the United States Environmental Protection Agency and/or any state

agency to present an unreasonable risk of injury to health or the environment pursuant to Toxic Substances Control Act 15 U.S.C. § 2601, et seq.; (e) any substance listed in the United States Department of Transportation Table, 49 C.F.R. 172.101; and (f) any substance designated or considered to be a "hazardous substance," "hazardous material," "hazardous waste," "waste," "pollutant" or "contaminant" under any federal, state or local law, statute, rule, regulation or judicial decision that relates to, amends or is a successor to any of the foregoing statutes, rules, regulations or cases, or that defines any of the foregoing terms.

1.17    "Extra-Contractual Claim" means any Claim against an insurer, seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.

1.18    "Fibrant" means and includes Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., and DSM Chemicals North America, LLC.

1.19    "Final Order" means an order as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Parties and their counsel or, in the event that an appeal, writ of certiorari, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed,

or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, petition for review, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order".

1.20    "Insurance Action" means the adversary proceeding commenced in the Bankruptcy Court by Plaintiffs against Admiral and others, docketed at Adversary Proceeding 19-01016 (SDB).

1.21    "Insurance Coverage Claim" means any Claim seeking defense or indemnity or any other benefit, including any Contribution Claim or other similar Claim, under or relating to the Admiral Policies.

1.22    "Interests" means all liens, Claims, encumbrances, interests, defenses and other rights of any nature, whether at law or in equity, including all Environmental Claims, Contribution Claims, Direct Action Claims, Insurance Coverage Claims and Extra-Contractual Claims.

1.23    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or partnership joint venture, trust or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.24    "PCS Nitrogen" means PCS Nitrogen, Inc., together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related

companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.25    "Plaintiffs" means Fibrant, LLC, Evergreen Nylon Recycling, LLC, South Center, Georgia Monomers Company, LLC, ChemicaInvest Holding, B.V., and Augusta Liquidations, LLC, together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates (including ELT), divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.26    "Plan" means the Second Amended and Restated Plan of Liquidation for the Debtors, as confirmed in the Bankruptcy Case by Order dated May 29, 2019.

1.27    "RCRA Costs" means investigative, remedial, and other costs and expenses incurred pursuant to RCRA, GHWMA, the RCRA Permit, other applicable environmental laws, and regulations, related to soil and groundwater contamination at the Site.

1.28    "RCRA Permit" means Hazardous Waste Permit No. HW-016(ST&CA) issued to Fibrant, as the same may be amended from time to time.

1.29    "Site" means all property, buildings, soil, surface water, and groundwater at and beneath the premises on Columbia Nitrogen Drive in Augusta Georgia, which is or has been owned and/or occupied by Fibrant, LLC and its predecessors in interest, as defined in the report of Ramboll Environ prepared for Fibrant and dated May 16, 2017, including without limitation Solid Waste Management Areas (SWMAs) A through D, and the air above the Site, the ground and groundwater below the Site, and all air, soil, surface water, and groundwater in the vicinity of the Site allegedly impacted by Environmental Contamination originating from the Site.

As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate; "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every".

**2.     SALE/BUYBACK OF THE ADMIRAL POLICIES AND THE SETTLEMENT PAYMENT**

2.1     **Settlement Payment**.  On or before forty-five (45) days following the Effective Date, one or more of the Admiral Insurers will pay CAP I BV the total sum of Ninety Thousand Dollars ($90,000) (hereinafter referred to as the "Settlement Payment").  Payment of the Settlement Payment will be made by wire transfer or other immediately available funds to:

> CAP I BV
> Mauritslaan 49
> 6129 EL Urmond
> The Netherlands
>
> CITIBANK EUROPE PLC, NL BRANCH
> IBAN Number: NL96CITI0266041485
> Swift code/BIC: CITINL2X

2.2     **Sale/Buyback of the Admiral Policies.**  Upon receipt of the Settlement Payment and in consideration thereof, and without any further action of the Parties, the Liquidating Agent, on behalf of the Debtors shall sell, convey, transfer, assign and deliver Debtors' Interest in the Admiral Policies, including any and all rights assigned pursuant to Section 3.7 of this Agreement, to the Admiral Insurers, free and clear of any and all Interests of any other Persons, in full and final settlement of all of Plaintiffs' Interests relating to the Admiral Policies.  Subject to the terms of this Agreement and the entry of the Approval Order, (i) the Settlement Payment is the total amount that the Admiral Insurers are obligated to pay on account of any and all Interests of any kind relating to the Admiral Policies; (ii) the Settlement Payment represents the full purchase price of the Admiral Policies, and, upon its payment, the Admiral Insurers shall own their respective

Admiral Policies free and clear of all Interests of any Person; and (iii) the Settlement Payment is reasonable and fair consideration for the buyback of the Admiral Policies.

2.3 **Payment is Final**.  The Settlement Payment will be final and irrevocable, and will not be subject to any claims for set-off, contribution, or charge-backs (including, without limitation, any claims for additional premiums, retrospective premiums, self-insured retentions, deductibles or recoupment of prior payments to any insured under the Admiral Policies).

2.4 **Allocation of the Settlement Payment**.  The Admiral Insurers have complete discretion to allocate the Settlement Payment to any of the Admiral Policies as they see fit. Nothing in this Agreement shall preclude the Admiral Insurers from pursuing reinsurance recoveries for the Settlement Payment from their reinsurers.

3. **RELEASE**

3.1 **Release of the Admiral Insurers and Termination of the Admiral Policies.** Effective upon receipt by Plaintiffs of the Settlement Payment, and in consideration thereof, Plaintiffs waive, release, and forever discharge the Admiral Insurers  from any and all past, present, and future Claims, liabilities, duties to defend or indemnify, causes of action, demands, rights, damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive or exemplary damages that were or could have been alleged), or any other obligations under or relating to the Admiral Policies  of every kind, nature and description whatsoever, whether arising in law or in equity.  As to Plaintiffs, the Admiral Policies will have no further force or effect whatsoever. Plaintiffs' releases include, without limitation, (a) any liability for past, present, or future Environmental Claims, known and unknown, arising out of the Site; (b) any liability arising under or relating to the RCRA Permit; (c) any Direct Action Claims; (d) any Contribution Claims; (e) any Extra-Contractual Claims, and (f) any claims that were asserted or could have been asserted in the Insurance Action.

3.2     **Additional Release of the Admiral Companies.**   In addition, Plaintiffs release the Admiral Companies under any other general liability insurance policy, or policy providing liability coverage for third-party property damage, bodily injury or personal injury, known or unknown, confirmed or unconfirmed, under which they can claim insurance coverage for liabilities relating to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC, or to the Site (including any adjoining properties).

3.3     **Limitations on Scope of Release**.   Notwithstanding any other provision of this Agreement, Plaintiffs do not release any Claims held by any entity that does not fall within the definition of "Plaintiffs" set forth above, including but not limited to PCS Nitrogen. Plaintiffs also do not release any claim under insurance policies issued after the Effective Date of the Plan. For the avoidance of doubt, it is not the Parties' intent to release any obligations in connection with currently effective policies maintained by entities currently performing work at the Site.

3.4     **Release In All Capacities.**   The releases provided in Paragraphs 3.1 and 3.2 above are provided by Plaintiffs in all of their actual or alleged capacities, including, without limitation, as an alleged insured, additional insured, successor to an insured, assignor, assignee, subrogor, subrogee, indemnitor, indemnitee, creditor, or judgment creditor of Fibrant, or of any other Person.

3.5     **Warranty Regarding Known Claims.**   Plaintiffs represent and warrant that as of the date it has executed this Agreement and delivered its signature page to the other Parties, Plaintiffs are not "on notice" of any Claims arising from the operations of Fibrant for which Plaintiffs are alleged to be liable other than the Environmental Claims relating to the Site. For purposes of this Agreement, "on notice" means that the Persons responsible for handling the

insurance affairs of the Plaintiffs have received notification from any source of the assertion or filing of a Claim.

3.6     **Changes In Fact Or Law.**   The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Admiral Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims released in this Agreement. Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

3.7     **Assignment of Interests in the Admiral Policies by Augusta Liquidations to South Center.**   To facilitate the releases contemplated in this Agreement, the Parties agree and acknowledge that Augusta Liquidations shall assign its Interests in the Admiral Policies to South Center.

3.8     **No Other Assignment.**   Other than the assignment of Debtors' rights to assert and pursue causes of action under the Admiral Policies in part to CIH and in part to Augusta Liquidations pursuant to the Plan, and other than any re-assignment expressly provided for in this Agreement, Plaintiffs warrant and represent that they have not assigned and will not assign or transfer, in whole or in part, to any Person any of their rights under the Admiral Policies with respect to Claims released under this Agreement, *provided, however,* that the Debtors' warranty is limited to the warranty that, subsequent to the assignment provided in Section 3.7 of this Agreement, the Debtors own any and all such rights assigned to the Debtor Entities by CIH, ELT and/or Augusta Liquidations, with no further warranty expressed or implied as to the scope of those rights.  Moreover, Plaintiffs represent, warrant, and agree that, except as provided for in this

Agreement, they will not in any way assist any Person in the establishment of any Claim against the Admiral Insurers relating to any Claim released under this Agreement.

## 4.    **FIBRANT'S BANKRUPTCY-RELATED OBLIGATIONS**

4.1     Within fourteen Business Days after the date on which this Agreement has been executed by all Parties, the Liquidating Agent shall file the appropriate motion or motions seeking approval of the terms of this Agreement, including the sale of the Admiral Policies and a modification of the Plan as provided for herein, and entry of the Approval Order together with appropriate findings of fact and conclusions of law, in the form attached as **Exhibit B** hereto.  The Approval Order shall:

(a)     Approve this Agreement in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 105(a), and Bankruptcy Rules 6004 and 9019;

(b)     Find this Agreement was negotiated in good faith, the product of arms-length bargaining, free from fraud or collusion, is reasonable, fair and equitable, and in the best interest of the estate and its creditors after consideration of (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the likely difficulties in collection; (c) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of creditors;

(c)     Authorize the Parties to undertake the settlement, perform the obligations and the transactions contemplated by this Agreement;

(d)     Authorize the sale of Plaintiffs' Interests in the Admiral Policies to the Admiral Insurers free and clear of any and all Interests of any Person, with all Interests in and to, and Claims against, Plaintiffs' Interests in the Admiral Policies being fully extinguished without reservation as to the Admiral Insurers;

(e)      Provide that the Admiral Insurers are good faith purchasers of the Admiral Policies for value and, as such, are entitled to all protections provided to a good faith purchaser under Bankruptcy Code § 363(m);

(f)      Provide that the consummation of this Agreement releases the Admiral Companies from liability to Plaintiffs under the Admiral Policies and/or applicable law;

(g)      Provide that the sale of the Admiral Policies outside the ordinary course of business, free and clear of the Interests of all Persons, satisfies the requirements respectively of § 363(b) and § 363(f);

(h)      Enter an injunction pursuant to 11 U.S.C. §§ 105(a) 1123, 1127, and 1129 providing that any person (other than the United States of America and the State of Georgia and PCS Nitrogen) who now holds or who may in the future hold any Claims or Interests of any kind or nature against the Plaintiffs or the Admiral Policies is hereby forever barred, prohibited, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any released Claims or such Interests against any of the Admiral Insurers, or the Admiral Policies.

(i)      Approve a modification of the Plan, pursuant to 11 U.S.C. § 1127, in form and substance reasonably acceptable to the Admiral Insurers and CIH, providing that the Admiral Insurers shall be deemed "Settling Insurers" for purposes of the Plan, and that "Settling Insurers" shall be deemed to be treated as "Creditor Released Parties" for purposes of the release and injunction provisions of the Plan (as those terms are defined in the modified Plan); provided that no release shall be required from the United States of America, the State of Georgia, or PCS Nitrogen.

(j)      Find that due and adequate notice of the (a) sale of the Admiral Policies; (b) terms and conditions of this Agreement; and, (c) hearing on the approval of this Agreement

-16-

(including the sale provided for herein) was provided in accordance with Bankruptcy Rules 2002 and 6004 and published in accordance with Section 4.2 of this Agreement.

For avoidance of doubt, all fees, expenses and other costs incurred by or to be incurred by the Debtors' Liquidating Agent shall be funded through an advance retainer by CIH and the Debtors' Liquidating Agent shall have no obligations under this Agreement with respect to Sections 3.7, 4.1 through 4.4, 4.6 and 5.1 in the absence of such prior funding.

4.2     The Debtors shall serve notice of the Approval Motion and of the hearing thereon. Such notice shall be accomplished through electronic means or, at the Admiral Insurers' election (which election shall be made by the Admiral Insurers by the date on which this Agreement has been executed by all Parties) by mail on each of the Bankruptcy Notice Parties by United States mail, postage pre-paid.  If mail notification is elected, the mailing expense shall be borne equally by the Admiral Insurers and any other Settling Insurers whose polices are also being sold that have elected notification through mail.

4.3     To ensure the broadest notice possible, the Debtors shall also publish notice of the sale of the Admiral Policies to the Admiral Insurers pursuant to §§ 363(b), (f) and (m) and Bankruptcy Rules 6004 and 9019 and of the hearing seeking the Approval Order in the national edition of the *USA Today*, and twice in the *Atlanta Journal-Constitution* and *The Augusta Chronicle*, within a period of seven (7) days.  Publication of the notice of the sale of the Admiral Policies shall be at the expense of the Admiral Insurers, and in a form and substance acceptable to the Admiral Insurers; *provided however*, if any such advertisement notices the sale of policies other than the Admiral Policies issued by the Admiral Insurers, the expense of such publication shall be borne equally by the Admiral Insurers and the other Settling Insurers whose polices are

also being sold, and the notice shall be in a form and substance acceptable to both the Admiral Insurers and those other Settling Insurers.

4.4     If the Approval Order is appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), then subject to the Parties' termination rights set forth below, the Parties shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; *provided, however*, that nothing herein shall preclude the Parties from mutually consummating the transactions contemplated herein if the Approval Order shall have been entered and is not stayed.

4.5     The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, either the Approval Order or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be materially inconsistent with the terms hereof.

4.6     Plaintiffs shall cooperate with the Admiral Insurers and their representatives in connection with efforts to obtain entry of the Approval Order and the bankruptcy proceedings directly related to entry of the Approval Order.  Plaintiffs shall not submit to the Bankruptcy Court for approval any motion, plan of reorganization, adversary proceeding, filing or other request the approval of which would conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of the Admiral Insurers hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

4.7      The Admiral Insurers shall have no obligation to remit the Settlement Payment until the Approval Order is entered and the Effective Date occurs.  If (i) the Approval Order is vacated or modified, or otherwise entered in a form that is not reasonably acceptable to the Admiral Insurers, or (ii) the Approval Order is reversed on appeal, then the Admiral Insurers may terminate this Agreement by delivering written notice to the Plaintiffs within ten (10) business days of such event.  In the event this Agreement is terminated, (i) the Agreement shall be void; (ii) the Admiral Insurers shall not be obligated to pay the Settlement Payment; and (iii) the Parties shall have all of the rights, defenses and obligations under or with respect to the Admiral Policies that they would have had absent this Agreement.

**5.      DISMISSAL**

5.1      **Dismissal of Admiral From the Insurance Action.**  Within ten (10) business days after receipt of the Settlement Payment, the Parties will file a stipulation in the Insurance Action dismissing, with prejudice and without costs to either party, all Claims and causes of action asserted in that action by Plaintiffs against Admiral.  Plaintiffs and Admiral, agree to cooperate and, if necessary, to take any further action consistent with this Agreement to effect the dismissal with prejudice of Admiral from the Insurance Action.

**6.      INDEMNIFICATION**

6.1      **Defense and Indemnification.**  CIH (or an affiliated entity established to maintain the following obligation) will defend and indemnify the Admiral Companies for claims against them by any Person relating to RCRA Costs, including but not limited to, the following: (i) Claims by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under any of the Admiral Policies, (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of Fibrant, and (iii) Claims directly against the Admiral Insurers by any other Person who does not qualify as an insured under

any of the Admiral Policies, including, but not limited to, Direct Action Claims or third-party beneficiary Claims.

      6.2    **Limitations on Plaintiffs' Indemnification Obligations.**

      (a)    The indemnification and defense obligations enumerated in Section 6.1 do not extend to claims brought by (i) a party to the Insurance Action (or affiliated entity) or (ii) PCS Nitrogen.

      (b)    The indemnification and defense obligations enumerated in Section 6.1 will incept upon the receipt of the Settlement Payment and will be capped at the amount of the Settlement Payment, less creditor recovery (i.e., the portion of the Settlement Payment paid to creditors and/or a trust established for the benefit of creditors under the Plan).  Upon exhaustion of the amounts set forth in this Section 6.2(b) by payment of defense or indemnity to the Admiral Companies, any obligations under this Section 6 shall immediately terminate and the Admiral Companies shall pay for their own defense and indemnity.

      (c)    Any obligation on the part of Plaintiffs to pay for the Admiral Companies' defense and indemnity under this Agreement shall immediately terminate upon the close of the Bankruptcy Case.

      6.3    **Defense of the Admiral Insurers**.  The defense of the Admiral Insurers for an indemnified Claim under Section 6.1 will proceed as follows:

      (a)    Plaintiffs, through their own counsel, will use reasonable efforts to obtain a dismissal of the Admiral Insurers and the substitution of an appropriate Plaintiff entity on the basis that the Admiral Insurers' obligations with respect thereto were finally resolved by a reasonable, good faith settlement and that Plaintiffs also agreed to accept a judgment reduction with respect to any obligation of the Admiral Insurers as set forth in Paragraphs 7.1 and 7.2 below.

(b)     Should the claimant refuse to dismiss the Admiral Insurers, the Admiral Insurers will have the right to select defense counsel, subject to Plaintiffs' consent, which consent shall not be unreasonably withheld, to defend the Admiral Insurers at Plaintiffs' expense ("Retained Counsel").  Any such Retained Counsel will be chosen from among insurance coverage counsel used by the Admiral Insurers, at rates not to exceed those routinely paid by the Admiral Insurers for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

(c)     The Admiral Insurers will have the right to control all positions taken on their behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the Admiral Policies.

## 7.     **JUDGMENT REDUCTION**

7.1     In connection with any Claim related to a Claim released under this Agreement brought by Fibrant, CIH or Augusta Liquidations against any Person other than the Admiral Insurers, which results in an adjudication on the merits, whether in court or another tribunal with jurisdiction, or in a binding arbitration award, that such other Person is liable to Fibrant, CIH or Augusta Liquidations, and that such judgment or binding arbitration award includes sums which are allocable to the Admiral Insurers under any Admiral Policies, Fibrant, CIH and Augusta Liquidations will agree to reduce the judgment or binding arbitration award against such other Person or take other steps as necessary in order to avoid such liability being imposed on the Admiral Insurers.  Such a reduction in Fibrant's, CIH's or Augusta Liquidations' judgment or binding arbitration award will be accomplished by subtracting from the judgment or binding arbitration award against any such Person the share of the judgment or binding arbitration award, if any, which is applicable to the Admiral Insurers.

7.2    To ensure that such a reduction is accomplished and the Admiral Insurers are protected, the applicable Plaintiff who brought any such Claim described in Section 7.1 and the Admiral Insurers shall move the court or appropriate tribunal for a finding this Agreement was made in good faith and the appropriate form of relief is a contribution bar in favor of the Admiral Insurers.  In the event a court or other tribunal will not make such findings or grant the appropriate relief, the Admiral Insurers will also be entitled to assert this paragraph as a defense in any Claim against them for any such portion of the judgment or binding arbitration award, and will be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Admiral Insurers from liability for the judgment or binding arbitration award solely to the extent such judgment or award relates to Claims released under this Agreement.

7.3    In the event any Plaintiff settles any Claim related to or arising out of a Claim released under this Agreement with any Person other than the Admiral Insurers without the Admiral Insurers' consent, the settling Plaintiff agrees that it will not seek from the Admiral Insurers any sums allocated to the Admiral Insurers by such settlement.  Each Plaintiff further agrees that it will use reasonable efforts to obtain a release in favor of the Admiral Insurers from any Person with which they settle any Claims relating to or arising out of Claims released under this Agreement.

## 8.    <u>ADDITIONAL PROVISIONS</u>

8.1    <u>**Restrictions On Disclosure Of Agreement.**</u>  It is a material inducement for the Parties to enter into this compromise and settlement of their disputes and differences that the terms and provisions of this Agreement, shall be, and remain, strictly confidential, until the Agreement is filed in the Bankruptcy Case for purposes of obtaining the Approval Order.  Prior to such public filing, neither this Agreement, nor any of its terms, may be disclosed to any Person, except that this Agreement and its terms may be disclosed; (a) as required by law or court order; (b) to any

-22-

reinsurer, reinsurance intermediary, or retrocessionaire of the Parties, if any, in connection with insurance or reinsurance obligations or to any reinsurance arbitrator(s); (c) to the officers, directors, employees, representatives, counsel, accountants, agents and auditors of any of the Parties; (d) in any action or proceeding between the Parties where the existence or terms of the Agreement are at issue; or (e) by written agreement of the Parties.  If this Agreement or its terms are disclosed pursuant to subparagraphs (a) or (d) above, the party disclosing such information shall give prior written notice thereof to each of the other Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (b), (c), or (e) above, the party disclosing such information shall advise the recipient of the provisions of this paragraph.

8.2     **"Most Favored Nation" Agreement.**  If Plaintiffs enter into a settlement with another insurer to resolve Plaintiffs' claims against such other insurer in the Insurance Action, and such settlement provides for broader releases or indemnification provisions than those agreed to herein, including within the context of the Bankruptcy Case, the release and indemnification provisions of the settlement between the Parties shall be modified automatically to provide the same scope of release (including the parties released, the relationship to the issuing insurer, and the breadth of the release) and scope of indemnification as provided in such other agreement between Plaintiffs and the other insurer, for no additional consideration. Plaintiffs, except for the Debtors or the Liquidating Agent or his professionals, shall provide the Admiral Insurers with information concerning other settlement agreements that implicate this provision.

8.3     **Amendments.**  Subject to the provisions of Section 8.2 hereof, neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties.

8.4   **No Precedential Value.**  This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies.  It shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of the Parties under any insurance policies issued to Fibrant or to any other Person.

8.5   **Agreement Voluntarily Entered Into By Each Of The Parties.**  This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them.  The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

8.6   **Interpretation.**  This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement.  In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties.  Accordingly, none of the Parties shall be presumptively entitled to have any provisions of the Agreement construed against any of the other Parties in accordance with any rule of law, legal decision or doctrine.

8.7   **No Admission.**  This Agreement is the result of a compromise of disputed issues. This Agreement does not constitute and may not be construed as an admission of any liability, fact, course of performance, or wrongdoing by any Party.  This Agreement is not, and cannot be construed as, any admission by any Party that any defense, indemnity, contribution, or other obligation exists under the Admiral Policies for the Claims released herein.

8.8   **Entire And Integrated Agreement.**  This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of

the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters and there are no promises, representations warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

8.9   **No Third-Party Beneficiaries.**  Nothing in this Agreement is intended or shall be construed to give any Person, other than the Admiral Companies and Plaintiffs and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the Admiral Companies and Plaintiffs, as well as each of their respective successors and permitted assigns, and for the benefit of no other Person.

8.10   **Severability.**  If any provisions of this Agreement or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, and application of such provisions to other circumstances, shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.

8.11   **Notice.**  Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid or by overnight mail or by electronic mail, addressed as follows or as the Parties subsequently may direct in writing:

As to the Admiral Insurers:

    To be provided in due course

    With a copy to:

    Jay Barber

    Lichtfield Cavo LLP
    2100 Riveredge Parkway Suite 1200
    Atlanta, Georgia 30328
    Barber@LitchfieldCavo.com

As to Plaintiffs:

    Michel Govaert
    Mauritslaan 49
    6129 EL Urmond | The Netherlands
    Michel.Govaert@chemicainvest.com

    With a copy to:

    Brook Roberts
    LATHAM & WATKINS LLP
    12670 High Bluff Drive
    San Diego, CA 92130
    brook.roberts@lw.com

8.12   **Headings.**  The section titles, captions, and headings contained in the Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

8.13   **Recitals.**  The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted therein in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

8.14   **Additional Representations and Warranties.**  CIH, Augusta Liquidations, ELT, the Liquidating Agent for the Debtors, and Admiral each represents and warrants that it is fully

authorized to enter into this Agreement on its own behalf and on behalf of Plaintiffs and the Admiral Insurers respectively, as those terms are defined herein.  In addition, each Party represents and warrants that (i) it is duly organized and existing in good standing under the laws of the United States, (ii) it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or internal approval is necessary, and (iii) the making and performance of this Agreement will not violate any provision of the law or the Party's articles of incorporation, charter, or by-laws.  In addition, each of the individuals signing this Agreement represents and warrants that they are authorized to execute this Agreement on behalf of the Party(ies) whom they represent.

8.15 **Execution in Counterparts.**  This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

[*remainder of page intentionally left blank*]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated:    9/22/2023                  CHEMICAINVEST HOLDING, B.V.

By: _____

Name: __Michel Govaert_____

Title: ___Director_____

Dated: _____         AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By:  Environmental Liability Transfer, Inc.
Its:  Manager

By:_____

Print Name:_Michael J. Roberts_____

Title:_Vice President_____

Dated:_____         ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name:_Michael J. Roberts_____

Title:_Vice President_____

*[signature page]*

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____

CHEMICAINVEST HOLDING, B.V.

By: _____

Name: _____

Title: _____

Dated: _9·22·23_____

AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By:  Environmental Liability Transfer, Inc.
Its:  Manager

By:_____

Print Name:_ Michael J. Roberts_____

Title:_ Vice President_____

Dated: _9·22·23_____

ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name:_ Michael J. Roberts_____

Title:_ Vice President_____

*[signature page]*

Dated: 9/3/2023

FIBRANT, LLC, on behalf of itself and Fibrant

By: _____

Name: Klaus Gerber

Title: Liquidating Agent on Behalf of Fibrant, LLC

Dated: 9/3/2023

FIBRANT SOUTH CENTER, LLC, on behalf of itself and South Center

By: _____

Name: Klaus Gerber

Title: Liquidating Agent on Behalf of Fibrant South Center, LLC

Dated: 9/3/2023

GEORGIA MONOMERS COMPANY, LLC, on behalf of itself and Georgia Monomers

By: _____

Name: Klaus Gerber

Title: Liquidating Agent on Behalf of Georgia Monomers Company, LLC

Dated: 9/3/2023

EVERGREEN NYLON RECYCLING, LLC, on behalf of itself and Evergreen

By: _____

Name: Klaus Gerber

Title: Liquidating Agent on Behalf of Evergreen Nylon Recycling, LLC

*[signature page]*

Dated: 9/6/23

ADMIRAL INSURANCE COMPANY

By: _Moore_

Name: Richard Moore

Title: Sr VP., General Counsel

*[signature page]*

## <u>EXHIBIT A</u>
**[Intentionally Omitted]**

## **EXHIBIT B**

The following insurance policies are included within the definition of Admiral Policies as set forth
in Section I, 1.3 of the Agreement:

| Insurer | Policy Number | Policy Period |
|---|---|---|
| Admiral Insurance Company | 5CG - 0071 | 2-1-75 to 2-1-76 |
| Admiral Insurance Company | A1CM 2315 | 4-1-81 to 4-1-82 |
| Admiral Insurance Company | A2CM 2956 | 4-1-82 to 4-1-83 |
| Admiral Insurance Company | A3CM 3088 | 4-1-83 to 4-1-84 |

## SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE

THIS SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE ("Agreement") is entered into by and between ChemicaInvest Holding, B.V. ("CIH"); Augusta Liquidations LLC ("Augusta Liquidations"); Environmental Liability Transfer, Inc. ("ELT"); and Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc. and DSM Chemicals North America, LLC ("Fibrant"), Evergreen Nylon Recycling, LLC, Fibrant South Center, LLC ("South Center"), and Georgia Monomers Company, LLC, by and through Klaus Gerber, as their duly appointed Liquidating Agent (the "Liquidating Agent"), on the one hand, and United States Fire Insurance Company ("US Fire"), TIG Insurance Company as successor by mergers to Mt. McKinley Insurance Company ("TIG"), and The North River Insurance Company ("North River"), on the other hand. The parties are sometimes referred to herein collectively as the "Parties," and individually as "Party."

## RECITALS

**WHEREAS**, US Fire, TIG, and North River issued or allegedly issued certain liability insurance policies to Columbia Nitrogen Corporation and Columbia Nipro Corporation, including without limitation the policies listed on **Exhibit A** hereto (as defined herein, the "Policies"); and

**WHEREAS**, Columbia Nipro Corporation became known as Fibrant (as hereinafter defined) through a series of corporate name changes and one change of corporate form from a corporation to a limited liability company; and

**WHEREAS**, beginning in or about 1963, Fibrant constructed and operated a facility located on a parcel of real estate at 1408 Columbia Nitrogen Drive, Augusta, Georgia, at which Fibrant manufactured caprolactam, ammonium sulfate, and other products (as hereinafter defined, the "Site"); and

-1-

**WHEREAS**, Fibrant's operations at the Site allegedly caused environmental contamination at and around the Site; and

**WHEREAS**, Fibrant has alleged that it is subject to potential environmental claims relating to historical operations at the Site, arising under certain environmental laws and regulations, including the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Georgia Hazardous Waste Management Act, O.C.G.A. § 12-8-60 et seq., and the Hazardous Waste Permit for the Site, (Permit No. HW-016 (ST&CA) and Facility I.D. No. GAD 051011609); and

**WHEREAS**, on February 3, 2018, Fibrant, together with Evergreen Nylon Recycling, LLC, South Center, and Georgia Monomers Company, LLC (collectively, "Debtors"), filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court"); and

**WHEREAS**, on May 29, 2019, an order was entered in the Bankruptcy Case confirming the Debtors' Second Amended and Restated Plan of Liquidation (the "Plan"); and

**WHEREAS**, pursuant to the Plan, (a) ownership of the Site was conveyed to Augusta Liquidations, and (b) the Debtors' rights to assert and pursue causes of action under the Policies were assigned in part to CIH and in part to Augusta Liquidations; and

**WHEREAS**, on or about June 12, 2019, Debtors, CIH and Augusta Liquidation commenced an adversary proceeding in the Bankruptcy Court (the "Insurance Action"), seeking a declaratory judgment that US Fire, TIG, and North River (together with other defendant insurers) are obligated to defend Debtors and CIH for claims arising from the Site, to reimburse past and future costs incurred to comply with the Debtors' obligations under RCRA Costs, and to indemnify

-2-

and defend Augusta Liquidations against any damages, expenses, and settlement payments at the Site.

**WHEREAS**, US Fire, TIG, and North River dispute the allegations of the Insurance Action and each deny that it has any obligation to provide coverage for the claims of Debtors, CIH and Augusta Liquidations; and

**WHEREAS**, certain Parties agreed to mediate their disputes before Timothy P. Gallagher, Esquire, of the Gallagher Law Group P.C., Los Angeles, CA; and

**WHEREAS**, the Parties now desire finally and completely to resolve, compromise, and settle all disputes between them, including without limitation (i) any and all Claims (as hereinafter defined) relating to the Site, the Insurance Action, and other matters addressed herein, and (ii) any disputes arising out of or related to the Bankruptcy Case, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, and

**WHEREAS**, as part of this compromise and resolution, US Fire, TIG, and North River wish to repurchase all of Debtors' rights, title and interests in the Policies, free and clear of all Interests of any Person, except as expressly set forth in this Agreement;

**WHEREAS**, by and through this Agreement, Plaintiffs seek to provide the RiverStone Affiliate Insurers (as hereinafter defined) with the broadest possible release, as set forth herein, with respect to the Policies and to provide that the RiverStone Affiliate Insurers shall have no further obligations to the Plaintiffs, Debtor's creditors or other parties-in-interest, except as expressly set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.    **DEFINITIONS**

As used in this Agreement, the following terms have the following meanings:

1.1    "Approval Motion" means the motion to be filed seeking approval of the terms of this Agreement, including the sale of the Policies provided for herein, and entry of the Approval Order, as provided in Section 4.1 hereof.

1.2    "Approval Order" means an order entered by the Bankruptcy Court, upon a hearing following proper notice, containing all of the provisions set out in Section 4.1 hereof, but no provision that is contrary to or inconsistent with such provisions, which becomes a Final Order, and the wording of the Approval Order shall be reasonably acceptable to the RiverStone Affiliate Insurers and CIH.

1.3    "Bankruptcy Case" means the bankruptcy case captioned *In re: Fibrant, LLC, et al.,* Case No. 18-10274-SDB, presently pending before the Bankruptcy Court, Judge Susan D. Barrett presiding.

1.4    "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

1.5    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Georgia.

1.6    "Bankruptcy Notice Parties" means the following

(i)    all known creditors of Debtors;

(ii)    the Office of the United States Trustee for the Southern District of Georgia;

(iii)    all Persons that have filed a notice of appearance and/or demand for service of papers in the Bankruptcy Case;

(iv)    all Persons that have filed a notice of appearance and/or demand for service of papers in the Insurance Action;

(v)     all Persons identified on any and all service lists in the Bankruptcy Case;

(vi)    the Georgia Department of Natural Resources, Environmental Protection Division;

(vii)   the Attorney General of the State of Georgia;

(viii)  the United States Environmental Protection Agency;

(ix)    the Attorney General of the United States;

(x)     the United States Attorney for the Southern District of Georgia;

(xi)    the United States Internal Revenue Service;

(xii)   all known insurers of the Debtors;

(xiii)  all Persons with a known Interest in the Site, including those Persons that ever owned the Site, had a leasehold interest in the Site, or that hold a lien against the Site, regardless of the date thereof, and any known insurer of such property owner or lessee;

(xiv)   all known Persons owning real property adjoining the Site;

(xv)    all known Persons with an Interest in the Policies;

(xvi)   any other known Person asserting an Interest in the Bankruptcy Case and/or sought to be bound by the Approval Order; and

(xvii)  any other Person designated by the Bankruptcy Court as requiring notice.

1.7     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure

1.8     "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause

of action of any sort, whether currently known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

1.9    "Contribution Claim" means any Claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a Claim of its insured in a situation where two or more policies issued by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

1.10    "Direct Action Claim" means any Claim by any Person against an insurer, which is identical or similar to, or relating to, the same or similar acts or omissions giving rise to a Claim against Plaintiffs, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action.

1.11    "Effective Date" means the last date on which each of the following conditions precedent have occurred: (a) each of the Parties has executed this Agreement and delivered its signature page to the other Parties; (b) the Approval Order is a Final Order; (c) the Plan Modification has been approved by Final Order of the Bankruptcy Court; and (d) this Agreement has not been terminated under Sections 4.7 or 8.10 hereof or otherwise.

1.12    "ELT" means Environmental Liability Transfer, Inc., which is an affiliate of Augusta Liquidations, the permitted assignee under the ELT Property Transfer Agreement, as defined within the Plan.

1.13    "Environmental Claim" means any Claim of any kind, including for bodily injury, property damage, personal injury, advertising injury, economic loss, loss of use, environmental

investigation or remediation costs, natural resource damages or toxic torts, that arises from Environmental Contamination.

1.14    "Environmental Contamination" means the actual, potential, or alleged presence of, exposure to, or injury or damage from any smoke, vapors, soot, fumes, acids, alkaloids, chemicals, liquids, gases, waste materials, irritants, contaminants or pollutants of any type, including, but not limited to: (a) any substance defined or designated as a "hazardous substance" pursuant to Sections 101(14) and 102(a) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601(14) and 9602(a); (b) any "pollutant or contaminant" under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1); (c) any substance defined as a "hazardous waste" in Section 6903(5) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, et seq.; (d) any chemical, substance or mixture found by the Administrator of the United States Environmental Protection Agency and/or any state agency to present an unreasonable risk of injury to health or the environment pursuant to Toxic Substances Control Act 15 U.S.C. § 2601, et seq.; (e) any substance listed in the United States Department of Transportation Table, 49 C.F.R. 172.101; and (f) any substance designated or considered to be a "hazardous substance," "hazardous material," "hazardous waste," "waste," "pollutant" or "contaminant" under any federal, state or local law, statute, rule, regulation or judicial decision that relates to, amends or is a successor to any of the foregoing statutes, rules, regulations or cases, or that defines any of the foregoing terms.

1.15    "Extra-Contractual Claim" means any Claim against an insurer, seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct;

or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.

1.16    "Fibrant" means and includes Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., and DSM Chemicals North America, LLC.

1.17    "Final Order" means an order as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Parties and their counsel or, in the event that an appeal, writ of certiorari, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, petition for review, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order".

1.18    "Insurance Action" means the adversary proceeding commenced in the Bankruptcy Court by Plaintiffs against US Fire, TIG, North River, and others, docketed at Adversary Proceeding 19-01016 (SDB).

1.19    "Insurance Coverage Claim" means any Claim seeking defense or indemnity or any other benefit, including any Contribution Claim or other similar Claim, under or relating to the Policies.

1.20    "Interests" means all liens, Claims, encumbrances, interests, defenses and other rights of any nature, whether at law or in equity, including all Environmental Claims, Contribution Claims, Direct Action Claims, Insurance Coverage Claims and Extra-Contractual Claims.

1.21    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or partnership joint venture, trust or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.22    "PCS Nitrogen" means PCS Nitrogen, Inc., together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.23    "Plaintiffs" means Fibrant, LLC, Evergreen Nylon Recycling, LLC, South Center, Georgia Monomers Company, LLC, ChemicaInvest Holding, B.V., and Augusta Liquidations, LLC, together with each of their predecessors and successors, and past, present and future parents (including ELT), subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.24    "Plan" means the Second Amended and Restated Plan of Liquidation for the Debtors, as confirmed in the Bankruptcy Case by Order dated May 29, 2019.

1.25    "Policies" means all insurance policies, known or unknown, issued or allegedly issued by, or novated to or assumed by, any RiverStone Affiliate Insurer to Columbia Nitrogen

Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC. "Policies" include, but are not limited to, the policies and alleged policies listed in **Exhibit A** hereto.  For the avoidance of doubt, "Policies" do not include insurance policies issued after the Effective Date of the Plan or those currently effective policies maintained by entities currently performing work at the Augusta Site—such as policies issued to Augusta Liquidations, remediation contractors, or subcontractors—if any.

1.26    "RCRA Costs" means investigative, remedial, and other costs and expenses incurred pursuant to RCRA, GHWMA, the RCRA Permit, other applicable environmental laws, and regulations, related to soil and groundwater contamination at the Site.

1.27    "RCRA Permit" means Hazardous Waste Permit No. HW-016(ST&CA) issued to Fibrant, as the same may be amended from time to time.

1.28     "RiverStone Affiliate Insurers" means US Fire, TIG, and North River and all of their predecessors and successors.

1.29    "Site" means all property, buildings, soil, surface water, and groundwater at and beneath the premises on Columbia Nitrogen Drive in Augusta Georgia, which is or has been owned and/or occupied by Fibrant, LLC and its predecessors in interest, as defined in the report of Ramboll Environ prepared for Fibrant and dated May 16, 2017, including without limitation Solid Waste Management Areas (SWMAs) A through D, and the air above the Site, the ground and groundwater below the Site, and all air, soil, surface water, and groundwater in the vicinity of the Site allegedly impacted by Environmental Contamination originating from the Site.

As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate; "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every".

2.      **SALE/BUYBACK OF THE POLICIES AND THE SETTLEMENT PAYMENT**

2.1      **Settlement Payment**.  On or before forty-five (45) days following the Effective Date, one or more of the RiverStone Affiliate Insurers will pay CAP I BV the total sum of Two Hundred Twenty-Five Thousand Dollars ($225,000) (hereinafter referred to as the "Settlement Payment").   Payment of the Settlement Payment will be made by wire transfer or other immediately available funds to:

> CAP I BV
> Mauritslaan 49
> 6129 EL Urmond
> The Netherlands
>
> CITIBANK EUROPE PLC, NL BRANCH
> IBAN Number: NL96CITI0266041485
> Swift code/BIC: CITINL2X

2.2      **Sale/Buyback of the Policies.**  Upon receipt of the Settlement Payment and in consideration thereof, and without any further action of the Parties, the Liquidating Agent, on behalf of the Debtors shall sell, convey, transfer, assign and deliver Debtors' Interest in the Policies, including any and all rights assigned to South Center pursuant to Section 3.6 of this Agreement, to the RiverStone Affiliate Insurers, free and clear of any and all Interests of any other Persons, in full and final settlement of all of Plaintiffs' Interests relating to the Policies.  Subject to the terms of this Agreement and the entry of the Approval Order, (i) the Settlement Payment is the total amount that the RiverStone Affiliate Insurers are obligated to pay on account of any and all Interests of any kind relating to the Policies; (ii) the Settlement Payment represents the full purchase price of the Policies, and, upon its payment, the RiverStone Affiliate Insurers shall own their respective Policies free and clear of all Interests of any Person; and (iii) the Settlement Payment is reasonable and fair consideration for the buyback of the Policies.

2.3   **Payment is Final**.  The Settlement Payment will be final and irrevocable, and will not be subject to any claims for set-off, contribution, or charge-backs (including, without limitation, any claims for additional premiums, retrospective premiums, self-insured retentions, deductibles or recoupment of prior payments to any insured under the Policies).

2.4   **Allocation of the Settlement Payment**.  The RiverStone Affiliate Insurers have complete discretion to allocate the Settlement Payment to any of the Policies as they see fit. Nothing in this Agreement shall preclude the RiverStone Affiliate Insurers from pursuing reinsurance recoveries for the Settlement Payment from their reinsurers.

**3.   RELEASE**

3.1   **Plaintiffs' Releases and Termination of the Policies.**  Effective upon receipt by Plaintiffs of the Settlement Payment, and in consideration thereof, Plaintiffs waive, release, and forever discharge the RiverStone Affiliate Insurers, their affiliated companies and direct and indirect subsidiaries, and each of their respective predecessors, successors, permitted assigns, directors, officers, employees, agents, attorneys and representatives when acting in their capacity as such (collectively, "Releasees"),  from any and all past, present, and future Claims, liabilities, duties to defend or indemnify, causes of action, demands, rights, damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive or exemplary damages that were or could have been alleged), or any other obligations of every kind, nature and description whatsoever, whether arising in law or in equity, under or relating to the Policies and any other policy providing liability coverage for third-party property damage, bodily injury or personal injury, known or unknown, confirmed or unconfirmed, under which they can claim insurance coverage for liabilities relating to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC, or to the Site (including any adjoining properties).  As to Plaintiffs, the Policies will have no further force or

effect whatsoever.  Plaintiffs' releases include, without limitation, (a) any liability for past, present, or future Environmental Claims, known and unknown, arising out of the Site; (b) any liability arising under or relating to the RCRA Permit; (c) any Direct Action Claims; (d) any Contribution Claims; (e) any Extra-Contractual Claims, and (f) any claims that were asserted or could have been asserted in the Insurance Action.

3.2    **Limitations on Scope of Release**.  Notwithstanding any other provision of this Agreement, Plaintiffs do not release any Claims held by any entity that does not fall within the definition of "Plaintiffs" set forth above, including but not limited to PCS Nitrogen.  Plaintiffs also do not release any claim under insurance policies issued after the Effective Date of the Plan.  For the avoidance of doubt, it is not the Parties' intent to release any obligations in connection with currently effective policies maintained by entities currently performing work at the Site.

3.3    **Release In All Capacities**.  The releases provided in Paragraph 3.1 above are provided by Plaintiffs in all of their actual or alleged capacities, including, without limitation, as an alleged insured, additional insured, successor to an insured, assignor, assignee, subrogor, subrogee, indemnitor, indemnitee, creditor, or judgment creditor of Fibrant, or of any other Person.

3.4    **Warranty Regarding Known Claims**.  Plaintiffs represent and warrant that as of the date it has executed this Agreement and delivered its signature page to the other Parties, Plaintiffs are not "on notice" of any Claims arising from the operations of Fibrant for which Plaintiffs are alleged to be liable other than the Environmental Claims relating to the Site.  For purposes of this Agreement, "on notice" means that the Persons responsible for handling the insurance affairs of the Plaintiffs have received notification from any source of the assertion or filing of a Claim.

3.5    **Changes In Fact Or Law.**  The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims released in this Agreement. Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

3.6    **Assignment of Interests in the Policies by Augusta Liquidations to South Center.**  To facilitate the releases contemplated in this Agreement, the Parties agree and acknowledge that Augusta Liquidations shall assign its Interests in the Policies, along with the interests of ELT and CIH, if any, to South Center.

3.7    **No Other Assignment.**  Other than the assignment of Debtors' rights to assert and pursue causes of action under the Policies in part to CIH and in part to Augusta Liquidations pursuant to the Plan, and other than any re-assignment expressly provided for in this Agreement, Plaintiffs warrant and represent that they (i) will not assign or transfer, in whole or in part, to any Person any of their rights under the Policies and (ii) have not assigned or transferred, in whole or in part, to any Person any of their rights under the Policies with respect to Claims released under this Agreement, *provided, however,* that Debtors' warranty with respect to this clause (ii) is limited to Debtors' warranty that, subsequent to the assignment provided in Section 3.6 of this Agreement, Debtors own any and all such rights assigned to Debtors by CIH, ELT and/or Augusta Liquidations, with no further warranty expressed or implied as to the scope of those rights. Moreover, Plaintiffs represent, warrant, and agree that, except as provided for in this Agreement, they will not in any way assist any Person in the establishment of any Claim against the Releasees relating to any Claim released under this Agreement.

4.      **FIBRANT'S BANKRUPTCY-RELATED OBLIGATIONS**

4.1      Within fourteen (14) Business Days after the date on which this Agreement has been executed by all Parties, the Liquidating Agent shall file the appropriate motion or motions seeking approval of the terms of this Agreement, including the sale of the Policies and a modification of the Plan as provided for herein, and entry of the Approval Order together with appropriate findings of fact and conclusions of law, in the form attached as **Exhibit B** hereto.  The Approval Order shall:

(a)      Approve this Agreement in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 105(a), and Bankruptcy Rules 6004 and 9019;

(b)      Find this Agreement was negotiated in good faith, the product of arms-length bargaining, free from fraud or collusion, is reasonable, fair and equitable, and in the best interest of the estate and its creditors after consideration of (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the likely difficulties in collection; (c) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of creditors;

(c)      Authorize the Parties to undertake the settlement, perform the obligations and the transactions contemplated by this Agreement;

(d)      Authorize the sale of Plaintiffs' Interests in the Policies to the RiverStone Affiliate Insurers free and clear of any and all Interests of any Person, with all Interests in and to, and Claims against, Plaintiffs' Interests in the Policies being fully extinguished without reservation as to the Releasees;

(e)      Provide that the RiverStone Affiliate Insurers are good faith purchasers of the Policies for value and, as such, are entitled to all protections provided to a good faith purchaser under Bankruptcy Code § 363(m);

(f)     Provide that the consummation of this Agreement effectuates the releases described in Paragraph 3.1;

(g)     Provide that the sale of the Policies outside the ordinary course of business, free and clear of the Interests of all Persons, satisfies the requirements respectively of § 363(b) and § 363(f);

(h)     Enter an injunction pursuant to 11 U.S.C. §§ 105(a) 1123, 1127, and 1129 providing that any person (other than the United States of America and the State of Georgia and PCS Nitrogen) who now holds or who may in the future hold any Claims or Interests of any kind or nature against the Plaintiffs or the Policies is hereby forever barred, prohibited, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any released Claims or such Interests against any of the RiverStone Affiliate Insurers, or the Policies.

(i)     Approve a modification of the Plan, pursuant to 11 U.S.C. § 1127, in form and substance reasonably acceptable to the RiverStone Affiliate Insurers and CIH, providing that the RiverStone Affiliate Insurers shall be deemed "Settling Insurers" for purposes of the Plan, and that "Settling Insurers" (as defined in the modified Plan) shall be deemed to be treated as "Creditor Released Parties" and "Debtor Released Parties" for purposes of the release and injunction provisions of the Plan (as those terms are defined in the modified Plan); provided that no release shall be required from the United States of America, the State of Georgia, or PCS Nitrogen.

(j)     Find that due and adequate notice of the (a) sale of the Policies; (b) terms and conditions of this Agreement; and, (c) hearing on the approval of this Agreement (including the sale provided for herein) was provided in accordance with Bankruptcy Rules 2002 and 6004 and published in accordance with Section 4.2 of this Agreement.

For avoidance of doubt, all fees, expenses and other costs incurred by or to be incurred by the Debtors' Liquidating Agent shall be funded through an advance retainer by CIH and the Debtors' Liquidating Agent shall have no obligations under this Agreement with respect to Sections 3.6, 4.1 through 4.4, 4.6 and 5.1 in the absence of such prior funding

4.2     The Debtors shall serve notice of the Approval Motion and of the hearing thereon. Such notice shall be accomplished through electronic means or, at the RiverStone Affiliate Insurers' election (which election shall be made by the RiverStone Affiliate Insurers by the date on which this Agreement has been executed by all Parties) by mail on each of the Bankruptcy Notice Parties by United States mail, postage pre-paid.  If mail notification is elected, the mailing expense shall be borne equally by the Riverstone Affiliate Insurers and any other Settling Insurers whose polices are also being sold that have elected notification through mail.

4.3     To ensure the broadest notice possible, Plaintiffs shall also publish notice of the sale of the Policies to the RiverStone Affiliate Insurers pursuant to §§ 363(b), (f) and (m) and Bankruptcy Rules 6004 and 9019 and of the hearing seeking the Approval Order in the national edition of the *USA Today*, and twice in the *Atlanta Journal-Constitution* and *The Augusta Chronicle*, within a period of seven (7) days.  Publication of the notice of the sale of the Policies shall be at the expense of the RiverStone Affiliate Insurers, and in a form and substance acceptable to the RiverStone Affiliate Insurers; *provided however*, if any such advertisement notices the sale of policies other than the Policies issued by the RiverStone Affiliate Insurers, the expense of such publication shall be borne equally by the RiverStone Affiliate Insurers and the other Settling Insurers whose policies are also being sold, and the notice shall be in a form and substance acceptable to both the RiverStone Affiliate Insurers and those other Settling Insurers.

-17-

4.4     If the Approval Order is appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), then subject to the Parties' termination rights set forth below, the Parties shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; *provided, however*, that nothing herein shall preclude the Parties from mutually consummating the transactions contemplated herein if the Approval Order shall have been entered and is not stayed.

4.5     The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, either the Approval Order or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be materially inconsistent with the terms hereof.

4.6     Plaintiffs shall cooperate with the RiverStone Affiliate Insurers and their representatives in connection with efforts to obtain entry of the Approval Order and the bankruptcy proceedings directly related to entry of the Approval Order.  Plaintiffs shall not submit to the Bankruptcy Court for approval any motion, plan of reorganization, adversary proceeding, filing or other request the approval of which would conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of the RiverStone Affiliate Insurers hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

4.7     The RiverStone Affiliate Insurers shall have no obligation to remit the Settlement Payment until the Approval Order is entered and the Effective Date occurs.  If (i) the Approval Order is vacated or modified, or otherwise entered in a form that is not reasonably acceptable to

-18-

the RiverStone Affiliate Insurers, or (ii) the Approval Order is reversed on appeal, then the RiverStone Affiliate Insurers may terminate this Agreement by delivering written notice to the Plaintiffs within ten (10) business days of such event.  In the event this Agreement is terminated, (i) the Agreement shall be void; (ii) the RiverStone Affiliate Insurers shall not be obligated to pay the Settlement Payment; and (iii) the Parties shall have all of the rights, defenses and obligations under or with respect to the Policies that they would have had absent this Agreement.

**5.**   **DISMISSAL**

6.1   **Dismissal of US Fire, TIG, and North River From the Insurance Action.** Within ten (10) business days after receipt of the Settlement Payment, the Parties will file a stipulation in the Insurance Action dismissing, with prejudice and without costs to either party, all Claims and causes of action asserted in that action by Plaintiffs against US Fire, TIG, and North River.  Plaintiffs, US Fire, TIG, and North River, agree to cooperate and, if necessary, to take any further action consistent with this Agreement to effect the dismissal with prejudice of US Fire, TIG, and North River from the Insurance Action.

**6.**   **INDEMNIFICATION**

6.1   **Defense and Indemnification.**  CIH (or an affiliated entity established to maintain the following obligation) will defend and indemnify the Releasees for claims against them by any Person relating to RCRA Costs, including but not limited to, the following: (i) Claims by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under any of the Policies, (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of Fibrant, and (iii) Claims directly against the Releasees by any other Person who does not qualify as an insured under any of the Policies, including, but not limited to, Direct Action Claims or third-party beneficiary Claims.

-19-

6.2     **Limitations on Plaintiffs' Indemnification Obligations.**

(a)     The indemnification and defense obligations enumerated in Section 6.1 do not extend to claims brought by (i) a party to the Insurance Action (or affiliated entity) or (ii) PCS Nitrogen.

(b)     The indemnification and defense obligations enumerated in Section 6.1 will incept upon the receipt of the Settlement Payment and will be capped at the amount of the Settlement Payment, less creditor recovery (i.e., the portion of the Settlement Payment paid to creditors and/or a trust established for the benefit of creditors under the Plan). Upon exhaustion of the amounts set forth in this Section 6.2(b) by payment of defense or indemnity to the Releasees, any obligations under this Section 6 shall immediately terminate and the Releasees shall pay for their own defense and indemnity.

(c)     Any obligation on the part of Plaintiffs to pay for the Releasees' defense and indemnity under this Agreement shall immediately terminate upon the close of the Bankruptcy Case.

6.3     **Defense of the Releasees**. The defense of the Releasees for an indemnified Claim under Section 6.1 will proceed as follows:

(a)     Plaintiffs, through their own counsel, will use reasonable efforts to obtain a dismissal of the Releasees and the substitution of an appropriate Plaintiff entity on the basis that the Releasees' obligations with respect thereto were finally resolved by a reasonable, good faith settlement and that Plaintiffs also agreed to accept a judgment reduction with respect to any obligation of the Releasees as set forth in Paragraphs 7.1 and 7.2 below.

(b)     Should the claimant refuse to dismiss the Releasees, the Releasees will have the right to select defense counsel, subject to Plaintiffs' consent, which consent shall not be

unreasonably withheld, to defend the Releasees at Plaintiffs' expense ("Retained Counsel").  Any such Retained Counsel will be chosen from among insurance coverage counsel used by the Releasees, at rates not to exceed those routinely paid by the Releasees for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

(c)     The Releasees will have the right to control all positions taken on their behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the Policies.

## 7.    <u>JUDGMENT REDUCTION</u>

7.1     In connection with any Claim related to a Claim released under this Agreement brought by Fibrant, CIH or Augusta Liquidations against any Person other than the Releasees, which results in an adjudication on the merits, whether in court or another tribunal with jurisdiction, or in a binding arbitration award, that such other Person is liable to Fibrant, CIH or Augusta Liquidations, and that such judgment or binding arbitration award includes sums which are allocable to the Releasees under any Policies, Fibrant, CIH and Augusta Liquidations will agree to reduce the judgment or binding arbitration award against such other Person or take other steps as necessary in order to avoid such liability being imposed on the Releasees.  Such a reduction in Fibrant's, CIH's or Augusta Liquidations' judgment or binding arbitration award will be accomplished by subtracting from the judgment or binding arbitration award against any such Person the share of the judgment or binding arbitration award, if any, which is applicable to the Releasees.

7.2     To ensure that such a reduction is accomplished and the Releasees are protected, the applicable Plaintiff who brought any such claim described in Section 7.1 and the Releasees shall move the court or appropriate tribunal for a finding this Agreement was made in good faith and the appropriate form of relief is a contribution bar in favor of the Releasees.  In the event a

court or other tribunal will not make such findings or grant the appropriate relief, the Releasees will also be entitled to assert this Agreement as a defense in any Claim against them for any such portion of the judgment or binding arbitration award, and will be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Releasees from liability for the judgment or binding arbitration award solely to the extent such judgment or award relates to Claims released under this Agreement.

7.3     In the event any Plaintiff settles any Claim related to or arising out of a Claim released under this Agreement with any Person other than the Releasees without the Releasees' consent, the settling Plaintiff agrees that it will not seek from the Releasees any sums allocated to the Releasees by such settlement.  Each Plaintiff further agrees that it will use reasonable efforts to obtain a release in favor of the Releasees from any Person with which they settle any Claims relating to or arising out of Claims released under this Agreement.

## 8.     ADDITIONAL PROVISIONS

8.1     **Restrictions On Disclosure Of Agreement.**  It is a material inducement for the Parties to enter into this compromise and settlement of their disputes and differences that the terms and provisions of this Agreement, shall be, and remain, strictly confidential, until the Agreement is filed in the Bankruptcy Case for purposes of obtaining the Approval Order.  Prior to such public filing, neither this Agreement, nor any of its terms, may be disclosed to any Person, except that this Agreement and its terms may be disclosed; (a) as required by law or court order; (b) to any reinsurer, reinsurance intermediary, or retrocessionaire of the Parties, if any, in connection with insurance or reinsurance obligations or to any reinsurance arbitrator(s); (c) to the officers, directors, employees, representatives, counsel, accountants, agents and auditors of any of the Parties; (d) in any action or proceeding between the Parties where the existence or terms of the Agreement are at issue; or (e) by written agreement of the Parties.  If this Agreement or its terms

are disclosed pursuant to subparagraphs (a) or (d) above, the party disclosing such information shall give prior written notice thereof to each of the other Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (b), (c), or (e) above, the party disclosing such information shall advise the recipient of the provisions of this paragraph.

8.2   **"Most Favored Nation" Agreement.**   If Plaintiffs enter into a settlement with another insurer to resolve Plaintiffs' claims against such other insurer in the Insurance Action, and such settlement provides for broader releases or indemnification provisions than those agreed to herein, including within the context of the Bankruptcy Case, the release and indemnification provisions of the settlement between the Parties shall be modified automatically to provide the same scope of release (including the parties released, the relationship to the issuing insurer, and the breadth of the release) and scope of indemnification as provided in such other agreement between Plaintiffs and the other insurer, for no additional consideration. Plaintiffs, except for the Debtors or the Liquidating Agent or his professionals, shall provide the RiverStone Affiliate Insurers with information concerning other settlement agreements that implicate this provision.

8.3   **Amendments.**   Subject to the provisions of Section 8.2 hereof, neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties.

8.4   **No Precedential Value.**   This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies. This Agreement shall not be construed as an admission of coverage under the Policies for any claim, or an admission concerning any issue of law or fact.  This Agreement is without prejudice to any positions taken by the Releasees with regard to other policies, other claims, and other insureds.  It shall not be used as evidence, or in any other manner, in any court or other dispute

resolution proceeding, to create, prove, or interpret the obligations of the Parties under any insurance policies issued to Fibrant or to any other Person.

8.5 **Agreement Voluntarily Entered Into By Each Of The Parties.** This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them. The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

8.6 **Interpretation.** This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties. Accordingly, none of the Parties shall be presumptively entitled to have any provisions of the Agreement construed against any of the other Parties in accordance with any rule of law, legal decision or doctrine.

8.7 **No Admission.** This Agreement is the result of a compromise of disputed issues. This Agreement does not constitute and may not be construed as an admission of any liability, fact, course of performance, or wrongdoing by any Party. This Agreement is not, and cannot be construed as, any admission by any Party that any defense, indemnity, contribution, or other obligation exists under the Policies for the Claims released herein.

8.8 **Entire And Integrated Agreement.** This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject

matters and there are no promises, representations warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

8.9     **No Third-Party Beneficiaries.**  Nothing in this Agreement is intended or shall be construed to give any Person, other than the Releasees and Plaintiffs, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the Releasees and Plaintiffs, as well as each of their respective successors and permitted assigns, and for the benefit of no other Person.

8.10     **Severability.**  If any provisions of this Agreement or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, and application of such provisions to other circumstances, shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.

8.11     **Notice.**  Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid or by overnight mail or by electronic mail, addressed as follows or as the Parties subsequently may direct in writing:

> As to the RiverStone Affiliate Insurers:
>
>> Robert Sampson
>> RiverStone Claims Management, LLC
>> 250 Commercial Street
>> Suite 5000
>> Manchester, NH 03101
>> Robert_Sampson @trg.com

With a copy to:

Christopher Freeman, Esq.
Carlton Fields
One Atlantic Center
1202 W. Peachtree St. NW, Ste. 3000
Atlanta, GA  30309-3455
cfreeman@carltonfields.com


As to Plaintiffs:

Michel Govaert
Mauritslaan 49
6129 EL Urmond | The Netherlands
Michel.Govaert@chemicainvest.com

With a copy to:

Brook Roberts
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
brook.roberts@lw.com

8.12    **Headings.**  The section titles, captions, and headings contained in the Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

8.13    **Recitals.**  The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted therein in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

8.14    **Additional Representations and Warranties.**  CIH, Augusta Liquidations, ELT, the Liquidating Agent for the Debtors, US Fire, TIG, and North River each represents and warrants that it is fully authorized to enter into this Agreement on its own behalf and on behalf of Plaintiffs

and the RiverStone Affiliate Insurers respectively, as those terms are defined herein.  In addition, each of CIH, Augusta Liquidations, ELT, US Fire, TIG, and North River represents and warrants that (i) it is duly organized and existing in good standing under the laws of the United States, (ii) it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or internal approval is necessary, and (iii) the making and performance of this Agreement will not violate any provision of the law or the Party's articles of incorporation, charter, or by-laws.  In addition, each of the individuals signing this Agreement represents and warrants that they are authorized to execute this Agreement on behalf of the Party(ies) whom they represent.

      8.15   **Execution in Counterparts.**   This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _9/22/2023_____

CHEMICAINVEST HOLDING, B.V.

By: _____

Name: _ Michel Govaert_____

Title: _ Director_____

Dated: _____

AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By:  Environmental Liability Transfer, Inc.
Its:  Manager

By:_____

Print Name: Michael J. Roberts_____

Title: Vice President_____

Dated:_____

ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name: Michael J. Roberts_____

Title: Vice President_____

[Signature Page]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.


Dated: _____    CHEMICAINVEST HOLDING, B.V.

By: _____

Name: _____

Title: _____


Dated: _9·22·23_____    AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By:  Environmental Liability Transfer, Inc.
Its:  Manager

By:_____

Print Name: _Michael J. Roberts_____

Title:_Vice President_____


Dated: _9·22·23_____    ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name: _Michael J. Roberts_____

Title: _Vice President_____


[Signature Page]

Dated: 9/3/2023 _____

FIBRANT, LLC, on behalf of itself and Fibrant

By: _____

Name: ___Klaus Gerber___

Title: Liquidating Agent on Behalf of Fibrant, LLC


Dated: 9/3/2023 _____

FIBRANT SOUTH CENTER, LLC, on behalf of itself and South Center

By: _____

Name: _Klaus Gerber_

Title: Liquidating Agent on Behalf of Fibrant South Center, LLC


Dated: 9/3/2023 _____

GEORGIA MONOMERS COMPANY, LLC, on behalf of itself and Georgia Monomers

By: _____

Name: _Klaus Gerber_

Title: Liquidating Agent on Behalf of Georgia Monomers Company, LLC


Dated: 9/3/2023 _____

EVERGREEN NYLON RECYCLING, LLC, on behalf of itself and Evergreen

By: _____

Name: _Klaus Gerber_

Title: Liquidating Agent on Behalf of Evergreen Nylon Recycling, LLC


[Signature Page]

Dated: _September 7, 2023_

UNITED STATES FIRE INSURANCE COMPANY, TIG INSURANCE COMPANY AS SUCCESSOR BY MERGERS TO MT. MCKINLEY INSURANCE COMPANY, AND THE NORTH RIVER INSURANCE COMPANY

By: _____

Name: _Rickey Glover_

Title: _VP, River Stone Claims Management_ _authorized rep._

[Signature Page]

## **EXHIBIT A**

The following insurance policies are included within the definition of Policies as set forth in Section I, 1.25 of the Agreement:

| **Insurer** | **Policy Number** | **Policy Period** |
| --- | --- | --- |
| United States Fire Insurance Company | GLA467745 | 4-1-76 to 5-1-78 |
| United States Fire Insurance Company | XSO002951 | 4-1-76 to 4-1-77 |
| United States Fire Insurance Company | XSO002973 | 4-1-77 to 4-1-78 |
| United States Fire Insurance Company | 540 1893627 | 4-1-78 to 4-1-79 |
| Gibraltar Casualty Company | GSL 00005 | 4-1-79 to 4-1-80 |
| Gibraltar Casualty Company | GSL 00106 | 4-1-80 to 4-1-81 |

## **EXHIBIT B**
## **[Intentionally Omitted]**

## SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE

THIS SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE ("Agreement") is entered into by and between ChemicaInvest Holding, B.V. ("CIH"); Augusta Liquidations LLC ("Augusta Liquidations"); Environmental Liability Transfer, Inc. ("ELT"); and Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc. and DSM Chemicals North America, LLC ("Fibrant"), Evergreen Nylon Recycling, LLC, Fibrant South Center, LLC ("South Center"), and Georgia Monomers Company, LLC, by and through Klaus Gerber, as their duly appointed Liquidating Agent (the "Liquidating Agent"), on the one hand, and Continental Casualty Company, Columbia Casualty Company, The Continental Insurance Company, Starr Indemnity and Liability Company (f/k/a Republic Insurance Company), Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company), Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (collectively, "Defendant Insurers") on the other hand. The parties are sometimes referred to herein collectively as the "Parties," and individually as "Party."

## RECITALS

**WHEREAS**, Defendant Insurers (as hereinafter defined) issued or allegedly issued certain liability insurance policies as referenced below in the definition of "Policies"; and

**WHEREAS**, Columbia Nipro Corporation became known as Fibrant (as hereinafter defined) through a series of corporate name changes and one change of corporate form from a corporation to a limited liability company; and

**WHEREAS**, beginning in or about 1963, Fibrant constructed and operated a facility located on a parcel of real estate at 1408 Columbia Nitrogen Drive, Augusta, Georgia, at which

-1-

Fibrant manufactured caprolactam, ammonium sulfate, and other products (as hereinafter defined, the "Site"); and

WHEREAS, Fibrant's operations at the Site allegedly caused environmental contamination at and around the Site; and

WHEREAS, Fibrant has alleged that it is subject to potential environmental claims relating to historical operations at the Site, arising under certain environmental laws and regulations, including the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Georgia Hazardous Waste Management Act, O.C.G.A. § 12-8-60 et seq., and the Hazardous Waste Permit for the Site, (Permit No. HW-016 (ST&CA) and Facility I.D. No. GAD 051011609); and

WHEREAS, on February 3, 2018, Fibrant, together with Evergreen Nylon Recycling, LLC, South Center, and Georgia Monomers Company, LLC (collectively, "Debtors"), filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court"); and

WHEREAS, on May 29, 2019, an order was entered in the Bankruptcy Case confirming the Debtors' Second Amended and Restated Plan of Liquidation (the "Plan"); and

WHEREAS, pursuant to the Plan, (a) ownership of the Site was conveyed to Augusta Liquidations, and (b) the Debtors' rights to assert and pursue causes of action under the Policies were assigned in part to CIH and in part to Augusta Liquidations; and

WHEREAS, on or about June 12, 2019, Debtors, CIH and Augusta Liquidation commenced an adversary proceeding in the Bankruptcy Court (the "Insurance Action"), seeking a declaratory judgment that Defendant Insurers (together with other defendant insurers) are obligated to defend Debtors and CIH for claims arising from the Site, to reimburse past and future

costs incurred to comply with the Debtors' obligations under RCRA Costs, and to indemnify and defend Augusta Liquidations against any damages, expenses, and settlement payments at the Site.

WHEREAS, Defendant Insurers dispute the allegations of the Insurance Action and deny that they have any obligation to provide coverage for the claims of Debtors, CIH and Augusta Liquidations; and

WHEREAS, certain Parties agreed to mediate their disputes before Timothy P. Gallagher, Esquire, of the Gallagher Law Group P.C., Los Angeles, CA; and

WHEREAS, the Parties now desire finally and completely to resolve, compromise, and settle all disputes between them, including without limitation (i) any and all Claims (as hereinafter defined) relating to the Site, the Insurance Action, and other matters addressed herein, and (ii) any disputes arising out of or related to the Bankruptcy Case, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, and

WHEREAS, as part of this compromise and resolution, Defendant Insurers wish to repurchase all of Debtors' rights, title and interests in the Policies, free and clear of all Interests of any Person, except as expressly set forth in this Agreement;

WHEREAS, by and through this Agreement, Debtor seeks to provide the Defendant Insurers with the broadest possible release, as set forth herein, with respect to the Policies and to provide that the Defendant Insurers shall have no further obligations to the Plaintiffs, Debtor's creditors or other parties-in-interest, except as expressly set forth in this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.    <u>DEFINITIONS</u>

As used in this Agreement, the following terms have the following meanings:

1.1     "Defendant Insurers" means Continental Casualty Company, Columbia Casualty Company, The Continental Insurance Company, Starr Indemnity and Liability Company (f/k/a Republic Insurance Company), Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company), Certain Underwriters at Lloyd's, London ("Lloyd's Underwriters"), and Certain London Market Insurance Companies ("London Market Companies"), and, in their capacity as such, their predecessors, successors, parents, divisions, subsidiaries, directors, officers, agents, and assigns.

1.2     "ELT" means Environmental Liability Transfer, Inc.  Augusta Liquidations, LLC is ELT's  permitted assignee under the ELT Property Transfer Agreement, as defined within the Plan.

1.3     "Policies" means all insurance policies, known or unknown, issued or allegedly issued by, or novated to or assumed by, any Defendant Insurer to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC. "Policies" include, but are not limited to, the policies and alleged policies listed in **Exhibit A** hereto.  For the avoidance of doubt, "Policies" do not include insurance policies issued after the Effective Date of the Plan or those currently effective policies maintained by entities currently performing work at the Augusta Site—such as policies issued to Augusta Liquidations, remediation contractors, or subcontractors—if any.

1.4     "Approval Motion" means the motion to be filed seeking approval of the terms of this Agreement, including the sale of the Policies provided for herein, and entry of the Approval Order, as provided in Section 4.1 hereof.

1.5     "Approval Order" means an order entered by the Bankruptcy Court, upon a hearing following proper notice, containing all of the provisions set out in Section 4.1 hereof, but no provision that is contrary to or inconsistent with such provisions, which becomes a Final Order, and the wording of the Approval Order shall be reasonably acceptable to the Defendant Insurers and CIH.

1.6     "Bankruptcy Case" means the bankruptcy case captioned *In re: Fibrant, LLC, et al.,* Case No. 18-10274-SDB, presently pending before the Bankruptcy Court, Judge Susan D. Barrett presiding.

1.7     "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

1.8     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Georgia.

1.9     "Bankruptcy Notice Parties" means the following

(i)      all known creditors of Debtors;

(ii)     the Office of the United States Trustee for the Southern District of Georgia;

(iii)    all Persons that have filed a notice of appearance and/or demand for service of papers in the Bankruptcy Case;

(iv)    all Persons that have filed a notice of appearance and/or demand for service of papers in the Insurance Action;

(v)     all Persons identified on any and all service lists in the Bankruptcy Case;

(vi)    the Georgia Department of Natural Resources, Environmental Protection Division;

(vii)   the Attorney General of the State of Georgia;

(viii)  the United States Environmental Protection Agency;

(ix)    the Attorney General of the United States;

-5-

(x)    the United States Attorney for the Southern District of Georgia;

(xi)    the United States Internal Revenue Service;

(xii)    all known insurers of the Debtors;

(xiii)    all Persons with a known Interest in the Site, including those Persons that ever owned the Site, had a leasehold interest in the Site, or that hold a lien against the Site, regardless of the date thereof, and any known insurer of such property owner or lessee;

(xiv)    all known Persons owning real property adjoining the Site;

(xv)    all known Persons with an Interest in the Policies;

(xvi)    any other known Person asserting an Interest in the Bankruptcy Case and/or sought to be bound by the Approval Order; and

(xvii)    any other Person designated by the Bankruptcy Court as requiring notice.

1.10    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure

1.11    "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause of action of any sort, whether currently known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

1.12    "Contribution Claim" means any Claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a

Claim of its insured in a situation where two or more policies issued by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

1.13    "Direct Action Claim" means any Claim by any Person against an insurer, which is identical or similar to, or relating to, the same or similar acts or omissions giving rise to a Claim against Plaintiffs, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action.

1.14    "Effective Date" means the last date on which each of the following conditions precedent have occurred: (a) each of the Parties has executed this Agreement and delivered its signature page to the other Parties; (b) the Approval Order is a Final Order; (c) the Plan Modification has been approved by Final Order of the Bankruptcy Court; and (d) this Agreement has not been terminated under Sections 4.7 or 8.10 hereof or otherwise.

1.15    "Environmental Claim" means any Claim of any kind, including for bodily injury, property damage, personal injury, advertising injury, economic loss, loss of use, environmental investigation or remediation costs, natural resource damages or toxic torts, that arises from Environmental Contamination.

1.16    "Environmental Contamination" means the actual, potential, or alleged presence of, exposure to, or injury or damage from any smoke, vapors, soot, fumes, acids, alkaloids, chemicals, liquids, gases, waste materials, irritants, contaminants or pollutants of any type, including, but not limited to: (a) any substance defined or designated as a "hazardous substance" pursuant to Sections 101(14) and 102(a) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601(14) and 9602(a); (b) any "pollutant or contaminant" under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1); (c) any

-7-

substance defined as a "hazardous waste" in Section 6903(5) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, et seq.; (d) any chemical, substance or mixture found by the Administrator of the United States Environmental Protection Agency and/or any state agency to present an unreasonable risk of injury to health or the environment pursuant to Toxic Substances Control Act 15 U.S.C. § 2601, et seq.; (e) any substance listed in the United States Department of Transportation Table, 49 C.F.R. 172.101; and (f) any substance designated or considered to be a "hazardous substance," "hazardous material," "hazardous waste," "waste," "pollutant" or "contaminant" under any federal, state or local law, statute, rule, regulation or judicial decision that relates to, amends or is a successor to any of the foregoing statutes, rules, regulations or cases, or that defines any of the foregoing terms.

  1.17 "Equitas Entities" means Equitas Limited, Equitas Reinsurance Limited, Equitas Insurance Limited, Equitas Holdings Limited, Equitas Policyholders Trustee Limited, and any other company from time to time in the Equitas group.

  1.18 "Extra-Contractual Claim" means any Claim against an insurer, seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.

  1.19 "Fibrant" means and includes Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc. and DSM Chemicals North America, LLC.

1.20    "Final Order" means an order as to which the time to appeal, petition for certiorari,

petition for review, or move for reargument or rehearing has expired and as to which no appeal,

petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as

to which any right to appeal, petition for certiorari, reargue, or rehearing shall have been waived

in writing in form and substance satisfactory to the Parties and their counsel or, in the event that

an appeal, writ of certiorari, petition for review, or reargument or rehearing thereof has been

sought, such order shall have been affirmed by the highest court to which such order was appealed,

or certiorari has been denied or from which reargument or rehearing was sought, and the time to

take any further appeal, petition for certiorari, petition for review, or move for reargument or

rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59

or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy

Rules may be filed with respect to such order shall not cause such order not to be a "Final Order".

1.21    "Insurance Action" means the adversary proceeding commenced in the

Bankruptcy Court by Plaintiffs against Defendant Insurers and others, docketed at Adversary

Proceeding 19-01016 (SDB).

1.22    "Insurance Coverage Claim" means any Claim seeking defense or indemnity or any

other benefit, including any Contribution Claim or other similar Claim, under or relating to the

Policies.

1.23    "Interests" means all liens, Claims, encumbrances, interests, defenses and other

rights of any nature, whether at law or in equity, including all Environmental Claims, Contribution

Claims, Direct Action Claims, Insurance Coverage Claims and Extra-Contractual Claims.

1.24    "Lloyd's Underwriters" means:

i.      All underwriters, members or Names at Lloyd's, London (including former underwriters, members, or Names) who, through their participation in syndicates, severally subscribed, each in his or her own proportionte share, to one or more of the Policies.  Lloyd's Underwriters shall also include all Lloyd's Underwriters, members, or Names at Lloyd's, London (including former underwriters, members, or Names) who, through their participation in syndicates, severally subscribed to any of the Policies: (a) the existence of which has not presently been established,  or (b) the existence of which has been established but as to which the identities of the Names, members, or syndicates are not presently known; and

ii.     Subject to paragraph 1.24.iv, all the past, present, and future employees (if any), representatives, attorneys, and agents of the Persons set forth in paragraph 1.24.i, and their respective predecessors and successors, if any, solely in such capacity; and

iii.    All the respective heirs, executors, successors, assigns (including without limitation any administrator, receiver, trustee, personal representative, or equivalent appointee under relevant insolvency law), reinsurers, and retrocessionaires (as such) of any of the Persons identified in paragraph 1.24.i.

iv.    Notwithstanding paragraph 1.24.ii, the London Market Third-Party Beneficiaries (defined below) who receive certain specified benefits under this Agreement are not Lloyd's Underwriters for these purposes.

1.25    "London Market Companies" means:

i.     The entities (except for Lloyd's Underwriters)  identified in **Exhibit B** to this Agreement that severally subscribed, each in its own proportionate share, to one or more of the Policies.

ii.    Subject to paragraph 1.25.iv, all the past, present, and future employees (if any), representatives, attorneys, and agents of the Persons set forth in paragraph 1.25.i, and their respective predecessors and successors, if any, solely in such capacity; and

iii.    All the respective heirs, executors, successors, assigns (including without limitation any administrator, receiver, trustee, personal representative, or equivalent appointee under relevant insolvency law), reinsurers, and retrocessionaires (as such) of any of the Persons identified in paragraph 1.25.i.

iv.    Notwithstanding paragraph 1.25.ii, the London Market Third-Party Beneficiaries (defined below) who receive certain specified benefits under this Agreement are not London Market Companies for these purposes.

1.26    "London Market Insurers" means Lloyd's Underwriters and the London Market Companies as defined herein.

1.27    "London Market Third-Party Beneficiaries" means:

i.    Resolute;

ii.    the Equitas Entities;

iii.    solely in such capacity, any Person from time to time retained by or on behalf of any London Market Insurer to act as its agent for claims handling (including reinsurance collection) and/or to provide actuarial, legal, or other advice or services related to claims handling (including reinsurance collection);

iv.    solely in such capacity, the past, present, and future reinsurers and retrocessionaires of the London Market Insurers and/or the Equitas Entities or any of them, including, but not limited to, National Indemnity Company and any other entity from time to time Controlled by Berkshire Hathaway, Inc. that is a reinsurer or retrocessionaire for any one or more of the London Market Insurers, Resolute, and/or the Equitas Entities;

v.    solely in their capacities as such, the directors, officers, agents, attorneys, representatives, and employees of the London Market Insurers and any of the Persons identified in paragraphs 1.27.(i), (ii), (iii), and (iv); and

vi.  solely in their capacities as such, the heirs, executors, successors (including, but not limited to, Equitas Insurance Limited ("EIL") to the extent that EIL is a successor to any London Market Insurer with respect to the subject matter of this Agreement), assigns (including, without limitation, any administrator, receiver, trustee, personal representative, or equivalent appointee under relevant insolvency law), reinsurers, and retrocessionaires of any London Market Insurer and of any of the Persons identified in paragraphs 1.27.(i), (ii), (iv), and (v).

1.28  "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or partnership joint venture, trust or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.29  "PCS Nitrogen" means PCS Nitrogen, Inc., together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.30  "Plaintiffs" means Fibrant, LLC, Evergreen Nylon Recycling, LLC, South Center, Georgia Monomers Company, LLC, ChemicaInvest Holding, B.V., and Augusta Liquidations, LLC, together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates (including ELT), divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.31  "Plan" means the Second Amended and Restated Plan of Liquidation for the Debtors, as confirmed in the Bankruptcy Case by Order dated May 29, 2019.

1.32     "RCRA Costs" means investigative, remedial, and other costs and expenses incurred pursuant to RCRA, GHWMA, the RCRA Permit, other applicable environmental laws, and regulations, related to soil and groundwater contamination at the Site.

1.33     "RCRA Permit" means Hazardous Waste Permit No. HW-016(ST&CA) issued to Fibrant, as the same may be amended from time to time.

1.34     "Resolute" means Resolute Management, Inc. and Resolute Management Services Limited (formerly known as Equitas Management Services Limited).

1.35     "Site" means all property, buildings, soil, surface water, and groundwater at and beneath the premises on Columbia Nitrogen Drive in Augusta Georgia, which is or has been owned and/or occupied by Fibrant, LLC and its predecessors in interest, as defined in the report of Ramboll Environ prepared for Fibrant and dated May 16, 2017, including without limitation Solid Waste Management Areas (SWMAs) A through D, and the air above the Site, the ground and groundwater below the Site, and all air, soil, surface water, and groundwater in the vicinity of the Site allegedly impacted by Environmental Contamination originating from the Site.

As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate; "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every".

## 2.     SALE/BUYBACK OF THE POLICIES AND THE SETTLEMENT PAYMENT

2.1     **Settlement Payment**.  On or before forty-five (45) days following the Effective Date, the Defendant Insurers will pay to CAP I BV the total lump sum of $2,300,000 (hereinafter referred to as the "Settlement Payment").  The allocated share of the Settlement Payment owed by each of the London Market Insurers is stated in **Exhibit C** hereto.  The remaining amount of the Settlement Payment that is owed by the Defendant Insurers other than the London Market Insurers

is $1,250,000.  Payment of the Settlement Payment will be made by wire transfer or other immediately available funds to:

> CAP I BV
> Mauritslaan 49
> 6129 EL Urmond
> The Netherlands
>
> CITIBANK EUROPE PLC, NL BRANCH
> IBAN Number: <u>NL96CITI0266041485</u>
> Swift code/BIC: CITINL2X

2.2 **<u>Sale/Buyback of the Policies.</u>**  Upon receipt of the Settlement Payment and in consideration thereof, and without any further action of the Parties, the Liquidating Agent, on behalf of the Debtors shall sell, convey, transfer, assign and deliver Debtors' Interest in the Policies, including any and all rights assigned pursuant to Section 3.7 of this Agreement, to the Defendant Insurers, free and clear of any and all Interests of any other Persons, in full and final settlement of all of Plaintiffs' Interests relating to the Policies.  Subject to the terms of this Agreement and the entry of the Approval Order, (i) the Settlement Payment is the total amount that the Defendant Insurers are obligated to pay on account of any and all Interests of any kind relating to the Policies; (ii) the Settlement Payment represents the full purchase price of the Policies, and, upon its payment, the Defendant Insurers shall own their respective Policies free and clear of all Interests of any Person; and (iii) the Settlement Payment is reasonable and fair consideration for the buyback of the Policies.

2.3 **<u>CIH Conveyance.</u>**  Upon receipt of the Settlement Payment and in consideration thereof, and without any further action of the Parties, CIH shall convey all right, title, and interest of any sort that it has in the Policies to the Defendant Insurers.

2.4 **<u>Payment is Final</u>**.  The Settlement Payment will be final and irrevocable, and will not be subject to any claims for set-off, contribution, or charge-backs (including, without

limitation, any claims for additional premiums, retrospective premiums, self-insured retentions, deductibles or recoupment of prior payments to any insured under the Policies).

  2.5 **Allocation of the Settlement Payment**. Plaintiffs acknowledge that the obligations of the London Market Insurers are several, and not joint.  Plaintiffs agree that no London Market Insurer shall be liable for any settlement amount allocable to any other London Market Insurer.  Accordingly, each identified London Market Insurer listed in Exhibit B agrees to pay only its individual, respective, allocated share of the Settlement Amount, which amount is set forth in **Exhibit C** hereto.  Plaintiffs shall not seek to recover from any individual London Market Insurer an amount in excess of its stated, respective, allocated share as set forth in Exhibit C hereto. Upon receipt of payment of each paying London Market Insurer's respective, allocated share of the Settlement Payment, Plaintiffs shall be deemed to have released such London Market Insurer pursuant to the terms of Section 3 below.

  The Defendant Insurers other than the London Market Insurers have complete discretion to allocate their portion of the Settlement Payment amongst themselves and to any of the Policies as they see fit.  Nothing in this Agreement shall preclude the Defendant Insurers from pursuing reinsurance recoveries for the Settlement Payment from their reinsurers.

**3.** **RELEASE**

  3.1 **Release of the Defendant Insurers and Termination of the Policies.**  Effective upon receipt by CAP I BV  of the Settlement Payment, and in consideration thereof, Plaintiffs waive, release, and forever discharge the Defendant Insurers and London Market Third-Party Beneficiaries  from any and all past, present, and future Claims, liabilities, duties to defend or indemnify, causes of action, demands, rights, damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive or exemplary damages that were or could have been alleged), or any other obligations under or relating to the Policies  of every kind, nature and

description whatsoever, whether arising in law or in equity.  As to Plaintiffs, the Policies will have no further force or effect whatsoever.  Plaintiffs' releases include, without limitation, (a) any liability for past, present, or future Environmental Claims, known and unknown, arising out of the Site; (b) any liability arising under or relating to the RCRA Permit; (c) any Direct Action Claims; (d) any Contribution Claims; (e) any Extra-Contractual Claims, and (f) any claims that were asserted or could have been asserted in the Insurance Action.

3.2    **Additional Release of the Defendant Insurers and London Market Third-Party Beneficiaries.**  In addition, Plaintiffs release the Defendant Insurers and London Market Third-Party Beneficiaries under any other general liability insurance policy, or policy providing liability coverage for third-party property damage, bodily injury or personal injury, known or unknown, confirmed or unconfirmed, under which they can claim insurance coverage for liabilities relating to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC, or to the Site (including any adjoining properties).

3.3    **Limitations on Scope of Release.**  Notwithstanding any other provision of this Agreement, Plaintiffs do not release any Claims held by any entity that does not fall within the definition of "Plaintiffs" set forth above, including but not limited to PCS Nitrogen.  Plaintiffs also do not release any claim under insurance policies issued after the Effective Date of the Plan.  For the avoidance of doubt, it is not the Parties' intent to release any obligations in connection with currently effective policies maintained by entities currently performing work at the Site.

3.4    **Release In All Capacities.**  The releases provided in Paragraphs 3.1 and 3.2 above are provided by Plaintiffs in all of their actual or alleged capacities, including, without limitation, as an alleged insured, additional insured, successor to an insured, assignor, assignee, subrogor, subrogee, indemnitor, indemnitee, creditor, or judgment creditor of Fibrant, or of any other Person.

3.5    **Warranty Regarding Known Claims.**  Plaintiffs represent and warrant that as of the date it has executed this Agreement and delivered its signature page to the other Parties, Plaintiffs are not "on notice" of any Claims arising from the operations of Fibrant for which Plaintiffs are alleged to be liable other than the Environmental Claims relating to the Site. For purposes of this Agreement, "on notice" means that the Persons responsible for handling the insurance affairs of the Plaintiffs have received notification from any source of the assertion or filing of a Claim.

3.6    **Changes In Fact Or Law.**  The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims released in this Agreement. Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

3.7    **Assignment of Interests in the Policies by Augusta Liquidations to South Center.**  To facilitate the releases contemplated in this Agreement, the Parties agree and acknowledge that Augusta Liquidations shall assign its Interests in the Policies to South Center.

3.8    **No Other Assignment.**  Other than the assignment of Debtors' rights to assert and pursue causes of action under the Policies in part to CIH and in part to Augusta Liquidations pursuant to the Plan, and other than any re-assignment expressly provided for in this Agreement, Plaintiffs warrant and represent that with respect to Claims related to the Site, they have not assigned and will not assign or transfer, in whole or in part, to any Person any of their rights under the Policies with respect to Claims released under this Agreement. As to all other Claims not related to the Site, Plaintiffs represent and warrant that they are not currently aware of any prior

-17-

assignments of their rights under the Policies and that they will not assign or transfer, in whole or in part, to any Person any of their rights under the Policies with respect to Claims released under this Agreement. .  Moreover, Plaintiffs represent, warrant, and agree that, except as provided for in this Agreement, they will not in any way assist any Person in the establishment of any Claim against the Defendant Insurers relating to any Claim released under this Agreement.

## 4.   **FIBRANT'S BANKRUPTCY-RELATED OBLIGATIONS**

4.1     Within fourteen (14) Business Days after the date on which this Agreement has been executed by all Parties, the Liquidating Agent, shall file the appropriate motion or motions seeking approval of the terms of this Agreement, including the sale of the Policies and a modification of the Plan as provided for herein, and entry of the Approval Order together with appropriate findings of fact and conclusions of law, in the form attached as **Exhibit D** hereto.  The Approval Order shall:

(a)      Approve this Agreement in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 105(a), and Bankruptcy Rules 6004 and 9019;

(b)      Find this Agreement was negotiated in good faith, the product of arms-length bargaining, free from fraud or collusion, is reasonable, fair and equitable, and in the best interest of the estate and its creditors after consideration of (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the likely difficulties in collection; (c) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of creditors;

(c)      Authorize the Parties to undertake the settlement, perform the obligations and the transactions contemplated by this Agreement;

(d)      Authorize the sale of Plaintiffs' Interests in the Policies to the Defendant Insurers free and clear of any and all Interests of any Person, with all Interests in and to, and Claims

against, Plaintiffs' Interests in the Policies being fully extinguished without reservation as to the Defendant Insurers;

(e)     Provide that the Defendant Insurers are good faith purchasers of the Policies for value and, as such, are entitled to all protections provided to a good faith purchaser under Bankruptcy Code § 363(m);

(f)     Provide that the consummation of this Agreement releases the [Defendant Insurer Companies] from liability to Plaintiffs under the Policies and/or applicable law;

(g)     Provide that the sale of the Policies outside the ordinary course of business, free and clear of the Interests of all Persons, satisfies the requirements respectively of § 363(b) and § 363(f);

(h)     Enter an injunction pursuant to 11 U.S.C. §§ 105(a) 1123, 1127, and 1129 providing that any person (other than the United States of America and the State of Georgia and PCS Nitrogen) who now holds or who may in the future hold any Claims or Interests of any kind or nature against the Plaintiffs or the Policies is hereby forever barred, prohibited, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any released Claims or such Interests against any of the Defendant Insurers, or the Policies.

(i)     Approve a modification of the Plan, pursuant to 11 U.S.C. § 1127, in form and substance reasonably acceptable to the Defendant Insurers and CIH, providing that the Defendant Insurers and London Market Third-Party Beneficiaries shall be deemed "Settling Insurers" for purposes of the Plan, and that "Settling Insurers" shall be deemed to be treated as "Creditor Released Parties" for purposes of the release and injunction provisions of the Plan (as those terms are defined in the modified Plan); provided that no release shall be required from the United States of America, the State of Georgia, or PCS Nitrogen.

-19-

(j)     Find that due and adequate notice of the (a) sale of the Policies; (b) terms and conditions of this Agreement; and, (c) hearing on the approval of this Agreement (including the sale provided for herein) was provided in accordance with Bankruptcy Rules 2002 and 6004 and published in accordance with Section 4.2 of this Agreement.

For avoidance of doubt, all fees, expenses and other costs incurred by or to be incurred by the Debtors' Liquidating Agent shall be funded through an advance retainer by CIH and the Debtors' Liquidating Agent shall have no obligations under this Agreement with respect to Sections 3.7, 4.1 through 4.4, 4.6 and 5.1 in the absence of such prior funding.

4.2     The Debtors shall serve notice of the Approval Motion and of the hearing thereon. Such notice shall be accomplished through electronic means or, at the Defendant Insurers' election (which election shall be made by the Defendant Insurers by the date on which this Agreement has been executed by all Parties) by mail on each of the Bankruptcy Notice Parties by United States mail, postage pre-paid.  If mail notification is elected, the mailing expense shall be borne equally by the Defendant Insurers and any other Settling Insurers whose polices are also being sold that have elected notification through mail.

4.3     To ensure the broadest notice possible, Debtors shall also publish notice of the sale of the Policies to the Defendant Insurers pursuant to §§ 363(b), (f) and (m) and Bankruptcy Rules 6004 and 9019 and of the hearing seeking the Approval Order in the national edition of the *USA Today*, and twice in the *Atlanta Journal-Constitution* and *The Augusta Chronicle*, within a period of seven (7) days.  Publication of the notice of the sale of the Policies shall be at the expense of the Defendant Insurers, and in a form and substance acceptable to the Defendant Insurers; *provided however*, if any such advertisement notices the sale of policies other than the Policies issued by

the Defendant Insurers, the expense of such publication shall be borne equally by the Defendant Insurers and the other Settling Insurers whose polices are also being sold, and the notice shall be in a form and substance acceptable to both the Defendant Insurers and those other Settling Insurers.

4.4     If the Approval Order is appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), then subject to the Parties' termination rights set forth below, the Parties shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; *provided, however*, that nothing herein shall preclude the Parties from mutually consummating the transactions contemplated herein if the Approval Order shall have been entered and is not stayed.

4.5     The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, either the Approval Order or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be materially inconsistent with the terms hereof.

4.6     Plaintiffs shall cooperate with the Defendant Insurers and their representatives in connection with efforts to obtain entry of the Approval Order and the bankruptcy proceedings directly related to entry of the Approval Order.  Plaintiffs shall not submit to the Bankruptcy Court for approval any motion, plan of reorganization, adversary proceeding, filing or other request the approval of which would conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of the Defendant Insurers hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

4.7     The Defendant Insurers shall have no obligation to remit the Settlement Payment until the Approval Order is entered and the Effective Date occurs.  If (i) the Approval Order is vacated or modified, or otherwise entered in a form that is not reasonably acceptable to the Defendant Insurers, or (ii) the Approval Order is reversed on appeal, then the Defendant Insurers may terminate this Agreement by delivering written notice to the Plaintiffs within ten (10) business days of such event.  In the event this Agreement is terminated, (i) the Agreement shall be void; (ii) the Defendant Insurers shall not be obligated to pay the Settlement Payment; and (iii) the Parties shall have all of the rights, defenses and obligations under or with respect to the Policies that they would have had absent this Agreement.

**5.     DISMISSAL**

5.1     **Dismissal of Defendant Insurers From the Insurance Action.**  Within ten (10) business days after receipt of the Settlement Payment, the Parties will file a stipulation in the Insurance Action dismissing, with prejudice and without costs to either party, all Claims and causes of action asserted in that action by Plaintiffs against Defendant Insurers.  Plaintiffs, Defendant Insurers, agree to cooperate and, if necessary, to take any further action consistent with this Agreement to effect the dismissal with prejudice of Defendant Insurers from the Insurance Action.

**6.     INDEMNIFICATION**

6.1     **Defense and Indemnification.**  CIH (or an affiliated entity established to maintain the following obligation) will defend and indemnify the Defendant Insurers for claims against them by any Person relating to RCRA Costs, including but not limited to, the following: (i) Claims by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under any of the Policies, (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of Fibrant, and (iii) Claims

directly against the Defendant Insurers by any other Person who does not qualify as an insured under any of the Policies, including, but not limited to, Direct Action Claims or third-party beneficiary Claims.

The indemnification in paragraph 6.1 shall also extend to the benefit of London Market Third-Party Beneficiaries, which are intended third-party beneficiaries of the indemnification with the right to enforce its terms.

6.2    **Limitations on Plaintiffs' Indemnification Obligations.**

(a)    The indemnification and defense obligations enumerated in Section 6.1 do not extend to claims brought by (i) a party to the Insurance Action (or affiliated entity) or (ii) PCS Nitrogen.

(b)    The indemnification and defense obligations enumerated in Section 6.1 will incept upon the receipt of the Settlement Payment and will be capped at the amount of the Settlement Payment, less creditor recovery (i.e., the portion of the Settlement Payment paid to creditors and/or a trust established for the benefit of creditors under the Plan).  Upon exhaustion of the amounts set forth in this Section 6.2(b) by payment of defense or indemnity to the Defendant Insurers, any obligations under this Section 6 shall immediately terminate and the Defendant Insurers shall pay for their own defense and indemnity.

(c)    Any obligation on the part of Plaintiffs to pay for the Defendant Insurers' defense and indemnity under this Agreement shall immediately terminate upon the close of the Bankruptcy Case.

6.3    **Defense of the Defendant Insurers**.  The defense of the Defendant Insurers for an indemnified Claim under Section 6.1 will proceed as follows:

(a)     Plaintiffs, through their own counsel, will use reasonable efforts to obtain a dismissal of the Defendant Insurers and the substitution of an appropriate Plaintiff entity on the basis that the Defendant Insurers' obligations with respect thereto were finally resolved by a reasonable, good faith settlement and that Plaintiffs also agreed to accept a judgment reduction with respect to any obligation of the Defendant Insurers as set forth in Paragraphs 7.1 and 7.2 below.

(b)     Should the claimant refuse to dismiss the Defendant Insurers, the Defendant Insurers will have the right to select defense counsel, subject to Plaintiffs' consent, which consent shall not be unreasonably withheld, to defend the Defendant Insurers at Plaintiffs' expense ("Retained Counsel").  Any such Retained Counsel will be chosen from among insurance coverage counsel used by the Defendant Insurers, at rates not to exceed those routinely paid by the Defendant Insurers for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

(c)     The Defendant Insurers will have the right to control all positions taken on their behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the Policies.

## 7.     **JUDGMENT REDUCTION**

7.1     In connection with any Claim related to a Claim released under this Agreement brought by Fibrant, CIH or Augusta Liquidations against any Person other than the Defendant Insurers, which results in an adjudication on the merits, whether in court or another tribunal with jurisdiction, or in a binding arbitration award, that such other Person is liable to Fibrant, CIH or Augusta Liquidations, and that such judgment or binding arbitration award includes sums which are allocable to the Defendant Insurers under any Policies, Fibrant, CIH and Augusta Liquidations will agree to reduce the judgment or binding arbitration award against such other Person or take

other steps as necessary in order to avoid such liability being imposed on the Defendant Insurers.  Such a reduction in Fibrant's, CIH's or Augusta Liquidations' judgment or binding arbitration award will be accomplished by subtracting from the judgment or binding arbitration award against any such Person the share of the judgment or binding arbitration award, if any, which is applicable to the Defendant Insurers.

7.2    To ensure that such a reduction is accomplished and the Defendant Insurers are protected, the applicable Plaintiff who brought any such Claim described in Section 7.1 and the Defendant Insurers shall move the court or appropriate tribunal for a finding this Agreement was made in good faith and the appropriate form of relief is a contribution bar in favor of the Defendant Insurers.  For the avoidance of doubt, the Parties herein state the appropriate share that should be deemed applicable to the Defendant Insurers, if any, should not exceed the amount of the Settlement Payment.  In the event a court or other tribunal will not make such findings or grant the appropriate relief, the Defendant Insurers will also be entitled to assert this paragraph as a defense in any Claim against them for any such portion of the judgment or binding arbitration award, and will be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Defendant Insurers from liability for the judgment or binding arbitration award solely to the extent such judgment or award relates to Claims released under this Agreement.

7.3    In the event any Plaintiff settles any Claim related to or arising out of a Claim released under this Agreement with any Person other than the Defendant Insurers without the Defendant Insurers' consent, the settling Plaintiff agrees that it will not seek from the Defendant Insurers any sums allocated to the Defendant Insurers by such settlement.  Each Plaintiff further agrees that it will use reasonable efforts to obtain a release in favor of the Defendant Insurers from

any Person with which they settle any Claims relating to or arising out of Claims released under this Agreement.

## 8.   ADDITIONAL PROVISIONS

8.1   **Restrictions On Disclosure Of Agreement.**  It is a material inducement for the Parties to enter into this compromise and settlement of their disputes and differences that the terms and provisions of this Agreement, shall be, and remain, strictly confidential, until the Agreement is filed in the Bankruptcy Case for purposes of obtaining the Approval Order.  Prior to such public filing, neither this Agreement, nor any of its terms, may be disclosed to any Person, except that this Agreement and its terms may be disclosed; (a) as required by law or court order; (b) to any reinsurer, reinsurance intermediary, or retrocessionaire of the Parties, if any, in connection with insurance or reinsurance obligations or to any reinsurance arbitrator(s); (c) to the officers, directors, employees, representatives, counsel, accountants, agents and auditors of any of the Parties; (d) in any action or proceeding between the Parties where the existence or terms of the Agreement are at issue; or (e) by written agreement of the Parties.  If this Agreement or its terms are disclosed pursuant to subparagraphs (a) or (d) above, the party disclosing such information shall give prior written notice thereof to each of the other Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (b), (c), or (e) above, the party disclosing such information shall advise the recipient of the provisions of this paragraph.

8.2   **"Most Favored Nation" Agreement.**  If Plaintiffs enter into a settlement with another insurer to resolve Plaintiffs' claims against such other insurer in the Insurance Action, and such settlement provides for broader releases or indemnification provisions than those agreed to herein, including within the context of the Bankruptcy Case, the release and indemnification provisions of the settlement between the Parties shall be modified automatically to provide the same scope of release (including the parties released, the relationship to the issuing insurer, and

the breadth of the release) and scope of indemnification as provided in such other agreement between Plaintiffs and the other insurer, for no additional consideration. Plaintiffs, except for the Debtors or the Liquidating Agent or his professionals,  shall provide the Defendant Insurers with information concerning other settlement agreements that implicate this provision.

8.3     **Amendments.**   Subject to the provisions of Section 8.2 hereof, neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties.

8.4     **No Precedential Value.**  This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies.  It shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of the Parties under any insurance policies issued to Fibrant or to any other Person.

8.5     **Agreement Voluntarily Entered Into By Each Of The Parties.**  This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them.  The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

8.6     **Interpretation.**  This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties.  Accordingly, none of the Parties shall be presumptively entitled to have any provisions of the Agreement construed against any of the other Parties in accordance with any rule of law, legal decision, or doctrine.

8.7     **No Admission.**  This Agreement is the result of a compromise of disputed issues. This Agreement does not constitute and may not be construed as an admission of any liability, fact, course of performance, or wrongdoing by any Party.  This Agreement is not, and cannot be construed as, any admission by any Party that any defense, indemnity, contribution, or other obligation exists under the Policies for the Claims released herein.

8.8     **Entire And Integrated Agreement.**  This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters and there are no promises, representations warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

8.9     **No Third-Party Beneficiaries.**  Nothing in this Agreement is intended or shall be construed to give any Person, other than the Defendant Insurers, London Market Third-Party Beneficiaries, and Plaintiffs and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the Defendant Insurers, London Market Third-Party Beneficiaries and Plaintiffs, as well as each of their respective successors and permitted assigns, and for the benefit of no other Person.

8.10    **Notice.**  Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid or by

-28-

overnight mail or by electronic mail, addressed as follows or as the Parties subsequently may direct in writing:

As to the Defendant Insurers:

Vice President, Direct Claims
Resolute Management, Inc.
125 High Street, 19th Floor
Boston, MA 02110

Catalina Worthing Insurance Limited
1 Alie Street
London E1 8DE
Attn: Steve Dodson (stevedodson@catalinare.com)

Dominion Insurance Company Ltd.
The Minster Building
21 Mincing Lane
London EC3R 7AG
Attn: David Debond (david.debond@premiare.uk)

With a copy to:

Clinton Cameron
Clyde & Co US LLP
55 West Monroe Street, Ste. 3000
Chicago, IL 60603

Helen Franzese
Foran Glennon (UK) LLP
11 Leadenhall Street – Third Floor
London  EC3V 1LP
England
hfranzese@foranglennon.co.uk

As to Plaintiffs:

Michel Govaert
Mauritslaan 49
6129 EL Urmond | The Netherlands
Michel.Govaert@chemicainvest.com

With a copy to:

Brook Roberts
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
brook.roberts@lw.com

8.11 **Headings.** The section titles, captions, and headings contained in the Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

8.12 **Recitals.** The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted therein in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

8.13 **Additional Representations and Warranties.** CIH, Augusta Liquidations, ELT, the Liquidating Agent for the Debtors, and Defendant Insurers each represents and warrants that it is fully authorized to enter into this Agreement on its own behalf and on behalf of Plaintiffs and the Defendant Insurers respectively, as those terms are defined herein. In addition, each of CIH, Augusta Liquidations, ELT, and Defendant Insurers represents and warrants that (i) it is duly organized and existing in good standing under the laws of the United States, (ii) it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or internal approval is necessary, and (iii) the making and performance of this Agreement will not violate any provision of the law or the Party's articles of incorporation, charter, or by-laws. In addition, each of the individuals signing this Agreement represents and warrants that they are authorized to execute this Agreement on behalf of the Party(ies) whom they represent.

-30-

8.14 **<u>Execution in Counterparts.</u>** This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

[*remainder of page intentionally left blank*]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: ___9/22/2023___

CHEMICAINVEST HOLDING, B.V.

By: _____

Name: __Michel Govaert_____

Title: __Director_____

Dated: _____

AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By: Environmental Liability Transfer, Inc.
Its: Manager

By:_____

Print Name:_Michael J. Roberts_____

Title:_Vice President_____

Dated:_____

ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name:_Michael J. Roberts_____

Title:_Vice President_____

[Signature Pages]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____          CHEMICAINVEST HOLDING, B.V.

By: _____

Name: _____

Title: _____

Dated: _9·22·23_          AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By: Environmental Liability Transfer, Inc.
Its: Manager

By: _____

Print Name: Michael J. Roberts

Title: Vice President

Dated: _9·22·23_          ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By: _____

Print Name: Michael J. Roberts

Title: Vice President

[Signature Pages]

Dated: 9/3/2023 _____

FIBRANT, LLC, on behalf of itself and Fibrant

By: _____

Name: Klaus Gerber _____

Title: Liquidating Agent on Behalf of Fibrant, LLC _____


Dated: 9/3/2023 _____

FIBRANT SOUTH CENTER, LLC, on behalf of itself and South Center

By: _____

Name: Klaus Gerber _____

Title: Liquidating Agent on Behalf of Fibrant South Center, LLC _____

Dated: 9/3/2023 _____

GEORGIA MONOMERS COMPANY, LLC, on behalf of itself and Georgia Monomers

By: _____

Name: Klaus Gerber _____

Title: Liquidating Agent on Behalf of Georgia Monomers Company, LLC

Dated: 9/3/2023 _____

EVERGREEN NYLON RECYCLING, LLC, on behalf of itself and Evergreen

By: _____

Name: Klaus Gerber _____

Title: Liquidating Agent on Behalf of Evergreen Nylon Recycling, LLC

[Signature Pages]

Dated: _29/9/2023_____

DEFENDANT INSURERS
REPRESENTED BY FORAN GLENNON[1]

By: _____

Name: _Helen A. Franzese_____

Title: _Partner_____

Dated: _____

LLOYD'S UNDERWRITERS AND
LONDON MARKET COMPANIES
ADMINISTERED BY RESOLUTE[2]

By: _____

Name: _____

Title: _____

---

[1] The Dominion Insurance Company Ltd., Catalina Worthing Insurance Ltd. f/k/a HFPI (as Part VII transferee of Excess Ins. Co. Ltd. and/or London & Edinburgh Ins. Co. Ltd. (as successor to London & Edinburgh General Ins. Co. Ltd.), River Thames Ins. Co. Ltd., Helvetia Swiss Insurance Company (fka Alba General Insurance Company Limited), British Reserve insurance Company Limited (formerly Allianz Suisse Insurance Company (fka Helvetia-Accident Swiss Insurance Company)), Cavello Bay Reinsurance Limited as successor to the interests of Harper Insurance Limited (formerly known as Turegum Insurance Company), National Casualty Company, National Casualty Company of America Ltd., Argonaut Northwest Ins. Co., Delta-Lloyd Non-Life Ins. Co. Ltd., and Assicurazioni Generali SPA (UK Branch).

[2] Lloyd's Underwriters, NRG Victory Reinsurance Limited (as successor to New London Reinsurance Company Limited), Tenecom Limited (as successor to Accident & Casualty Company of Winterthur), The Ocean Marine Insurance Company Limited (as successor to Edinburgh Assurance Company and World Auxiliary Insurance Corporation Limited), The Scottish Lion Insurance Company Limited.

[Signature Pages]

Dated: _____

DEFENDANT INSURERS
REPRESENTED BY FORAN GLENNON[1]

By: _____

Name: _____

Title: _____

Dated: _____

LLOYD'S UNDERWRITERS AND
LONDON MARKET COMPANIES
ADMINISTERED BY RESOLUTE[2]

By: _____

Name: _Thomas N. Ryan_

Title: _Authorized Representative_

---

[1] The Dominion Insurance Company Ltd., Catalina Worthing Insurance Ltd. f/k/a HFPI (as Part VII transferee of Excess Ins. Co. Ltd. and/or London & Edinburgh Ins. Co. Ltd. (as successor to London & Edinburgh General Ins. Co. Ltd.), River Thames Ins. Co. Ltd., Helvetia Swiss Insurance Company (fka Alba General Insurance Company Limited), British Reserve insurance Company Limited (formerly Allianz Suisse Insurance Company (fka Helvetia-Accident Swiss Insurance Company)), Cavello Bay Reinsurance Limited as successor to the interests of Harper Insurance Limited (formerly known as Turegum Insurance Company), National Casualty Company, National Casualty Company of America Ltd., Argonaut Northwest Ins. Co., Delta-Lloyd Non-Life Ins. Co. Ltd., and Assicurazioni Generali SPA (UK Branch).

[2] Lloyd's Underwriters, NRG Victory Reinsurance Limited (as successor to New London Reinsurance Company Limited), Tenecom Limited (as successor to Accident & Casualty Company of Winterthur), The Ocean Marine Insurance Company Limited (as successor to Edinburgh Assurance Company and World Auxiliary Insurance Corporation Limited), The Scottish Lion Insurance Company Limited.

[Signature Pages]

Dated: _____

BERKSHIRE HATHAWAY SPECIALTY
INSURANCE COMPANY

By: _____

Name: _____

Title: _____


Dated: _____

STARR INDEMNITY AND LIABILITY
COMPANY

By: _____

Name: _____

Title: _____


Dated: _____

CONTINENTAL CASUALTY
COMPANY, COLUMBIA CASUALTY
COMPANY, AND THE CONTINENTAL
INSURANCE COMPANY

By: _____

Name: _____

Title: _____


[Signature Pages]

**Exhibit A**
**Known Policies**

| Policy Number | Policy Start Date | Policy End Date |
|---|---|---|
| 64-10754-2 | 2/13/1964 | 2/13/1965 |
| 64-10754-3 | 2/13/1964 | 2/13/1965 |
| 65-10754-2 | 2/13/1965 | 2/13/1968 |
| 65-10754-3 | 2/13/1965 | 2/13/1968 |
| 68-10754-2 | 2/13/1968 | 2/13/1971 |
| 68-10754-3 | 2/13/1968 | 2/13/1971 |
| 71-10754-5 | 2/13/1971 | 11/12/1973 |
| 71-10754-4 | 2/13/1971 | 11/12/1973 |
| 64/10754/2 | 2/13/1964 | 2/13/1965 |
| 64/10754/3 | 2/13/1964 | 2/13/1965 |
| 65/10754/2 | 2/13/1965 | 2/13/1968 |
| 65/10754/3 | 2/13/1965 | 2/13/1968 |
| 68/10754/2 | 2/13/1968 | 2/13/1971 |
| 68/10754/3 | 2/13/1968 | 2/13/1971 |
| 71/10754/5 | 2/13/1971 | 11/12/1973 |
| 71/10754/4 | 2/13/1971 | 11/12/1973 |
| 9682195 | 1/1/1973 | 1/1/1974 |
| 9883159 | 1/1/1974 | 2/1/1975 |
| 33000534 | 2/1/1975 | 2/1/1976 |
| CDU 1583 | 4/1/1978 | 4/1/1979 |
| CDU 2583 | 4/1/1979 | 4/1/1980 |
| CDU 6578 | 6/15/1981 | 4/1/1982 |
| 122409 | 4/1/1976 | 10/1/1978 |
| RDX4169991 | 4/1/1980 | 4/1/1981 |

**Exhibit B**
**List of All Known London Market Insurer Subscribers that Are Settling Entities**

| |
|---|
| Lloyd's Underwriters |
| Helvetia Swiss Insurance Company (fka Alba General Insurance Company Limited) |
| Argonaut Northwest Insurance Company per HSW |
| Delta-Lloyd Non Life per HSW |
| Dominion Insurance Company Ltd. |
| Catalina Worthing Insurance Ltd. f/k/a HFPI (as Part VII Transferee of (Excess Insurance Company Ltd. and/or London & Edinburgh Insurance Company Ltd. as successor to London & Edinburgh General Insurance Company Ltd.)) |
| Generali |
| Cavello Bay Reinsurance Limited as successor to the interests of Harper Insurance Limited (formerly known as Turegum Insurance Company) |
| British Reserve insurance Company Limited (formerly Allianz Suisse Insurance Company (fka Helvetia-Accident Swiss Insurance Company)) |
| National Casualty Company |
| National Casualty Company of America Limited |
| NRG Victory Reinsurance Limited (as successor to New London Reinsurance Company Limited) |
| River Thames Insurance Company Ltd. |
| Tenecom Limited (as successor to Accident & Casualty Company of Winterthur) |
| The Ocean Marine Insurance Company Limited (as successor to Edinburgh Assurance Company and World Auxiliary Insurance Corporation Limited) |
| The Scottish Lion Insurance Company Limited |

[Exhibit C]

**Exhibit C**
**Participating London Market Insurers**
**and Their Several Settlement Shares**

| Settling Insurer | Allocated Share of Settlement Amount |
|---|---|
| Lloyd's Underwriters | $789,319 |
| Alba General Insurance Company / Helvetia Swiss Insurance Company Ltd. | $3,793.36 |
| Argonaut Northwest Insurance Company per HSW | $9,930.75 |
| Delta-Lloyd Non Life per HSW | $1,986.84 |
| Dominion Insurance Company Ltd. | $94,315.83 |
| Catalina Worthing Insurance Ltd. f/k/a HFPI (as Part VII Transferee of (Excess Insurance Company Ltd. and/or London & Edinburgh Insurance Company Ltd. as successor to London & Edinburgh General Insurance Company Ltd.)) | $51,334.06 |
| Generali | $5,797.44 |
| Harper Insurance Ltd. f/k/a Turegum Insurance Company | $10,729.64 |
| Helvetia Accident (per R.W. Gibbon) / Helvetia Swiss Insurance Company Ltd. | $5,052.24 |
| National Casualty Company | $4,965.39 |
| National Casualty Company of America Limited | $2,979.39 |
| NRG Victory Reinsurance Limited (as successor to New London Reinsurance Company Limited) | $11,909 |
| River Thames Insurance Company Ltd. | $9,115.06 |
| Tenecom Limited (as successor to Accident & Casualty Company of Winterthur) | $19,898 |
| The Ocean Marine Insurance Company Limited (as successor to Edinburgh Assurance Company and World Auxiliary Insurance Corporation Limited) | $28,131 |
| The Scottish Lion Insurance Company Limited | $744 |

[Exhibit C]

**Exhibit D**
**[Intentionally Omitted]**

[Exhibit D]

## SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE

THIS SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE ("Agreement") is entered into by and between ChemicaInvest Holding, B.V. ("CIH"); Augusta Liquidations LLC ("Augusta Liquidations"); Environmental Liability Transfer, Inc. ("ELT"); and Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc. and DSM Chemicals North America, LLC ("Fibrant"), Fibrant South Center, LLC ("South Center"), Evergreen Nylon Recycling, LLC ("Evergreen"), and Georgia Monomers Company, LLC ("Georgia Monomers"), by and through Klaus Gerber, as their duly appointed Liquidating Agent (the "Liquidating Agent"), and together with CIH, Augusta Liquidations, and ELT, "Plaintiffs," as further defined) on the one hand, and First State Insurance Company ("First State"), on the other hand. The Plaintiffs and First State are sometimes referred to herein collectively as the "Parties," and individually as "Party."

## RECITALS

**WHEREAS**, First State issued or allegedly issued certain liability insurance policies to Columbia Nitrogen Corporation, and Nipro, Inc., including without limitation the policies listed on Exhibit B hereto (as defined herein, the "First State Policies"); and

**WHEREAS**, Columbia Nipro Corporation is alleged to be an insured under the First State Policies;

**WHEREAS,** Columbia Nipro Corporation became known as Fibrant (as hereinafter defined) through a series of corporate name changes and one change of corporate form from a corporation to a limited liability company; and

**WHEREAS**, beginning in or about 1963, Fibrant constructed and operated a facility located on a parcel of real estate at 1408 Columbia Nitrogen Drive, Augusta, Georgia, at which

Fibrant manufactured caprolactam, ammonium sulfate, and other products (as hereinafter defined, the "Site"); and

WHEREAS, Fibrant's operations at the Site allegedly caused environmental contamination at and around the Site; and

WHEREAS, Fibrant has alleged that it is subject to potential environmental claims relating to historical operations at the Site, arising under certain environmental laws and regulations, including the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Georgia Hazardous Waste Management Act, O.C.G.A. § 12-8-60 et seq., and the Hazardous Waste Permit for the Site, (Permit No. HW-016 (ST&CA) and Facility I.D. No. GAD 051011609); and

WHEREAS, on February 3, 2018, Fibrant, together with Evergreen, South Center, and Georgia Monomers (collectively, "Debtors")[1], filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court"); and

WHEREAS, on May 29, 2019, an order was entered in the Bankruptcy Case confirming the Debtors' Second Amended and Restated Plan of Liquidation (the "Plan"); and

WHEREAS, pursuant to the Plan, (a) ownership of the Site was conveyed to Augusta Liquidations, and (b) the Debtors' rights to assert and pursue causes of action under the First State Policies were assigned in part to CIH and in part to Augusta Liquidations without First State's consent; and

WHEREAS, on or about June 12, 2019, Debtors, CIH and Augusta Liquidation commenced an adversary proceeding in the Bankruptcy Court (the "Insurance Action"), seeking a

---

[1] The original Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Fibrant, LLC (6694); Evergreen Nylon Recycling, LLC (7625); Fibrant South Center, LLC (8270); and Georgia Monomers Company, LLC (0042).  Pursuant to the Plan, as modified, Fibrant, LLC, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC were dissolved.

declaratory judgment that First State (together with other defendant insurers) are obligated to defend Debtors and CIH for claims arising from the Site, to reimburse past and future costs incurred to comply with the Debtors' obligations under RCRA Costs, and to indemnify and defend Augusta Liquidations against any damages, expenses, and settlement payments at the Site.

WHEREAS, First State disputes the allegations of the Insurance Action and denies that it has any obligation to provide coverage for the claims of Debtors, CIH and Augusta Liquidations; and

WHEREAS, certain Parties agreed to mediate their disputes before Timothy P. Gallagher, Esquire, of the Gallagher Law Group P.C., Los Angeles, CA; and

WHEREAS, the Parties now desire finally and completely to resolve, compromise, and settle all disputes between them, including without limitation (i) any and all Claims (as hereinafter defined) relating to the First State Policies, the Site, the Insurance Action, and other matters addressed herein, and (ii) any disputes arising out of or related to the Bankruptcy Case, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, and

WHEREAS, as part of this compromise and resolution, First State wishes to repurchase all of Plaintiffs' rights, title and interests, if any, in the First State Policies, free and clear of all Interests of any Person, except as expressly set forth in this Agreement;

WHEREAS, by and through this Agreement, Debtors, CIH and Augusta Liquidation seek to provide the Hartford Companies (as hereinafter defined) with the broadest possible release, as set forth herein, with respect to the First State Policies and to provide that the Hartford Companies shall have no further obligations to the Plaintiffs, Debtor's' creditors or any other Persons (including parties-in-interest), except as expressly set forth in this Agreement;

-3-

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.     <u>**DEFINITIONS**</u>

As used in this Agreement, the following terms have the following meanings:

1.1     "Approval Motion" means the motion to be filed seeking approval of the terms of this Agreement, including the sale of the First State Policies provided for herein, and entry of the Approval Order, as provided in Section 4.1 hereof.

1.2     "Approval Order" means an order entered by the Bankruptcy Court, upon a hearing following proper notice, containing all of the provisions set out in Section 4.1 hereof, but no provision that is contrary to or inconsistent with such provisions, which becomes a Final Order, and the wording of the Approval Order shall be reasonably acceptable to the Parties.

1.3     "Bankruptcy Case" means the bankruptcy case captioned *In re: Fibrant, LLC, et al.,* Case No. 18-10274-SDB, presently pending before the Bankruptcy Court, Judge Susan D. Barrett presiding.

1.4     "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

1.5     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Georgia.

1.6     "Bankruptcy Notice Parties" means the following

> (i)     all known creditors of Debtors;
>
> (ii)    the Office of the United States Trustee for the Southern District of Georgia;
>
> (iii)   all Persons that have filed a notice of appearance and/or demand for service of papers in the Bankruptcy Case;

(iv)    all Persons that have filed a notice of appearance and/or demand for service of papers in the Insurance Action;

(v)    all Persons identified on any and all service lists in the Bankruptcy Case;

(vi)    the Georgia Department of Natural Resources, Environmental Protection Division;

(vii)    the Attorney General of the State of Georgia;

(viii)    the United States Environmental Protection Agency;

(ix)    the Attorney General of the United States;

(x)    the United States Attorney for the Southern District of Georgia;

(xi)    the United States Internal Revenue Service;

(xii)    all known insurers of the Debtors;

(xiii)    all Persons with a known Interest in the Site, including those Persons that ever owned the Site, had a leasehold interest in the Site, or that hold a lien against the Site, regardless of the date thereof, and any known insurer of such property owner or lessee;

(xiv)    all known Persons owning real property adjoining the Site;

(xv)    all known Persons with an Interest in the First State Policies;

(xvi)    any other known Person asserting an Interest in the Bankruptcy Case and/or sought to be bound by the Approval Order; and

(xvii)    any other Person designated by the Bankruptcy Court as requiring notice.

1.7    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure

1.8    "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any

kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause of action of any sort, whether currently known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

1.9     "Contribution Claim" means any Claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a Claim of its insured in a situation where two or more policies issued by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

1.10    "Debtor Entities" means South Center and shall also encompass the rights and interests, if any, of the dissolved entities previously party to the Bankruptcy Case, including, Fibrant, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC.

1.11    "Direct Action Claim" means any Claim by any Person against a Hartford Company, which is identical or similar to, or relating to, the same or similar acts or omissions giving rise to a Claim against Plaintiffs, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action.

1.12    "Effective Date" means the last date on which each of the following conditions precedent have occurred: (a) each of the Parties has executed this Agreement and delivered its signature page to the other Parties; (b) the Approval Order is a Final Order; (c) the Plan Modification has been approved by Final Order of the Bankruptcy Court; and (d) this Agreement has not been terminated under Sections 4.7 or 8.10 hereof or otherwise.

1.13    "ELT" shall have the meaning assigned in Section 1.1.59 of the Plan.

1.14    "Environmental Claim" means any Claim of any kind, including for bodily injury, property damage, personal injury, advertising injury, economic loss, loss of use, environmental investigation or remediation costs, natural resource damages or toxic torts, that arises from Environmental Contamination.

1.15    "Environmental Contamination" means the actual, potential, or alleged presence of, exposure to, or injury or damage from any smoke, vapors, soot, fumes, acids, alkaloids, chemicals, liquids, gases, waste materials, irritants, contaminants or pollutants of any type, including, but not limited to: (a) any substance defined or designated as a "hazardous substance" pursuant to Sections 101(14) and 102(a) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601(14) and 9602(a); (b) any "pollutant or contaminant" under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1); (c) any substance defined as a "hazardous waste" in Section 6903(5) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, et seq.; (d) any chemical, substance or mixture found by the Administrator of the United States Environmental Protection Agency and/or any state agency to present an unreasonable risk of injury to health or the environment pursuant to Toxic Substances Control Act 15 U.S.C. § 2601, et seq.; (e) any substance listed in the United States Department of Transportation Table, 49 C.F.R. 172.101; and (f) any substance designated or considered to be a "hazardous substance," "hazardous material," "hazardous waste," "waste," "pollutant" or "contaminant" under any federal, state or local law, statute, rule, regulation or judicial decision that relates to, amends or is a successor to any of the foregoing statutes, rules, regulations or cases, or that defines any of the foregoing terms.

1.16    "Extra-Contractual Claim" means any Claim against an insurer, seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.

1.17    "Fibrant" means DSM Chemicals North America, LLC. and any of its predecessor entities including Columbia Nipro Corporation, Nipro, Inc., and DSM Chemicals North America, LLC.

1.18    "Final Order" means an order as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Parties and their counsel or, in the event that an appeal, writ of certiorari, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, petition for review, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order".

1.19    "First State" means First State Insurance Company.

1.20    "First State Policies" means all insurance policies, known or unknown, issued or allegedly issued by, or novated to or assumed by, any Hartford Company to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, Synres Chemical Corporation, Custom Chemical, Daniel Products, or Fibrant, LLC. "First State Policies" include, but are not limited to, the policies and alleged policies listed in Exhibit B attached.  For the avoidance of doubt, "First State Policies" do not include insurance policies issued after the Effective Date of the Plan or those currently effective policies maintained by environmental remediation contractors currently performing work at the Site—such as policies issued to Augusta Liquidations, remediation contractors, or subcontractors—if any.

1.21    "Hartford Companies" means First State, The Hartford Financial Services Group, Inc, and each of their  predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such)

1.22    "Insurance Action" means the adversary proceeding commenced in the Bankruptcy Court by Plaintiffs against First State and others, docketed at Adversary Proceeding 19-01016 (SDB).

1.23    "Insurance Coverage Claim" means any Claim seeking defense or indemnity or any other benefit, including any Contribution Claim or other similar Claim, under or relating to the First State Policies.

1.24    "Interests" means all liens, Claims, encumbrances, interests, defenses and other rights of any nature, whether at law or in equity, including all Environmental Claims, Contribution Claims, Direct Action Claims, Insurance Coverage Claims and Extra-Contractual Claims.

1.25    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or partnership joint venture, trust or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.26    "PCS Nitrogen" means PCS Nitrogen, Inc., together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).  PCS Nitrogen shall not include the Plaintiffs.

1.27    "Plaintiffs" means Fibrant, LLC, Evergreen, South Center, Georgia Monomers, CIH, and Augusta Liquidations, together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates (including ELT), divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.28    "Plan" means the Second Amended and Restated Plan of Liquidation for the Debtors, as confirmed in the Bankruptcy Case by Order dated May 29, 2019.

1.29    "RCRA Costs" means investigative, remedial, and other costs and expenses incurred pursuant to RCRA, GHWMA, the RCRA Permit, other applicable environmental laws, and regulations, related to soil and groundwater contamination at the Site.

1.30    "RCRA Permit" means Hazardous Waste Permit No. HW-016(ST&CA) issued to Fibrant, as the same may be amended from time to time.

-10-

1.31    "Site" means all property, buildings, soil, surface water, and groundwater at and beneath the premises on Columbia Nitrogen Drive in Augusta Georgia, which is or has been owned and/or occupied by Fibrant, LLC and its predecessors in interest, as defined in the report of Ramboll Environ prepared for Fibrant and dated May 16, 2017, including without limitation Solid Waste Management Areas (SWMAs) A through D, and the air above the Site, the ground and groundwater below the Site, and all air, soil, surface water, and groundwater in the vicinity of the Site allegedly impacted, now or in the future, by Environmental Contamination originating from the Site.

As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate; "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every".

## 2.    SALE/BUYBACK OF THE FIRST STATE POLICIES AND THE SETTLEMENT PAYMENT

2.1    **Settlement Payment**.  On or before forty-five (45) days following the Effective Date, First State will pay to CAP I BV the total sum of Four Hundred Thousand Dollars ($400,000) (hereinafter referred to as the "Settlement Payment").  The Settlement Payment will be made by check(s) to:

> CAP I BV
> Mauritslaan 49
> 6129 EL Urmond
> The Netherlands

and payment will be sent by second day overnight delivery to:

> LATHAM & WATKINS LLP
> 12670 High Bluff Drive
> San Diego, CA 92130
> c/o Steven Lesan

    2.2    **Sale/Buyback of the First State Policies.**  Upon receipt of the Settlement Payment and in consideration thereof, and without any further action of the Parties, the Liquidating Agent, on behalf of the Debtors, shall sell, convey, transfer, assign and deliver any and all of Debtors' Interest in the First State Policies, including any and all rights assigned to the Debtor Entities pursuant to Section 3.8 of this Agreement encompassing the rights of any other Plaintiff claiming an interest in the First State Policies, to the Hartford Companies, free and clear of any and all Interests of any other Persons, in full and final settlement of all of Plaintiffs' Interests relating to the First State Policies.  Subject to the terms of this Agreement and the entry of the Approval Order, (i) the Settlement Payment is the total amount that First State is obligated to pay on account of any and all Interests of any kind relating to the First State Policies; (ii) the Settlement Payment represents the full purchase price of the First State Policies, and, upon its payment, the Hartford Companies shall own the First State Policies free and clear of all Interests of any Person; and (iii) the Settlement Payment is reasonable and fair consideration for the buyback of the First State Policies.

    2.3    **Payment is Final**.  The Settlement Payment will be final and irrevocable, and will not be subject to any claims for set-off, contribution, or charge-backs, except as set forth in Section 2.4 (including, without limitation, any claims for additional premiums, retrospective premiums, self-insured retentions, deductibles or recoupment of prior payments to any insured under the First State Policies).

    2.4    **Allocation of the Settlement Payment**.  First State has complete discretion to allocate the Settlement Payment to any of the First State Policies as they see fit.  Nothing in this Agreement shall preclude First State from pursuing reinsurance recoveries for the Settlement Payment from their reinsurers.

3.  **RELEASE**

3.1    **Release of the Hartford Companies and Termination of the First State Policies.**

Effective upon receipt by Latham and Watkins of the Settlement Payment, and in consideration

thereof, Plaintiffs waive, release, and forever discharge the Hartford Companies  from any and all

past, present, and future Claims, liabilities, duties to defend or indemnify, causes of action, demands,

rights, damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive

or exemplary damages that were or could have been alleged), or any other obligations, benefits or

proceeds under or relating to the First State Policies of every kind, nature and description whatsoever,

whether arising in law or in equity.  As to Plaintiffs, the First State Policies will have no further force

or effect whatsoever.   Plaintiffs' releases include, without limitation, (a) any liability for past,

present, or future Environmental Claims, known and unknown, arising out of the Site; (b) any

liability arising under or relating to the RCRA Permit; (c) any Direct Action Claims; (d) any

Contribution Claims; (e) any Extra-Contractual Claims, and (f) any Claims that were asserted or

could have been asserted in the Insurance Action.

3.2    **Limitations on Scope of Release.**  Notwithstanding any other provision of this

Agreement, Plaintiffs do not release any Claims held by any entity that does not fall within the

definition of "Plaintiffs" set forth above, including but not limited to PCS Nitrogen.  Plaintiffs also

do not release any claim under insurance policies issued after the Effective Date of the Plan.  For

the avoidance of doubt, it is not the Parties' intent to release any obligations in connection with

currently effective policies maintained by entities currently performing work at the Site.

3.3    **Release In All Capacities.**  The releases provided in Paragraphs 3.1 above are

provided by Plaintiffs regardless of their capacity as an alleged insured, additional insured,

successor to an insured, assignor, assignee, subrogor, subrogee, indemnitor, indemnitee, creditor,

or judgment creditor of Fibrant, or of any other Person.

3.4    **Warranty Regarding Known Claims.**  Plaintiffs represent and warrant that as of the date it has executed this Agreement and delivered its signature page to the other Parties, Plaintiffs are not "on notice" of any Claims arising from the operations of Fibrant for which Plaintiffs are alleged to be liable other than the Environmental Claims relating to the Site.  For purposes of this Agreement, "on notice" means that the Plaintiffs have received notification from any source of the assertion or filing of a Claim.

3.5    **Changes In Fact Or Law.**  The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the First State Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims released in this Agreement. Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

3.6    **Assignment of Interests in the First State Policies by Augusta Liquidations to the Debtor Entities.**  Only for the limited purpose of facilitating the releases contemplated in this Agreement, the Parties agree and acknowledge that Augusta Liquidations shall assign its Interests in the First State Policies, along with the interests of ELT and CIH, if any, to the Debtor Entities.

3.7    **No Other Assignment.**  Other than the assignment of Debtors' rights to assert and pursue causes of action under the First State Policies in part to CIH and in part to Augusta Liquidations pursuant to the Plan, and other than any re-assignment expressly provided for in this Agreement, Plaintiffs warrant and represent that they have not assigned and will not assign or transfer, in whole or in part, to any Person any of their rights under the First State Policies with respect to Claims released under this Agreement, *provided, however,* that Debtors' warranty is

-14-

limited to the warranty that, subsequent to the assignment provided in Section 3.7 of this Agreement, Debtors own any and all such rights assigned to Debtors by CIH, ELT and/or Augusta Liquidations, with no further warranty expressed or implied as to the scope of those rights. Moreover, Plaintiffs represent, warrant, and agree that, except as provided for in this Agreement, they will not in any way assist any Person in the establishment of any Claim against the Hartford Companies relating to any Claim released under this Agreement.

## 4.   **FIBRANT'S BANKRUPTCY-RELATED OBLIGATIONS**

4.1    Within fourteen (14) Business Days after the date on which this Agreement has been executed by all Parties, the Liquidating Agent shall file the appropriate motion or motions seeking approval of the terms of this Agreement, including the sale of the First State Policies and a modification of the Plan as provided for herein, and entry of the Approval Order together with appropriate findings of fact and conclusions of law, in the form attached as **Exhibit A** hereto.  The Approval Order shall:

(a)    Approve this Agreement in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 105(a), and Bankruptcy Rules 6004 and 9019;

(b)    Find this Agreement was negotiated in good faith, the product of arms-length bargaining, free from fraud or collusion, is reasonable, fair and equitable, and in the best interest of the estate and its creditors after consideration of (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the likely difficulties in collection; (c) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of creditors;

(c)    Authorize the Parties to undertake the settlement, perform the obligations and the transactions contemplated by this Agreement;

(d)     Authorize the sale of Plaintiffs' Interests in the First State Policies to the Hartford Companies. free and clear of any and all Interests of any Person, with all Interests in and to, and Claims against, Plaintiffs' Interests in the First State Policies being fully extinguished without reservation as to the First State;

(e)      Provide that First State is a good faith purchaser of the First State Policies for value and, as such, the Hartford Companies are entitled to all protections provided to a good faith purchaser under Bankruptcy Code § 363(m);

(f)     Provide that the consummation of this Agreement releases the Hartford Companies from liability to Plaintiffs under the First State Policies and/or applicable law;

(g)     Provide that the sale of the First State Policies outside the ordinary course of business, free and clear of the Interests of all Persons, satisfies the requirements respectively of § 363(b) and § 363(f);

(h)     Provide that the Releases in Section 3, Indemnity in Section 6 and Most Favored Nations Agreement in 8.2 satisfies the Bankruptcy Code and applicable non-Bankruptcy law;

(i)     Enter an injunction pursuant to 11 U.S.C. §§ 105(a) 1123, 1127, and 1129 providing that any person (other than the United States of America and the State of Georgia and PCS Nitrogen) who now holds or who may in the future hold any Claims or Interests of any kind or nature against the Plaintiffs or the First State Policies is hereby forever barred, prohibited, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any released Claims or such Interests against any of the Hartford Companies, or the First State Policies;

(j)     Approve a modification of the Plan, pursuant to 11 U.S.C. § 1127, in form and substance reasonably acceptable to the Hartford Companies and CIH, providing that the

-16-

Hartford Companies shall be deemed "Settling Insurers" for purposes of the Plan, and that "Settling Insurers" shall be deemed to be treated as "Creditor Released Parties" and "Debtor Released Parties" for purposes of the release and injunction provisions of the Plan (as those terms are defined in the modified Plan); provided that no release shall be required from the United States of America, the State of Georgia, or PCS Nitrogen; and

(k)     Find that due and adequate notice of the (a) sale of the First State Policies; (b) terms and conditions of this Agreement; and, (c) hearing on the approval of this Agreement (including the sale provided for herein) was provided in accordance with Bankruptcy Rules 2002 and 6004 and published in accordance with Section 4.2 of this Agreement.

For avoidance of doubt, all fees, expenses and other costs incurred by or to be incurred by the Debtors' Liquidating Agent shall be funded through an advance retainer by CIH and the Debtors' Liquidating Agent shall have no obligations under this Agreement with respect to Sections 3.6, 4.1 through 4.4, 4.6 and 5.1 in the absence of such prior funding.

4.2     The Debtors shall serve notice of the Approval Motion and of the hearing thereon. Such notice shall be accomplished through electronic means or, at the Hartford Companies' election (which election shall be made by the Hartford Companies by the date on which this Agreement has been executed by all Parties) by mail on each of the Bankruptcy Notice Parties by United States mail, postage pre-paid.  If mail notification is elected, the mailing expense shall be borne equally by the Hartford Companies and any Other Settling Insurers (as defined in Section 4.3 of this Agreement) whose polices are also being sold that have elected notification through mail.

4.3     To ensure the broadest notice possible, South Center shall also publish notice of the sale of the First State Policies to the Hartford Companies pursuant to §§ 363(b), (f) and (m) and Bankruptcy Rules 6004 and 9019 and of the hearing seeking the Approval Order in the national edition of the *USA Today*, and twice in the *Atlanta Journal-Constitution* and *The Augusta Chronicle*, within a period of seven (7) days.  Publication of the notice of the sale of the First State Policies shall be shared equally among the Parties and any other insurers seeking publication for purposes of entry of an Approval Order ("Other Settling Insurers"), and in a form and substance acceptable to the Hartford Companies; *provided however*, if any such advertisement notices the sale of policies of Other Settling Insurers, the notice shall be in a form and substance acceptable to both the Hartford Companies and those Other Settling Insurers.

4.4     If the Approval Order is appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), then subject to the Parties' termination rights set forth below, the Parties shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; *provided, however*, that nothing herein shall preclude the Parties from mutually consummating the transactions contemplated herein if the Approval Order shall have been entered and is not stayed.

4.5     The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, either the Approval Order or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be materially inconsistent with the terms hereof.

4.6     Plaintiffs shall cooperate with First State and their representatives in connection with efforts to obtain entry of the Approval Order and the bankruptcy proceedings directly related

to entry of the Approval Order. Plaintiffs shall not submit to the Bankruptcy Court for approval any motion, plan of reorganization, adversary proceeding, filing or other request the approval of which would conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of the Hartford Companies hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

4.7    First State shall have no obligation to remit the Settlement Payment until the Approval Order is entered and the Effective Date occurs. If (i) the Approval Order is vacated or modified, or otherwise entered in a form that is not reasonably acceptable to the Hartford Companies, or (ii) the Approval Order is reversed on appeal, then First State may terminate this Agreement by delivering written notice to the Plaintiffs within ten (10) business days of such event. In the event this Agreement is terminated, (i) the Agreement shall be void; (ii) First State shall not be obligated to pay the Settlement Payment; and (iii) the Parties shall have all of the rights, defenses and obligations under or with respect to the First State Policies that they would have had absent this Agreement.

## 5.    **DISMISSAL**

5.1    **Dismissal of First State From the Insurance Action.**  Within ten (10) business days after receipt of the Settlement Payment, the Parties will file a stipulation in the Insurance Action dismissing, with prejudice and without costs to either party, all Claims and causes of action asserted in that action by Plaintiffs against First State. Plaintiffs and First State agree to cooperate and, if necessary, to take any further action consistent with this Agreement to effect the dismissal with prejudice of First State from the Insurance Action.

6.    **INDEMNIFICATION**

6.1    **Defense and Indemnification.**  CIH, or an affiliated entity established to maintain the following obligation, will defend and indemnify the Hartford Companies for claims against them by any Person relating to RCRA Costs, including but not limited to, the following: (i) Claims by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under any of the First State Policies, (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of Fibrant, and (iii) Claims directly against the Hartford Companies by any other Person who does not qualify as an insured under any of the First State Policies, including, but not limited to, Direct Action Claims or third-party beneficiary Claims.

6.2    **Limitations on Plaintiffs' Indemnification Obligations.**

(a)    The indemnification and defense obligations enumerated in Section 6.1 do not extend to claims brought by (i) a party to the Insurance Action (or affiliated entity) or (ii) PCS Nitrogen.

(b)    The indemnification and defense obligations enumerated in Section 6.1 will incept upon the receipt of the Settlement Payment and will be capped at the amount of the Settlement Payment, less creditor recovery (i.e., the portion of the Settlement Payment paid to creditors and/or a trust established for the benefit of creditors under the Plan).  Upon exhaustion of the amounts set forth in this Section 6.2(b) by payment of defense or indemnity to the Hartford Companies, any obligations under this Section 6 shall immediately terminate and the Hartford Companies shall pay for their own defense and indemnity.

(c)    Any obligation on the part of Plaintiffs to pay for the Hartford Companies' defense and indemnity under this Agreement shall immediately terminate upon the close of the Bankruptcy Case.

-20-

6.3   **Defense of the Hartford Companies**.  The defense of the Hartford Insurers for an indemnified Claim under Section 6.1 will proceed as follows:

(a)   Plaintiffs, through their own counsel, will use reasonable efforts to obtain a dismissal of the Hartford Companies and the substitution of an appropriate Plaintiff entity on the basis that the Hartford Companies' obligations with respect thereto were finally resolved by a reasonable, good faith settlement and that Plaintiffs also agreed to accept a judgment reduction with respect to any obligation of the Hartford Companies as set forth in Paragraphs 7.1 and 7.2 below.

(b)   Should the claimant refuse to dismiss the Hartford Companies, the Hartford Companies will have the right to select defense counsel, subject to Plaintiffs' consent, which consent shall not be unreasonably withheld, to defend the Hartford Companies at Plaintiffs' expense ("Retained Counsel").  Any such Retained Counsel will be chosen from among insurance coverage counsel used by the Hartford Companies, at rates not to exceed those routinely paid by the Hartford Companies for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

(c)   The Hartford Companies will have the right to control all positions taken on their behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the First State Policies.

7.   **JUDGMENT REDUCTION**

7.1   In connection with any Claim related to a Claim released under this Agreement brought by one or more of the Plaintiffs against any Person other than the Hartford Companies, which results in an adjudication on the merits, whether in court or another tribunal with jurisdiction, or in a binding arbitration award, that such other Person is liable to one or more of the Plaintiffs, and that such judgment or binding arbitration award includes sums which are allocable

-21-

to the Hartford Companies under any First State Policies, Plaintiff(s) will agree to reduce the judgment or binding arbitration award against such other Person or take other steps as necessary in order to avoid such liability being imposed on the Hartford Companies. Such a reduction in one or more of the Plaintiffs' judgment or binding arbitration award will be accomplished by subtracting from the judgment or binding arbitration award against any such Person the share of the judgment or binding arbitration award, if any, which is applicable to the Hartford Companies.

7.2     To ensure that such a reduction is accomplished and the Hartford Companies are protected, the applicable Plaintiff who brought any such Claim described in Section 7.1 and the Hartford Companies shall move the court or appropriate tribunal for a finding this Agreement was made in good faith and the appropriate form of relief is a contribution bar in favor of the Hartford Companies. In the event a court or other tribunal will not make such findings or grant the appropriate relief, the Hartford Companies will also be entitled to assert this paragraph as a defense in any Claim against them for any such portion of the judgment or binding arbitration award, and will be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Hartford Companies from liability for the judgment or binding arbitration award solely to the extent such judgment or award relates to Claims released under this Agreement.

7.3     In the event any Plaintiff settles any Claim related to or arising out of a Claim released under this Agreement with any Person other than the Hartford Companies without the Hartford Companies' consent, the settling Plaintiff agrees that it will not seek from the Hartford Companies any sums allocated to the Hartford Companies by such settlement. Each Plaintiff further agrees that it will use reasonable efforts to obtain a release in favor of the Hartford

Companies from any Person with which they settle any Claims relating to or arising out of Claims released under this Agreement.

## 8.     ADDITIONAL PROVISIONS

8.1     **Restrictions On Disclosure Of Agreement.**  It is a material inducement for the Parties to enter into this compromise and settlement of their disputes and differences that the terms and provisions of this Agreement, shall be, and remain, strictly confidential, until the Agreement is filed in the Bankruptcy Case for purposes of obtaining the Approval Order.  Prior to such public filing, neither this Agreement, nor any of its terms, may be disclosed to any Person, except that this Agreement and its terms may be disclosed; (a) as required by law or court order; (b) to any reinsurer, reinsurance intermediary, or retrocessionaire of the Parties, if any, in connection with insurance or reinsurance obligations or to any reinsurance arbitrator(s); (c) to the officers, directors, employees, representatives, counsel, accountants, agents and auditors of any of the Parties; (d) in any action or proceeding between the Parties where the existence or terms of the Agreement are at issue; or (e) by written agreement of the Parties.  If this Agreement or its terms are disclosed pursuant to subparagraphs (a) or (d) above, the party disclosing such information shall give prior written notice thereof to each of the other Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (b), (c), or (e) above, the party disclosing such information shall advise the recipient of the provisions of this paragraph.

8.2     **"Most Favored Nation" Agreement.**  If one or more of the Plaintiffs enter into a settlement with another insurer to resolve a Plaintiff's Claims against such other insurer in the Insurance Action, and such settlement provides for broader releases or indemnification provisions than those agreed to herein, including within the context of the Bankruptcy Case, the release and indemnification provisions of the settlement between the Parties shall be modified automatically to provide the same scope of release (including the parties released, the relationship to the issuing

-23-

insurer, and the breadth of the release) and scope of indemnification as provided in such other agreement between Plaintiffs and the other insurer, for no additional consideration.  Plaintiffs, except for the Debtors or their Liquidating Agent and his professionals, shall provide the Hartford Companies with information concerning other settlement agreements that implicate this provision.

8.3    **Amendments.**  Subject to the provisions of Section 8.2 hereof, neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties.

8.4    **No Precedential Value.**  This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies. This Agreement shall not be construed as an admission of coverage under the First State Policies for any claim, or an admission concerning any issue of law or fact.  This Agreement is without prejudice to any positions taken by the Hartford Companies with regard to other policies, other claims, and other insureds.  It shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of the Parties under any insurance policies issued to Plaintiffs, Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, Synres Chemical Corporation, Custom Chemical and Daniel Products, or Fibrant, LLC. or to any other Person.

8.5    **Agreement Voluntarily Entered Into By Each Of The Parties.**  This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them.  The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

8.6   **Interpretation.**  This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties.  Accordingly, none of the Parties shall be presumptively entitled to have any provisions of the Agreement construed against any of the other Parties in accordance with any rule of law, legal decision or doctrine.

8.7   **No Admission.**  This Agreement is the result of a compromise of disputed issues. This Agreement does not constitute and may not be construed as an admission of any liability, fact, course of performance, or wrongdoing by any Party.  This Agreement is not, and cannot be construed as, any admission by any Party that any defense, indemnity, contribution, or other obligation exists under the First State Policies for the Claims released herein.

8.8   **Entire And Integrated Agreement.**  This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters and there are no promises, representations warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

8.9   **No Third-Party Beneficiaries.**  Nothing in this Agreement is intended or shall be construed to give any Person, other than the Hartford Companies and Plaintiffs and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the Hartford

Companies and Plaintiffs, as well as each of their respective successors and permitted assigns, and for the benefit of no other Person.

 8.10 **Severability.** If any provisions of this Agreement or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, and application of such provisions to other circumstances, shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.

 8.11 **Notice.** Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid or by overnight mail or by electronic mail, addressed as follows or as the Parties subsequently may direct in writing:

   As to First State:

    Andrew Hryn
    AVP Complex Claims Unit
    The Hartford
    One Hartford Plaza
    Hartford, Connecticut  06155
    Andrew.hryn@thehartford.com


   With a copy to:

    Wayne Karbal
    Karbal Cohen Economou Silk & Dunne
    200 S Michigan, Ste 2550
    Chicago, IL 60606
    wkarbal@karballaw.com

   As to Plaintiffs:

    Michel Govaert
    Mauritslaan 49
    6129 EL Urmond | The Netherlands
    Michel.Govaert@chemicainvest.com

With a copy to:

Brook Roberts
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
brook.roberts@lw.com

8.12 **Headings.** The section titles, captions, and headings contained in the Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

8.13 **Recitals.** The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted therein in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

8.14 **Additional Representations and Warranties.** CIH, Augusta Liquidations, ELT, the Liquidating Agent for the Debtors, and First State each represents and warrants that it is fully authorized to enter into this Agreement on its own behalf and on behalf of Plaintiffs and the Hartford Companies respectively, as those terms are defined herein. In addition, each of CIH, Augusta Liquidations, ELT, and First State represents and warrants that (i) it is duly organized and existing in good standing under the laws of the United States, (ii) it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or internal approval is necessary, and (iii) the making and performance of this Agreement will not violate any provision of the law or the Party's articles of incorporation, charter, or by-laws. In addition, each of the individuals signing this Agreement represents and warrants that they are authorized to execute this Agreement on behalf of the Party(ies) whom they represent.

8.15   **<u>Execution in Counterparts.</u>**   This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

[*remainder of page intentionally left blank*]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _9/26/2023_____

CHEMICAINVEST HOLDING, B.V.

By: _____

Name: __Michel Govaert_____

Title: ___Director_____

Dated: _____

AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By:  Environmental Liability Transfer, Inc.
Its:  Manager

By:_____

Print Name:_ Michael J. Roberts_____

Title:_ Vice President_____

Dated:_____

ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name:_ Michael J. Roberts_____

Title:_ Vice President_____

[Signature Page]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____

CHEMICAINVEST HOLDING, B.V.

By: _____

Name: _____

Title: _____

Dated: _9·22·23_____

AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By:  Environmental Liability Transfer, Inc.
Its:  Manager

By:_____

Print Name:_ Michael J. Roberts_____

Title:_ Vice President_____

Dated: _9·22·23_____

ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name:_ Michael J. Roberts_____

Title:_ Vice President_____

[Signature Page]

Dated: 9/3/2023 _____

FIBRANT, LLC, on behalf of itself and Fibrant

By: _____

Name: Klaus Gerber _____

Title: Liquidating Agent on Behalf of
Fibrant, LLC _____


Dated: 9/3/2023 _____

FIBRANT SOUTH CENTER, LLC, on behalf of itself and South Center

By: _____

Name: Klaus Gerber _____

Title: Liquidating Agent on Behalf of
Fibrant South Center, LLC _____


Dated: 9/3/2023 _____

GEORGIA MONOMERS COMPANY, LLC, on behalf of itself and Georgia Monomers

By: _____

Name: Klaus Gerber _____

Title: Liquidating Agent on Behalf of
Georgia Monomers Company, LLC


Dated: 9/3/2023 _____

EVERGREEN NYLON RECYCLING, LLC, on behalf of itself and Evergreen

By: _____

Name: Klaus Gerber _____

Title: Liquidating Agent on Behalf of
Evergreen Nylon Recycling, LLC


[Signature Page]

Dated: _9/26/23_

FIRST STATE

By: _____

Name: _Aaron Singer_

Title: _Assistant Vice President_

[Signature Page]

## EXHIBIT A
### [Intentionally Omitted]

## **EXHIBIT B**

The following insurance policies are included within the definition of First State Policies as set forth in Section I, 1.18 of the Agreement:

| Insurer | Policy Number | Policy Period |
|---|---|---|
| First State Insurance Company | 945396 | 04/01/1980 – 04/01/1981 |
| First State Insurance Company | 948534 | 04/01/1981 – 06/15/1981 |
| First State Insurance Company | 902403 | 05/01/1975 – 04/01/1977 |
| First State Insurance Company | 903060 | 04/01/1976 – 10/01/1978 (or job completion) |
| First State Insurance Company | GC 803797 | 08/01/1976 – 08/01/1979 |

## SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE

THIS SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE ("Agreement") is entered into by and between ChemicaInvest Holding, B.V. ("CIH"); Augusta Liquidations LLC ("Augusta Liquidations"); Environmental Liability Transfer, Inc. ("ELT"); and Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc. and DSM Chemicals North America, LLC ("Fibrant"), Evergreen Nylon Recycling, LLC, Fibrant South Center, LLC ("South Center"), and Georgia Monomers Company, LLC, by and through Klaus Gerber, as their duly appointed Liquidating Agent (the "Liquidating Agent"), on the one hand, and Employers Insurance of Wausau, A Mutual Company (previously identified as Liberty Mutual, "Wausau"), on the other hand.  The parties are sometimes referred to herein collectively as the "Parties," and individually as "Party."

## RECITALS

**WHEREAS**, Wausau issued or allegedly issued certain liability insurance policies to Columbia Nitrogen Corporation and Columbia Nipro Corporation, including without limitation the policies listed on **Exhibit B** hereto (as defined herein, the "Wausau Policies"); and

**WHEREAS**, Columbia Nipro Corporation became known as Fibrant (as hereinafter defined) through a series of corporate name changes and one change of corporate form from a corporation to a limited liability company; and

**WHEREAS**, beginning in or about 1963, Fibrant constructed and operated a facility located on a parcel of real estate at 1408 Columbia Nitrogen Drive, Augusta, Georgia, at which Fibrant manufactured caprolactam, ammonium sulfate, and other products (as hereinafter defined, the "Site"); and

1

**WHEREAS**, Fibrant's operations at the Site allegedly caused environmental contamination at and around the Site; and

**WHEREAS**, Fibrant has alleged that it is subject to potential environmental claims relating to historical operations at the Site, arising under certain environmental laws and regulations, including the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Georgia Hazardous Waste Management Act, O.C.G.A. § 12-8-60 et seq., and the Hazardous Waste Permit for the Site, (Permit No. HW-016 (ST&CA) and Facility I.D. No. GAD 051011609); and

**WHEREAS**, on February 3, 2018, Fibrant, together with Evergreen Nylon Recycling, LLC, South Center, and Georgia Monomers Company, LLC (collectively, "Debtors"), filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court"); and

**WHEREAS**, on May 29, 2019, an order was entered in the Bankruptcy Case confirming the Debtors' Second Amended and Restated Plan of Liquidation (the "Plan"); and

**WHEREAS**, pursuant to the Plan, (a) ownership of the Site was conveyed to Augusta Liquidations, and (b) the Debtors' rights to assert and pursue causes of action under the Wausau Policies were assigned in part to CIH and in part to Augusta Liquidations; and

**WHEREAS**, on or about June 12, 2019, Debtors, CIH and Augusta Liquidation commenced an adversary proceeding in the Bankruptcy Court (the "Insurance Action"), seeking a declaratory judgment that Wausau (together with other defendant insurers) are obligated to defend Debtors and CIH for claims arising from the Site, to reimburse past and future costs incurred to comply with the Debtors' obligations under RCRA Costs, and to indemnify and defend Augusta Liquidations against any damages, expenses, and settlement payments at the Site.

**WHEREAS**, Wausau disputes the allegations of the Insurance Action and denies that it has any obligation to provide coverage for the claims of Debtors, CIH and Augusta Liquidations; and

**WHEREAS**, certain Parties agreed to mediate their disputes before Timothy P. Gallagher, Esquire, of the Gallagher Law Group P.C., Los Angeles, CA; and

**WHEREAS**, the Parties now desire finally and completely to resolve, compromise, and settle all disputes between them, including without limitation (i) any and all Claims (as hereinafter defined) relating to the Site, the Insurance Action, and other matters addressed herein, and (ii) any disputes arising out of or related to the Bankruptcy Case, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, and

**WHEREAS**, as part of this compromise and resolution, Wausau wishes to repurchase all of Debtors' rights, title and interests in the Wausau Policies, free and clear of all Interests of any Person, except as expressly set forth in this Agreement;

**WHEREAS**, by and through this Agreement, Debtor seeks to provide the Wausau Insurers (as hereinafter defined) with the broadest possible release, as set forth herein, with respect to the Wausau Policies and to provide that the Wausau Insurers shall have no further obligations to the Plaintiffs, Debtor's creditors or other parties-in-interest, except as expressly set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1. **DEFINITIONS**

As used in this Agreement, the following terms have the following meanings:

3

1.1     "Approval Motion" means the motion to be filed seeking approval of the terms of
this Agreement, including the sale of the Wausau Policies provided for herein, and entry of the
Approval Order, as provided in Section 4.1 hereof.

1.2     "Approval Order" means an order entered by the Bankruptcy Court, upon a hearing
following proper notice, containing all of the provisions set out in Section 4.1 hereof, but no
provision that is contrary to or inconsistent with such provisions, which becomes a Final Order,
and the wording of the Approval Order shall be reasonably acceptable to the Wausau Insurers and
CIH.

1.3     "Bankruptcy Case" means the bankruptcy case captioned *In re: Fibrant, LLC, et
al.,* Case No. 18-10274-SDB, presently pending before the Bankruptcy Court, Judge Susan D.
Barrett presiding.

1.4     "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et
seq.*, as amended from time to time.

1.5     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern
District of Georgia.

1.6     "Bankruptcy Notice Parties" means the following

(i)     all known creditors of Debtors;

(ii)    the Office of the United States Trustee for the Southern District of
Georgia;

(iii)   all Persons that have filed a notice of appearance and/or demand for
service of papers in the Bankruptcy Case;

(iv)    all Persons that have filed a notice of appearance and/or demand for
service of papers in the Insurance Action;

(v)     all Persons identified on any and all service lists in the Bankruptcy
Case;

4

(vi)     the Georgia Department of Natural Resources, Environmental Protection Division;

(vii)    the Attorney General of the State of Georgia;

(viii)   the United States Environmental Protection Agency;

(ix)     the Attorney General of the United States;

(x)      the United States Attorney for the Southern District of Georgia;

(xi)     the United States Internal Revenue Service;

(xii)    all known insurers of the Debtors;

(xiii)   all Persons with a known Interest in the Site, including those Persons that ever owned the Site, had a leasehold interest in the Site, or that hold a lien against the Site, regardless of the date thereof, and any known insurer of such property owner or lessee;

(xiv)    all known Persons owning real property adjoining the Site;

(xv)     all known Persons with an Interest in the Wausau Policies;

(xvi)    any other known Person asserting an Interest in the Bankruptcy Case and/or sought to be bound by the Approval Order; and

(xvii)   any other Person designated by the Bankruptcy Court as requiring notice.

1.7      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure

1.8      "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause of action of any sort, whether currently known or unknown, fixed or contingent, matured or

unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

1.9    "Contribution Claim" means any Claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a Claim of its insured in a situation where two or more policies issued by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

1.10    "Debtor Entities" means South Center and shall also encompass the rights and interests, if any, of the dissolved entities previously party to the Bankruptcy Case, including, Fibrant, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC.

1.11    "Direct Action Claim" means any Claim by any Person against an insurer, which is identical or similar to, or relating to, the same or similar acts or omissions giving rise to a Claim against Plaintiffs, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action.

1.12    "Effective Date" means the last date on which each of the following conditions precedent have occurred: (a) each of the Parties has executed this Agreement and delivered its signature page to the other Parties; (b) the Approval Order is a Final Order; (c) the Plan Modification has been approved by Final Order of the Bankruptcy Court; and (d) this Agreement has not been terminated under Sections 4.7 or 8.10 hereof or otherwise.

1.13    "ELT" shall have the meaning assigned in Section 1.1.59 of the Plan.

1.14    "Environmental Claim" means any Claim of any kind, including for bodily injury, property damage, personal injury, advertising injury, economic loss, loss of use, environmental

6

investigation or remediation costs, natural resource damages or toxic torts, that arises from Environmental Contamination.

    1.15   "Environmental Contamination" means the actual, potential, or alleged presence of, exposure to, or injury or damage from any smoke, vapors, soot, fumes, acids, alkaloids, chemicals, liquids, gases, waste materials, irritants, contaminants or pollutants of any type, including, but not limited to: (a) any substance defined or designated as a "hazardous substance" pursuant to Sections 101(14) and 102(a) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601(14) and 9602(a); (b) any "pollutant or contaminant" under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1); (c) any substance defined as a "hazardous waste" in Section 6903(5) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, et seq.; (d) any chemical, substance or mixture found by the Administrator of the United States Environmental Protection Agency and/or any state agency to present an unreasonable risk of injury to health or the environment pursuant to Toxic Substances Control Act 15 U.S.C. § 2601, et seq.; (e) any substance listed in the United States Department of Transportation Table, 49 C.F.R. 172.101; and (f) any substance designated or considered to be a "hazardous substance," "hazardous material," "hazardous waste," "waste," "pollutant" or "contaminant" under any federal, state or local law, statute, rule, regulation or judicial decision that relates to, amends or is a successor to any of the foregoing statutes, rules, regulations or cases, or that defines any of the foregoing terms.

    1.16   "Extra-Contractual Claim" means any Claim against an insurer, seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct;

or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.

1.17    "Fibrant" means and includes Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., and DSM Chemicals North America, LLC.

1.18    "Final Order" means an order as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Parties and their counsel or, in the event that an appeal, writ of certiorari, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, petition for review, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order".

1.19    "Insurance Action" means the adversary proceeding commenced in the Bankruptcy Court by Plaintiffs against Wausau and others, docketed at Adversary Proceeding 19-01016 (SDB).

1.20    "Insurance Coverage Claim" means any Claim seeking defense or indemnity or any other benefit, including any Contribution Claim or other similar Claim, under or relating to the Wausau Policies.

8

1.21    "Interests" means all liens, Claims, encumbrances, interests, defenses and other rights of any nature, whether at law or in equity, including all Environmental Claims, Contribution Claims, Direct Action Claims, Insurance Coverage Claims and Extra-Contractual Claims.

1.22    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or partnership joint venture, trust or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.23    "PCS Nitrogen" means PCS Nitrogen, Inc., together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.24    "Plaintiffs" means Fibrant, LLC, Evergreen Nylon Recycling, LLC, South Center, Georgia Monomers Company, LLC, ChemicaInvest Holding, B.V., and Augusta Liquidations, LLC, together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates (including ELT), divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.25    "Plan" means the Second Amended and Restated Plan of Liquidation for the Debtors, as confirmed in the Bankruptcy Case by Order dated May 29, 2019.

1.26    "RCRA Costs" means investigative, remedial, and other costs and expenses incurred pursuant to RCRA, GHWMA, the RCRA Permit, other applicable environmental laws, and regulations, related to soil and groundwater contamination at the Site.

1.27    "RCRA Permit" means Hazardous Waste Permit No. HW-016(ST&CA) issued to Fibrant, as the same may be amended from time to time.

1.28    "Site" means all property, buildings, soil, surface water, and groundwater at and beneath the premises on Columbia Nitrogen Drive in Augusta Georgia, which is or has been owned and/or occupied by Fibrant, LLC and its predecessors in interest, as defined in the report of Ramboll Environ prepared for Fibrant and dated May 16, 2017, including without limitation Solid Waste Management Areas (SWMAs) A through D, and the air above the Site, the ground and groundwater below the Site, and all air, soil, surface water, and groundwater in the vicinity of the Site allegedly impacted by Environmental Contamination originating from the Site.

1.29    "Wausau" means Employers Insurance Company of Wausau f/k/a Employers Insurance of Wausau, A Mutual Company, and each of its respective predecessors, successors, subsidiaries and/or affiliated or related companies, corporations, parent companies, divisions, officers, directors, shareholders, stockholders, attorneys, sureties, reinsurers, agents, representatives, executors, administrators and assigns.  For purposes of this Agreement, the term Wausau includes Nationwide Indemnity Company, which, effective January 1, 1999, and pursuant to its de-affiliation agreement, assumed administrative responsibility for handling of the claims under the Wausau Policies.

1.30    "Wausau Companies" means the Wausau Insurers and all their affiliated companies and representatives.

1.31     "Wausau Insurers" means Wausau and all of its predecessors and successors.

10

1.32    "Wausau Policies" means all insurance policies, known or unknown, issued or allegedly issued by, or novated to or assumed by, any Wausau Insurer to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC. "Wausau Policies" include, but are not limited to, the policies and alleged policies listed in Schedule "B" attached.  For the avoidance of doubt, "Wausau Policies" do not include insurance policies issued after the Effective Date of the Plan or those currently effective policies maintained by entities currently performing work at the Augusta Site—such as policies issued to Augusta Liquidations, remediation contractors, or subcontractors—if any.

As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate; "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every".

## 2. SALE/BUYBACK OF THE WAUSAU POLICIES AND THE SETTLEMENT PAYMENT

2.1    **Settlement Payment**.  On or before forty-five (45) days following the Effective Date, one or more of the Wausau Insurers will pay to CAP I BV the total sum of Fifty Thousand Dollars ($50,000) (hereinafter referred to as the "Settlement Payment").  Payment of the Settlement Payment will be made by wire transfer or other immediately available funds to:

CAP I BV
Mauritslaan 49
6129 EL Urmond
The Netherlands

CITIBANK EUROPE PLC, NL BRANCH
IBAN Number: NL96CITI0266041485
Swift code/BIC: CITINL2X

2.2    **Sale/Buyback of the Wausau Policies.**  Upon receipt of the Settlement Payment and in consideration thereof, and without any further action of the Parties, the Liquidating Agent,

11

on behalf of the Debtors shall sell, convey, transfer, assign and deliver Debtors' interest in the
Wausau Policies, including any and all rights assigned pursuant to Section 3.7 of this Agreement,
to the Wausau Insurers, free and clear of any and all Interests of any other Persons, in full and final
settlement of all of Plaintiffs' Interests relating to the Wausau Policies.  Subject to the terms of
this Agreement and the entry of the Approval Order, (i) the Settlement Payment is the total amount
that the Wausau Insurers are obligated to pay on account of any and all Interests of any kind
relating to the Wausau Policies; (ii) the Settlement Payment represents the full purchase price of
the Wausau Policies, and, upon its payment, the Wausau Insurers shall own their respective
Wausau Policies free and clear of all Interests of any Person; and (iii) the Settlement Payment is
reasonable and fair consideration for the buyback of the Wausau Policies.

2.3    **Payment is Final**.  The Settlement Payment will be final and irrevocable, and will
not be subject to any claims for set-off, contribution, or charge-backs (including, without
limitation, any claims for additional premiums, retrospective premiums, self-insured retentions,
deductibles or recoupment of prior payments to any insured under the Wausau Policies).

2.4    **Allocation of the Settlement Payment**.  The Wausau Insurers have complete
discretion to allocate the Settlement Payment to any of the Wausau Policies as they see fit.  Nothing
in this Agreement shall preclude the Wausau Insurers from pursuing reinsurance recoveries for the
Settlement Payment from their reinsurers.

3.    **RELEASE**

3.1    **Release of the Wausau Insurers and Termination of the Wausau Policies.**
Effective upon receipt by Plaintiffs of the Settlement Payment, and in consideration thereof,
Plaintiffs waive, release, and forever discharge the Wausau Insurers from any and all past, present,
and future Claims, liabilities, duties to defend or indemnify, causes of action, demands, rights,
damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive or

12

exemplary damages that were or could have been alleged), or any other obligations under or relating to the Wausau Policies of every kind, nature and description whatsoever, whether arising in law or in equity. As to Plaintiffs, the Wausau Policies will have no further force or effect whatsoever. Plaintiffs' releases include, without limitation, (a) any liability for past, present, or future Environmental Claims, known and unknown, arising out of the Site; (b) any liability arising under or relating to the RCRA Permit; (c) any Direct Action Claims; (d) any Contribution Claims; (e) any Extra-Contractual Claims, and (f) any claims that were asserted or could have been asserted in the Insurance Action.

3.2     **Additional Release of the Wausau Companies.** In addition, Plaintiffs release the Wausau Companies under any other general liability insurance policy, or policy providing liability coverage for third-party property damage, bodily injury or personal injury, known or unknown, confirmed or unconfirmed, under which they can claim insurance coverage for liabilities relating to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC, or to the Site (including any adjoining properties).

3.3     **Limitations on Scope of Release**. Notwithstanding any other provision of this Agreement, Plaintiffs do not release any Claims held by any entity that does not fall within the definition of "Plaintiffs" set forth above, including but not limited to PCS Nitrogen. Plaintiffs also do not release any claim under insurance policies issued after the Effective Date of the Plan. For the avoidance of doubt, it is not the Parties' intent to release any obligations in connection with currently effective policies maintained by entities currently performing work at the Site.

3.4     **Release In All Capacities.** The releases provided in Paragraphs 3.1 and 3.2 above are provided by Plaintiffs in all of their actual or alleged capacities, including, without limitation,

as an alleged insured, additional insured, successor to an insured, assignor, assignee, subrogor, subrogee, indemnitor, indemnitee, creditor, or judgment creditor of Fibrant, or of any other Person.

3.5    **Warranty Regarding Known Claims.**  Plaintiffs represent and warrant that as of the date it has executed this Agreement and delivered its signature page to the other Parties, Plaintiffs are not "on notice" of any Claims arising from the operations of Fibrant for which Plaintiffs are alleged to be liable other than the Environmental Claims relating to the Site.  For purposes of this Agreement, "on notice" means that the Persons responsible for handling the insurance affairs of the Plaintiffs have received notification from any source of the assertion or filing of a Claim.

3.6    **Changes In Fact Or Law.**  The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Wausau Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims released in this Agreement. Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

3.7    **Assignment of Interests in the Wausau Policies by Augusta Liquidations to South Center.**  To facilitate the releases contemplated in this Agreement, the Parties agree and acknowledge that Augusta Liquidations shall assign its Interests in the Wausau Policies, along with the interests of ELT and CIH (if any), to the Debtor Entities.

3.8    **No Other Assignment.**  Other than the assignment of Debtors' rights to assert and pursue causes of action under the Wausau Policies in part to CIH and in part to Augusta Liquidations pursuant to the Plan, and other than any re-assignment expressly provided for in this

14

Agreement, Plaintiffs warrant and represent that they have not assigned and will not assign or transfer, in whole or in part, to any Person any of their rights under the Wausau Policies with respect to Claims released under this Agreement, *provided, however,* that the Debtors' warranty is limited to the warranty that, subsequent to the assignment provided in Section 3.7 of this Agreement, the Debtors own any and all such rights assigned to the Debtor Entities by CIH, ELT and/or Augusta Liquidations, with no further warranty expressed or implied as to the scope of those rights.  Moreover, Plaintiffs represent, warrant, and agree that, except as provided for in this Agreement, they will not in any way assist any Person in the establishment of any Claim against the Wausau Insurers relating to any Claim released under this Agreement.

## 4.   **FIBRANT'S BANKRUPTCY-RELATED OBLIGATIONS**

4.1   Within fourteen (14) Business Days after the date on which this Agreement has been executed by all Parties, the Liquidating Agent shall file the appropriate motion or motions seeking approval of the terms of this Agreement, including the sale of the Wausau Policies and a modification of the Plan as provided for herein, and entry of the Approval Order together with appropriate findings of fact and conclusions of law, in the form attached as **Exhibit A** hereto.  The Approval Order shall:

(a)   Approve this Agreement in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 105(a), and Bankruptcy Rules 6004 and 9019;

(b)   Find this Agreement was negotiated in good faith, the product of arms-length bargaining, free from fraud or collusion, is reasonable, fair and equitable, and in the best interest of the estate and its creditors after consideration of (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the likely difficulties in collection; (c) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of creditors;

15

(c)     Authorize the Parties to undertake the settlement, perform the obligations and the transactions contemplated by this Agreement;

(d)     Authorize the sale of Plaintiffs' Interests in the Wausau Policies to the Wausau Insurers free and clear of any and all Interests of any Person, with all Interests in and to, and Claims against, Plaintiffs' Interests in the Wausau Policies being fully extinguished without reservation as to the Wausau Insurers;

(e)     Provide that the Wausau Insurers are good faith purchasers of the Wausau Policies for value and, as such, are entitled to all protections provided to a good faith purchaser under Bankruptcy Code § 363(m);

(f)     Provide that the consummation of this Agreement releases the Wausau Companies from liability to Plaintiffs under the Wausau Policies and/or applicable law;

(g)     Provide that the sale of the Wausau Policies outside the ordinary course of business, free and clear of the Interests of all Persons, satisfies the requirements respectively of § 363(b) and § 363(f);

(h)     Enter an injunction pursuant to 11 U.S.C. §§ 105(a) 1123, 1127, and 1129 providing that any person (other than the United States of America and the State of Georgia and PCS Nitrogen) who now holds or who may in the future hold any Claims or Interests of any kind or nature against the Plaintiffs or the Wausau Policies is hereby forever barred, prohibited, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any released Claims or such Interests against any of the Wausau Insurers, or the Wausau Policies.

(i)     Approve a modification of the Plan, pursuant to 11 U.S.C. § 1127, in form and substance reasonably acceptable to the Wausau Insurers and CIH, providing that the Wausau Insurers shall be deemed "Settling Insurers" for purposes of the Plan, and that "Settling Insurers"

16

shall be deemed to be treated as "Creditor Released Parties" for purposes of the release and injunction provisions of the Plan (as those terms are defined in the modified Plan); provided that no release shall be required from the United States of America, the State of Georgia, or PCS Nitrogen.

(j)     Find that due and adequate notice of the (a) sale of the Wausau Policies; (b) terms and conditions of this Agreement; and, (c) hearing on the approval of this Agreement (including the sale provided for herein) was provided in accordance with Bankruptcy Rules 2002 and 6004 and published in accordance with Section 4.2 of this Agreement.


For avoidance of doubt, all fees, expenses and other costs incurred by or to be incurred by the Debtors' Liquidating Agent shall be funded through an advance retainer by CIH and the Debtors' Liquidating Agent shall have no obligations under this Agreement with respect to Sections 3.7, 4.1 through 4.4, 4.6 and 5.1 in the absence of such prior funding

4.2     The Debtors shall serve notice of the Approval Motion and of the hearing thereon. Such notice shall be accomplished through electronic means or, at the Wausau Insurers' election (which election shall be made by the Wausau Insurers by the date on which this Agreement has been executed by all Parties) by mail on each of the Bankruptcy Notice Parties by United States mail, postage pre-paid.  If mail notification is elected, the mailing expense shall be borne equally by the Chubb Insurers and any other Settling Insurers whose polices are also being sold that have elected notification through mail.

4.3     To ensure the broadest notice possible, South Center shall also publish notice of the sale of the Wausau Policies to the Wausau Insurers pursuant to §§ 363(b), (f) and (m) and Bankruptcy Rules 6004 and 9019 and of the hearing seeking the Approval Order in the national

edition of the *USA Today*, and twice in the *Atlanta Journal-Constitution* and *The Augusta Chronicle*, within a period of seven (7) days.  Publication of the notice of the sale of the Wausau Policies shall be at the expense of the Wausau Insurers, and in a form and substance acceptable to the Wausau Insurers; *provided however*, if any such advertisement notices the sale of policies other than the Wausau Policies issued by the Wausau Insurers, the expense of such publication shall be borne equally by the Wausau Insurers and the other Settling Insurers whose polices are also being sold, and the notice shall be in a form and substance acceptable to both the Wausau Insurers and those other Settling Insurers.

4.4     If the Approval Order is appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), then subject to the Parties' termination rights set forth below, the Parties shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; *provided, however*, that nothing herein shall preclude the Parties from mutually consummating the transactions contemplated herein if the Approval Order shall have been entered and is not stayed.

4.5     The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, either the Approval Order or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be materially inconsistent with the terms hereof.

4.6     Plaintiffs shall cooperate with the Wausau Insurers and their representatives in connection with efforts to obtain entry of the Approval Order and the bankruptcy proceedings directly related to entry of the Approval Order.  Plaintiffs shall not submit to the Bankruptcy Court for approval any motion, plan of reorganization, adversary proceeding, filing or other request the

18

approval of which would conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of the Wausau Insurers hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

4.7     The Wausau Insurers shall have no obligation to remit the Settlement Payment until the Approval Order is entered and the Effective Date occurs.  If (i) the Approval Order is vacated or modified, or otherwise entered in a form that is not reasonably acceptable to the Wausau Insurers, or (ii) the Approval Order is reversed on appeal, then the Wausau Insurers may terminate this Agreement by delivering written notice to the Plaintiffs within ten (10) business days of such event.  In the event this Agreement is terminated, (i) the Agreement shall be void; (ii) the Wausau Insurers shall not be obligated to pay the Settlement Payment; and (iii) the Parties shall have all of the rights, defenses and obligations under or with respect to the Wausau Policies that they would have had absent this Agreement.

**5.**     **DISMISSAL**

5.1     **Dismissal of Wausau From the Insurance Action.**  Within ten (10) business days after receipt of the Settlement Payment, the Parties will file a stipulation in the Insurance Action dismissing, with prejudice and without costs to either party, all Claims and causes of action asserted in that action by Plaintiffs against Wausau.  Plaintiffs and Wausau agree to cooperate and, if necessary, to take any further action consistent with this Agreement to effect the dismissal with prejudice of Wausau from the Insurance Action.

**6.**     **INDEMNIFICATION**

6.1     **Defense and Indemnification.**  CIH (or an affiliated entity established to maintain the following obligation) will defend and indemnify the Wausau Companies for claims against them by any Person relating to RCRA Costs, including but not limited to, the following: (i) Claims

by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under any of the Wausau Policies, (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of Fibrant, and (iii) Claims directly against the Wausau Insurers by any other Person who does not qualify as an insured under any of the Wausau Policies, including, but not limited to, Direct Action Claims or third-party beneficiary Claims.

      6.2     **Limitations on Plaintiffs' Indemnification Obligations**.

      (a)     The indemnification and defense obligations enumerated in Section 6.1 do not extend to claims brought by (i) a party to the Insurance Action (or affiliated entity) or (ii) PCS Nitrogen.

      (b)     The indemnification and defense obligations enumerated in Section 6.1 will incept upon the receipt of the Settlement Payment and will be capped at the amount of the Settlement Payment, less creditor recovery (i.e., the portion of the Settlement Payment paid to creditors and/or a trust established for the benefit of creditors under the Plan).  Upon exhaustion of the amounts set forth in this Section 6.2(b) by payment of defense or indemnity to the Wausau Companies, any obligations under this Section 6 shall immediately terminate and the Wausau Companies shall pay for their own defense and indemnity.

      (c)     Any obligation on the part of Plaintiffs to pay for the Wausau Companies' defense and indemnity under this Agreement shall immediately terminate upon the close of the Bankruptcy Case.

      6.3     **Defense of the Wausau Insurers**.  The defense of the Wausau Insurers for an indemnified Claim under Section 6.1 will proceed as follows:

(a)     Plaintiffs, through their own counsel, will use reasonable efforts to obtain a dismissal of the Wausau Insurers and the substitution of an appropriate Plaintiff entity on the basis that the Wausau Insurers' obligations with respect thereto were finally resolved by a reasonable, good faith settlement and that Plaintiffs also agreed to accept a judgment reduction with respect to any obligation of the Wausau Insurers as set forth in Paragraphs 7.1 and 7.2 below.

(b)     Should the claimant refuse to dismiss the Wausau Insurers, the Wausau Insurers will have the right to select defense counsel, subject to Plaintiffs' consent, which consent shall not be unreasonably withheld, to defend the Wausau Insurers at Plaintiffs' expense ("Retained Counsel").  Any such Retained Counsel will be chosen from among insurance coverage counsel used by the Wausau Insurers, at rates not to exceed those routinely paid by the Wausau Insurers for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

(c)     The Wausau Insurers will have the right to control all positions taken on their behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the Wausau Policies.

7.     **JUDGMENT REDUCTION**

7.1     In connection with any Claim related to a Claim released under this Agreement brought by Fibrant, CIH or Augusta Liquidations against any Person other than the Wausau Insurers, which results in an adjudication on the merits, whether in court or another tribunal with jurisdiction, or in a binding arbitration award, that such other Person is liable to Fibrant, CIH or Augusta Liquidations, and that such judgment or binding arbitration award includes sums which are allocable to the Wausau Insurers under any Wausau Policies, Fibrant, CIH and Augusta Liquidations will agree to reduce the judgment or binding arbitration award against such other Person or take other steps as necessary in order to avoid such liability being imposed on the

21

Wausau Insurers. Such a reduction in Fibrant's, CIH's or Augusta Liquidations' judgment or binding arbitration award will be accomplished by subtracting from the judgment or binding arbitration award against any such Person the share of the judgment or binding arbitration award, if any, which is applicable to the Wausau Insurers.

7.2    To ensure that such a reduction is accomplished and the Wausau Insurers are protected, the applicable Plaintiff who brought any such Claim described in Section 7.1 and the Wausau Insurers shall move the court or appropriate tribunal for a finding this Agreement was made in good faith and the appropriate form of relief is a contribution bar in favor of the Wausau Insurers. In the event a court or other tribunal will not make such findings or grant the appropriate relief, the Wausau Insurers will also be entitled to assert this paragraph as a defense in any Claim against them for any such portion of the judgment or binding arbitration award, and will be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the Wausau Insurers from liability for the judgment or binding arbitration award solely to the extent such judgment or award relates to Claims released under this Agreement.

7.3    In the event any Plaintiff settles any Claim related to or arising out of a Claim released under this Agreement with any Person other than the Wausau Insurers without the Wausau Insurers' consent, the settling Plaintiff agrees that it will not seek from the Wausau Insurers any sums allocated to the Wausau Insurers by such settlement. Each Plaintiff further agrees that it will use reasonable efforts to obtain a release in favor of the Wausau Insurers from any Person with which they settle any Claims relating to or arising out of Claims released under this Agreement.

## 8.    ADDITIONAL PROVISIONS

8.1    **Restrictions On Disclosure Of Agreement.** It is a material inducement for the Parties to enter into this compromise and settlement of their disputes and differences that the terms and provisions of this Agreement, shall be, and remain, strictly confidential, until the Agreement

is filed in the Bankruptcy Case for purposes of obtaining the Approval Order. Prior to such public filing, neither this Agreement, nor any of its terms, may be disclosed to any Person, except that this Agreement and its terms may be disclosed; (a) as required by law or court order; (b) to any reinsurer, reinsurance intermediary, or retrocessionaire of the Parties, if any, in connection with insurance or reinsurance obligations or to any reinsurance arbitrator(s); (c) to the officers, directors, employees, representatives, counsel, accountants, agents and auditors of any of the Parties; (d) in any action or proceeding between the Parties where the existence or terms of the Agreement are at issue; or (e) by written agreement of the Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (a) or (d) above, the party disclosing such information shall give prior written notice thereof to each of the other Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (b), (c), or (e) above, the party disclosing such information shall advise the recipient of the provisions of this paragraph.

8.2 **"Most Favored Nation" Agreement.** If Plaintiffs enter into a settlement with another insurer to resolve Plaintiffs' claims against such other insurer in the Insurance Action, and such settlement provides for broader releases or indemnification provisions than those agreed to herein, including within the context of the Bankruptcy Case, the release and indemnification provisions of the settlement between the Parties shall be modified automatically to provide the same scope of release (including the parties released, the relationship to the issuing insurer, and the breadth of the release) and scope of indemnification as provided in such other agreement between Plaintiffs and the other insurer, for no additional consideration. Plaintiffs, except for the Debtors or the Liquidating Agent or his professionals, shall provide the Wausau Insurers with information concerning other settlement agreements that implicate this provision.

8.3 **Amendments.** Subject to the provisions of Section 8.2 hereof, neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties.

8.4 **No Precedential Value.** This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies. It shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of the Parties under any insurance policies issued to Fibrant or to any other Person.

8.5 **Agreement Voluntarily Entered Into By Each Of The Parties.** This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them. The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

8.6 **Interpretation.** This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties. Accordingly, none of the Parties shall be presumptively entitled to have any provisions of the Agreement construed against any of the other Parties in accordance with any rule of law, legal decision or doctrine.

8.7 **No Admission.** This Agreement is the result of a compromise of disputed issues. This Agreement does not constitute and may not be construed as an admission of any liability, fact, course of performance, or wrongdoing by any Party. This Agreement is not, and cannot be

construed as, any admission by any Party that any defense, indemnity, contribution, or other obligation exists under the Wausau Policies for the Claims released herein.

8.8 **Entire And Integrated Agreement.** This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters and there are no promises, representations warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

8.9 **No Third-Party Beneficiaries.** Nothing in this Agreement is intended or shall be construed to give any Person, other than the Wausau Companies and Plaintiffs and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the Wausau Companies and Plaintiffs, as well as each of their respective successors and permitted assigns, and for the benefit of no other Person.

8.10 **Severability.** If any provisions of this Agreement or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, and application of such provisions to other circumstances, shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.

8.11 **Notice.** Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid or by

overnight mail or by electronic mail, addressed as follows or as the Parties subsequently may direct in writing:

As to the Wausau Insurers:

Anita Smith - Director Environmental Claim
Nationwide Indemnity - Agent for Employers Insurance of Wausau
500 N 3rd St, STE 302
PO BOX 8101
Wausau, WI 54403

As to Plaintiffs:

Michel Govaert
Mauritslaan 49
6129 EL Urmond | The Netherlands
Michel.Govaert@chemicainvest.com

With a copy to:

Brook Roberts
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
brook.roberts@lw.com

8.12    **Headings.**  The section titles, captions, and headings contained in the Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

8.13    **Recitals.**  The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted therein in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

8.14    **Additional Representations and Warranties.**  CIH, Augusta Liquidations, ELT, the Liquidating Agent for the Debtors, and Wausau each represents and warrants that it is fully authorized to enter into this Agreement on its own behalf and on behalf of Plaintiffs and the Wausau Insurers respectively, as those terms are defined herein.  In addition, each Party represents

and warrants that (i) it is duly organized and existing in good standing under the laws of the United States, (ii) it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or internal approval is necessary, and (iii) the making and performance of this Agreement will not violate any provision of the law or the Party's articles of incorporation, charter, or by-laws.  In addition, each of the individuals signing this Agreement represents and warrants that they are authorized to execute this Agreement on behalf of the Party(ies) whom they represent.

8.15   **Execution in Counterparts.**   This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

*[remainder of page intentionally left blank]*

28

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____9/14/2023_____

CHEMICAINVEST HOLDING, B.V.

By: _____

Name: __Michel Govaert__

Title: __Director__

Dated: _____

AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By: Environmental Liability Transfer, Inc.
Its: Manager

By:_____

Print Name:_Michael J. Roberts_

Title:_Vice President_

Dated:_____

ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name:_Michael J. Roberts_

Title:_Vice President_

[Signature Page]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____          CHEMICAINVEST HOLDING, B.V.

                                          By: _____

                                          Name: _____

                                          Title: _____

Dated: _9·22·23_____          AUGUSTA LIQUIDATIONS LLC
                                          a Missouri limited liability company
                                          By:  Environmental Liability Transfer, Inc.
                                          Its:  Manager

                                          By:_____

                                          Print Name:  Michael J. Roberts_____

                                          Title:  Vice President_____

Dated: _9·22·23_____          ENVIRONMENTAL LIABILITY
                                          TRANSFER, INC.
                                          a Missouri corporation

                                          By:_____

                                          Print Name:  Michael J. Roberts_____

                                          Title:  Vice President_____

[Signature Page]

Dated: 9/3/2023

FIBRANT, LLC, on behalf of itself and Fibrant

By:

Name:    Klaus Gerber

Title:    Liquidating Agent on Behalf of Fibrant, LLC


Dated: 9/3/2023

FIBRANT SOUTH CENTER, LLC, on behalf of itself and South Center

By:

Name:    Klaus Gerber

Title:    Liquidating Agent on Behalf of Fibrant South Center, LLC


Dated: 9/3/2023

GEORGIA MONOMERS COMPANY, LLC, on behalf of itself and Georgia Monomers

By:

Name:    Klaus Gerber

Title:    Liquidating Agent on Behalf of Georgia Monomers Company, LLC


Dated: 9/3/2023

EVERGREEN NYLON RECYCLING, LLC, on behalf of itself and Evergreen

By:

Name:    Klaus Gerber

Title:    Liquidating Agent on Behalf of Evergreen Nylon Recycling, LLC


[Signature Page]

Dated: 9/14/23

EMPLOYERS INSURANCE OF
WAUSAU, A MUTUAL COMPANY

By:

Name: *Herald Moore*

Title: *SR Consultant*

[Signature Page]

**<u>EXHIBIT A</u>**
**[Intentionally Omitted]**

## **EXHIBIT B**

    The following insurance policies are included within the definition of the Wausau Policies as set forth in Section I, 1.32 of the Agreement:

| **Insurer** | **Policy Number** | **Policy Period** |
|---|---|---|
| Employers Insurance of Wausau, A Mutual Company | 5736-00-102718 | 1985-1986 |

## SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE

THIS SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE ("Agreement") is entered into by and between ChemicaInvest Holding, B.V. ("CIH"); Augusta Liquidations LLC ("Augusta Liquidations"); Environmental Liability Transfer, Inc. ("ELT"); and Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc. and DSM Chemicals North America, LLC ("Fibrant"), Evergreen Nylon Recycling, LLC, Fibrant South Center, LLC ("South Center"), and Georgia Monomers Company, LLC, by and through Klaus Gerber, as their duly appointed Liquidating Agent (the "Liquidating Agent"), on the one hand, and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") and Lexington Insurance Company ("Lexington") on the other hand, on the other hand.  The parties are sometimes referred to herein collectively as the "Parties," and individually as "Party."

## RECITALS

**WHEREAS**, National Union and Lexington issued or allegedly issued certain liability insurance policies to Columbia Nitrogen Corporation and Columbia Nipro Corporation, including without limitation the policies listed on **Exhibit A** hereto (as defined herein, the "AIG Policies"); and

**WHEREAS**, Columbia Nipro Corporation became known as Fibrant (as hereinafter defined) through a series of corporate name changes and one change of corporate form from a corporation to a limited liability company; and

**WHEREAS**, beginning in or about 1963, Fibrant constructed and operated a facility located on a parcel of real estate at 1408 Columbia Nitrogen Drive, Augusta, Georgia, at which

Fibrant manufactured caprolactam, ammonium sulfate, and other products (as hereinafter defined, the "Site"); and

**WHEREAS**, Fibrant's operations at the Site allegedly caused environmental contamination at and around the Site; and

**WHEREAS**, Fibrant has alleged that it is subject to potential environmental claims relating to historical operations at the Site, arising under certain environmental laws and regulations, including the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Georgia Hazardous Waste Management Act, O.C.G.A. § 12-8-60 et seq., and the Hazardous Waste Permit for the Site, (Permit No. HW-016 (ST&CA) and Facility I.D. No. GAD 051011609); and

**WHEREAS**, on February 3, 2018, Fibrant, together with Evergreen Nylon Recycling, LLC, South Center, and Georgia Monomers Company, LLC (collectively, "Debtors"),[1] filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Georgia (the "Bankruptcy Court"); and

**WHEREAS**, on May 29, 2019, an order was entered in the Bankruptcy Case confirming the Debtors' Second Amended and Restated Plan of Liquidation (the "Plan"); and

**WHEREAS**, pursuant to the Plan, (a) ownership of the Site was conveyed to Augusta Liquidations, and (b) the Debtors' rights to assert and pursue causes of action under the AIG Policies were assigned in part to CIH and in part to Augusta Liquidations; and

**WHEREAS**, on or about June 12, 2019, Debtors, CIH and Augusta Liquidation commenced an adversary proceeding in the Bankruptcy Court (the "Insurance Action"), seeking a

---

[1] The original Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Fibrant, LLC (6694); Evergreen Nylon Recycling, LLC (7625); Fibrant South Center, LLC (8270); and Georgia Monomers Company, LLC (0042). Pursuant to the Plan, as modified, Fibrant, LLC, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC were dissolved.

declaratory judgment that National Union and Lexington (together with other defendant insurers) are obligated to defend Debtors and CIH for claims arising from the Site, to reimburse past and future costs incurred to comply with the Debtors' obligations under RCRA Costs, and to indemnify and defend Augusta Liquidations against any damages, expenses, and settlement payments at the Site.

**WHEREAS**, National Union and Lexington dispute the allegations of the Insurance Action and deny that they have any obligation to provide coverage for the claims of Debtors, CIH and Augusta Liquidations; and

**WHEREAS**, certain Parties agreed to mediate their disputes before Timothy P. Gallagher, Esquire, of the Gallagher Law Group P.C., Los Angeles, CA; and

**WHEREAS**, the Parties now desire finally and completely to resolve, compromise, and settle all disputes between them, including without limitation (i) any and all Claims (as hereinafter defined) relating to the Site, the Insurance Action, and other matters addressed herein, and (ii) any disputes arising out of or related to the Bankruptcy Case, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, and

**WHEREAS**, as part of this compromise and resolution, National Union and Lexington wishes to repurchase all of Debtors' rights, title and interests in the AIG Policies, free and clear of all Interests of any Person, except as expressly set forth in this Agreement;

**WHEREAS**, by and through this Agreement, Debtor seeks to provide the AIG Insurers (as hereinafter defined) with the broadest possible release, as set forth herein, with respect to the AIG Policies and to provide that the AIG Insurers shall have no further obligations to the Plaintiffs, Debtor's creditors or other parties-in-interest, except as expressly set forth in this Agreement;

-3-

  **NOW, THEREFORE**, in consideration of the foregoing and the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

**1.**   <u>**DEFINITIONS**</u>

  As used in this Agreement, the following terms have the following meanings:

  1.1   "AIG Companies" means the AIG Insurers and all their affiliated companies and representatives.

  1.2   "AIG Insurers" means Lexington, National Union, and all of its predecessors and successors.

  1.3   "AIG Policies" means all insurance policies, known or unknown, issued or allegedly issued by, or novated to or assumed by, any AIG Insurer to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC. "AIG Policies" include, but are not limited to, the policies and alleged policies listed in **Exhibit A** hereto.  For the avoidance of doubt, "AIG Policies" do not include insurance policies issued after the Effective Date of the Plan or those currently effective policies maintained by entities currently performing work at the Augusta Site— such as policies issued to Augusta Liquidations, remediation contractors, or subcontractors—if any.

  1.4   "Approval Motion" means the motion to be filed seeking approval of the terms of this Agreement, including the sale of the AIG Policies provided for herein, and entry of the Approval Order, as provided in Section 4.1 hereof.

  1.5   "Approval Order" means an order entered by the Bankruptcy Court, upon a hearing following proper notice, containing all of the provisions set out in Section 4.1 hereof, but no provision that is contrary to or inconsistent with such provisions, which becomes a Final Order,

and the wording of the Approval Order shall be reasonably acceptable to the AIG Insurers and CIH.

  1.6 "Bankruptcy Case" means the bankruptcy case captioned *In re: Fibrant, LLC, et al.,* Case No. 18-10274-SDB, presently pending before the Bankruptcy Court, Judge Susan D. Barrett presiding.

  1.7 "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

  1.8 "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Georgia.

  1.9 "Bankruptcy Notice Parties" means the following

    (i) all known creditors of Debtors;

    (ii) the Office of the United States Trustee for the Southern District of Georgia;

    (iii) all Persons that have filed a notice of appearance and/or demand for service of papers in the Bankruptcy Case;

    (iv) all Persons that have filed a notice of appearance and/or demand for service of papers in the Insurance Action;

    (v) all Persons identified on any and all service lists in the Bankruptcy Case;

    (vi) the Georgia Department of Natural Resources, Environmental Protection Division;

    (vii) the Attorney General of the State of Georgia;

    (viii) the United States Environmental Protection Agency;

    (ix) the Attorney General of the United States;

    (x) the United States Attorney for the Southern District of Georgia;

    (xi) the United States Internal Revenue Service;

    (xii) all known insurers of the Debtors;

(xiii) all Persons with a known Interest in the Site, including those Persons that ever owned the Site, had a leasehold interest in the Site, or that hold a lien against the Site, regardless of the date thereof, and any known insurer of such property owner or lessee;

(xiv) all known Persons owning real property adjoining the Site;

(xv) all known Persons with an Interest in the AIG Policies;

(xvi) any other known Person asserting an Interest in the Bankruptcy Case and/or sought to be bound by the Approval Order; and

(xvii) any other Person designated by the Bankruptcy Court as requiring notice.

1.10 "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure

1.11 "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause of action of any sort, whether currently known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

1.12 "Contribution Claim" means any Claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a Claim of its insured in a situation where two or more policies issued by different insurers cover

the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

1.13    "Debtor Entities" means South Center and shall also encompass the rights and interests, if any, of the dissolved entities previously party to the Bankruptcy Case, including, Fibrant, Evergreen Nylon Recycling, LLC, and Georgia Monomers Company, LLC.

1.14    "Direct Action Claim" means any Claim by any Person against an insurer, which is identical or similar to, or relating to, the same or similar acts or omissions giving rise to a Claim against Plaintiffs, whether arising by contract, in tort or under the laws of any jurisdiction, including any statute that gives a third party a direct cause of action.

1.15    "Effective Date" means the last date on which each of the following conditions precedent have occurred: (a) each of the Parties has executed this Agreement and delivered its signature page to the other Parties; (b) the Approval Order is a Final Order; (c) the Plan Modification has been approved by Final Order of the Bankruptcy Court; and (d) this Agreement has not been terminated under Sections 4.7 or 8.10 hereof or otherwise.

1.16    "ELT" shall have the meaning assigned in Section 1.1.59 of the Plan.

1.17    "Environmental Claim" means any Claim of any kind, including for bodily injury, property damage, personal injury, advertising injury, economic loss, loss of use, environmental investigation or remediation costs, natural resource damages or toxic torts, that arises from Environmental Contamination.

1.18    "Environmental Contamination" means the actual, potential, or alleged presence of, exposure to, or injury or damage from any smoke, vapors, soot, fumes, acids, alkaloids, chemicals, liquids, gases, waste materials, irritants, contaminants or pollutants of any type, including, but not limited to: (a) any substance defined or designated as a "hazardous substance"

pursuant to Sections 101(14) and 102(a) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601(14) and 9602(a); (b) any "pollutant or contaminant" under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1); (c) any substance defined as a "hazardous waste" in Section 6903(5) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, et seq.; (d) any chemical, substance or mixture found by the Administrator of the United States Environmental Protection Agency and/or any state agency to present an unreasonable risk of injury to health or the environment pursuant to Toxic Substances Control Act 15 U.S.C. § 2601, et seq.; (e) any substance listed in the United States Department of Transportation Table, 49 C.F.R. 172.101; and (f) any substance designated or considered to be a "hazardous substance," "hazardous material," "hazardous waste," "waste," "pollutant" or "contaminant" under any federal, state or local law, statute, rule, regulation or judicial decision that relates to, amends or is a successor to any of the foregoing statutes, rules, regulations or cases, or that defines any of the foregoing terms.

1.19    "Extra-Contractual Claim" means any Claim against an insurer, seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.

1.20    "Fibrant" means and includes Fibrant, LLC, formerly known as Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals North America, Inc., and DSM Chemicals North America, LLC.

1.21    "Final Order" means an order as to which the time to appeal, petition for certiorari, petition for review, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehearing shall have been waived in writing in form and substance satisfactory to the Parties and their counsel or, in the event that an appeal, writ of certiorari, petition for review, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, petition for review, or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a "Final Order".

1.22    "Insurance Action" means the adversary proceeding commenced in the Bankruptcy Court by Plaintiffs against National Union, Lexington, and others, docketed at Adversary Proceeding 19-01016 (SDB).

1.23    "Insurance Coverage Claim" means any Claim seeking defense or indemnity or any other benefit, including any Contribution Claim or other similar Claim, under or relating to the AIG Policies.

1.24    "Interests" means all liens, Claims, encumbrances, interests, defenses and other rights of any nature, whether at law or in equity, including all Environmental Claims, Contribution Claims, Direct Action Claims, Insurance Coverage Claims and Extra-Contractual Claims.

1.25    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in a collegial capacity (e.g., as a

committee, board of directors, etc.), a corporation, partnership, limited liability company or partnership joint venture, trust or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.26    "PCS Nitrogen" means PCS Nitrogen, Inc., together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates, divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.27    "Plaintiffs" means Fibrant, LLC, Evergreen Nylon Recycling, LLC, South Center, Georgia Monomers Company, LLC, ChemicaInvest Holding, B.V., and Augusta Liquidations, LLC, together with each of their predecessors and successors, and past, present and future parents, subsidiaries, affiliates (including ELT), divisions, related companies, representatives, attorneys, agents, employees, officers, directors, shareholders, and assigns (in each case, solely in their capacities as such).

1.28    "Plan" means the Second Amended and Restated Plan of Liquidation for the Debtors, as confirmed in the Bankruptcy Case by Order dated May 29, 2019.

1.29    "RCRA Costs" means investigative, remedial, and other costs and expenses incurred pursuant to RCRA, GHWMA, the RCRA Permit, other applicable environmental laws, and regulations, related to soil and groundwater contamination at the Site.

1.30    "RCRA Permit" means Hazardous Waste Permit No. HW-016(ST&CA) issued to Fibrant, as the same may be amended from time to time.

1.31    "Site" means all property, buildings, soil, surface water, and groundwater at and beneath the premises on Columbia Nitrogen Drive in Augusta Georgia, which is or has been owned

and/or occupied by Fibrant, LLC and its predecessors in interest, as defined in the report of
Ramboll Environ prepared for Fibrant and dated May 16, 2017, including without limitation Solid
Waste Management Areas (SWMAs) A through D, and the air above the Site, the ground and
groundwater below the Site, and all air, soil, surface water, and groundwater in the vicinity of the
Site allegedly impacted by Environmental Contamination originating from the Site.

As used in this Agreement, the singular and masculine gender shall mean also the plural
and feminine or neuter, as may be appropriate; "it" shall include "he" and "she"; and "each" and
"all" includes "each" and "every".

**2.**     **SALE/BUYBACK OF THE AIG POLICIES AND THE SETTLEMENT PAYMENT**

2.1     **Settlement Payment**.  On or before forty-five (45) days following the Effective
Date, one or more of the AIG Insurers will pay to CAP I BV the total sum of Two Hundred Seventy
Five Thousand Dollars ($275,000) (hereinafter referred to as the "Settlement Payment").  Payment
of the Settlement Payment will be made by check to:

> CAP I BV
> Mauritslaan 49
> 6129 EL Urmond
> The Netherlands
>
> CITIBANK EUROPE PLC, NL BRANCH
> IBAN Number: NL96CITI0266041485
> Swift code/BIC: CITINL2X

2.2     **Sale/Buyback of the AIG Policies.**  Upon receipt of the Settlement Payment and
in consideration thereof, and without any further action of the Parties, the Liquidating Agent, on
behalf of the Debtors shall sell, convey, transfer, assign and deliver Debtors' Interest in the AIG
Policies, including any and all rights assigned pursuant to Section 3.7 of this Agreement, to the
AIG Insurers, free and clear of any and all Interests of any other Persons, in full and final settlement
of all of Plaintiffs' Interests relating to the AIG Policies.  Subject to the terms of this Agreement

and the entry of the Approval Order, (i) the Settlement Payment is the total amount that the AIG Insurers are obligated to pay on account of any and all Interests of any kind relating to the AIG Policies; (ii) the Settlement Payment represents the full purchase price of the AIG Policies, and, upon its payment, the AIG Insurers shall own their respective AIG Policies free and clear of all Interests of any Person; and (iii) the Settlement Payment is reasonable and fair consideration for the buyback of the AIG Policies.

2.3    **Payment is Final**.  The Settlement Payment will be final and irrevocable, and will not be subject to any claims for set-off, contribution, or charge-backs (including, without limitation, any claims for additional premiums, retrospective premiums, self-insured retentions, deductibles or recoupment of prior payments to any insured under the AIG Policies).

2.4    **Allocation of the Settlement Payment**.  The AIG Insurers have complete discretion to allocate the Settlement Payment to any of the AIG Policies as they see fit.  Nothing in this Agreement shall preclude the AIG Insurers from pursuing reinsurance recoveries for the Settlement Payment from their reinsurers.

3.    **RELEASE**

3.1    **Release of the AIG Insurers and Termination of the AIG Policies**.  Effective upon receipt by Plaintiffs of the Settlement Payment, and in consideration thereof, Plaintiffs waive, release, and forever discharge the AIG Insurers  from any and all past, present, and future Claims, liabilities, duties to defend or indemnify, causes of action, demands, rights, damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive or exemplary damages that were or could have been alleged), or any other obligations under or relating to the AIG Policies  of every kind, nature and description whatsoever, whether arising in law or in equity.  As to Plaintiffs, the AIG Policies will have no further force or effect whatsoever.  Plaintiffs' releases include, without limitation, (a) any liability for past, present, or future Environmental Claims, known and unknown,

-12-

arising out of the Site; (b) any liability arising under or relating to the RCRA Permit; (c) any Direct
Action Claims; (d) any Contribution Claims; (e) any Extra-Contractual Claims, and (f) any claims
that were asserted or could have been asserted in the Insurance Action.

3.2     **Additional Release of the AIG Companies.**  In addition, Plaintiffs release the AIG
Companies under any other general liability insurance policy, or policy providing liability
coverage for third-party property damage, bodily injury or personal injury, known or unknown,
confirmed or unconfirmed, under which they can claim insurance coverage for liabilities relating
to Columbia Nitrogen Corporation, Columbia Nipro Corporation, Nipro, Inc., DSM Chemicals
North America, Inc., DSM Chemicals North America, LLC, or Fibrant, LLC, or to the Site
(including any adjoining properties).

3.3     **Limitations on Scope of Release**.  Notwithstanding any other provision of this
Agreement, Plaintiffs do not release any Claims held by any entity that does not fall within the
definition of "Plaintiffs" set forth above, including but not limited to PCS Nitrogen.  Plaintiffs also
do not release any claim under insurance policies issued after the Effective Date of the Plan.  For
the avoidance of doubt, it is not the Parties' intent to release any obligations in connection with
currently effective policies maintained by entities currently performing work at the Site.

3.4     **Release In All Capacities.**  The releases provided in Paragraphs 3.1 and 3.2 above
are provided by Plaintiffs in all of their actual or alleged capacities, including, without limitation,
as an alleged insured, additional insured, successor to an insured, assignor, assignee, subrogor,
subrogee, indemnitor, indemnitee, creditor, or judgment creditor of Fibrant, or of any other Person.

3.5     **Warranty Regarding Known Claims.**  Plaintiffs represent and warrant that as of
the date it has executed this Agreement and delivered its signature page to the other Parties,
Plaintiffs are not "on notice" of any Claims arising from the operations of Fibrant for which

Plaintiffs are alleged to be liable other than the Environmental Claims relating to the Site.  For purposes of this Agreement, "on notice" means that the Persons responsible for handling the insurance affairs of the Plaintiffs have received notification from any source of the assertion or filing of a Claim.

3.6  **Changes In Fact Or Law.**  The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the AIG Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims released in this Agreement.  Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

3.7  **Assignment of Interests in the AIG Policies by Augusta Liquidations to South Center.**  To facilitate the releases contemplated in this Agreement, the Parties agree and acknowledge that Augusta Liquidations shall assign its Interests in the AIG Policies, along with the interests of ELT and CIH (if any), to the Debtor Entities.

3.8  **No Other Assignment.**  Other than the assignment of Debtors' rights to assert and pursue causes of action under the AIG Policies in part to CIH and in part to Augusta Liquidations pursuant to the Plan, and other than any re-assignment expressly provided for in this Agreement, Plaintiffs warrant and represent that they have not assigned and will not assign or transfer, in whole or in part, to any Person any of their rights under the AIG Policies with respect to Claims released under this Agreement *provided, however,* that the Debtors' warranty is limited to the warranty that, subsequent to the assignment provided in Section 3.7 of this Agreement, the Debtors own any and all such rights assigned to the Debtor Entities by CIH, ELT and/or Augusta Liquidations, with no further warranty expressed or implied as to the scope of those rights.  Further, CIH, ELT, and

-14-

Augusta Liquidations warrant and represent that they have not assigned or transferred, in whole or in part, any of their rights under the AIG Policies beyond the permitted assignment pursuant to the Plan.  Moreover, Plaintiffs represent, warrant, and agree that, except as provided for in this Agreement, they will not in any way assist any Person in the establishment of any Claim against the AIG Insurers relating to any Claim released under this Agreement.

## 4.    FIBRANT'S BANKRUPTCY-RELATED OBLIGATIONS

4.1    Within fourteen (14) Business Days after the date on which this Agreement has been executed by all Parties, the Liquidating Agent shall file the appropriate motion or motions seeking approval of the terms of this Agreement, including the sale of the AIG Policies and a modification of the Plan as provided for herein, and entry of the Approval Order together with appropriate findings of fact and conclusions of law, in the form attached as **Exhibit B** hereto.  The Approval Order shall:

(a)    Approve this Agreement in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 105(a), and Bankruptcy Rules 6004 and 9019;

(b)    Find this Agreement was negotiated in good faith, the product of arms-length bargaining, free from fraud or collusion, is reasonable, fair and equitable, and in the best interest of the estate and its creditors after consideration of (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the likely difficulties in collection; (c) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of creditors;

(c)    Authorize the Parties to undertake the settlement, perform the obligations and the transactions contemplated by this Agreement;

(d)    Authorize the sale of Plaintiffs' Interests in the AIG Policies to the AIG Insurers free and clear of any and all Interests of any Person, with all Interests in and to, and Claims

-15-

against, Plaintiffs' Interests in the AIG Policies being fully extinguished without reservation as to the AIG Insurers;

(e)      Provide that the AIG Insurers are good faith purchasers of the AIG Policies for value and, as such, are entitled to all protections provided to a good faith purchaser under Bankruptcy Code § 363(m);

(f)      Provide that the consummation of this Agreement releases the AIG Companies from liability to Plaintiffs under the AIG Policies and/or applicable law;

(g)      Provide that the sale of the AIG Policies outside the ordinary course of business, free and clear of the Interests of all Persons, satisfies the requirements respectively of § 363(b) and § 363(f);

(h)      Enter an injunction pursuant to 11 U.S.C. §§ 105(a) 1123, 1127, and 1129 providing that any person (other than the United States of America and the State of Georgia and PCS Nitrogen) who now holds or who may in the future hold any Claims or Interests of any kind or nature against the Plaintiffs or the AIG Policies is hereby forever barred, prohibited, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing any released Claims or such Interests against any of the AIG Insurers, or the AIG Policies.

(i)      Approve a modification of the Plan, pursuant to 11 U.S.C. § 1127, in form and substance reasonably acceptable to the AIG Insurers and CIH, providing that the AIG Insurers shall be deemed "Settling Insurers" for purposes of the Plan, and that "Settling Insurers" shall be deemed to be treated as "Creditor Released Parties" for purposes of the release and injunction provisions of the Plan (as those terms are defined in the modified Plan); provided that no release shall be required from the United States of America, the State of Georgia, or PCS Nitrogen.

     (j)     Find that due and adequate notice of the (a) sale of the AIG Policies; (b) terms and conditions of this Agreement; and, (c) hearing on the approval of this Agreement (including the sale provided for herein) was provided in accordance with Bankruptcy Rules 2002 and 6004 and published in accordance with Section 4.2 of this Agreement.

For avoidance of doubt, all fees, expenses and other costs incurred by or to be incurred by the Debtors' Liquidating Agent shall be funded through an advance retainer by CIH and the Debtors' Liquidating Agent shall have no obligations under this Agreement with respect to Sections 3.7, 4.1 through 4.4, 4.6 and 5.1 in the absence of such prior funding.

    4.2    The Debtors shall serve notice of the Approval Motion and of the hearing thereon. Such notice shall be accomplished through electronic means or, at the AIG Insurers' election (which election shall be made by the AIG Insurers by the date on which this Agreement has been executed by all Parties) by mail on each of the Bankruptcy Notice Parties by United States mail, postage pre-paid. If mail notification is elected, the mailing expense shall be borne equally by the AIG Insurers and any other Settling Insurers whose polices are also being sold that have elected notification through mail.

    4.3    To ensure the broadest notice possible, South Center shall also publish notice of the sale of the AIG Policies to the AIG Insurers pursuant to §§ 363(b), (f) and (m) and Bankruptcy Rules 6004 and 9019 and of the hearing seeking the Approval Order in the national edition of the *USA Today*, and twice in the *Atlanta Journal-Constitution* and *The Augusta Chronicle*, within a period of seven (7) days. Publication of the notice of the sale of the AIG Policies shall be at the expense of the AIG Insurers, and in a form and substance acceptable to the AIG Insurers; *provided however*, if any such advertisement notices the sale of policies other than the AIG Policies issued

-17-

by the AIG Insurers, the expense of such publication shall be borne equally by the AIG Insurers and the other Settling Insurers whose polices are also being sold, and the notice shall be in a form and substance acceptable to both the AIG Insurers and those other Settling Insurers.

4.4     If the Approval Order is appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), then subject to the Parties' termination rights set forth below, the Parties shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; *provided, however*, that nothing herein shall preclude the Parties from mutually consummating the transactions contemplated herein if the Approval Order shall have been entered and is not stayed.

4.5     The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, either the Approval Order or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be materially inconsistent with the terms hereof.

4.6     Plaintiffs shall cooperate with the AIG Insurers and their representatives in connection with efforts to obtain entry of the Approval Order and the bankruptcy proceedings directly related to entry of the Approval Order.  Plaintiffs shall not submit to the Bankruptcy Court for approval any motion, plan of reorganization, adversary proceeding, filing or other request the approval of which would conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of the AIG Insurers hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

4.7     The AIG Insurers shall have no obligation to remit the Settlement Payment until the Approval Order is entered and the Effective Date occurs.  If (i) the Approval Order is vacated or modified, or otherwise entered in a form that is not reasonably acceptable to the AIG Insurers, or (ii) the Approval Order is reversed on appeal, then the AIG Insurers may terminate this Agreement by delivering written notice to the Plaintiffs within ten (10) business days of such event.  In the event this Agreement is terminated, (i) the Agreement shall be void; (ii) the AIG Insurers shall not be obligated to pay the Settlement Payment; and (iii) the Parties shall have all of the rights, defenses and obligations under or with respect to the AIG Policies that they would have had absent this Agreement.

5.     **DISMISSAL**

5.1     **Dismissal of National Union and Lexington From the Insurance Action.** Within ten (10) business days after receipt of the Settlement Payment, the Parties will file a stipulation in the Insurance Action dismissing, with prejudice and without costs to either party, all Claims and causes of action asserted in that action by Plaintiffs against National Union and Lexington.  Plaintiffs, National Union, and Lexington, agree to cooperate and, if necessary, to take any further action consistent with this Agreement to effect the dismissal with prejudice of National Union and Lexington from the Insurance Action.

6.     **INDEMNIFICATION**

6.1     **Defense and Indemnification.**  CIH (or an affiliated entity established to maintain the following obligation) will defend and indemnify the AIG Companies for claims against them by any Person relating to RCRA Costs, including but not limited to, the following: (i) Claims by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under any of the AIG Policies, (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of Fibrant, and (iii) Claims

-19-

directly against the AIG Insurers by any other Person who does not qualify as an insured under any of the AIG Policies, including, but not limited to, Direct Action Claims or third-party beneficiary Claims.

6.2    **Limitations on Plaintiffs' Indemnification Obligations**.

(a)    The indemnification and defense obligations enumerated in Section 6.1 do not extend to claims brought by (i) a party to the Insurance Action (or affiliated entity) or (ii) PCS Nitrogen.

(b)    The indemnification and defense obligations enumerated in Section 6.1 will incept upon the receipt of the Settlement Payment and will be capped at the amount of the Settlement Payment, less creditor recovery (i.e., the portion of the Settlement Payment paid to creditors and/or a trust established for the benefit of creditors under the Plan).  Upon exhaustion of the amounts set forth in this Section 6.2(b) by payment of defense or indemnity to the AIG Companies, any obligations under this Section 6 shall immediately terminate and the AIG Companies shall pay for their own defense and indemnity.

(c)    Any obligation on the part of Plaintiffs to pay for the AIG Companies' defense and indemnity under this Agreement shall immediately terminate upon the close of the Bankruptcy Case.

6.3    **Defense of the AIG Insurers**.  The defense of the AIG Insurers for an indemnified Claim under Section 6.1 will proceed as follows:

(a)    Plaintiffs, through their own counsel, will use reasonable efforts to obtain a dismissal of the AIG Insurers and the substitution of an appropriate Plaintiff entity on the basis that the AIG Insurers' obligations with respect thereto were finally resolved by a reasonable, good

faith settlement and that Plaintiffs also agreed to accept a judgment reduction with respect to any obligation of the AIG Insurers as set forth in Paragraphs 7.1 and 7.2 below.

(b)     Should the claimant refuse to dismiss the AIG Insurers, the AIG Insurers will have the right to select defense counsel, subject to Plaintiffs' consent, which consent shall not be unreasonably withheld, to defend the AIG Insurers at Plaintiffs' expense ("Retained Counsel"). Any such Retained Counsel will be chosen from among insurance coverage counsel used by the AIG Insurers, at rates not to exceed those routinely paid by the AIG Insurers for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

(c)     The AIG Insurers will have the right to control all positions taken on their behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the AIG Policies.

## 7.    **JUDGMENT REDUCTION**

7.1     In connection with any Claim related to a Claim released under this Agreement brought by Fibrant, CIH or Augusta Liquidations against any Person other than the AIG Insurers, which results in an adjudication on the merits, whether in court or another tribunal with jurisdiction, or in a binding arbitration award, that such other Person is liable to Fibrant, CIH or Augusta Liquidations, and that such judgment or binding arbitration award includes sums which are allocable to the AIG Insurers under any AIG Policies, Fibrant, CIH and Augusta Liquidations will agree to reduce the judgment or binding arbitration award against such other Person or take other steps as necessary in order to avoid such liability being imposed on the AIG Insurers.  Such a reduction in Fibrant's, CIH's or Augusta Liquidations' judgment or binding arbitration award will be accomplished by subtracting from the judgment or binding arbitration award against any such Person the share of the judgment or binding arbitration award, if any, which is applicable to the AIG Insurers.

7.2     To ensure that such a reduction is accomplished and the AIG Insurers are protected, the applicable Plaintiff who brought any such Claim described in Section 7.1 and the AIG Insurers shall move the court or appropriate tribunal for a finding this Agreement was made in good faith and the appropriate form of relief is a contribution bar in favor of the AIG Insurers.  In the event a court or other tribunal will not make such findings or grant the appropriate relief, the AIG Insurers will also be entitled to assert this paragraph as a defense in any Claim against them for any such portion of the judgment or binding arbitration award, and will be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect the AIG Insurers from liability for the judgment or binding arbitration award solely to the extent such judgment or award relates to Claims released under this Agreement.

7.3     In the event any Plaintiff settles any Claim related to or arising out of a Claim released under this Agreement with any Person other than the AIG Insurers without the AIG Insurers' consent, the settling Plaintiff agrees that it will not seek from the AIG Insurers any sums allocated to the AIG Insurers by such settlement.  Each Plaintiff further agrees that it will use reasonable efforts to obtain a release in favor of the AIG Insurers from any Person with which they settle any Claims relating to or arising out of Claims released under this Agreement.

## 8.     ADDITIONAL PROVISIONS

8.1     **Restrictions On Disclosure Of Agreement.**  It is a material inducement for the Parties to enter into this compromise and settlement of their disputes and differences that the terms and provisions of this Agreement, shall be, and remain, strictly confidential, until the Agreement is filed in the Bankruptcy Case for purposes of obtaining the Approval Order.  Prior to such public filing, neither this Agreement, nor any of its terms, may be disclosed to any Person, except that this Agreement and its terms may be disclosed; (a) as required by law or court order; (b) to any reinsurer, reinsurance intermediary, or retrocessionaire of the Parties, if any, in connection with

insurance or reinsurance obligations or to any reinsurance arbitrator(s); (c) to the officers, directors, employees, representatives, counsel, accountants, agents and auditors of any of the Parties; (d) in any action or proceeding between the Parties where the existence or terms of the Agreement are at issue; or (e) by written agreement of the Parties.  If this Agreement or its terms are disclosed pursuant to subparagraphs (a) or (d) above, the party disclosing such information shall give prior written notice thereof to each of the other Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (b), (c), or (e) above, the party disclosing such information shall advise the recipient of the provisions of this paragraph.

8.2   **"Most Favored Nation" Agreement.**  If Plaintiffs enter into a settlement with another insurer to resolve Plaintiffs' claims against such other insurer in the Insurance Action, and such settlement provides for broader releases or indemnification provisions than those agreed to herein, including within the context of the Bankruptcy Case, the release and indemnification provisions of the settlement between the Parties shall be modified automatically to provide the same scope of release (including the parties released, the relationship to the issuing insurer, and the breadth of the release) and scope of indemnification as provided in such other agreement between Plaintiffs and the other insurer, for no additional consideration. Plaintiffs, except for the Debtors or the Liquidating Agent or his professionals, shall provide the AIG Insurers with information concerning other settlement agreements that implicate this provision.

8.3   **Amendments.**   Subject to the provisions of Section 8.2 hereof, neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties.

8.4   **No Precedential Value.**  This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies.  It

shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of the Parties under any insurance policies issued to Fibrant or to any other Person.

8.5 **Agreement Voluntarily Entered Into By Each Of The Parties.** This Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them. The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

8.6 **Interpretation.** This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties. Accordingly, none of the Parties shall be presumptively entitled to have any provisions of the Agreement construed against any of the other Parties in accordance with any rule of law, legal decision or doctrine.

8.7 **No Admission.** This Agreement is the result of a compromise of disputed issues. This Agreement does not constitute and may not be construed as an admission of any liability, fact, course of performance, or wrongdoing by any Party. This Agreement is not, and cannot be construed as, any admission by any Party that any defense, indemnity, contribution, or other obligation exists under the AIG Policies for the Claims released herein.

8.8 **Entire And Integrated Agreement.** This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements,

understandings, and undertakings between or among the Parties with respect to such subject matters and there are no promises, representations warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

8.9     **No Third-Party Beneficiaries.**  Nothing in this Agreement is intended or shall be construed to give any Person, other than the AIG Companies and Plaintiffs and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the AIG Companies and Plaintiffs, as well as each of their respective successors and permitted assigns, and for the benefit of no other Person.

8.10     **Severability.**  If any provisions of this Agreement or the application thereof, shall for any reason or to any extent be construed by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, and application of such provisions to other circumstances, shall remain in effect and be interpreted so as best to reasonably effect the intent of the Parties.

8.11     **Notice.**  Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid or by overnight mail or by electronic mail, addressed as follows or as the Parties subsequently may direct in writing:

As to the AIG Insurers:

Andrew Engel
P.O. Box 25942
Shawnee Mission, KS 66225

With a copy to:

Stephen J. Rapp
WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
3344 Peachtree Rd. NE, Suite 2400
Atlanta, GA 30326

As to Plaintiffs:

Michel Govaert
Mauritslaan 49
6129 EL Urmond | The Netherlands
Michel.Govaert@chemicainvest.com

With a copy to:

Brook Roberts
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
brook.roberts@lw.com

8.12   **Headings.**  The section titles, captions, and headings contained in the Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

8.13   **Recitals.**  The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted therein in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

8.14   **Additional Representations and Warranties.**   CIH, Augusta Liquidations, Debtors, National Union, and Lexington each represents and warrants that it is fully authorized to enter into this Agreement on its own behalf and on behalf of Plaintiffs and the AIG Insurers respectively, as those terms are defined herein.  In addition, each of CIH, Augusta Liquidations, ELT, National Union, and Lexington represents and warrants that (i) it is duly organized and

existing in good standing under the laws of the United States, (ii) it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or internal approval is necessary, and (iii) the making and performance of this Agreement will not violate any provision of the law or the Party's articles of incorporation, charter, or by-laws.  In addition, each of the individuals signing this Agreement represents and warrants that they are authorized to execute this Agreement on behalf of the Party(ies) whom they represent.

      8.15  **Execution in Counterparts.**  This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

[<em>remainder of page intentionally left blank</em>]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____9/12/2023_____

CHEMICAINVEST HOLDING, B.V.

By: _____

Name: _Michel Govaert_____

Title: __Director_____

Dated: _____

AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By: Environmental Liability Transfer, Inc.
Its: Manager

By:_____

Print Name:_Michael J. Roberts_____

Title:_Vice President_____

Dated:_____

ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By:_____

Print Name:_Michael J. Roberts_____

Title:_Vice President_____

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____

CHEMICAINVEST HOLDING, B.V.

By: _____

Name: _____

Title: _____

Dated: _9·22·23_

AUGUSTA LIQUIDATIONS LLC
a Missouri limited liability company
By: Environmental Liability Transfer, Inc.
Its: Manager

By: _____

Print Name: Michael J. Roberts

Title: Vice President

Dated: _9·22·23_

ENVIRONMENTAL LIABILITY
TRANSFER, INC.
a Missouri corporation

By: _____

Print Name: Michael J. Roberts

Title: Vice President

[Signature Page]

Dated: 9/3/2023

FIBRANT, LLC, on behalf of itself and Fibrant

By:

Name:   Klaus Gerber

Title:   Liquidating Agent on Behalf of Fibrant, LLC


Dated: 9/3/2023

FIBRANT SOUTH CENTER, LLC, on behalf of itself and South Center

By:

Name:   Klaus Gerber

Title:   Liquidating Agent on Behalf of Fibrant South Center, LLC


Dated: 9/3/2023

GEORGIA MONOMERS COMPANY, LLC, on behalf of itself and Georgia Monomers

By:

Name:   Klaus Gerber

Title:   Liquidating Agent on Behalf of Georgia Monomers Company, LLC


Dated: 9/3/2023

EVERGREEN NYLON RECYCLING, LLC, on behalf of itself and Evergreen

By:

Name:   Klaus Gerber

Title:   Liquidating Agent on Behalf of Evergreen Nylon Recycling, LLC


[Signature Page]

Dated: _9/12/2023_

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA. AND
LEXINGTON INSURANCE COMPANY,
by their authorized claims representative,
Fortitude P&C Solutions, Inc.

By: _____

Name: _Andrew Engel_

Title: _Vice President_

[Signature Page]

## **EXHIBIT A**

The following insurance policies are included within the definition of the AIG Policies as set forth in Section I, 1.3 of the Agreement:

| **Insurer** | **Policy Number** | **Policy Period** |
|---|---|---|
| Lexington Insurance Company | 1168554 | 4/1/76 – 12/31/77 |
| Lexington Insurance Company | 5001284 | 2/1/76 – 2/1/77 |
| Lexington Insurance Company | 5001787 | 4/1/77 – 4/1/78 |
| Lexington Insurance Company | 5513162 | 4/1/80 – 4/1/81 |
| National Union Fire Ins. Co. of Pittsburgh, Pa. | 1168554 | 4/1/76 – 12/31/77 |

## **EXHIBIT B**
**[Intentionally Omitted]**